1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         NORTHERN DISTRICT OF CALIFORNIA

10                                SAN JOSE DIVISION

11

12   DELANEY GERAL MARKS,                )      CASE NO. CV 11-2458 LHK
                                         )
13          Petitioner,                  )      **DEATH PENALTY CASE**
                                         )
14          v.                           )
                                         )      ORDER GRANTING RESPONDENT'S
15   RON DAVIS, Acting Warden of         )      MOTION FOR SUMMARY JUDGMENT AS
     California State Prison at San Quentin,[1] )  TO CLAIMS 2, 3, AND 5
16                                       )
            Respondent.                  )
17   _____ )

18                                  **INTRODUCTION**

19          The instant case arises from Petitioner's conviction and death sentence for crimes that

20   occurred on October 17, 1990.  On January 31, 1992, while awaiting trial, Petitioner moved under

21   California Penal Code section 1368 to suspend the criminal proceedings against him in order to

22

23

24   _____

25          [1] Ron Davis, acting warden of the California State Prison at San Quentin, is substituted as
     Respondent for his predecessor in that position pursuant to Rule 25(d) of the Federal Rules of Civil
26   Procedure.

27                                          1

28   Case No. 11-CV-2458-LHK
     ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1   determine whether he was competent to stand trial.  (AG000943–44, AG000946–47.)[2]  On July 22,

2   1992, after a month-long trial, a jury found Petitioner competent to stand trial.  (AG001257.)  On

3   January 21, 1994, three days before jury selection for his capital murder trial was set to begin,

4   Petitioner filed a second motion to suspend the proceedings and determine his competency

5   (AG011558, AG011563–64), which the trial judge denied three days later (AG011586–87).  On

6   March 28, 1994, during his trial, Petitioner filed a third motion to suspend the proceedings and have

7   his competency evaluated.  (AG014987–90.)  The trial judge again denied the motion.  (AG015298.)

8           On April 13, 1994, Petitioner was convicted of two counts of first degree murder with

9   personal use of a firearm, and two counts of attempted premeditated murder and infliction of great

10  bodily injury.  (AG016577–83.)  On May 6, 1994, after a penalty phase trial, the jury returned a

11  verdict of death, as well as terms of imprisonment on the other charges.  (AG017687–89.)

12          Petitioner's conviction and death sentence were affirmed by the California Supreme Court on

13  direct appeal on July 24, 2003.  *See People v. Marks*, 31 Cal. 4th 197 (2003).  Petitioner filed a

14  petition for writ of habeas corpus in the California Supreme Court on October 28, 2002.  On March

15  16, 2005, that court ordered Respondent to show cause in the Alameda County Superior Court why

16  the death sentence should not be vacated and Petitioner re-sentenced to life without parole on the

17  ground that he is intellectually disabled within the meaning of *Atkins v. Virginia*, 536 U.S. 304

18  (2002), which held that intellectually disabled[3] individuals may not be executed.  (AG023690.)  The

19  California Supreme Court denied the remaining claims in the petition.

20          The Alameda County Superior Court conducted an evidentiary hearing on the issue of

21  Petitioner's alleged intellectual disability.  On June 13, 2006, the Superior Court denied his petition,

22  and found that Petitioner had failed to prove by a preponderance of the evidence that he is

23  intellectually disabled within the meaning of *Atkins*.  (AG028412–37.)  On August 14, 2006,

24  _____

25      [2] Citations to "AG" refer to the Bates-stamped page numbers identified in the California
    Attorney General's lodging of the state court record with this Court.

26      [3] At the time *Atkins* was decided, the condition at issue was known as "mental retardation," but
27  the U.S. Supreme Court recently announced that it would henceforth use the term "intellectual
    disability."  *Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).  This Court will do the same, except when
28  quoting from the record.

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1   Petitioner filed a further writ of habeas corpus on the issue of his intellectual disability

2   (AG025463–561); this petition was denied by the California Supreme Court on December 15, 2010

3   (AG028382).

4           On December 14, 2011, Petitioner filed his federal petition for writ of habeas corpus in this

5   Court.  ECF No. 3 ("Pet.").  Respondent filed an answer on July 17, 2012, ECF No. 24, and

6   Petitioner filed a traverse on November 19, 2012, ECF No. 33.  The parties have since filed cross-

7   motions for summary judgment on Claims 2, 3, and 5 of the petition, which concern Petitioner's

8   competency and intellectual disability.  ECF No. 37-1 ("Pet'r's MSJ"); ECF No. 38 ("Resp't's

9   MSJ").

10                                  **STANDARD OF REVIEW**

11  **I.      THE ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT ("AEDPA")**

12          Because Petitioner filed his original petition in 2011, well after AEDPA's effective date of

13  April 24, 1996, the parties agree that the standards of AEDPA apply to this case.  *See Woodford v.*

14  *Garceau*, 538 U.S. 202, 206 (2003).  Pursuant to AEDPA, a district court may not grant a writ of

15  habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the

16  state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

17  unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

18  the United States; or (2) resulted in a decision that was based on an unreasonable determination of

19  the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  In

20  determining whether a petitioner is entitled to relief under this provision, a federal court's review "is

21  limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen*

22  *v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

23          The "contrary to" and "unreasonable application" prongs of section 2254(d)(1) have separate

24  and distinct meanings.  *See Williams v. Taylor*, 529 U.S. 362, 404 (2000).  A state court's decision is

25  "contrary to" clearly established U.S. Supreme Court law if that decision fails to apply the correct

26  controlling authority or if it applies the controlling authority to a case involving facts materially

27  indistinguishable from those in a controlling case, but nonetheless reaches a different result.  *Id.* at

28

3

412–13.  A decision is an "unreasonable application" of U.S. Supreme Court law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  Importantly, "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'"  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410).  A state court's determination that a claim lacks merit is not unreasonable "so long as 'fairminded jurists could disagree' on [its] correctness."  *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 653, 664 (2004)).

Holdings of the U.S. Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under section 2254(d)(1).  *See Williams*, 529 U.S. at 412; *see also Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (per curiam) ("AEDPA permits habeas relief only if a state court's decision is 'contrary to, or involved an unreasonable application of, clearly established Federal law' as determined by this Court, not by the courts of appeals.").  While a federal court may "look to circuit precedent to ascertain whether [the circuit] has already held that the particular point in issue is clearly established by Supreme Court precedent," *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (per curiam), "[c]ircuit precedent cannot refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced," *Lopez*, 135 S. Ct. at 4 (internal quotation marks omitted).

To find under section 2254(d)(2) that a state court's decision was based on "an unreasonable determination of the facts," a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court."  *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir.) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 710 (2014).  In other words, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (internal quotation marks omitted).  That said, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process,

1  rendering the resulting factual finding unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th

2  Cir. 2004).[4]

3         Under AEDPA, a federal court reviews "the last reasoned state-court decision." *Castellanos*

4  *v. Small*, 766 F.3d 1137, 1145 (9th Cir. 2014).  In a case where "no state-court decision furnishes a

5  basis for the state court's underlying reasoning," a federal court's "duty under AEDPA is not

6  absolved." *Murray*, 745 F.3d at 996.  Rather, "the habeas petitioner's burden still must be met by

7  showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

8  To determine whether a petitioner has met this burden, a federal court must ask "what arguments or

9  theories supported or, . . . could have supported, the state court's decision" and decide "whether it is

10  possible fairminded jurists could disagree that those arguments or theories are inconsistent with the

11  holding in a prior decision of [the U.S. Supreme Court]." *Id.* at 102.  Thus, when a state court does

12  not supply reasoning for its decision, a federal court "must engage in an independent review of the

13  record and ascertain whether the state court's decision was objectively unreasonable." *Castellanos*,

14  766 F.3d at 1145 (internal quotation marks omitted).  Critically, independent review of the record "is

15  not a de novo review of the constitutional question," but rather the only way a federal court can

16  determine whether a silent state decision is objectively unreasonable.  *Murray*, 745 F.3d at

17  997.

18         In the event that a federal court "determine[s], considering only the evidence before the state

19  court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an

20  unreasonable application of clearly established federal law, or that the state court's decision was

21  based on an unreasonable determination of the facts," the federal court evaluates the petitioner's

22

23         [4] AEDPA also requires a federal court to presume the correctness of the state court's factual findings, and that presumption of correctness may only be rebutted by clear and convincing evidence.

24  28 U.S.C. § 2254(e)(1).  However, the U.S. Supreme Court has "not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)," *Titlow*, 134 S. Ct. at 15, and the Ninth Circuit remains "in a

25  state of confusion as to whether § 2254(d)(2) or (e)(1), or both, applies to AEDPA review of state-court factual findings," *Murray v. Schriro*, 745 F.3d 984, 1001 (9th Cir. 2014).  The Court need not resolve

26  that confusion here because, for the reasons stated below, Petitioner has not shown that the relevant state court decisions were based on an unreasonable determination of the facts under section 2254(d)(2). *See*

27  *Wood v. Allen*, 558 U.S. 290, 301 (2010) (concluding that because the state court's finding "was not an unreasonable determination of the facts," there was no "need to decide whether that determination

28  should be reviewed under the arguably more deferential standard set out in § 2254(e)(1)").

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1  constitutional claim "de novo." *Hurles*, 752 F.3d at 778.  If constitutional error is found, however,

2  habeas relief is warranted only if that error "had substantial and injurious effect or influence in

3  determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  Under this

4  standard, petitioners "may obtain plenary review of their constitutional claims, but they are not

5  entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual

6  prejudice.'" *Brecht*, 507 U.S. at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986));

7  *accord Davis v. Ayala*, 576 U.S. —, 2015 WL 2473373, at *8 (June 18, 2015).

8  **II.    SUMMARY JUDGMENT**

9         Summary judgment is appropriate if, viewing the evidence and drawing all reasonable

10  inferences in the light most favorable to the nonmoving party, there are no genuine disputes of

11  material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see*

12  *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).  At the summary judgment stage, the Court

13  "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine

14  factual issue for trial." *House v. Bell*, 547 U.S. 518, 559–60 (2006).  A fact is "material" if it "might

15  affect the outcome of the suit under the governing law," and a dispute as to a material fact is

16  "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the

17  nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Bald assertions that

18  genuine issues of material fact exist," however, "are insufficient." *Galen v. Cnty. of L.A.*, 477 F.3d

19  652, 658 (9th Cir. 2007); *see also United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637

20  F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth

21  non-speculative evidence of specific facts, not sweeping conclusory allegations.").  "If the evidence

22  is merely colorable, or is not significantly probative, summary judgment may be granted."

23  *Anderson*, 477 U.S. at 249–50 (citations omitted).

24         When, as here, the parties have filed cross-motions for summary judgment, the Court

25  "review[s] each motion for summary judgment separately, giving the nonmoving party for each

26  motion the benefit of all reasonable inferences." *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty.*

27  *Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir. 2008).  In so doing, the Court "must consider each party's

28

6

1  evidence, regardless under which motion the evidence is offered."  *Las Vegas Sands, LLC v. Nehme*,

2  632 F.3d 526, 532 (9th Cir. 2011).

3  **DISCUSSION**

4  **I.      Claim 2: Inadequate Competency Hearing**

5          Respondent first moves for summary judgment on Petitioner's claim that he was denied a

6  fair, reliable, and adequate determination of his competency in his June–July 1992 competency trial.

7  Resp't's MSJ at 6–10.  Respondent argues that Petitioner has failed to establish that the California

8  Supreme Court's rejection of this claim in its summary order of March 16, 2005 (AG023690), was

9  contrary to or an unreasonable application of U.S. Supreme Court precedent, or was based on an

10 unreasonable determination of the facts in light of the evidence presented in the state court

11 proceedings, *see* 28 U.S.C. § 2254(d).  Petitioner cross-moves for summary judgment, contending

12 that Respondent has failed to present affirmative evidence to controvert Petitioner's factual

13 allegations, and that those allegations establish that he is entitled to relief.  Pet'r's MSJ at 15–37.

14         A criminal defendant has a constitutional due process right not to be tried or convicted while

15 incompetent to stand trial.  This right assures that a defendant has: (1) a rational, as well as a factual,

16 understanding of the nature of the proceedings against him; and (2) the present ability to consult

17 with his lawyer with a reasonable degree of rational understanding and to assist with the preparation

18 and presentation of his defense.  *See Drope v. Missouri*, 420 U.S. 162, 171–72 (1975) (quoting

19 *Dusky v. United States*, 362 U.S. 402, 402 (1960)).  Protecting this right is "fundamental to an

20 adversary system of justice."  *Id.* at 172.

21         To that end, due process requires a trial court to conduct a competency hearing whenever it

22 has a "bona fide doubt" concerning the defendant's competence.  *Pate v. Robinson*, 383 U.S. 375,

23 385 (1966); *accord Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010).  Petitioner contends that his

24 June–July 1992 competency trial was constitutionally inadequate for three reasons: (1) the trial court

25 provided inadequate funding to two court-appointed psychiatrists who believed that Petitioner was

26 incompetent but needed to perform additional testing in order to confirm their opinions; (2)

27 Petitioner's counsel failed to coordinate the testimony of Petitioner's retained clinical psychologist

28

7

with the two court-appointed psychiatrists; and (3) the trial court made erroneous evidentiary rulings and gave erroneous instructions that prevented the jury from validly and accurately determining Petitioner's competence to stand trial.

### A.     First Subclaim: Inadequate Psychiatric Expert Assistance

#### 1.     Factual Summary

On January 31, 1992, the state trial court, upon Petitioner's motion, suspended criminal proceedings against Petitioner and appointed two psychiatrists, Karen Gudiksen, M.D., and Fred Rosenthal, M.D., to evaluate Petitioner's competency to stand trial.  (AG000943–44, AG000946–47.)  In March 1992, both experts informed the court that, in their opinions, Petitioner was not competent to stand trial.  According to Dr. Rosenthal, the nature of Petitioner's condition was organic, meaning based on neurological defects or brain damage.  Neither expert rendered a formal diagnosis of organic brain damage, however, because "appropriate neurological testing" would have been necessary in order to complete a diagnosis of Petitioner's medical condition, and there was insufficient funding available for Drs. Gudiksen and Rosenthal to conduct such testing.  (AG009803–04, AG023064–65, AG023584.)

Petitioner's counsel, however, had previously been granted funding to employ Dr. David Stein, Ph.D., to perform neuropsychological testing on Petitioner.  (AG010927.)  Dr. Stein eventually performed the testing in May 1992.  (AG010928–29.)  At the state's request, a full jury trial on the issue of Petitioner's competency was conducted before Judge Michael Ballachey[5] of the Alameda County Superior Court from June 24 to July 22, 1992.  (AG000957–60, AG001258.)  Petitioner called all three doctors as expert witnesses.  Drs. Gudiksen and Rosenthal both testified that, in their opinions, Petitioner was not competent to stand trial, and Dr. Stein testified that based upon the neuropsychological testing he had performed, Petitioner suffered from considerable pervasive brain impairment.  (AG010591, AG010883, AG010948–49.)  Petitioner's counsel did not provide Dr. Stein's test results to Drs. Gudiksen and Rosenthal.  (AG023065, AG023074.)  The state

---

[5] Although Judge Ballachey did not preside over Petitioner's capital murder trial, *see infra* note 18, this Court will nevertheless refer to him in this section as the "trial court."

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

offered three lay witnesses from the Santa Rita Jail who testified in support of Petitioner's

competency. *See Marks*, 31 Cal. 4th at 217–18. The jury found Petitioner competent to stand trial.

(AG001257.)

## 2. **Applicable Supreme Court Precedent**

The clearly established federal law applicable to this subclaim is set out in *Ake v. Oklahoma*,

470 U.S. 68 (1985). In *Ake*, the U.S. Supreme Court held that "when a defendant demonstrates to

the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State

must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an

appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.*

at 83.

## 3. **Analysis**

Petitioner contends that he "was entitled to state procedures that ensured a reliable

assessment of his competency by a competent psychiatrist who was enabled to perform an

appropriate examination." Pet'r's MSJ at 32. Petitioner, however, does not contend that Drs.

Gudiksen and Rosenthal were incompetent. Nor does Petitioner contend that he was denied access

to them. The issue for the Court, therefore, is whether the examinations conducted by the two court-

appointed psychiatrists were "appropriate."

At Petitioner's competency trial, Dr. Rosenthal testified as follows:

> MS. SAWYER[6]: Now, when you're asked by the court to examine someone, does the court pay you your fee?
>
> A: Yes. There is a standard fee that is paid by the court, it's a county – I imagine through a county financial services [sic], but it is set by the court.
>
> Q: Okay. Now when you're asked to examine someone for their competence, what, in general, do you do?
>
> A: Well, mostly, I do an evaluation interview with the person, and then whatever records are provided, generally the material that I'm given, generally not too much, but

---

[6] Susan Sawyer was one of the assistant public defenders who represented Petitioner during pretrial proceedings in state court. (AG023071–77.) Joseph Najpaver, Joseph McGrew, and Charles Denton were the others. (AG023074, AG023146.) On December 10, 1992, the Alameda County Public Defender's office declared a conflict in Petitioner's case, and private counsel, Louis Wies and Albert Thews, were subsequently appointed to represent Petitioner at trial. (AG023077.)

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1   if I'm given some records by the court or by one of the attorneys, I'll review that as well.

2   (AG010588–89.)  Based upon this testimony, combined with testimony that Dr. Rosenthal had

3   examined Petitioner and had reviewed social history information prepared by the defense, Dr.

4   Rosenthal was qualified as an expert and permitted to testify that, in his opinion, Petitioner was not

5   competent to stand trial.  Dr. Rosenthal offered the following reasons for his conclusion:

6           [MS. SAWYER]: And could you give us your reasons why you believed he
        was not competent to stand trial?

7

8           A: There are actually several things in Mr. Marks' history.  He had a history of
        numerous head injuries, some of which from – at least from the available history that I
        had, sounded serious.

9

10          He had a history of seizure, of a seizure disorder which apparently was post-
        traumatic, that is, the seizures were induced by head injuries.  And he had a fairly long
        history of seizures. . . .

11

12          He had been treated by a number of – with a number of antiseizure medications,
        fairly strong ones, including dilantin and mysoline, and when I saw him he was still
        receiving mysoline, which is an antiseizure medication.

13

14          He also had been described by a number of people over the years as having
        strange behaviors and strange thoughts and personality problems.  And it appeared from
        the history that his mental state was changeable.  There would be times when he would
        look fairly intact and other times when he would look apparently quite deranged and
        quite strange.

15

16          He also had a history of fairly excessive drug and alcohol abuse.  The reason this
        is significant is that if someone has head injury and if, in the case of Mr. Marks, there
        is a chance for brain damage, which I believe exists here, then medications or substances
        that alter mental states can, over a long period of time, produce additional damage.
        Alcohol is one that is fairly potent in this respect.  And, of course, many of the street
        drugs will do the same thing over long use.  So this is adding insult to the brain that's
        already damaged.

17

18

19

20          And then getting down to when I saw him, it was fairly clear that this was a man
        who was having mental problems.  He was quite scattered.  He would, at times in the
        interview, be able to attend what looked like in a rational fashion, but it was soon
        obvious that he could not control that and he very quickly lapsed into repetitive
        pressured speech that made little sense.

21

22

23          He, at times, would become somewhat scattered, not focused on the material that
        we were discussing.  He had a number of rather unusual ideas about what was going on
        in his life.

24

25          He didn't really understand his situation.  He couldn't really tell me clearly what
        the charges were that he was being held on.  He had some idea of charges that really
        didn't relate to the seriousness of the charges that he was being held on.

26

27   (AG010591–93.)

28

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

Dr. Gudiksen testified similarly:

> [MS. SAWYER]: Now, could you tell us first in general what you do when you – when the court notifies you to examine someone to see if that person is competent or not to stand trial?
>
> A: I get a telephone call from a court clerk or perhaps a minute order in the mail that mentions the attorney of record, and I call that person, because part of the issue is whether this person is understanding the proceedings and whether they are cooperating with the defense counsel in their preparation and presentation of their defense.
>
> So the issue, that issue especially comes to someone's mind, and often the defense attorney's, so I call that person.
>
> And sometimes more than one defense attorney has been involved in working with this particular client, so sometimes I call more than one defense attorney.
>
> I ask for them to summarize the case and ask about what the charges are and if there is any past mental record and what prior offenses may be, often ask that attorney to send me some materials from their file that they think would be pertinent, obviously, a probation officer's report, past ones, or police reports or summaries of mental health or psychiatric treatment, or I'll tell the attorney, "Send me anything you think is pertinent, and I'll take a look at it."
>
> Then I schedule an appointment to see the defendant, who is almost always in custody. In fact, I guess in 1368,[7] he or she is always in custody. But I schedule the appointment and go to the facility where the person is incarcerated and conduct my examination.
>
> That's how I get ready to do the exam.

(AG010879–80.) Based upon Dr. Gudiksen's subsequent testimony that she had reviewed Petitioner's social history report, spoken with Petitioner's attorneys, and interviewed Petitioner, Dr. Gudiksen was deemed qualified as an expert and permitted to testify that, in her opinion, Petitioner was incompetent to stand trial. (AG010880–82). Dr. Gudiksen based her opinion on both her observations of and conversations with Petitioner (AG010880–94), as well as his medical history, which she testified consisted of "extensive substance abuse," "repeated episodes of head trauma," and a "poorly controlled" seizure disorder (AG010890–91). In addition, Dr. Gudiksen testified as to her specific observations of Petitioner that led her to conclude that he was incompetent, stating:

> A: Based upon the history and my examination, I didn't feel that he was able to understand the nature of the proceedings against him or to cooperate with defense

---

[7] "1368" refers to California Penal Code section 1368, which governs the suspension of criminal proceedings in order for a defendant's mental competence to be evaluated. *See People v. Taylor*, 47 Cal. 4th 850, 859 & n.3 (2009).

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1      counsel in the preparation and presentation of a rational defense.

2  (AG010883.)

3         Petitioner's argument is essentially that because there was insufficient funding for the two

4  court-appointed psychiatrists to conduct additional neurological or neuropsychological testing to

5  confirm their opinions that Petitioner was incompetent, the examinations that the psychiatrists did

6  conduct were not "appropriate" under *Ake*.  The Court disagrees.  To start, the Court notes that

7  Petitioner was only entitled "to 'provision of *one* competent psychiatrist.'"  *Leavitt v. Arave*, 646

8  F.3d 605, 610 (9th Cir. 2011) (quoting *Ake*, 470 U.S. at 79).  "Given this unambiguous language,"

9  the Ninth Circuit has held, a "defendant 'lacks the right to appointment of a *second* psychiatrist,'

10 even where the first psychiatrist is alleged to be incompetent or reaches a diagnosis unfavorable to

11 the defense."  *Id.* (quoting *Pawlyk v. Wood*, 248 F.3d 815, 824 (9th Cir. 2001)).  Petitioner,

12 therefore, has already received more than what *Ake* requires.  What's more, the Ninth Circuit has

13 expressed doubt that a right to an "appropriate examination" even exists.  "[I]t's far from clear," the

14 Ninth Circuit has said, "that such a right exists, or that, if it does, we'd be able to review it on

15 habeas."  *Leavitt*, 646 F.3d at 610 (citations omitted).

16        In any event, the above passages reveal that both psychiatrists examined Petitioner according

17 to their usual and customary procedures, and that, based upon those standards, they testified as

18 experts that Petitioner was incompetent to stand trial.  The testimony of Drs. Gudiksen and

19 Rosenthal was thorough and referred to numerous, specific reasons why they concluded that

20 Petitioner was incompetent.  (AG010591–92, AG010883.)  Additionally, Dr. Stein, a clinical

21 psychologist, actually conducted neuropsychological tests on Petitioner and opined that, based upon

22 the testing he had performed, Petitioner suffered from considerable pervasive brain impairment.

23 (AG010924–27, AG010947–49.)  Petitioner cites no case or statute requiring additional neurological

24 or neuropsychological testing in such a situation.

25        Indeed, the fact that Drs. Gudiksen and Rosenthal could have performed more testing than

26 what they usually and customarily performed in examining defendants for competency to stand trial

27 does not render the examinations they did perform insufficient under *Ake*.  This is all the more true

28

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

considering that Petitioner *did* undergo neuropsychological testing by a clinical psychologist, Dr. Stein, who also testified on Petitioner's behalf.  That a jury nevertheless found Petitioner competent to stand trial does not necessarily mean his psychiatric examinations were inadequate.

Because Petitioner was not denied "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense," *Ake*, 470 U.S. at 83, the California Supreme Court's summary denial of this subclaim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the U.S. Supreme Court, *see* 28 U.S.C. § 2254(d)(1).  As a result, this subclaim must be denied.

### B.    Second Subclaim: Ineffective Assistance of Counsel

#### 1.    Factual Summary

As explained above, Petitioner offered testimony at his competency trial from two court-appointed psychiatrists, both of whom opined that he was incompetent to stand trial.  Neither expert, however, conducted neurological or neuropsychological testing to confirm their impression that Petitioner suffered from organic brain damage.  Petitioner also presented the testimony of a clinical psychologist, Dr. Stein, who did conduct neuropsychological tests confirming that Petitioner suffered from significant brain impairment.  Dr. Stein, however, did not opine as to Petitioner's competence to stand trial.

Petitioner argues that his counsel should have: (1) provided the results of Dr. Stein's neuropsychological testing to Drs. Gudiksen and Rosenthal, the court-appointed psychiatrists; and (2) elicited testimony from Dr. Stein that Petitioner was incompetent to stand trial.  Petitioner contends that by failing to do either, his counsel rendered constitutionally ineffective assistance.  *See* Pet'r's MSJ at 33–34.

#### 2.    Applicable Supreme Court Precedent

The clearly established federal law applicable to this subclaim is set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the U.S. Supreme Court held that ineffective assistance of counsel is cognizable as a denial of the Sixth Amendment right to counsel, which

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

guarantees not only assistance, but effective assistance, of counsel.  *Id.* at 686.  To prevail on an ineffective assistance of counsel claim, a petitioner must establish that: (1) his counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms; and (2) he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 688–94.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  Ultimately, a petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "might be considered sound trial strategy" under the circumstances.  *Id.* at 689 (internal quotation marks omitted).

A "doubly" deferential standard of review is appropriate in analyzing ineffective assistance of counsel claims under AEDPA because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential."  *Richter*, 562 U.S. at 105 (internal quotation marks omitted).  When section 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*

### 3.    Prejudice

Petitioner is unable to establish prejudice resulting from his counsel's alleged deficient performance, and, thus, Petitioner is unable to prevail on this subclaim.  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  *See Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 n.3 (9th Cir. 1995) (commending the district court's decision not to consider whether counsel's conduct was deficient after determining that the Petitioner could not establish prejudice).  Even assuming Petitioner had established that his counsel's performance was deficient,[8] the Court finds that it was not unreasonable for the California Supreme Court to conclude

---

[8] Sawyer, one of Petitioner's attorneys in state court, said in an affidavit: "In the course of
(continued...)

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1    that there was no reasonable probability that, had counsel provided Dr. Stein's test results to Drs.

2    Gudiksen and Rosenthal, the jury would have ruled differently and found that Petitioner was

3    incompetent to stand trial.

4           Petitioner emphasizes that the California Supreme Court, in reviewing the separate question

5    whether substantial evidence supported the competency jury's verdict, found the testimony of the

6    court-appointed psychiatrists "suspect" because the bases for their opinions were at times "limited."

7    *See* Pet'r's MSJ at 32 & n.7 (citing *Marks*, 31 Cal. 4th at 219–20).  For instance, the California

8    Supreme Court found "Dr. Gudiksen's information about defendant's history was limited to that

9    which she received from defense counsel and her meetings with defendant," chiding Dr. Gudiksen at

10   one point because "she had not read the preliminary hearing transcript."  *Marks*, 31 Cal. 4th at 219.

11   Seizing on that language, Petitioner contends that had counsel provided Drs. Gudiksen and

12   Rosenthal with the results of Dr. Stein's neuropsychological testing and Petitioner's social history,

13   there is a reasonable probability that the jury would have found him incompetent to stand trial.

14   Pet'r's MSJ at 33–34.

15          The Court is not convinced.  First of all, Petitioner's assertion that the psychiatrists were not

16   provided evidence of Petitioner's social history is directly refuted by the record.  (AG010589,

17   AG010592–93 (Dr. Rosenthal testifying that he had reviewed "a summary" of Petitioner's "social

18   history" and describing that history); AG010881 (Dr. Gudiksen testifying that she had reviewed "a

19   summary of Mr. Marks' social history").)  Second, as explained above, to the extent the

20   psychiatrists' credibility was weakened by the fact that they did not conduct neuropsychological

21   testing, Dr. Stein's testimony – that he had performed such testing and that Petitioner indeed

22   suffered from organic brain damage – would likely have rehabilitated their credibility in the eyes of

23   the jury.  Far from the complicated "jigsaw puzzle" Petitioner portrays, Pet'r's MSJ at 34, a

24

25          [8](...continued)
     preparing and presenting evidence of Mr. Marks's incompetence, I did not have any tactical reason not
26   to provide Dr. Gudiksen and Dr. Rosenthal with the results of Dr. Stein's neuropsychological
     evaluation."  (AG023074.)  Nonetheless, the Court need not decide whether it was deficient
27   performance for counsel not to provide Drs. Gudiksen and Rosenthal with the results of Dr. Stein's
     examination.  As noted above, this Court may properly analyze the prejudicial impact of any alleged
28   deficiencies without first determining whether counsel's performance was actually deficient.

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1    reasonable jury could have drawn the logical inferences from the experts' testimony.

2         Finally, the contrary evidence submitted by the state was quite strong, including statements

3    Petitioner had made demonstrating that he was well aware of the nature of the proceedings against

4    him and the potential punishments he faced. *See Marks*, 31 Cal. 4th at 219–20. For example, in

5    June 1992, Petitioner, then incarcerated in the Santa Rita Jail, asked Deputy Sheriff Timothy Durbin

6    for a work assignment, telling Durbin that Petitioner believed that if he had a job it would look better

7    to the jury in his upcoming trial. *Id.* at 217. In the course of their conversation, Petitioner stated that

8    he would have a competency hearing soon. *Id.* When Durbin asked Petitioner if that was a hearing

9    to decide whether to fire his attorney, Petitioner responded, "No, it is a competency hearing to see

10   whether or not I am sane." *Id.* at 218. Petitioner then added, "I should lose that in June and I'll start

11   my main trial later in the year or early '93." *Id.*

12        As the California Supreme Court concluded in affirming the jury's finding that Petitioner

13   was competent to stand trial:

14        [T]he People below produced abundant evidence that contradicted the defense
          testimony, most of it coming from defendant's own mouth. For example, although Dr.
15        Rosenthal opined that defendant believed the charge concerned only possession of a
          weapon, defendant himself remarked, "I didn't do no Taco Bell shootings and no
16        Gourmet shootings and no cab shootings." Defendant's statements support the inference
          that he fully recognized the magnitude of the charges he faced and the potential
17        consequences, as well as counsel's unwillingness to seek an acquittal. "And this is a life
          or death, either I get life or I get death. It's just cut and dry. Either you get life or you
18        get death and here are two people playing with your life. I need somebody who is
          serious that wants to see me victorious. . . ." Defendant objected to the fact that
19        Attorneys Najpaver and McGrew "tried to . . . manipulate me to take life sentences for
          something I did not do." At one *Marsden* hearing,[9] defendant told the court "I want a
20        public defender . . . who I can work with, understand me. . . . I know I can't pick my
          own lawyer, but I'm saying if there is a conflict and my life is at stake . . . . I can't get
21        my rights with the counsel who don't believe I'm innocent. He don't believe I'm
          innocent and he's addressed me as such." Defendant also indicated he understood the
22        nature of the competency hearing: "[I]t is a competency hearing to see whether or not I
          am sane."

23        Defendant's statements and conduct further showed he could assist counsel in the
24        conduct of the defense. Although he did not cooperate with the attorney who was trying
          to arrange defendant's conviction for noncapital murder, he cooperated with Attorney
25        Sawyer because he trusted her. He took her advice not to appear on television and he

26   _____

27        [9] A *Marsden* hearing in California state court occurs when "a defendant requests substitute
     counsel." *People v. Sanchez*, 53 Cal. 4th 80, 90 (2011) (citing *People v. Marsden*, 2 Cal. 3d 118
28   (1970)).

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1    sought work to make a good impression on the jury. Defendant thus showed he *was able*
2    to cooperate with counsel but sometimes *refused* to do so, largely to achieve a
substitution of counsel. In an earlier proceeding described during the instant hearing,
3    defendant remarked, "I know I acted like a zip-down fool in the courtroom. I don't want
Mr. Denton as my attorney and I will not cooperate with him." Defendant promised to
cooperate and refrain from acting like a "zip-down fool" if he were granted a new
4    attorney.

5           Furthermore, although defendant's outbursts did not comport with courtroom
protocol, they did reflect his attempt to provide advice to counsel. For example,
6    defendant complained that counsel failed to ask a witness who claimed to have been five
feet from the smiling perpetrator whether there was anything unusual about the
7    perpetrator's teeth, as defendant had missing teeth. We conclude there was substantial
evidence from which the jury could rationally infer defendant's competence to stand
8    trial.

9  *Marks*, 31 Cal. 4th at 218–20 (alterations in original).

10       The Court therefore finds that even had defense counsel provided the neuropsychological test

11  results to the two court-appointed psychiatrists, Drs. Gudiksen and Rosenthal, and also elicited from

12  Petitioner's clinical psychologist, Dr. Stein, the opinion that Petitioner was incompetent to stand

13  trial, the state's contrary evidence, especially Durbin's testimony and defendant's own documented

14  statements and conduct, was sufficiently strong that Petitioner cannot show a reasonable probability

15  the jury would have found Petitioner incompetent to stand trial.

16       As a result, the Court finds that the California Supreme Court's summary denial of this

17  subclaim was neither contrary to, nor the result of an unreasonable application of, clearly established

18  federal law as determined by the U.S. Supreme Court in *Strickland* and *Richter*. *See* 28 U.S.C.

19  § 2254(d)(1). In addition, the decision was not based on an unreasonable determination of the facts.

20  *See id.* § 2254(d)(2). Accordingly, this subclaim must be denied.

21      **C.**     **Third Subclaim: Inadequate Fact-Finding Procedures**

22             **1.**     **Factual Summary**

23       During the competency trial, the trial court made four evidentiary rulings that resulted in the

24  exclusion of certain evidence that Petitioner contends was relevant to the issue of his competency to

25  stand trial. First, when the defense attempted to show that Petitioner was unable to provide his

26  attorneys with truthful information about either the crime at issue or his life while growing up, the

27  trial court refused to admit the evidence on the ground that it is not "a function of competence for a

28

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1    client to tell a lawyer the truth." (AG010441.)  Second, in response to defense questioning about

2    whether Petitioner had the ability to cooperate during testing, the trial court limited Dr. Stein's

3    answer to the one occasion on which Dr. Stein was able to administer the test, thereby preventing the

4    jury from learning that Petitioner had refused to be tested on two other occasions.  (AG011384.)

5    Third, the trial court did not allow Dr. Stein to answer the defense's question as to whether the

6    ability to cooperate with neuropsychological testing was different from the ability to cooperate with

7    his defense counsel.  Finally, when Petitioner voiced disagreement with a witness's testimony about

8    a statement Petitioner allegedly had made, the trial court, after asking Petitioner to be quiet, told the

9    jury, "Mr. Marks' outburst is not evidence, unless he testifies." (AG010784–85.)  Petitioner

10   contends that these rulings denied him a fair opportunity to demonstrate to the jury that he was not

11   competent to stand trial.  *See* Pet'r's MSJ at 23–30.

12                        **2.      Applicable Supreme Court Precedent**

13        Petitioner asserts that the clearly established federal law applicable to his subclaim is set

14   forth in *Panetti v. Quarterman*, 551 U.S. 930 (2007).[10]  In *Panetti*, a condemned inmate argued

15   during his federal habeas corpus proceedings that he was incompetent to be executed, and the federal

16   court stayed the proceedings so that the state court could determine whether he was in fact

17   incompetent.  The state court appointed two experts to examine the defendant, and they filed a report

18   concluding that he was competent to be executed.  The state court then closed the case without

19   letting the inmate respond to the report.  The U.S. Supreme Court explained that in competency

20   determination proceedings, the Due Process Clause of the Fourteenth Amendment requires, at a

21   minimum, that an inmate who makes a threshold showing of incompetency be provided "factfinding

22   procedures" that are "adequate for reaching reasonably correct results." *Id.* at 952, 954 (internal

23   quotation marks omitted).  The U.S. Supreme Court further held that fact-finding procedures

24

25        [10] Petitioner may rely on *Panetti*, a 2007 U.S. Supreme Court case, even though it had not yet
     been decided when the California Supreme Court summarily denied Petitioner's subclaim on March 16,
26   2005.  This is so because *Panetti* was itself a post-AEDPA habeas case that merely explained the
     "clearly established law" of *Ford v. Wainwright*, 477 U.S. 399 (1986), concerning the procedures for
27   a competency determination to which a defendant is entitled.  *Panetti*, 551 U.S. at 948; *see also Moses
     v. Payne*, 555 F.3d 742, 751–52 (9th Cir. 2009).  Respondent does not argue otherwise.

28

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1  adequate for achieving reasonably correct results in a competency determination hearing involved at

2  least some form of hearing in which the inmate had the "opportunity to submit expert evidence in

3  response to the report filed by the court-appointed experts." *Id.* at 951–52.  The U.S. Supreme Court

4  explicitly reserved ruling on whether other procedures, such as the opportunity for discovery or for

5  the cross-examination of witnesses, would be required.  *Id.* at 952.

6                                     **3.      Analysis**

7          Petitioner argues that because the rulings by the trial court prevented him from introducing

8  some evidence that was arguably relevant to the issue of his competency, the fact-finding procedures

9  at his competency trial were inadequate for reaching a reasonably correct result as to his competency

10  to stand trial.  Pet'r's MSJ at 23, 36–37.  Respondent counters that Petitioner confuses the

11  opportunity to submit evidence with the trial court's rulings on whether to admit the evidence, and

12  that, because Petitioner was provided the opportunity to submit expert psychiatric evidence, his

13  competency proceedings did not violate the requirements set forth in *Panetti*.  ECF No. 44 ("Opp'n

14  to Pet'r's MSJ") at 5–9.

15          *Panetti* is distinguishable from the present case.  Petitioner does not dispute that he was

16  given the "opportunity to submit expert evidence," which is what *Panetti* requires.  551 U.S. at 951.

17  Unlike the defendant in *Panetti*, Petitioner *was* provided a hearing and *did* submit expert testimony

18  as well as other evidence.  As this Court has indicated above, the trial court held a month-long jury

19  trial regarding the issue of competency.  Having the opportunity to submit evidence does not mean

20  that a court must admit all of the evidence submitted by the defendant.  *See, e.g.*, *United States v.*

21  *Waters*, 627 F.3d 345, 354 (9th Cir. 2010) (holding that evidentiary rulings by the trial court do not

22  deprive defendant of a meaningful opportunity to present a complete defense as long as he is able to

23  present the substance of his factual innocence theory).[11]

24  _____

25          [11] In general, admission or exclusion of evidence in state court is not a matter for federal habeas review unless the admission or exclusion violates a particular constitutional guarantee or is so

26  prejudicial that it results in a denial of due process.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (reiterating "that it is not the province of a federal habeas court to reexamine state-court determinations

27  on state-law questions"); *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) ("We have no

28                                                                                      (continued...)

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1    Moreover, much of the evidence that Petitioner says was improperly excluded from his

2    competency trial was in fact admitted in some form or another.  For example, when Petitioner's

3    defense counsel asked Najpaver, another of Petitioner's counsel who testified during the competency

4    trial, whether Petitioner could provide his attorneys truthful information about the facts of his case or

5    his life history, the trial court sustained a relevance objection (AG010428), stating that it is not "a

6    function of competence for a client to tell a lawyer the truth" (AG010441).  Shortly thereafter,

7    however, Najpaver was allowed to respond to the following similar question: "Have you received

8    information from Mr. Marks that later checked out to be accurate or inaccurate[?]"  (AG010429.)  In

9    addition, evidence of Petitioner's earlier refusals to submit to neuropsychological testing was

10   admitted when Dr. Stein testified that Petitioner did not submit to testing in October and December

11   1991 due to extreme agitation and bizarre behavior.  (AG010927–28.)  Contrary to Petitioner's

12   assertion, then, the jury was not left "to speculate that Mr. Marks was able to comply with testing

13   procedures any time that he chose."  Pet'r's MSJ at 29.  Lastly, the trial court's admonishment to the

14   jury that "Mr. Marks' outburst is not evidence, unless he testifies" was wholly proper.

15   (AG010784–85.)  The trial court was not instructing the jury to ignore *the fact* that Petitioner hade

16   made an outburst.  Rather, the trial court was instructing the jury to ignore *the content* of that

17   outburst unless Petitioner took the stand and uttered the same.  In any event, other evidence of

18   Petitioner's disruptive behavior was considered by the jury, which heard testimony from the

19   magistrate who had presided over Petitioner's preliminary hearing that Petitioner "act[ed] out"

20   during that hearing and "seemed to be unable to control himself."  (AG010538.)

21   As a result, Petitioner cannot demonstrate that the particular evidence he wanted to submit

22   would have altered the competency determination.  Not telling the truth to one's attorney, refusing to

23   submit to a certain psychiatric exam, and improperly voicing disagreement with a witness's

24   testimony are not compelling indicia of incompetency, and Petitioner cites to no case law suggesting

25

26   [11](...continued)

27   authority to review alleged violations of a state's evidentiary rules in a federal habeas proceeding.  Our
     role is limited to determining whether the admission of evidence rendered the trial so fundamentally

28   unfair as to violate due process." (citation omitted)).

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1    that they are.  In the absence of such authority, Petitioner cannot demonstrate either that an error

2    occurred or that any alleged error "had substantial and injurious effect or influence in determining

3    the jury's verdict."  *Brecht*, 507 U.S. at 638.

4              Because Petitioner does not dispute that he was able to present the substance of his claim that

5    he was incompetent to stand trial, Petitioner's contention that he was denied a meaningful

6    opportunity to present evidence in support of that claim fails.  Accordingly, Petitioner cannot

7    establish that the fact-finding procedures at his competency trial were constitutionally inadequate

8    under *Panetti*.  The Court therefore finds that the California Supreme Court's summary denial of this

9    subclaim was neither contrary to, nor the result of an unreasonable application of, clearly established

10   federal law.  *See* 28 U.S.C. § 2254(d)(1).  Additionally, Petitioner has not demonstrated that the

11   California Supreme Court's decision was based on an unreasonable determination of the facts.  *See*

12   *id.* § 2254(d)(2).  This subclaim must be denied.

13             **D.       Claim 2 Conclusion**

14             For the foregoing reasons, the Court grants Respondent's motion for summary judgment as

15   to Claim 2 and denies Petitioner's motion for summary judgment as to that claim.

16   **II.    Claim 3: Failure to Conduct a Second Competency Hearing**

17             Respondent next moves for summary judgment on Petitioner's claim that the trial court's[12]

18   refusal to suspend Petitioner's trial proceedings and redetermine his competency denied him due

19   process.  Resp't's MSJ at 10–14.  Respondent argues that Petitioner has failed to establish that the

20   California Supreme Court's summary rejection of this claim was contrary to or an unreasonable

21   application of U.S. Supreme Court precedent, or that the California Supreme Court's decision was

22   based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).  Petitioner cross-

23   moves for summary judgment, contending that Respondent has failed to present affirmative evidence

24   to controvert Petitioner's factual allegations and that those allegations entitle him to relief.  Pet'r's

25   MSJ at 37–66.

26

27             [12] The "trial court" now refers to Judge Jeffrey Horner, the Alameda County Superior Court
28   judge who presided over the guilt and penalty phases of Petitioner's capital murder trial.

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1      **A.      Factual Summary**

2           As explained in the analysis of Claim 2 above, a jury found Petitioner competent to stand

3      trial on July 22, 1992.  (AG001257.)  On January 21, 1994, three days before jury selection in

4      Petitioner's capital murder trial was set to begin, the defense moved under California Penal Code

5      section 1368 to suspend the proceedings and have a second hearing to determine Petitioner's

6      competency.  (AG011558, AG011563–64.)  Petitioner's counsel represented to the trial court that

7      Petitioner was out of touch with basic reality and could not comprehend the significance of simple

8      facts that were necessary to prepare his case.  As an example, counsel pointed out that a key piece of

9      evidence in the case was a tape recording of Petitioner's statement to police.  According to defense

10     counsel, however, Petitioner not only refused to concede that the voice on the tape recording was his

11     voice; he sincerely believed that it was not his voice.  (AG011556–63.)  Petitioner insisted that he

12     did not make a tape recorded statement; that the transcripts had been altered; and that defense

13     counsel, the prosecutor, and the trial court were engaged in a conspiracy against him.  (AG011574.)

14          The state law applicable to Petitioner's motion provided:

15               When a competency hearing has already been held and defendant has been found
                 competent to stand trial . . . a trial court need not suspend proceedings to conduct a
16               second competency hearing unless it is presented with a substantial change of
                 circumstances or with new evidence casting a serious doubt on the validity of that
17               finding.

18     *People v. Kelly*, 1 Cal. 4th 495, 542 (1992) (citations and internal quotation marks omitted).  After

19     reviewing the transcript of the 1992 competency trial, the trial court found on January 24, 1994, that

20     Petitioner's circumstances at trial were not substantially different from his circumstances at that

21     prior hearing, and that the new evidence he presented did not cast a serious doubt on the validity of

22     the jury's prior finding that Petitioner was competent (AG011586–87 (relying on *Kelly*).)

23          On March 28, 1994, Petitioner moved to dismiss his attorneys and to represent himself, and

24     Petitioner's counsel moved once again to have the trial court suspend the proceedings and conduct a

25     hearing to determine Petitioner's competency.  (AG014987.)  Later that day, Petitioner spoke out of

26     turn to disagree with a witness's testimony, and the trial court threatened repeatedly to have

27     Petitioner removed from the courtroom if he continued to disrupt the proceedings.  (AG015045–46,

28

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1    AG015090–93.)

2        On March 29, 1994, the trial court first denied Petitioner's motions to dismiss his attorneys

3    and to represent himself.  (AG015273, AG015279.)  In support of the motion to suspend

4    proceedings, defense counsel contended that Petitioner was unable to answer their questions or

5    confer with them, and that Petitioner was firmly convinced that the prosecutor, trial court, and

6    defense counsel had accepted bribes in his case.  (AG015280–81.)  Counsel also contended that

7    Petitioner had changed drastically since the trial began, when they had meaningful conversations

8    with him about the case, and that they believed there was a risk that the jury would "see Mr. Marks

9    acting out and being removed" from the courtroom.  (AG015283–84.)  Upon being questioned by

10   the trial court, Petitioner stated, "I'm mentally sound.  I'm aware of, I'm aware of my – I'm not

11   saying nothing else, because I already know I'm being treated unfairly.  I'm not going to make

12   ambiguous outbursts, this is a biased courtroom."  (AG015292.)

13       The trial court again denied the defense's section 1368 motion to suspend the proceedings.

14   (AG015298 (relying on *Kelly*).)  The trial court stated that because there had been a previous

15   competency hearing at which Petitioner had been found competent, suspension of the criminal

16   proceedings was not required unless the court found that the circumstances had changed

17   substantially or new evidence had surfaced to now cast serious doubt on the validity of the jury's

18   previous finding of competency.  The trial court also stated that it had reviewed the entire transcript

19   of the 1992 competency hearing.  The trial court noted that Petitioner's previous attorneys had made

20   the same complaints during that hearing as defense counsel was making at trial; namely, lack of

21   cooperation and differing views of the evidence and trial tactics.  Applying the *Kelly* standard, the

22   trial court found that: (1) Petitioner's circumstances had not substantially changed from his

23   circumstances at the time of the 1992 competency determination; and (2) the new evidence

24   Petitioner submitted did not cast a serious doubt on that determination.  The trial court also noted

25   that Petitioner's outbursts and his responses to the court's questions showed that Petitioner

26   understood the nature of the proceedings as well as the significance of the evidence being introduced

27   against him, and that Petitioner was able to recognize and understand weaknesses or flaws in that

28

23

1    evidence. (AG015293–98.) Because Petitioner continued to disrupt the proceedings despite the trial

2    court's repeated warnings, the trial court ultimately had Petitioner removed. (AG015228–30.)

3            On direct review in 2003, the California Supreme Court upheld the trial court's decision not

4    to conduct an additional competency hearing, finding as follows:

5            [A]lthough defendant's outbursts did not comport with courtroom protocol, they
             did reflect his attempt to provide advice to counsel. For example, defendant complained
6            that counsel failed to ask a witness who claimed to have been five feet from the smiling
             perpetrator whether there was anything unusual about the perpetrator's teeth, as
7            defendant had missing teeth. . . .

8            Defendant further contends that his conduct during trial warranted a further
             examination of his competency, and the trial court erred in failing to suspend the
9            proceedings. However, once a defendant has been found to be competent, even bizarre
             statements and actions are not enough to require further inquiry. ([*People v. Marshall*,
10           15 Cal. 4th 1, 33 (1997)].)[13]  Reviewing courts give great deference to a trial court's
             decision whether to hold a competency hearing. "An appellate court is in no position to
11           appraise a defendant's conduct in the trial court as indicating insanity, a calculated
             attempt to feign insanity and delay the proceedings, or sheer temper." (*Ibid.*)

12           Moreover, defendant's most conspicuous outburst during trial amply proves his
13           ability to understand the proceedings and assist counsel. When the prosecutor concluded
             his redirect examination of John Myers, defendant interrupted, "Your Honor, I object.
14           This person stated it was not me, it was No. 6 who committed the shooting. . . . He did
             not even ask." Discussion among the attorneys and the court revealed that Myers had
15           selected a suspect other than defendant at a photographic lineup.  The prosecutor
             recognized, however, there was a sound tactical reason for defense counsel's not asking
16           Myers about his failure to select defendant: Myers had indicated "it was a toss up"
             between defendant and the "number six" individual; Myers finally chose the latter.
17           Although there was a legitimate reason for not asking Myers about his selection at the
             lineup, defendant's comment reflected he comprehended not just the nature of the
18           proceedings but the state of the People's case and its potential deficiencies.  Defendant
             also demonstrated his ability to offer assistance to counsel, even if such assistance was
19           neither solicited nor welcomed.  FN4

20                   FN4.  The defense again moved for a competency hearing after
                     defendant testified in the guilt phase.  The motion was based in
21                   large part on defendant's frequent nonresponsiveness to the
                     questions posed.  As the trial court found, however, defendant
22                   strategically  ignored  the  limited  scope  of  questions  and
                     aggressively presented to the jury material that would either tend
23                   to raise a doubt about his guilt or engender sympathy for him.

24   _____

25           [13] *Marshall*, which was decided after the trial court's 1994 denials of Petitioner's motions for
     a second competency hearing, adopts the same standard described above in *Kelly*, on which the trial
26   court relied.  *See Marshall*, 15 Cal. 4th at 33 ("When, as here, a competency hearing has already been
     held and the defendant was found to be competent to stand trial, a trial court is not required to conduct
27   a second competency hearing unless it is presented with a substantial change of circumstances or with
     new evidence that gives rise to a serious doubt about the validity of the competency finding." (internal
28   quotation marks omitted)).

                                                    24

     Case No. 11-CV-2458-LHK
     ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1
2

> The court considered this "an intentional and volitional and willful decision by him to go outside the scope of questions and place material before the jury that he perceived to be in his interests."

3

Defendant was properly found competent to stand trial.

4

*Marks*, 31 Cal. 4th at 220–21 & n.4 (citations and internal quotation marks omitted).

5

6       **B.       Applicable Supreme Court Precedent**

7       The clearly established federal law applicable to this claim is set out in *Pate v. Robinson*, 383

8   U.S. 375 (1966), and *Drope v. Missouri*, 420 U.S. 162 (1975).  In *Pate*, the U.S. Supreme Court held

9   that if, at anytime during the trial, the trial court becomes aware of circumstances that would lead a

10  reasonable person to have a "bona fide doubt" as to the defendant's competence, the trial court must

11  suspend the proceedings and conduct a hearing to determine the defendant's competency.  383 U.S.

12  at 385; *accord Maxwell*, 606 F.3d at 568.  In *Drope*, moreover, the U.S. Supreme Court held that

13  "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always

14  be alert to circumstances suggesting a change that would render the accused unable to meet the

15  standards of competence to stand trial."  420 U.S. at 181; *accord Maxwell*, 606 F.3d at 574.

16      **C.       Analysis**

17      Petitioner contends that the California Supreme Court's determination[14] that a second

18  competency hearing was not required was contrary to or an unreasonable application of clearly

19  established federal law as determined by the U.S. Supreme Court, or based on an unreasonable

20  determination of the facts.  *See* Pet'r's MSJ at 54–65.  Petitioner advances two arguments.  First,

21  Petitioner argues that California's standard for conducting a second competency hearing—i.e., that a

22

23      [14] In evaluating Petitioner's arguments, the Court "look[s] through" the California Supreme
    Court's March 16, 2005 summary denial of Claim 3 to the "the last reasoned state-court opinion on the
24  claim at issue."  *Ortiz v. Yates*, 704 F.3d 1026, 1034 (9th Cir. 2012) (citing *Ylst v. Nunnemaker*, 501
    U.S. 797, 804–06 (1991)).  Here, that means reviewing the California Supreme Court's 2003 decision
25  affirming Petitioner's conviction on direct appeal.  Moreover, this Court notes that with respect to Claim
    3, the California Supreme Court's summary denial contained an alternative basis for its ruling—namely,
26  that Claim 3 was procedurally barred as repetitive of a claim previously rejected by the California
    Supreme Court on direct appeal.  (AG023690 (citing *In re Waltreus*, 62 Cal. 2d 218, 225 (1965).)
27  Because this Court fully considers Claim 3 on the merits, *infra*, it need not reach Petitioner's argument
    that the California Supreme Court's application of the *Waltreus* bar was itself unreasonable.  *See* Pet'r's
28  MSJ at 49–52.

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

court find either a "substantial change in circumstances" or "new evidence that gives rise to a serious doubt about the validity of the [prior] competency finding," *Marshall*, 15 Cal. 4th at 33 (internal quotation marks omitted)—is more restrictive than the clearly established federal law counterpart, which requires that a state court be alert to "circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial," *Drope*, 420 U.S. at 181. For that reason, Petitioner argues, the state law standard, upon which the California Supreme Court implicitly relied in affirming the trial court's denials of a second competency hearing, *see Marks*, 31 Cal. 4th at 220–21 (quoting *Marshall*, 15 Cal. 4th at 33), is either contrary to, or the result of an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court in *Pate* and *Drope.* Pet'r's MSJ at 54–58. Because a state court's application of the "wrong legal framework" is "unworthy of AEDPA deference," *Milke v. Ryan*, 711 F.3d 998, 1006–07 (9th Cir. 2013), Petitioner contends that he is entitled to de novo review of Claim 3, *see* Pet'r's MSJ at 65.

Petitioner's first argument is without merit. It is true that when a "state court applies a legal standard that contradicts clearly established federal law," a federal court may "review de novo the applicant's claims, applying the correct legal standard to determine whether the applicant is entitled to relief." *Castellanos v. Small*, 766 F.3d 1137, 1146 (9th Cir. 2014). There is no indication, however, that the standard set forth in *Marshall* and *Kelly* contradicts the clearly established federal law of *Pate* and *Drope.* Petitioner emphasizes the Ninth Circuit's statement that a federal court must "apply the same bona fide doubt standard to determine whether an additional competency hearing was required." Pet'r's MSJ at 55 (quoting *Maxwell*, 606 F.3d at 568). Even assuming the Ninth Circuit's reading of *Drope* constitutes clearly established federal law under AEDPA, which is not entirely clear, California's requirements are not necessarily inconsistent with that principle. Nothing in *Marshall* and *Kelly* demands more than the raising of a "bona fide doubt" to trigger an additional competency hearing. *Maxwell* itself seemingly recognized as much, explaining that "once there is substantial new evidence of incompetency, a bona fide doubt is raised" warranting an additional competency hearing. 606 F.3d at 575 (citing *de Kaplany v. Enomoto*, 540 F.2d 975, 980–81 (9th

1   Cir. 1976)).  Although the terminology differs—e.g., "serious doubt" compared to "bona fide

2   doubt"—the two standards appear substantially the same.

3         Furthermore, the Ninth Circuit explained in another case: "California law requires that, after

4   an initial finding of competency, a second hearing is required only 'if the evidence discloses a

5   substantial change of circumstances or new evidence is presented casting serious doubt on the

6   validity of the prior finding.'"  *Gomez v. Harrington*, 522 F. App'x 393, 394 (9th Cir. 2013)

7   (quoting *People v. Medina*, 11 Cal. 4th 694, 734 (1995)).[15]  Although the parties in *Gomez* raised the

8   issue, *see* No. 11-16961 (9th Cir.), Appellant's Br. at 41 n.13, the Ninth Circuit declined to find the

9   California rule contrary to or an unreasonable application of clearly established U.S. Supreme Court

10  precedent.  Quite the opposite.  The Ninth Circuit upheld the state court's denial of a second

11  competency hearing "[i]n light of the deference due under AEDPA."  *Gomez*, 522 F. App'x at 394.

12  Thus, as Petitioner has not shown that the state court's reliance on California's standard for

13  conducting a second competency hearing was contrary to or an unreasonable application of clearly

14  established federal law as determined by the U.S. Supreme Court, Petitioner's first argument fails.

15  *See Smith v. California*, No. C 04-3190 RMW (PR), 2007 WL 2893765, at *6 (N.D. Cal. Sept. 28,

16  2007) (holding that "the state court's denial of a second competency hearing," a denial premised on

17  the *Kelly* standard, "was not contrary to, or an unreasonable application of, clearly established

18  Supreme Court precedent"); *cf. Medina v. California*, 505 U.S. 437, 453 (1992) (holding generally

19  that California's procedures for determining the competency of criminal defendants are

20  "constitutionally adequate." (citing *Drope*, 420 U.S. at 172)).

21        Second, Petitioner argues that the evidence before the trial court was sufficient to establish a

22  bona fide doubt as to Petitioner's competency to stand trial, and that the California Supreme Court's

23  decision affirming the trial court's denial of an additional competency hearing was therefore based

24  on an unreasonable determination of the facts.  Pet'r's MSJ at 59–65.  The question for this Court,

25  then, is whether it was objectively unreasonable, in light of the evidence before the trial court at the

26  time Petitioner requested that his competency be reassessed, for the trial court to have concluded that

27

28        [15] *Medina*, in turn, cites to *Kelly* for that proposition.

1   Petitioner had: (1) a rational, as well as a factual, understanding of the nature of the proceedings

2   against him; and (2) the present ability to consult with his lawyer with a reasonable degree of

3   rational understanding and to assist with the preparation and presentation of his defense. *See Drope*,

4   420 U.S. at 171–72.

5   During Petitioner's guilt phase trial, the state presented the testimony of two eyewitnesses to

6   the shooting that took place at a Taco Bell restaurant.  The witnesses picked Petitioner out of

7   lineups, in part because of their memories of the shooter's unusual hair braids.  On cross-

8   examination, the defense attempted to point out inconsistencies between the witnesses' descriptions

9   of the shooter's dark complexion and dark clothing with photographs of Petitioner wearing a light-

10  colored top and having a medium complexion.  On March 28, 1994, Petitioner spoke out of turn and

11  disrupted the proceedings numerous times during the examinations of these two witnesses, as shown

12  by the following three passages.  First, Petitioner interrupted the proceedings when the trial court

13  addressed the jurors regarding the photographs.

> THE COURT: Then, ladies and gentlemen, counsel have also entered into a stipulation, and I will inform you that with respect to the exhibits, 28A, B and C, to which there's been testimony, that they reflect the photographs of the defendant, Delaney Marks. Photograph 28A is a photograph, booking photograph, so to speak, taken shortly after his arrest on October 18, 1990.  23B [sic] and 28C are photographs taken of Mr. Marks on earlier occasions, prior to October 18, 1990.  So is that –
>
> THE DEFENDANT: Excuse me, Your Honor, that was after I was transferred.
>
> THE COURT: Mr. Marks, please.
>
> THE DEFENDANT: That was after I was taken to Oakland that was taken.
>
> THE COURT: Mr. Marks, I'm going to stop these proceedings and have you removed from the courtroom if you continue.
>
> THE DEFENDANT: Sir, you have misquoted.
>
> THE COURT: If I hear one more remark from you, Mr. Marks, we will stop these proceedings, and I will have you removed.  Go ahead, Mr. Thews [defense counsel].
>
> DEFENSE COUNSEL: Your Honor, as to 8A, we enter into the stipulation that was taken shortly after the arrest.  As to 8B and C, we'll enter into the stipulation that these are photographs of Mr. Marks taken on previous occasions, earlier occasions, not having to do with this incident.

(AG015045–46.)

Later that day, when his defense counsel was cross-examining a witness, Petitioner again interrupted the proceedings.

DEFENSE COUNSEL [MR. THEWS]: Thinking back to the night of the shooting, can you tell us what the man was wearing on the upper part of his body?

THE WITNESS [MS. HAYNES]: Not really.  Okay.  I'll put it this way, it looked like a dark blue jacket, but after I saw the gun, everything was black.

Q: Would your comment be the same as to the kind of pants he wore?

A: Dark.

Q: Just dark, that's it?

A: Just dark.

Q: When you say jacket, are you talking about the kind of a jacket that would fit over a shirt or something like that?

A: No, just like wearing a jean jacket.

Q: Like a Levy [sic] jean jacket?

A: Yes.

Q: Showing you people's 8A, do you recognize the person in that photograph?

A: Yes.

Q: Is that the person seated down to my right?

A: Yes.

Q: Look at the clothing on his upper body and tell me, is that what the shooter had on that night in the Taco Bell?

A: I can't really say.

Q: You can't say?

A: No.

Q: Would you say that that's in the form of a jean jacket?

A: No.

Q: Would you say it's dark blue?

A: No.

Q: Thank you.  In your view of the shooter in the Taco Bell, could you ascertain whether or not he had any facial hair?

29

1

2   A: No, I don't remember that.  I really didn't pay attention to his facial hair or even if he had any.

3   Q: Your mind was on other things?

4   A: My mind was definitely on other things.

5   DEFENSE COUNSEL: I have no further questions, Your Honor.  Thank you, Miss Haynes.

6

7   THE COURT: Thank you, Mr. Thews.  Mr. Burr [prosecutor].

8   THE DEFENDANT: This person came within five feet –

9   THE COURT: Mr. Marks, I don't want to do this again.  Mr. Marks, please keep quiet.

10   THE DEFENDANT: He keeps blotching his question.

11   THE COURT: Mr. Burr, you may proceed.

12   THE PROSECUTOR: Yes.  Thank you.

13   (AG015086–88.)

14   After the state performed a short redirect examination, Petitioner again interrupted the

15   proceedings during his counsel's recross of the witness:

16   DEFENSE COUNSEL: Directing your attention to 8A again, the photo of Mr. Marks, with the light colored jacket, when you say that's consistent –

17

18   THE DEFENDANT: That's a shirt.  That ain't no jacket.  You're trying to insinuate –

19   DEFENSE COUNSEL: Could we have a recess, please, Your Honor?

20   THE COURT: Let's complete the testimony of this witness, then I'll take a recess.

21   DEFENSE COUNSEL: All right.  When you say that jacket is consistent with –

22   THE DEFENDANT: That's a shirt, that's not a jacket.  He's blotching –

23   DEFENSE COUNSEL: Could we have a recess?

24   THE DEFENDANT: You need one.  You need to question –

25   THE COURT: Mr. Marks, if you don't remain quiet and let your attorney represent you here, I'm going to have you removed.  I've told you this several times in several different questions.  Now, please –

26

27   THE DEFENDANT: Your Honor, you know, he's blotching these proceedings.  This person came within five feet of [me] with a mustache.  She hasn't stated that.  He's insufficient as a counsel.

28

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

DEFENSE COUNSEL: Could we have a recess?

THE COURT: It looks like we need one.

THE DEFENDANT: I think *he's* 1368.

(AG015089–90 (emphasis added).)

After the jurors were excused, the following colloquy occurred:

THE COURT: The record will reflect that all of the jurors and the alternate jurors have left the courtroom and have gone to another floor of the courthouse, awaiting our summons.

Mr. Marks remains at counsel table, Mr. Thews and Mr. Wies [defense counsel] are both present, Mr. Burr is present, the witness has stepped out of the courtroom and is not present, the court staff is here.

Mr. Thews, you requested a recess and I agreed.

And I'm going to make this statement to you, Mr. Marks, you have disrupted these proceedings on a number of different occasions, over several different days, you have done so over my express warning and admonition that if you continue to disrupt the proceedings I would have you removed from the courtroom. Now, on several different occasions I had explained in some detail what I meant by that. I will do it one more time, and let me make absolutely clear what remedies are available to me if you continue to disrupt these proceedings. First of all, I do find that your behavior today was disruptive, it disrupted your own attorney, it disrupted the witness, it disrupted all phases of these proceedings and did so in a significant and substantial way. You have done this before. I have warned you many times to cease and desist from this conduct. I'm going to do it one more time. If you continue with behavior such as you exhibited just before I took the recess, I will have no recourse but to remove you from these proceedings. I want you to understand that I'm not given to idle threats. I'm telling you exactly what I will do if you continue to disrupt these proceedings.

Now, I want your assurance that you will cease and desist from this conduct. If you don't give me that assurance, I will consider removing you right now.

Now, will you desist from this disruptive behavior?

THE DEFENDANT: I give you my word, Your Honor, under oath that I won't do any disruptive misconduct, I will not voice my opinion anymore, I will not say anything else.

But I was just saying, if somebody came within five feet of you, you would know if they would have any facial hair. He's not questioning. As an attorney, Mr. Burr was so sufficient, as he went through the photographs, A, B, C and D –

THE COURT: Mr. Marks, I'm not your attorney, obviously, but I'm –

THE DEFENDANT: I'm not going to say anything else.

THE COURT: I'm going to tell you from my observation –

1

2     THE DEFENDANT: I'm not saying anything else.

3     THE COURT:  Fine.  I want to address –

4     THE DEFENDANT: She was openly see [sic] his mustache, Your Honor, five feet, she said, and right this five feet, she didn't see a mustache, he couldn't possibly even never mentioned that to her, Your Honor.  He tried to make her force me in the jacket to make me appear guilty.  That's the sweat shirt he keeps –

5

6     THE COURT: Thank you, Mr. Marks.

7 (AG015090–92.)

8    The following day, on March 29, 1994, the trial court denied Petitioner's section 1368

9 motion to suspend criminal proceedings.  (AG015298.)  In doing so, the trial court could reasonably

10 have inferred from the above passages that Petitioner's behavior was consistent with competency

11 and an understanding of the proceedings against him.  Petitioner apparently believed his attorney

12 was not being sufficiently aggressive in attacking the witness for not noticing whether or not the

13 shooter had facial hair, and Petitioner believed his attorney should have noted the distinction

14 between whether he was wearing a light-colored shirt or a light-colored jacket in his booking photo.

15 While Petitioner's outburst was not compatible with courtroom decorum, it does not clearly indicate

16 incompetency.  *See Marks*, 31 Cal. 4th at 220 ("[A]lthough defendant's outbursts did not comport

17 with courtroom protocol, they did reflect his attempt to provide advice to counsel."). In fact, it is

18 arguable that Petitioner's statements demonstrated a lucid understanding of the identity issues at

19 stake.

20    The trial court could also have reasonably inferred from the circumstances that Petitioner

21 disrupted the proceedings either to direct his counsel to make points he felt needed to be made, or to

22 complain about his counsel's failure to do so.  In discussing the colloquy between Petitioner and the

23 trial court, the California Supreme Court found that Petitioner's comments "reflected he

24 comprehended not just the nature of the proceedings but the state of the People's case and its

25 potential deficiencies.  Defendant also demonstrated his ability to offer assistance to counsel, even if

26 such assistance was neither solicited nor welcomed." *Marks*, 31 Cal. 4th at 221.  In light of

27 Petitioner's comments, the jury's previous determination following an exhaustive hearing that

28

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1    Petitioner was competent, and the trial court's ability to observe Petitioner in person, this Court

2    cannot say that the trial court was objectively unreasonable in finding no bona fide doubt had been

3    raised as to Petitioner's competency to stand trial. *See Drope*, 420 U.S. at 179 (explaining that "a

4    defendant's demeanor during trial may be such as to obviate the need for extensive reliance on

5    psychiatric prediction concerning his capabilities" (internal quotation marks omitted)).

6           Nonetheless, Petitioner contends that the trial court should have had a bona fide doubt as to

7    Petitioner's competency in light of the totality of the evidence before the trial court, which included

8    not only Petitioner's comments and the prior competency determination, but also the following:

9    (1) Petitioner engaged in so many outbursts that he eventually was removed from the courtroom; (2)

10   defense counsel opined that Petitioner was incompetent; (3) Petitioner believed that the trial court,

11   his attorneys, and the prosecution were engaged in a conspiracy against him; (4) when confronted

12   with a tape recorded statement he had given, Petitioner stated emphatically that it was not his voice

13   on the tape; (5) at the previous competency trial, all of the expert witnesses had testified that

14   Petitioner was incompetent to stand trial; and (6) a judge in a separate criminal proceeding against

15   Petitioner ordered Petitioner to be certified for a competency evaluation.  The Court addresses each

16   point in turn.

17          First, the fact that Petitioner interrupted the proceedings so often that he was removed may

18   not have worked in his best interest, but his reasons for doing so—to correct what he thought was

19   inaccurate evidence, and to complain about his attorney's failing to follow up on questions he felt

20   would help his defense—do not suggest that Petitioner lacked a reasonable degree of rational

21   understanding of the nature and object of the proceedings. *See Davis v. Woodford*, 384 F.3d 628,

22   645 (9th Cir. 2004) ("Although there is little doubt that [habeas petitioner] was recalcitrant and acted

23   in ways that were detrimental to his case, his interactions with the trial judge indicated that he

24   understood what was at stake during the penalty phase and could make informed decisions.").

25   Accordingly, it would not have been unreasonable for the trial court to have given the fact that

26   Petitioner engaged in many such outbursts little weight in determining whether it had a bona fide

27   doubt as to Petitioner's competency to stand trial.

28

33

Second, although defense counsel may have the best informed view of a defendant's ability to participate in his defense, counsel's opinion is not determinative.  *See Miles v. Stainer*, 108 F.3d 1109, 1113 (9th Cir. 1997) (finding that even if defense counsel's failure to move for a competency hearing is evidence of competence, it is not determinative).  Additionally, as the California Supreme Court found in its reasoned opinion, Petitioner's "most conspicuous outburst during trial amply proves his ability to understand the proceedings and assist counsel." *Marks*, 31 Cal. 4th at 221.  The California Supreme Court also agreed with the trial court's finding that Petitioner, while on the stand, "strategically ignored the limited scope of questions and aggressively presented to the jury material that would either tend to raise a doubt about his guilt or engender sympathy for him." *Id.* at 221 n.4.  For example, when asked by the prosecutor whether an officer had testified that Petitioner, while talking with that officer at the police station, had removed a rubber band from his hair so that his "hair fell down straight on his shoulders" as depicted in several photographs, Petitioner gave the following answer: "That would be a false allegation and false statement.  Your chief witness, Robin Menefee, has stated my appearance in hair never changed." (AG016132.)  While the second part of Petitioner's answer was ruled nonresponsive, it reasonably could be interpreted as an attempt to cast doubt on testimony presented by the state.  Furthermore, Petitioner stated shortly thereafter, "Your Honor, why is [the prosecutor] so sufficient, and my counsel will not present this evidence to the jury?" (AG016136.)  Though nonresponsive to the question pending, Petitioner's answer could reasonably be interpreted as an attempt to curry favor with the jury.  In other words, while defense counsel might have had a good faith belief that Petitioner was unable to assist in his defense, it was not unreasonable for the state court to have found otherwise, based on the record.

Third, while Petitioner's belief that the attorneys and trial court were conspiring to convict him could be characterized as irrational or paranoid, these beliefs do not suggest either an inability to rationally understand the nature of the proceedings or an inability to consult with and assist counsel.  *See, e.g.*, *United States v. Marks*, 530 F.3d 799, 814–15 (9th Cir. 2008).[16]  While *Marks* dealt with a direct appeal from a federal conviction, the Ninth Circuit's discussion in that case is

---

[16] *United States v. Marks* involved a Richard Ernest Marks, not Petitioner.

34

instructive here:

> In support of his argument that the district court should have ordered a competency hearing, Marks points to his courtroom demeanor, his "doggedness" in arguing that the district court had no jurisdiction over him, and his second appointed counsel's representation, in filing a motion for Marks to proceed *pro se*, that he had no relationship with Marks that could assist him in representing Marks. It is true that Marks sometimes was rude to the court, that he repeatedly argued that the court lacked jurisdiction over him, and that he refused to work with, and consider himself represented by, appointed counsel. However, the record demonstrates that these acts simply reflected Marks' claimed beliefs that the court lacked legal authority over him and could not be trusted to appoint effective and neutral counsel to help him.
>
> While Marks' claimed beliefs may have been unorthodox and wrongheaded, they were not indicative of an inability to understand the proceedings against him or conduct his own defense. . . . Accordingly, we conclude that Marks' conduct does not constitute substantial evidence of incompetence to stand trial.

*Marks*, 530 F.3d at 814–15.

In addition, while Petitioner's beliefs may not have been wholly accurate, they were not wholly delusional: Petitioner was aware that his counsel took some steps toward negotiating a plea agreement, even though Petitioner was firm in his desire to go to trial. *See Marks*, 31 Cal. 4th at 219. As such, it is not necessarily indicative of incompetency for Petitioner to have believed that his counsel and the prosecution were, at a minimum, in discussions to convict him, and it was not objectively unreasonable for the trial court to conclude that Petitioner's distrust in the fairness of the proceedings did not raise a bona fide doubt as to Petitioner's competency to stand trial.

Fourth, a person with a reasonable degree of rational understanding of the nature of the proceedings against him would understand, as Petitioner apparently did, that maintaining a defense of actual innocence requires that inculpatory evidence be explained in a way consistent with innocence. Petitioner's explanation as to the tape recording—that the person speaking on the tape was imitating his voice—may not have been believable, but in the absence of a better explanation it was not necessarily irrational. Furthermore, while considering whether a trial court should have held a competency hearing prior to or during the penalty phase of a defendant's capital trial, the Ninth Circuit found that even if a defendant acts in ways that are detrimental to his case, the requirement for a competency hearing is not necessarily triggered. *See Davis*, 384 F.3d at 645 (recognizing that the trial judge was in a key position to gauge whether a competency hearing was

1   needed, and holding that the trial judge did not err in declining to hold a competency hearing either

2   prior to or during the penalty phase of the trial).  Accordingly, it would not have been unreasonable

3   for the trial court in Petitioner's case to accord little weight to the fact that Petitioner offered an

4   incredible explanation for inculpatory evidence in determining whether the trial court had a bona

5   fide doubt as to Petitioner's competency to stand trial.

6           Fifth, the trial court was well aware that despite the testimony of two court-appointed

7   psychiatrists during the 1992 competency trial that Petitioner was incompetent, a jury concluded that

8   Petitioner was in fact competent.  As this Court has discussed in the analysis of Claim 2, *supra*, the

9   jury reached this conclusion after hearing all of the expert and lay evidence.  In upholding the jury's

10  competency determination, the California Supreme Court detailed the "abundant evidence"

11  contradicting the expert testimony, finding that Petitioner's own statements and comments

12  demonstrated that he could assist counsel in his defense.  *Marks*, 31 Cal. 4th at 219.  For the reasons

13  stated above, the California Supreme Court reasonably concluded that "there was substantial

14  evidence from which the jury could rationally infer defendant's competence to stand trial." *Id.* at

15  220.

16          Finally, Petitioner argues that his being referred for a competency assessment by another

17  judge in a separate criminal proceeding demonstrates that a further competency hearing in his capital

18  case was necessary.  *See* Pet'r's MSJ at 39–40, 52–53.  By way of background, Petitioner was

19  charged with felony assault based on an altercation during his time at Santa Rita Jail.  The judge in

20  that matter (Judge Ronald Hyde of Livermore Municipal Court) transferred the matter to Judge

21  Alfred Delucchi (the Alameda County Superior Court judge who had ordered the original

22  competency evaluation in January 1992 in Petitioner's capital case).  (AG022411.)  The charges,

23  were eventually dismissed and no competency hearing in the felony assault matter was held.

24          Petitioner maintains that the above facts mandated a further competency hearing in his

25  capital case.  However, Petitioner does not cite to, nor is the Court aware of, any U.S. Supreme

26  Court case holding that a trial court's referral of a defendant for a competency hearing in a case that

27  is later dismissed requires that an additional competency hearing be held in a separate criminal case

28

1  involving that same defendant.  Indeed, Petitioner cites no case law holding as much.  While the

2  Court is concerned that the prosecution may have sought dismissal of the assault charges in order to

3  avoid a further competency hearing, there is simply no basis here for the Court to review that

4  decision.[17]

5          In sum, because Petitioner behaved at trial as if he understood the nature and purpose of the

6  proceedings against him and was capable in assisting in his defense, and because Petitioner's

7  evidence to the contrary was not overwhelming, it was not unreasonable for the trial court to have

8  determined that the totality of the evidence did not raise a bona fide doubt as to Petitioner's

9  competence to stand trial.  The Court therefore finds that the California Supreme Court's decision to

10  affirm the trial court's rejection of Petitioner's claim was neither contrary to, nor the result of an

11  unreasonable application of, clearly established federal law as determined by the U.S. Supreme

12  Court in *Pate* and *Drope*.  *See* 28 U.S.C. § 2254(d)(1).  The Court also finds that the California

13  Supreme Court's ruling was not based upon an unreasonable determination of the facts in light of the

14  evidence before it.  *See id.* § 2254(d)(2).  The Court therefore grants Respondent's motion for

15  summary judgment as to Petitioner's Claim 3 and denies Petitioner's cross-motion for summary

16  judgment as to that claim.

17  **III.     Claim 5: Ineligibility for Execution Due to Intellectual Disability**

18          In Claim 5, Respondent moves for summary judgment on Petitioner's claim that he meets the

19  diagnostic criteria for intellectual disability and is therefore ineligible for a death sentence under

20

21          [17] Further, the Court is not persuaded by *Maxwell v. Roe*, 606 F.3d 561 (9th Cir. 2010), and
22  *Torres v. Prunty*, 223 F.3d 1103 (9th Cir. 2000), two cases cited by Petitioner in which the Ninth Circuit
    found the state courts' failure to hold a competency hearing unreasonable.  *Maxwell* is factually
23  distinguishable because the trial court in that case failed to hold a second competency hearing even after
    the petitioner had been involuntarily committed to a state psychiatric hospital following a suicide
24  attempt, placed on a subsequent "14-day involuntary psychiatric hold" by two psychiatrists, and forced
    to miss a substantial portion of his trial as a result.  606 F.3d at 565–66, 571–73.  Unlike here, "a jury
25  that never saw Maxwell convicted him of first degree murder."  *Id.* at 566; *see also Gonzales v. Walker*,
    No. 02-02279 JSW, 2010 WL 3893577, at *19 (N.D. Cal. Sept. 30, 2010) (distinguishing *Maxwell* on
26  similar grounds).  *Torres* is likewise distinguishable because, in that case, the trial court failed to hold
    even a single competency hearing and thus "never addressed the question of whether Torres was
27  competent to stand trial."  223 F.3d at 1106; *see also Gonzales*, 2010 WL 3893577, at *20
    (distinguishing *Torres* on similar grounds).  Here, by contrast, Petitioner received a full jury trial on his
28  competency.

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1    *Atkins v. Virginia*, 536 U.S. 304 (2002).  Resp't's MSJ at 14–18.  Respondent argues that Petitioner

2    has failed to establish that the California Supreme Court's summary rejection of this claim in 2010

3    was contrary to or an unreasonable application of clearly established U.S. Supreme Court precedent,

4    or based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).  Petitioner cross-

5    moves for summary judgment on Claim 5, contending that the California Supreme Court's decision

6    denying this claim was objectively unreasonable.  Specifically, Petitioner maintains that at the

7    May–June 2006 evidentiary hearing on this issue, Petitioner presented expert opinion testimony that

8    he was intellectually disabled and Respondent failed to produce evidence to contradict his experts'

9    conclusions.  Pet'r's MSJ at 66–81.

10             **A.        Factual Summary**

11            In response to the California Supreme Court's March 16, 2005 order to show cause why

12   Petitioner's death sentence should not be vacated under *Atkins*, an evidentiary hearing was

13   conducted by Judge Horner[18] of the Alameda County Superior Court on May 17, 18, 22–24, 30, 31,

14   and June 1, 5 and 6, 2006.  Pet. at 15.  At that hearing, counsel for Petitioner presented evidence of

15   Petitioner's intellectual disability.  In particular, the trial court considered the documentary evidence

16   Petitioner had submitted to the California Supreme Court in support of his state habeas petition,

17   including Petitioner's school records; military service records; prison records; correspondence; and

18   dozens of declarations of lay witnesses who knew Petitioner, of experts who had evaluated

19   Petitioner, and of attorneys who had represented Petitioner.  (AG020049–53.)  In addition, the trial

20   court heard the live testimony of five defense witnesses and one witness for the state.  All three of

21   the defense's expert witnesses on intellectual disability—Dr. Ruben Gur, Dr. Nancy Cowardin, and

22   Dr. George Woods—testified that Petitioner was intellectually disabled.  (AG025612, AG025926,

23   AG026123–24.)  The other two defense witnesses, Dr. Pablo Stewart and Dr. Erin Bigler, were also

24   experts and testified respectively about Petitioner's medication and the scientific community's

25   acceptance of the brain imaging procedures relied on by Dr. Gur.  (AG028415.)  The state's sole

26   ─────────────

27         [18] As indicated above, *see supra* note 12, Judge Horner also presided over Petitioner's 1994 guilt
     phase and penalty phase trials.  As it did in the previous section, the Court will refer to Judge Horner

28   as the "trial court" in this section.

witness, Michael Richard, was Petitioner's first cousin, and he testified about Petitioner as a youth. (AG026609–27.)  Importantly, the burden at the hearing was on Petitioner to show by a preponderance of the evidence that Petitioner suffered from (1) significantly subaverage general intellectual functioning prior to age eighteen; and (2) deficits in adaptive behavior that manifested prior to age eighteen.  *See* Cal. Penal Code § 1376(a)–(b).

As to Petitioner's general intellectual functioning before age eighteen, the evidence before the trial court was that Petitioner's intelligence quotient ("IQ") was measured as 98 at age six, 95 at age seven, 80 at age eight, 86 at age ten, and 74 at age eleven. Pet. at 94–95.  There was no evidence that Petitioner's IQ was tested between age eleven and age eighteen.  The evidence also showed that Petitioner was required to repeat the second grade, and although Petitioner managed to graduate from high school, his cumulative grade point average of 1.71 on a 4.0 scale ranked him 280th out of 290 students.  (AG020948, AG020951.)  After graduation, Petitioner attended three different junior colleges over a span of thirteen years, but passed only thirty-seven quarter units of the 114 in which he enrolled, and received virtually all of his academic credit in pass/fail remedial classes and vocational courses.  (AG020953–55.)  As an adult, Petitioner's IQ was tested on five occasions: Petitioner scored 60 at age twenty-seven, 74 at age thirty-two, 65 at age thirty-three, 74 at age forty-six, and 72 at age forty-nine.  (AG028434.)

As to Petitioner's deficits in adaptive behavior manifested before age eighteen, Petitioner relies on the declarations of three lay witnesses who knew Petitioner as a child.  *See* Pet'r's MSJ at 70.  For example, Jimmy D. Marks, Petitioner's younger brother, stated in his declaration:

> Jimmie Lee and Sallie[19] treated Delaney with kid gloves. He was babied because he was very sensitive and always took things to heart. Delaney was their pet. He needed extra encouragement from Jimmie Lee and Sallie. Delaney was treated differently even when we got into trouble together. Delaney cried more when he was in trouble. Jimmie Lee took me aside to tell me not to follow up behind Delaney because I could not be Delaney.
>
> Even though Delaney was a lot more sensitive than I was, I was envious of him because he was more popular than I was. Delaney was happy go lucky. He had the smile and the hazel eyes while I had a gap in my teeth and plain brown eyes. I was the one who got suspended for getting caught in the girl's restroom at school. Delaney was

[19] Petitioner's father and mother, respectively.

1    a good guy and I was the bad guy the way our friends talked to our parents.

2  (AG022690–91.)

3    Steven Ford, a neighbor who knew Petitioner throughout elementary and high school, stated

4  in his declaration:

5    Delaney was always a jokester.  He was always talking and doing silly things to
     try and make people laugh. . . .  Teachers were always telling him to be quiet or sit
6    down.  You heard his name all the time. . . .

7    Delaney and his brothers were all loud and hyperactive.  They usually traveled
     together.  Delaney was the most outgoing of his next two younger brothers, Kenny and
8    Jimmy.  Jimmy tried the most to be like Delaney, but he was more annoying. Kenny was
     quieter.  They were even more loud and hyper when they were together.
9
10                                    . . . .

11    Delaney and his brothers were teased because they were small and Delaney was
     often forced to fight.  It was the rule in the projects that you could not back down from
12   anyone if you did not want to have to fight all the time.  Delaney would not back down,
     but he often got the worst of the fights.

13                                    . . . .

14    In high school, Delaney was just as much a class clown as he had been in
     elementary school.  He still talked non-stop and made jokes.  Half the time you could tell
15   what he was talking about and half the time you could not.  He was talking so much that
     you would tune him out or say something to him to get him to shut up.  He was always
16   being told to be quiet.

17  (AG022545–46, AG022551.)

18    Jude Bullock, another neighbor who was three years older than Petitioner, stated in his

19  declaration:

20    Before joining the Navy, Delaney was like his brothers in the amount of energy he had.
     All of the Marks children loved to run.  They all seemed to have energy that they needed
21   to burn because they ran everywhere and played a lot in the neighborhood.  My only
     problem with Delaney was that he talked so much.  It was like he tried to make himself
22   seem more together by talking and smiling to keep people from messing with him.

23  (AG022521.)

24    The state's only live witness, Richard, testified at the evidentiary hearing that he spent a

25  couple of weeks each month in the Marks' household for a period of approximately ten years and

26  that during this time Petitioner, as the oldest of the children, was larger, tougher, and better at sports

27  than his siblings and was their leader.  (AG026609–14, AG026622.)  Richard testified further that

28

                                    40

1   Petitioner, who was Richard's first cousin, was good at fighting, and that there was always a normal

2   relationship between Petitioner, his siblings, and their parents.  (AG026614–15.)  Richard also

3   testified that he never personally saw any signs of intellectual disability in Petitioner.  (AG026625.)

4           As an adult, Petitioner did not achieve any significant promotion during a two-year stint in

5   the U.S. Navy, and although Petitioner was discharged honorably, he was deemed ineligible for

6   reinstatement.  (AG022485–90, AG022507–09, AG022607–09.)  Following his discharge from the

7   Navy, Petitioner suffered from drug addiction and was unable to maintain self-sufficiency as an

8   adult.  *See Marks*, 31 Cal. 4th at 213 ("[Petitioner's] problems began after his discharge from the

9   Navy, where he 'lost himself' through drugs.").  Moreover, Petitioner endured a plethora of "serious

10  traumatic events" as an adult, "including possible head injuries as a result of a motor vehicle

11  accident, the loss of his mother (with whom [Petitioner] had a particularly close relationship), his

12  inability to attend his mother's funeral due to his incarceration, his incarceration in prison itself, his

13  rape while in prison, . . . and, of course, his personal commission of the violent murders and other

14  crimes which resulted in his conviction and death sentence by verdict of jury."  (AG028435.)

15          During the penalty phase of Petitioner's capital murder trial in 1994, the defense made no

16  attempt to argue and presented no evidence that Petitioner was intellectually disabled, even though

17  prior to 2002, when *Atkins* was decided, that condition would still have been considered a factor

18  mitigating against a death sentence.  *See, e.g.*, *Williams*, 529 U.S. at 371, 395–96 (explaining that

19  evidence of intellectual disability is "significant mitigating evidence" and finding defense counsel

20  constitutionally ineffective for failing to introduce such evidence at the penalty phase of petitioner's

21  capital murder trial).  Instead, the defense's apparent strategy was to show that Petitioner, a good-

22  natured, helpful youth, was raised under relatively normal circumstances but turned violent after

23  experiencing a series of traumatic events later in life.  To that end, the jury in 1994 heard testimony

24  from seven individuals who knew Petitioner during his childhood: Elaine Marks Bell (Petitioner's

25  sister), Bobbie Jane Redic (Petitioner's aunt), Lorraine Winn (Petitioner's cousin), Damon Marks

26  (Petitioner's brother), and three women who had known Petitioner since his childhood or birth,

27

28

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1   Reverend Betty Williams, Effie Jones, and Willoris Childs.[20]  As the California Supreme Court

2   noted on direct review, these witnesses "presented mostly consistent testimony" about Petitioner's

3   childhood.  *Marks*, 31 Cal. 4th at 213.  In short, they "described defendant as having grown up in a

4   good family environment with religion, where there was no drug or alcohol abuse, no domestic

5   violence, and with a father who encouraged education and hard work."  *Id.*

6          At Petitioner's *Atkins* hearing twelve years later, the same trial court that heard the live

7   penalty phase testimony of these seven witnesses in 1994 compared that testimony to the

8   declarations these witnesses filed in 2002 in support of Petitioner's state habeas petition.  The 2002

9   declarations, according to the trial court, painted a very different picture of Petitioner's upbringing:

10          These declarations made a number of factual allegations regarding the circumstances of
            the defendant's growing up as a young child in the family home, including that the
11          defendant Delaney Marks was regularly and severely beaten by both of his parents; that
            the defendant was regularly beaten by his siblings; that other siblings and friends of the
12          defendant were beaten in the defendant's presence; that the defendant was forced to
            engage in fistfights with his siblings; that the defendant watched his mother being
13          severely beaten by his father on frequent occasions; that the defendant was, at various
            times, thrown out of his home by his parents, was not allowed to return, and was
14          abandoned by them; that the defendant suffered from acute food deprivation over a long
            period of time; that the defendant, on at least one occasion, was chased by his mother
15          with a gun; and that both of the defendant's parents continually and regularly abused
            alcohol.
16
17   (AG028416–17.)  Faced with contradictory evidence regarding Petitioner's home life from the live

18   penalty phase testimony in 1994 and the declarations in 2002 from the same seven witnesses, the

19   trial court made the credibility determination that those witnesses "were telling the truth when they

20   testified at [Petitioner's] penalty phase trial in 1994."  (AG028419.)  The trial court gave several

21   reasons for its conclusion, including the fact that the seven witnesses had been subject to cross-

22   examination in 1994 but only submitted declarations in 2002.  (AG028417.)  Moreover, despite

23   having had every incentive to testify in 1994 about Petitioner's "abusive childhood and upbringing,"

24   the seven witnesses did not mention what would have been "powerful evidence in mitigation."

25   (AG028421–22.)  In addition, the trial court discredited the live testimony of Drs. Gur, Cowardin,

26   and Woods, all of whom opined that Petitioner was intellectually disabled, in large part because

27          [20] The penalty phase jury also heard testimony from Petitioner's daughter, Ralecia Marks, whose
28   name is sometimes spelled "Relisha."  (AG017117.)

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1   these experts "relied very heavily" on the 2002 declarations of friends and family that the trial court

2   had chosen to disbelieve.  (AG028416, AG028424–25.)

3          On June 13, 2006, following a ten-day hearing and having reviewed all of the

4   aforementioned evidence, the trial court issued a twenty-six-page order stating its conclusions.

5   (AG028412–37.)  In particular, the trial court concluded that Petitioner had failed to establish that

6   prior to age eighteen he suffered from significantly subaverage general intellectual functioning or

7   that Petitioner manifested deficits in adaptive functioning.  The trial court, therefore, made the

8   factual determination that Petitioner was not intellectually disabled under the meaning of *Atkins*.

9   (AG028437.)

10         **B.         Applicable Supreme Court Precedent**

11         *Atkins* establishes that "the Eighth and Fourteenth Amendments to the Constitution forbid the

12  execution of persons with intellectual disability."  *Hall*, 134 S. Ct. at 1990; *accord Brumfield v.*

13  *Cain*, 576 U.S. —, 2015 WL 2473376, at *3 (June 18, 2015).  In so holding, the U.S. Supreme Court

14  recognized that "[n]ot all people who claim to be [intellectually disabled] will be so impaired as to

15  fall within the range of [intellectually disabled] offenders."  *Atkins*, 536 U.S. at 317.  Importantly,

16  "*Atkins* did not provide definitive procedural or substantive guides for determining when a person

17  who claims [intellectual disability] falls within the protection of the Eighth Amendment."  *Hall*, 134

18  S. Ct. at 1998 (internal quotation marks omitted).  Rather, "the Supreme Court left to the states 'the

19  task of developing appropriate ways to enforce the constitutional restriction upon their execution of

20  sentences.'"  *Moormann v. Schriro*, 672 F.3d 644, 648 (9th Cir. 2012) (quoting *Atkins*, 536 U.S. at

21  317) (brackets omitted).

22         In response to the U.S. Supreme Court's decision in *Atkins*, California enacted Penal Code

23  section 1376, defining intellectual disability as "the condition of significantly subaverage general

24  intellectual functioning existing concurrently with deficits in adaptive behavior and manifested

25  before 18 years of age."  Cal. Penal Code § 1376(a); *see In re Hawthorne*, 35 Cal. 4th 40, 44 (2005).

26  The California legislature derived this standard from clinical definitions cited in the *Atkins*

27

28

                                                 43

1  decision.[21]  *See Atkins*, 536 U.S. at 308 n.3; *Hawthorne*, 35 Cal. 4th at 47 (noting that California's

2  definition of intellectual disability generally conforms to "the clinical definitions referenced in

3  *Atkins*").  Intellectual disability is a question of fact based on state law, measured by an assessment

4  of the individual's overall capacity, and based on consideration of all relevant evidence.  *Hawthorne*,

5  35 Cal. 4th at 49–50.  A court "shall not be bound by the opinion testimony of expert witnesses or by

6  test results, but may weigh and consider all evidence bearing on the issue of [intellectual disability]."

7  *Id.* at 50 (internal quotation marks omitted).

8  **C.      Analysis**

9      Petitioner contends that the California Supreme Court's December 15, 2010 summary denial

10  of his *Atkins* claim (AG028382) was both contrary to clearly established U.S. Supreme Court

11  precedent and based upon an unreasonable determination of the facts in light of the evidence

12  presented in Petitioner's state court proceedings.  Pet'r's MSJ at 80.  In considering Petitioner's

13  arguments, the Court "look[s] through" any summary denial to the "the last reasoned state-court

14  opinion on the claim at issue."  *Ortiz*, 704 F.3d at 1034.  Here, that means the Court looks to the trial

15  court's Findings and Judgment issued on June 13, 2006.  (AG028412–37.)

16  **1.      Reliance on California Penal Code Section 1376**

17      The first issue for this Court to address is whether the trial court's reliance on California

18  Penal Code section 1376 was contrary to, or involved an unreasonable application of, clearly

19  established federal law as determined by the U.S. Supreme Court.  Section 1376, as noted above,

20  defines "intellectual disability" as "the condition of significantly subaverage general intellectual

21  functioning existing concurrently with deficits in adaptive behavior and manifested before 18 years

22  of age."  Cal. Penal Code § 1376(a).

23      The Court finds that the trial court's reliance on section 1376 was not unreasonable because

24  that provision's definition of intellectual disability generally "conform[s] to" "the clinical definitions

25  _____

26  [21] In *Atkins*, the U.S. Supreme Court cited the American Psychiatric Association's clinical
    definition of intellectual disability, requiring "significantly subaverage general intellectual functioning
27  . . . that is accompanied by significant limitations in adaptive functioning" and the condition "must occur
    before age 18 years."  *Atkins*, 536 U.S. at 308 n.3 (quoting Am. Psychiatric Ass'n, *Diagnostic and*
28  *Statistical Manual of Mental Disorders* 41 (4th ed. 2000)).

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1  referenced in *Atkins*."  *Hawthorne*, 35 Cal. 4th at 47; *see Atkins*, 536 U.S. at 308 n.3.  Indeed, the

2  clinical definitions to which *Atkins* refers "require not only subaverage intellectual functioning, but

3  also significant limitations in adaptive skills . . . that became manifest before age 18." 536 U.S. at

4  318.  Section 1376 mirrors that language.  Accordingly, the trial court's adjudication based on

5  section 1376 was neither contrary to, nor an unreasonable application of, clearly established federal

6  law as determined by the U.S. Supreme Court in *Atkins*.  *See* 28 U.S.C. § 2254(d)(1).[22]

7       The next issue for the Court to decide is whether the trial court's twin factual

8  determinations—i.e., that Petitioner (1) did not suffer from significantly subaverage general

9  intellectual functioning prior to age eighteen; and (2) did not manifest deficits in adaptive behavior

10  prior to age eighteen—were unreasonable in light of the evidence presented in the state court

11  proceedings.  *See* 28 U.S.C. § 2254(d)(2).  The Court addresses each issue in turn.

12              **2.    Significantly Subaverage General Intellectual Functioning Before Age 18**

13       The trial court, after a thorough evidentiary hearing that spanned ten days, examined the

14  evidence as to Petitioner's significantly subaverage general intellectual functioning before age

15  eighteen and concluded that:

16       Test result[s] which vary this widely, and which (while the defendant is under 18) barely
17       dip into the range for borderline mental retardation on only one single occasion, cannot
         be considered very "powerful evidence" supporting a finding of mental retardation.
18       Indeed, the test results while defendant is under 18, standing alone, would seem to
         support the <u>contrary</u> inference, that the defendant does <u>not</u> meet the statutory definition
19       of mental retardation, with at least equal weight and equal convincing force.

20  (AG028434–35.)

21       Petitioner contends that this interpretation of his IQ test scores is unreasonable.  First,

22  Petitioner argues that the trial court unreasonably characterized Petitioner's age eleven IQ score of

23  74 as "into the range for borderline mental retardation." (AG028434.)  However, one of Petitioner's

24  own experts, Dr. Cowardin, testified at the *Atkins* hearing that an IQ score of 74 indicated

25

26       [22] California's statute is notably different from Florida's, which the U.S. Supreme Court held
     unconstitutional in 2014.  *See Hall*, 134 S. Ct. at 2000–01.  Florida's invalidated statute involved a
27   bright-line rule, foreclosing further investigation into a capital defendant's alleged intellectual disability
     if he or she had an IQ score higher than 70.  *Id.* at 1993–2000.  California's statute, on the other hand,
28   has no such IQ cutoff.  *See* Cal. Penal Code § 1376(a).

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

"borderline mental retardation." (AG026014–15.)  Petitioner argues next that because his IQ scores dropped from 98 to 74 by age eleven and he has never scored above 74 as an adult, his IQ prior to age eighteen was most likely 74.  Petitioner also points out that an IQ score of 70–75 is within the range of significantly subaverage general intellectual functioning, according to the American Association on Intellectual and Developmental Disabilities.  *See* Pet'r's MSJ at 66 n.11, 75–77; *see also Hall*, 134 S. Ct. at 1999 (noting that "an IQ between 70 and 75 or lower is typically considered the cutoff IQ score for the intellectual function prong of the [intellectual disability] definition" (quoting *Atkins*, 536 U.S. at 309 n.5) (ellipsis omitted)).  Thus, rather than interpret Petitioner's IQ scores as varying "widely," Petitioner contends that the trial court should have interpreted the scores as showing a precipitous drop between the ages of six and eleven, with the result that Petitioner suffered from significantly subaverage general intellectual functioning from that point onward.

Although the conclusion Petitioner draws from his IQ test scores may be reasonable, the fact that he can posit a reasonable interpretation of the evidence does not mean that any contrary interpretation of that evidence is objectively unreasonable under AEDPA.  *See Rice v. Collins*, 546 U.S. 333, 341–42 (2006) ("Reasonable minds reviewing the record might disagree about the [state court's factual finding], but on habeas review that does not suffice . . . .").  Petitioner's IQ scores might support the conclusion that he suffered from subaverage general intellectual functioning before age eighteen, yet the legal standard for intellectual disability is not merely subaverage general intellectual functioning, but rather *significantly* subaverage general intellectual functioning.  In the intellectual disability context, significantly subaverage general intellectual functioning means general intellectual functioning, as measured by IQ testing, within the bottom one to three percent of the general population.  *See Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002); *see also Hawthorne*, 35 Cal. 4th at 52 (Chin, J., concurring) (explaining that "the term 'significantly subaverage' has been used by [intellectual disability] professionals to describe the level of impairment found in individuals whose performance *on standardized intelligence tests* places them two standard deviations below the mean; that is, in the lowest two and a half or three percent of the population").

As the trial court pointed out, although Petitioner needed to repeat the second grade and his

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1   high school grade point average of 1.71 on a 4.0 scale ranked him 280th out of the 290 students in

2   his high school class, he nevertheless managed to graduate.[23]  (AG028435–36.)  Petitioner also

3   appears to have skipped the fifth grade, and while several teachers expressed concern with

4   Petitioner's progress, one teacher noted in eighth grade that Petitioner's "testing scores indicate

5   ability."  (AG020944.)  It was therefore not unreasonable for the trial court to find that an individual

6   who graduated from high school on schedule and whose IQ tested at or above 80 four out of five

7   times before age 18 possessed general intellectual functioning superior to the bottom three percent of

8   the general population, especially considering that the individual ranked just above the bottom three

9   percent of the students in his high school class who graduated.  *See McManus v. Neal*, 779 F.3d 634,

10  654 (7th Cir. 2015) (noting that while intellectually disabled people graduate from high school, a

11  state court's determination that petitioner was not intellectually disabled under *Atkins* was not

12  objectively unreasonable where the court relied on petitioner's graduation from high school as

13  additional evidence of intellectual ability on top of petitioner's IQ scores).

14          Petitioner also contends that the trial court gave insufficient weight to the fact that although

15  Petitioner attended three different junior colleges over a span of thirteen years, he passed only thirty-

16  seven quarter units of the 114 in which he enrolled and received virtually all of his academic credit

17  in pass/fail remedial classes and vocational courses.  ECF No. 45 ("Opp'n to Resp't's MSJ") at 29.

18  Because Petitioner was over eighteen when he took these classes, however, it would not have been

19  unreasonable for the state court to give this evidence less weight on the issue of whether Petitioner's

20  general intellectual functioning was significantly subaverage before he turned eighteen years of age.

21  As the trial court reasonably found and concluded:

22          The fact also remains that [Petitioner] attended classes in a Junior College, where
        he passed some classes, dropped out or withdrew from other classes, over a 13 year
23      period.  He apparently never completed the curriculum at the Junior College.  But the
        fact is that he attended – and despite the many distractions and obstacles which would
24      arise over the years, including his own entry into the criminal justice system, he attended
        Junior College at various times spanning more than a decade.  The fact is that he did pass
25      some classes, including classes in basic skills in reading, mathematics, and writing,
        classes in typing, office management, physical education, and a language class in

26

27  _____
    [23] A high school friend of Petitioner's who did not graduate stated in a declaration: "Because
28  Delaney graduated, I thought he must have been smart in high school."  (AG022855.)

Case No. 11-CV-2458-LHK
ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT AS TO CLAIMS 2, 3 AND 5

1    Swahili. This may not be a scholastic record which Dr. Cowardin, or the other experts,
2    would consider as exemplary. The defendant was certainly never on any Dean's list.
     But, standing alone, it is not indicative of a person who is mentally retarded. And, in
3    combination with the other evidence, it indicates that, for at least some time *after* he
     turned 18, the defendant retained, and attempted to better, some level of intellectual and
     academic achievement. Overall, this also does not support a finding of mental
4    retardation.

5    (AG028436.)

6         Petitioner also contends that the trial court did not give sufficient weight to the fact that

7    although Petitioner served in the U.S. Navy and received an honorable discharge, he was in the

8    lower intelligence group of all enlisted men, unable to advance beyond a rank normally achieved

9    before completion of basic training, and was deemed ineligible to return to active duty following his

10   discharge. Pet'r's MSJ at 70–71. Again, it was not unreasonable for the trial court to give this

11   evidence little weight, especially considering that Petitioner served in the Navy *after* he turned

12   eighteen years of age.[24] (AG021739.)

13        The Court finds that the trial court's determination that Petitioner did not suffer from

14   significantly subaverage general intellectual functioning before age eighteen was not unreasonable

15   in light of the evidence before the trial court. The California Supreme Court's summary decision

16   affirming the trial court was therefore not based on an unreasonable determination of the facts. As a

17   result of this finding, the Court need not address Petitioner's arguments regarding the second

18   element of the intellectual disability test: adaptive behavior deficits manifested before age eighteen.

19   Out of an abundance of caution, however, the Court will do so.

20                      **3.     Deficits in Adaptive Behavior Manifested Before Age 18**

21        After presiding over the ten-day evidentiary hearing, the trial court found that any deficits in

22   Petitioner's adaptive behavior manifested *after* he turned eighteen years of age. (AG028436.) In

23   making this finding, the trial court relied heavily on the testimony of Michael Richard, Petitioner's

24   first cousin, who, as indicated previously, was the state's sole witness who testified live during the

25   _____

26        [24] Petitioner was an adult (age twenty) when he was honorably discharged from the Navy.
     (AG021739.) Although Petitioner was not recommended for reenlistment (AG021747), he did receive
27   a National Defense Service Medal (AG021739). Moreover, the Court notes that while Petitioner was
     in the Navy, he was charged with moving bombs, missiles, and other ordnance around the U.S.S.
28   Nimitz, a nuclear attack carrier. (AG022862–63.)

                                                        48

1   *Atkins* hearing.  (AG028422.)  Richard testified that he had spent a great deal of time with Petitioner

2   and Petitioner's family over a ten-year period while he and Petitioner were juveniles.  Richard

3   testified that Petitioner was the leader of his siblings and looked after them, had a normal

4   relationship with them and his parents, could take care of himself in a fight, and was good at sports.

5   (AG026609–15.)  Critically, Richard testified that he never personally saw any signs of intellectual

6   disability in Petitioner.  (AG026625.)  The trial court gave several reasons for crediting Richard's

7   testimony, including the fact that Richard testified live in court, appeared to have no bias for or

8   against Petitioner, was a person of sound character and judgment, and his testimony was subject to,

9   and was not significantly weakened by, cross-examination.  (AG028422–24.)  Petitioner offers no

10  persuasive reason to second guess the trial court's credibility determination regarding Richard's live

11  testimony.  *See Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013) (explaining that a federal

12  court's review on habeas of a state trial court's credibility determinations is "doubly deferential"

13  because "demeanor and credibility lies peculiarly within a trial judge's province" (internal quotation

14  marks omitted)).

15          The trial court also relied heavily on live testimony given by several of Petitioner's friends

16  and family members at the penalty phase of Petitioner's capital murder trial in 1994.  As *Atkins* was

17  decided in 2002, Petitioner was unable to claim during the penalty phase that he was categorically

18  exempt from the death penalty on account of his intellectual disability.  However, Petitioner was

19  permitted to—and did—submit significant mitigating evidence during the penalty phase of his trial.

20  Included in the evidence Petitioner was permitted to submit to the jury was:

21          factor (h), "whether or not at the time of the offense the capacity of the defendant to
            appreciate the criminality of his conduct or to conform his conduct to the requirements
22          of the law was impaired as a result of *mental disease or defect* or the effects of
            intoxication" and . . . . factor (k) "any other circumstance which extenuates the gravity
23          of the crime even though it is not a legal excise for the crime and any sympathetic or
            other aspect of the defendant's character or record that the defendant offers as a basis for
24          a sentence less than death, whether or not related to the offense for which he is on trial.
            You must disregard any jury instruction given to you in the guilt or innocence phase of
25          this trial which conflicts with this principle."

26  (AG028421 (emphasis added) (citing CALJIC 8.85).)

27          As indicated previously, a host of mitigation witnesses testified in 1994 as to Petitioner's

28

background and upbringing.  On direct review, the California Supreme Court accurately summarized that testimony as follows:

> Several other witnesses testified at the penalty phase, including defendant's daughter Relisha [sic] Marks, his sister Elaine Marks Bell, his aunt Bobbie Jane Redic, his cousin Lorraine Winn, his brother Damon Marks, and three women who had known defendant since his childhood or birth, Reverend Betty Williams, Effie Jones, and Willoris Childs, the grandmother of defendant's daughter.  They presented mostly consistent testimony that described defendant as having grown up in a good family environment with religion, where there was no drug or alcohol abuse, no domestic violence, and with a father who encouraged education and hard work.  Defendant was helpful to his family as a child.  He had no more problems than the average child and was never in serious trouble.

> Defendant's problems began after his discharge from the Navy, where he "lost himself" through drugs.  "[I]t seem[ed] as if there had been [a] deterioration in [defendant's] thought processes," as defendant was "talking off the wall."  Defendant's father disapproved of defendant's drug use, but defendant refused to listen to his father's advice.  Because of defendant's trouble, his father did not want him at the family home, at the home of defendant's grandmother, or at the funeral of defendant's mother.  Defendant had a close relationship with his mother, and his inability to attend her funeral may have contributed to his problems.

> Defendant never hit his daughter (age 15 when she testified), or anyone else in her presence.  She never saw him intoxicated and never had any problems with him.  When he was not in prison, she saw him once or twice a week.

*Marks*, 31 Cal. 4th at 212–13.

The witnesses mentioned by the California Supreme Court who testified and were subject to cross-examination at Petitioner's penalty phase trial also submitted declarations in 2002 in support of Petitioner's state habeas petition.  As indicated above, the trial court found that those declarations contradicted the witnesses' 1994 testimony "in very significant and important respects." (AG028417.)  Petitioner concedes that two of the 1994 witnesses—Elaine Marks Bell and Lorraine Winn—submitted declarations in 2002 that contradicted their testimony at Petitioner's penalty phase. ECF No. 49 ("Pet'r's Reply") at 32.  Bell, Petitioner's sister, testified in 1994 that neither of her parents abused drugs or alcohol (AG017285–86), but declared in 2002 that her parents were substance abusers (AG022467).  Winn, Petitioner's cousin, testified in 1994 that there was "never" any physical violence in the Marks household (AG017302), but declared in 2002 that she had witnessed domestic violence, including an attempted shooting of Petitioner by his mother (AG022927).  Despite Petitioner's assertion to the contrary, *see* Pet'r's Reply at 32–33, these were

not the only contradictions borne out by the record.  For instance, Damon Marks, Petitioner's youngest brother, testified in 1994 that everybody in the family went to church growing up and that the Marks children had a father who supported them.  (AG017136–37.)  In his 2002 declaration, by contrast, Damon Marks declared that his parents did not attend church, that his father "was not a religious or church going person," and that only his mother worked regularly to support the family.  (AG022668–70.)

The trial court, which presided over the guilt and penalty phases of Petitioner's capital trial, remembered those witnesses testifying live in 1994 and, in light of the contradictions with the 2002 declarations, made the factual determination that the witnesses "were telling the truth when they testified at [Petitioner's] penalty phase trial in 1994."  (AG028418–19.)  The trial court, which listened to and observed the witnesses' live testimony during Petitioner's penalty phase trial, was in the best position to make such a finding.  On a cold record, and considering AEDPA's "doubly deferential" standard of review when it comes to state court credibility determinations, *Jamerson*, 713 F.3d at 1225, this Court sees no basis for disturbing the trial court's finding.[25]

This factual determination was also critical to the trial court's evaluation of Petitioner's three expert witnesses, all of whom testified live that Petitioner was intellectually disabled.  (AG025612, AG025926, AG026123–24.)  The trial court ultimately found the experts less than credible because they each "relied heavily upon statements contained in the various 2002 declarations, from members of the family, neighbors, and members of the community, relating details of [Petitioner's] supposedly violent upbringing."  (AG028425.)  However, those were the same 2002 declarations that the trial court chose not to credit insofar as they contradicted the 1994 penalty phase testimony.  Especially concerning to the trial court was the fact that Dr. Gur, the defense's chief expert, did not

---

[25] The Court notes one important *consistency* between the 1994 penalty phase testimony and the 2002 declarations: that Petitioner was a good-natured, helpful kid whose behavior changed dramatically after he returned from serving in the U.S. Navy as an adult and began to abuse drugs.  *Compare* (AG017135, AG017281), *with* (AG022474–75, AG022677–79).

51

1  even review the 1994 penalty phase testimony.[26]  (AG028425.)  Considering that the trial court need

2  "not be bound by the opinion testimony of expert witnesses or by test results, but may weigh and

3  consider all evidence bearing on the issue of [intellectual disability]," *Hawthorne*, 35 Cal. 4th at 50

4  (internal quotation marks omitted), this Court cannot say that the trial court's decision to give less

5  weight to Petitioner's experts was objectively unreasonable.  Further, this Court finds that it was not

6  unreasonable for the trial court to rely instead on the evidence of witnesses who, unlike the experts,

7  knew Petitioner before he turned eighteen.

8          Petitioner advances several other arguments in support of his claim that the trial court's

9  factual findings were objectively unreasonable.  However, because Petitioner never adequately

10  addresses the trial court's reliance on Richard's testimony and the 1994 testimony of Petitioner's

11  friends and family, Petitioner fails to establish that the trial court's factual determination regarding

12  deficits in Petitioner's adaptive behavior before age eighteen was unreasonable in light of the

13  evidence presented at the state court proceedings.  *See* 28 U.S.C. § 2254(d)(2).  Moreover, although

14  Petitioner contends that "objective lay . . . observations made by individuals who knew [Petitioner]

15  through all relevant periods of his life[] reveal that his childhood . . . [was] marked by . . . adaptive

16  behavioral deficits in multiple areas," Pet'r's MSJ at 73, the evidence he cites in support of this

17  assertion do not necessarily reveal deficits in Petitioner's adaptive behavior.  For example, Petitioner

18  relies on the declarations quoted above of Jimmy D. Marks (Petitioner's younger brother), Steven

19

20          [26] The trial court stated incorrectly that "*none* of the experts reviewed any of the testimony
21  presented on [Petitioner's] behalf in the 1994 penalty trial." (AG028425 (emphasis added).)  Although
   neither Dr. Gur nor Dr. Cowardin reviewed the 1994 testimony (AG025817–18, AG025988), Dr. Woods
22  testified that he had in fact reviewed that testimony but found "nothing inconsistent with mental
   retardation" (AG026371-75).  This Court noticed a few other instances where the trial court either
23  exaggerated or misstated the record.  For instance, despite the trial court's assertion that Dr. Gur had
   described Petitioner's apparent desire to have a female lawyer represent him as "irrational"
24  (AG028427), this Court found no support for that quotation in Dr. Gur's testimony (AG026218).
   Similarly, this Court did not locate in Dr. Gur's testimony the statement attributed to him by the trial
25  court that Petitioner "should have had a social network to prevent [his eviction while in jail]."
   (AG028427.)  The closest this Court could find was Dr. Gur's testimony that "someone in that age [i.e.,
26  twenty-nine years old] not to have anybody who could make sure his stuff is not thrown into the street
   does not have the kind of vocational, social, and occupational adjustment from a healthy individual."
27  (AG026240.)  In this Court's judgment, however, these errors do not "fatally undermine" the trial
   court's ultimate factual finding that Petitioner was not intellectually disabled under *Atkins. Taylor*, 366
28  F.3d at 1001.

Ford (Petitioner's neighbor growing up), and Jude Bullock (another neighbor growing up).  *See id.* at

70.  However, this declaration testimony could reasonably suggest that in growing up in a rough

neighborhood, Petitioner learned how and when to fight and how to talk his way out of having to do

so.  (AG022545–46, AG022551.)  The testimony suggests further that Petitioner was popular among

his classmates and that he was portrayed by his parents to his siblings as an example of how they

should conduct themselves.  (AG022690–91.)  While this testimony may not be inconsistent with

deficits in adaptive behavior, it is hardly compelling proof of intellectual disability.

Lastly, Petitioner contends that the trial court gave insufficient weight to the fact that while

Petitioner was in prison at age thirty-two, his IQ was determined to be 74, and he was diagnosed

with "mental retardation to borderline."  (AG028263.)  The trial court's determination that the

California Department of Corrections' ("CDC") diagnosis was entitled to less than substantial

weight was based on the fact that the diagnosis was made after Petitioner had turned eighteen, yet no

similar diagnosis was ever made before Petitioner had turned eighteen.  (AG028434–35.)  Because

the standard for intellectual disability requires Petitioner to show deficits in his adaptive behavior

that "manifested *before* 18 years of age," Cal. Penal Code § 1376(a) (emphasis added), the Court

finds that it was not unreasonable for the trial court to give less than substantial weight to the CDC's

diagnosis when Petitioner was thirty-two years of age.

Nor was it unreasonable for the trial court, in determining that Petitioner did not manifest

deficits in adaptive behavior prior to age eighteen, to give more weight to Richard's live testimony

during the evidentiary hearing and the live 1994 penalty phase testimony of Petitioner's friends and

family who knew Petitioner growing up, than to the opinions of experts who only examined

Petitioner after the multiple traumas Petitioner endured as an adult and Petitioner's drug abuse as an

adult.  (AG028435 (trial court describing the list of "significant intervening traumatic events"

Petitioner suffered as an adult, including head injuries from a car accident, the sudden loss of his

mother with whom Petitioner was very close, his inability to attend his mother's funeral due to his

incarceration, his incarceration in prison itself, his rape while in prison, and his drug and alcohol

abuse).)  Accordingly, the trial court's factual determination that Petitioner failed to establish he had

1   deficits in adaptive behavior before the age of eighteen was not unreasonable in light of the evidence

2   presented at Petitioner's *Atkins* hearing.[27]

3        In summary, to prevail on federal habeas, Petitioner must establish that both of the trial

4   court's factual findings—i.e., that Petitioner did not suffer from significantly below average general

5   intellectual functioning prior to age eighteen, *and* that his deficits in adaptive behavior did not

6   manifest before age eighteen—were objectively unreasonable in light of the evidence presented in

7   the trial court proceedings.  *See* 28 U.S.C. § 2254(d)(2).  Under this deferential standard of review,

8   and because Petitioner fails to establish that the California Supreme Court's summary affirmance of

9   either of the trial court's factual findings was objectively unreasonable in light of the evidence

10  presented to the trial court, the Court grants Respondent's motion for summary judgment as to Claim

11  5 and denies Petitioner's motion for summary judgment as to that claim.

12  **CONCLUSION**

13       For the foregoing reasons, Respondent's motion for summary judgment as to Claims 2, 3,

14  and 5 in Petitioner's application for a writ of habeas corpus is hereby GRANTED, and Petitioner's

15  motion for summary judgment as to those claims is hereby DENIED.

16  **IT IS SO ORDERED.**

17

18  DATED: June 25, 2015          _Lucy H. Koh_____

19                  HON. LUCY H. KOH

                United States District Judge

20

21

22

23  [27] The Court is aware that on June 18, 2015, the U.S. Supreme Court found that a Louisiana state
court's refusal to allow a death row inmate an evidentiary hearing under *Atkins* was "based on an
24  unreasonable determination of the facts" under section 2254(d)(2).  *Brumfield v. Cain*, 576 U.S. —,
2015 WL 2473376, at *3 (June 18, 2015).  *Brumfield* is distinguishable from the instant case in several
25  respects, most notably because the state court there dismissed the petitioner's *Atkins* claim "[w]ithout
holding an evidentiary hearing."  *Id.* at *4.  Here, by contrast, the trial court held a ten-day evidentiary
26  hearing on Petitioner's *Atkins* claim, reviewed thousands of pages of documentary evidence, listened
to the live testimony of six witnesses (five of whom were defense experts), and issued a twenty-six-page
27  order detailing the bases for its finding that Petitioner is not intellectually disabled.  In addition, the
petitioner in *Brumfield*, unlike Petitioner, had been "treated at psychiatric hospitals as a child" and
28  "placed in special education classes at an early age."  *Id.* at *4, *9.