UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DELANEY GERAL MARKS,

          Petitioner,

   v.

RON DAVIS, Warden, California State Prison at San Quentin,

          Respondent.

Case No.  11-cv-02458-LHK

**ORDER DENYING CLAIMS 1, 6, AND 7**

Re: Dkt. Nos. 62 & 63

     In 1994, Petitioner Delaney Geral Marks ("Petitioner") was convicted of two counts of first degree murder with personal use of a firearm, and two counts of attempted premeditated murder and infliction of great bodily injury, and sentenced to death.  On December 14, 2011, Petitioner filed a petition for a writ of habeas corpus before this Court.

     On June 25, 2015, this Court issued an Order denying Claims 2, 3, and 5 in Petitioner's federal habeas petition.  This Order addresses Claims 1, 6, and 7.  For the reasons discussed below, Claims 1, 6, and 7 are DENIED.

I.      **BACKGROUND**

**A. Factual Background**[1]

On October 17, 1990, Petitioner entered a Taco Bell restaurant in Oakland, California. After ordering, he shot employee Mui Luong in the head. Luong survived the shooting but remained in a persistent vegetative state. Petitioner then entered the Gourmet Market, not far from the Taco Bell. There, he shot John Myers and Peter Baeza. Baeza died at the scene but Myers survived. Later that evening, Petitioner and his girlfriend, Robin Menefee, took a cab driven by Daniel McDermott. Petitioner shot and killed McDermott. *Marks*, 31 Cal. 4th at 204–06.

Petitioner was arrested shortly after McDermott was shot. Lansing Lee, a criminalist, testified at trial with "virtual absolute certainty" that the bullets that shot Baeza and Myers came from Petitioner's gun. *Id.* at 207. Lee also testified that his analysis "indicated" that the bullet that shot McDermott came from Petitioner's gun and "suggested" that the bullet that injured Luong also came from the same source. *Id.* Eyewitness testimony also identified Petitioner as the shooter. *Id.* at 206–07. Petitioner testified and denied all of the shootings. *Id.* at 207. The defense also presented evidence that Petitioner's hands did not test positive for gunshot residue. *Id.* at 208. On April 24, 1994, the jury convicted Petitioner of two counts of first degree murder with personal use of a firearm, and two counts of attempted premeditated murder with personal use of a firearm and infliction of great bodily injury.

During the penalty phase, the prosecutor presented in aggravation evidence of Petitioner's past violent conduct, including incidents of domestic violence and violent conduct while incarcerated. *Id.* at 208–10. The prosecutor also presented evidence of the effect of the murders on the families of the victims. *Id.* at 210–11. In mitigation, Petitioner testified as to his history of

---

[1]  The following facts are taken from the California Supreme Court's opinion on direct appeal. *See People v. Marks*, 31 Cal. 4th 197, 203–14 (2003). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Case No. 11-CV-2458-LHK
ORDER DENYING CLAIMS 1, 6, AND 7

1  seizures.  *Id.* at 212.  Other witnesses testified that Petitioner had grown up in a strong family

2  environment, and had not engaged in problematic behavior until he was discharged from the army

3  and began using drugs.  *Id.* at 212–13.  Petitioner's daughter testified that Petitioner had never hit

4  her, and that she saw him regularly when he was not incarcerated.  *Id.* at 213.  On May 6, 1994,

5  the jury set the penalty for the capital crimes at death.  *Id.* at 203.

6  **B. Procedural History**

7  On July 24, 2003, the California Supreme Court affirmed the conviction and sentence on

8  direct appeal.  *People v. Marks*, 31 Cal. 4th 197 (2003).  Petitioner filed a petition for writ of

9  habeas corpus in the California Supreme Court, and on March 16, 2005, that Court ordered

10  Respondent to show cause in the Alameda County Superior Court why the death sentence should

11  not be vacated and Petitioner re-sentenced to life without parole on the ground that he was

12  intellectually disabled within the meaning of *Atkins v. Virginia*, 536 U.S. 304 (2002), which held

13  that intellectually disabled individuals may not be executed.  The California Supreme Court

14  denied the remaining claims in the petition.

15  The Alameda County Superior Court conducted an evidentiary hearing on the issue of

16  Petitioner's alleged intellectual disability.  On June 13, 2006, the Superior Court denied his

17  petition, and found that Petitioner had failed to prove by a preponderance of the evidence that he is

18  intellectually disabled within the meaning of *Atkins*.  On August 14, 2006, Petitioner filed a

19  further petition for writ of habeas corpus on the issue of his intellectual disability.  The petition

20  was denied by the California Supreme Court on December 15, 2010.

21  On December 14, 2011, Petitioner filed his federal petition for writ of habeas corpus in this

22  Court.  ECF No. 3.  The parties subsequently filed cross-motions for summary judgment on

23  Claims 2, 3, and 5.  ECF Nos. 37–38.  The claims were denied and summary judgment in favor of

24  Respondent granted pursuant to an Order filed on June 25, 2015.  ECF No. 52.

3

Case No. 11-CV-2458-LHK
ORDER DENYING CLAIMS 1, 6, AND 7

Now before the Court are Claims 1, 6, and 7.  Petitioner filed his opening brief on the merits as to Claims 1, 4, 6, 7, 8, 9, 10, and 11 on December 15, 2015.  ECF No. 63.  Respondent filed his reply to Petitioner's merits briefing as to these claims on February 12, 2016.  ECF No. 65. Similarly, Respondent filed his merits briefing as to these claims on December 15, 2015.  ECF No. 62.  Petitioner filed his response to Respondent's merits briefing as to these claims on February 11, 2016.  ECF No. 64.  The Court will address Claims 4, 8, 9, 10, and 11 in separate orders.

## II.  LEGAL STANDARD

### A.  Antiterrorism and Effective Death Penalty Act (28 U.S.C. § 2254(d))

Because Petitioner filed his original federal habeas petition in 2011, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to the instant action.  *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003) (holding that AEDPA applies whenever a federal habeas petition is filed after April 24, 1996).  Pursuant to AEDPA, a federal court may grant habeas relief on a claim adjudicated on the merits in state court only if the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

### 1.  Contrary To or Unreasonable Application of Clearly Established Federal Law

As to 28 U.S.C. § 2254(d)(1), the "contrary to" and "unreasonable application" prongs have separate and distinct meanings.  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court.").  A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to

4

1    that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case

2    differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Id*. at

3    412–13.  A state court's decision is an "unreasonable application" of clearly established federal

4    law if "the state court identifies the correct governing legal principle . . . but unreasonably applies

5    that principle to the facts of the prisoner's case." *Id*. at 413.  "[A]n *unreasonable* application of

6    federal law is different from an *incorrect* application of federal law."  *Harrington v. Richter*, 562

7    U.S. 86, 101 (2011).  A state court's determination that a claim lacks merit is not unreasonable "so

8    long as 'fairminded jurists could disagree' on [its] correctness."  *Id*. (quoting *Yarborough v.*

9    *Alvarado*, 541 U.S. 652, 664 (2004)).

10          Holdings of the U.S. Supreme Court at the time of the state court decision are the sole

11   determinant of clearly established federal law.  *Williams*, 529 U.S. at 412.  Although a district

12   court may "look to circuit precedent to ascertain whether [the circuit] has already held that the

13   particular point in issue is clearly established by Supreme Court precedent," *Marshall v. Rodgers*,

14   133 S. Ct. 1446, 1450 (2013) (per curiam), "[c]ircuit precedent cannot refine or sharpen a general

15   principle of [U.S.] Supreme Court jurisprudence into a specific legal rule," *Lopez v. Smith*, 135 S.

16   Ct. 1, 4 (2014) (per curiam) (internal quotation marks omitted).

17          **2.  Unreasonable Determination of the Facts**

18          In order to find that a state court's decision was based on "an unreasonable determination

19   of the facts," 28 U.S.C. § 2254(d)(2), a federal court "must be convinced that an appellate panel,

20   applying the normal standards of appellate review, could not reasonably conclude that the finding

21   is supported by the record before the state court," *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir.

22   2014) (internal quotation marks omitted).  "[A] state-court factual determination is not

23   unreasonable merely because the federal habeas court would have reached a different conclusion

24   in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).  That said, "where the state courts

25   plainly misapprehend or misstate the record in making their findings, and the misapprehension

26   goes to a material factual issue that is central to petitioner's claim, that misapprehension can

27

1    fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable."

2    *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

3         To determine whether a petitioner is entitled to relief under 28 U.S.C. § 2254(d)(1) or

4    § 2254(d)(2), a federal court's review "is limited to the record that was before the state court that

5    adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  In the event

6    that a federal court "determine[s], considering only the evidence before the state court, that the

7    adjudication of a claim on the merits resulted in a decision contrary to or involving an

8    unreasonable application of clearly established federal law, or that the state court's decision was

9    based on an unreasonable determination of the facts," the federal court evaluates the petitioner's

10   claim *de novo*.  *Hurles*, 752 F.3d at 778.  If error is found, habeas relief is warranted if that error

11   "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v.*

12   *Abrahamson*, 507 U.S. 619, 638 (1993).  Petitioners "are not entitled to habeas relief based on trial

13   error unless they can establish that it resulted in 'actual prejudice.'"  *Id*. at 637 (quoting *United*

14   *States v. Lane*, 474 U.S. 438, 449 (1986)).

15        **B.  Federal Evidentiary Hearing (28 U.S.C. § 2254(e))**

16        Under *Cullen v. Pinholster*, habeas review under AEDPA "is limited to the record that was

17   before the state court that adjudicated the claim on the merits."  563 U.S. at 180–81.  The Ninth

18   Circuit has recognized that *Pinholster* "effectively precludes federal evidentiary hearings" on

19   claims adjudicated on the merits in state court.  *Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th Cir.

20   2013); *see also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("Although the Supreme Court

21   has declined to decide whether a district court may ever choose to hold an evidentiary hearing

22   *before* it determines that § 2254(d) has been satisfied, an evidentiary hearing is pointless once the

23   district court has determined that § 2254(d) precludes habeas relief.") (internal quotation marks

24   and citation omitted).

25   **III.    DISCUSSION**

26        **A.  Claim 1**

27                                                         6

28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1  In Claim 1, Petitioner argues that he was involuntarily medicated with medically

2  inappropriate drugs and without medical necessity prior to and during his competency and capital

3  murder trials.  According to Petitioner, the forced medication violated his rights to due process and

4  to a fair trial.  *See Riggins v. Nevada*, 504 U.S. 127, 134–38 (1992).  This claim was rejected on

5  the merits by the California Supreme Court in a postcard denial.

6  The parties do not dispute that, during his pre-trial incarceration, Petitioner was prescribed

7  medication (Mysoline) for seizures.  Petitioner does not deny that he sought treatment for seizures.

8  (AG022139.)  Petitioner also requested a prescription for Vistaril, to counteract symptoms such as

9  nausea that he maintained were caused by his seizures.  (AG022247–49.)

10  Petitioner cannot establish, however, that he was forcibly administered medication in

11  violation of clearly established federal law.  Absent a substantial showing, the state may not

12  involuntarily administer antipsychotic drugs to a mentally-ill defendant facing serious criminal

13  charges in order to render that defendant competent to stand trial.  *Sell v. United States*, 539 U.S.

14  166, 179 (2003).  Here, however, Petitioner willingly took medication that was prescribed for his

15  seizure condition.  Furthermore, as discussed below, he was not prescribed antipsychotic

16  medications.

17  The record confirms that Petitioner himself sought treatment for his seizures.

18  (AG022139.)  The parties stipulated during Petitioner's competency trial that he had been

19  diagnosed with a seizure disorder in 1988.  (AG011222–23.)  In 1990, physicians at Highland

20  Hospital also diagnosed Petitioner as suffering from complex grand mal seizures.  (AG011309–

21  10.)  Mysoline is an anticonvulsant, and prescribed to control grand mal and epileptic seizures.

22  (AG023104–05.)  Vistaril is indicated to treat nausea, and Petitioner himself requested medication

23  to control his nausea.  (AG022247–49.)  There is absolutely no evidence, however, that Petitioner

24  was ever administered antipsychotic medications.  In addition, there is no evidence that, prior to

25  January 22, 1994, Petitioner was ever prescribed medication that he did not request.

26  Petitioner does allege that on January 21, 1994, the day before his criminal trial, he stated

7

1    that he no longer wanted to take Mysoline, but that the prescription was renewed the next day and

2    that he took Mysoline during the criminal trial.  The portions of the record cited by Petitioner,

3    however, do not appear to support this claim.  Petitioner cites to AG022184 and AG022193, both

4    of which are reports of Petitioner's follow up visits to medical services while incarcerated.

5    AG022193 is dated March 2, 1993, not January 21, 1994, and does not indicate that Petitioner did

6    not want to take Mysoline.

7        AG022184 is dated January 21, 1994.  That report, however, does not state that Petitioner

8    specifically did not want to take Mysoline or Vistaril.  It does state that Petitioner had "[m]any

9    physical complaints and doesn't want Rx."  In addition, the report states that no medication was

10   prescribed.  (AG022184.)  Petitioner also cites to AG023109–10, which is part of Dr. Pablo

11   Stewart's (one of Petitioner's experts) declaration dated October 21, 2002.  Dr. Stewart avers that

12   "Mr. Marks's records reflect his desire not [sic] be medicated in January 1994, but the medication

13   was resumed the following day."  The declaration, however, does not cite to any portion of the

14   record.

15       Assuming that the January 21, 1994 report's statement that Petitioner had  "[m]any

16   physical complaints and doesn't want Rx" was a statement that Petitioner no longer wanted to take

17   Mysoline and Vistaril, there is no clear evidence in the record that Petitioner was nonetheless

18   prescribed Mysoline and took it during the trial.  The January 21, 1994 report states that no

19   medication was prescribed.  (AG022184.)  Again, Petitioner cites to Dr. Stewart's declaration in

20   support of his claim that medication was continued on January 22, 1994, but the declaration does

21   not cite to any portion of the record.

22       Petitioner also cites to four pages of Physicians' Orders in support of his claim that

23   Petitioner was medicated starting on January 22, 1994.  (AG022343–46.)  The Court has reviewed

24   the Physicians' Orders, and they do not support Petitioner's claims.  The Physicians' Orders are

25   difficult to read, and in some places the handwriting is illegible and/or impossible to decipher due

26   to the faded quality of the photocopies.  Neither party has provided a clear copy or transcription.

Case No. 11-CV-2458-LHK
ORDER DENYING CLAIMS 1, 6, AND 7

None of the listed dates appear to be January 22, 1994.  Primidone (another name for Mysoline) was listed on the dates of March 22, 1994 and on an illegible date in February 1994.  (AG022343.) Disalcid (an anti-inflammatory indicated for pain) was also noted[2] on at least two days. (AG022344.)  While the trial was still taking place in February and March 1994, these records do not confirm that Petitioner actually took any medication during that time.  More importantly, they do not indicate that any medication he may have taken was forced upon him in violation of clearly established federal law.  *See Sell*, 539 U.S. at 179.

Petitioner's medical records do confirm that, numerous times, he refused recommended treatment or medication, and he signed releases confirming his refusal.  (AG022174, AG023645, AG023646.)  The presence of these releases tends to suggest that Petitioner did not hesitate to inform medical staff when he did not want to accept the recommended treatment.  Moreover, the releases indicate that the medical staff acknowledged and confirmed his refusal, and did not proceed with the recommended treatment.

In addition, at least some medical records state that Petitioner was not prescribed medication during the trial.  On February 4, 1994, for example, Petitioner visited a prison medical clinic and the notes from that visit state that Petitioner had "[n]o current medication." (AG022183.)  Furthermore, notes from a February 18, 1994 visit state "[n]o current prescribed." (AG022182.)  Taken in their entirety, the medical records do not support Petitioner's allegation that he was forced to take Mysoline over his stated objections, and thus Petitioner cannot demonstrate that the California Supreme Court's denial of this claim was based on an unreasonable determination of the facts in light of the evidence before it.  28 U.S.C. § 2254(d).  In order to show he is entitled to relief under AEDPA, Petitioner must show that the state court's decision was not only wrong, but unreasonable "beyond any possibility for fair-minded disagreement."  *Richter*, 131 S. Ct. at 786.  This Petitioner cannot do.

---

[2]  It is unclear from the notations if the medication was actually prescribed at that time, or referred to medication Petitioner had been previously prescribed.

Case No. 11-CV-2458-LHK
ORDER DENYING CLAIMS 1, 6, AND 7

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Petitioner also argues that he was prescribed inappropriate medication because he did not

2    actually have a seizure disorder, and that the inappropriate medication contributed to his inability

3    to rationally assist counsel.  In support of this argument, Petitioner relies primarily on the

4    testimony of Dr. Pablo Stewart, a psychiatrist retained post-conviction.  In his declaration, Dr.

5    Stewart avers that in his opinion, Petitioner did not have a seizure disorder, and that any beliefs

6    held by Petitioner that he had a seizure disorder were "delusional."  Furthermore, Dr. Stewart

7    states that Petitioner's experience of seizures was actually hallucinations and delusional ideation.

8    (AG023106–07.)  As a result, Dr. Stewart maintains that treatment with a powerful anticonvulsant

9    such as Mysoline was inappropriate.  (AG023106–07.)

10    To begin with, the Court notes that Dr. Stewart is neither a neurologist nor a specialist in

11    seizure disorders.  In addition, Dr. Stewart did not perform a full medical examination of

12    Petitioner, but rather conducted a "clinical interview" with Petitioner, years after he had been

13    diagnosed with and treated for a seizure disorder.  (AG023103.)[3]

14    In contrast to Dr. Stewart's opinion, substantial evidence in the record supports the

15    conclusion that Petitioner suffered from a seizure disorder.  The parties stipulated in 1992, during

16    pre-trial proceedings, that Petitioner had been diagnosed with a seizure disorder in 1988.

17    (AG011222.)  In addition, Petitioner was diagnosed by physicians at Highland Hospital in 1990 as

18    suffering from seizures; he was subsequently prescribed anticonvulsants.  (AG011309–10.)

19    Petitioner experienced seizures in jail that were observed by jail staff and other inmates.

20    (AG10775, AG010810-811, AG010890-91, AG011030.)

21    Moreover, Petitioner's own medical experts testified that Petitioner had a seizure disorder.

22    Dr. Fred Rosenthal, a psychiatrist who testified on Petitioner's behalf at his competency trial,

23    confirmed that Petitioner had a seizure disorder and a "fairly long history of seizures."

24

25    [3]  While Dr. Stewart's declaration does not specify the date of his clinical interview with
Petitioner, his declaration was executed on October 21, 2002.  (AG023110.)  Based on Dr.

26    Stewart's statement that he interviewed Petitioner (who was born on August 15, 1956) when
Petitioner was 45, the interview likely occurred in 2001.

27    10

28    Case No. 11-CV-2458-LHK
ORDER DENYING CLAIMS 1, 6, AND 7

1   (AG010592, AG010596, AG010600.)  Dr. Jules Burstein, a defense expert who argued that

2   Petitioner was not competent to stand trial, also confirmed that Petitioner had a seizure disorder

3   and that he was not malingering.  (AG011310–12.)  Dr. Karen Gudiksen, a defense witness and

4   psychiatrist at the Santa Rita jail, also testified as to Petitioner's seizures.  (AG0108884,

5   AG010891, AG011030.)

6           Based on this record, Petitioner cannot establish that the state court's decision denying his

7   claim was unreasonable.  Given Petitioner's diagnoses of seizure disorder, his seizures while

8   incarcerated, and the testimony of his own experts, it would not have been unreasonable for the

9   California Supreme Court to have found that Petitioner was properly diagnosed with, and

10  medicated for, a seizure disorder.

11          Finally, Petitioner argues that even if he did consent to the medication, he was not properly

12  informed about the risks and benefits of the medication.  In support of this argument, Petitioner

13  relies on *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002), where the Ninth Circuit held that a

14  pretrial detainee had a right to "refuse unwanted medical treatment and receive sufficient

15  information to exercise those rights intelligently."

16          In *Benson*, the petitioner, a female inmate, had been administered a number of medications

17  for a variety of ailments.  *Id*. at 877–78.  She consented to the medications, but maintained that she

18  had not been properly informed about the risks and benefits of the medication.  *Id*.  The Ninth

19  Circuit found that the record confirmed that the petitioner had been aware of her right to refuse

20  medication, because petitioner utilized this right several times during her detention.  *Id*. at 885.

21  Accordingly, the Circuit found that because petitioner was capable of refusing treatment or asking

22  for more information, "the jail staff had no affirmative duty to volunteer information about the

23  drugs."

24          The same is true here.  As this Court has already detailed *supra*, Petitioner cannot establish

25  that he was involuntarily medicated.  In addition, like the petitioner in *Benson*, Petitioner Marks

26  refused medical care on multiple occasions.  (AG022174, AG023645, AG023646.)  Like the

27

Case No. 11-CV-2458-LHK
28  ORDER DENYING CLAIMS 1, 6, AND 7

United States District Court
Northern District of California

petitioner in *Benson*, who "utilized her capacity to refuse medication on three occasions," Petitioner in the instant case was "clearly aware []he could have objected to medication during trial—or asked for information about the nature or dosage of particular drugs." *Benson*, 304 F.3d at 885. The medication that Petitioner took was properly prescribed for a diagnosed seizure disorder, and Petitioner cannot establish that he is entitled to relief under *Benson*.

Because Petitioner cannot establish that the California Supreme Court's decision denying his claim was contrary to clearly established federal law, involved an unreasonable application of clearly established federal law, or resulted in a decision based on an unreasonable determination of the facts, Claim 1 must be denied in its entirety.

**B. Claim 6**

In Claim 6, Petitioner contends that, based on the bias and behavior of the trial judge, Petitioner was deprived of a fair and neutral trial. The California Supreme Court rejected this claim in a postcard denial on collateral review. (AG023690.)

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge. *See In re Murchison*, 349 U.S. 133, 136 (1955). A "biased decisionmaker [is] constitutionally unacceptable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). In some cases, the proceedings and surrounding circumstances may demonstrate actual bias or an appearance of advocacy on the part of the judge, i.e., improper conduct. *See Taylor v. Hayes*, 418 U.S. 488, 501–04 (1974); *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995) (civil context).

A trial judge "must be ever mindful of the sensitive role [the court] plays in a jury trial and avoid even the appearance of advocacy or partiality." *United States v. Hall*, 271 F. App'x 559, 560 (9th Cir. 2008) (quoting *United States v. Harris*, 501 F.2d 1, 10 (9th Cir. 1974)). At the same time, however, courts have recognized that a trial judge is "more than an umpire." *United States v. Laurins*, 857 F.2d 529, 537 (9th Cir. 1988). It is generally appropriate for a trial judge to take part where necessary to clarify testimony and assist the jury in understanding the evidence. *See id*. A trial judge's participation oversteps the bounds of propriety and deprives the parties of a fair

12

United States District Court
Northern District of California

trial only when the record discloses actual bias or leaves the reviewing court with an abiding

impression that the judge's remarks and questioning projected to the jury an appearance of

advocacy or partiality.  *See, e.g, United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir. 2001);

*United States v. Odachyan*, 749 F.3d 798, 802–03 (9th Cir. 2014) (statement by district court at

sentencing did not reflect such a high degree of favoritism or antagonism as to make fair judgment

impossible and therefore does not evidence constitutional error, where it appears that statement

was in response to arguments made by defendant, was offered to explain why the court was not

persuaded by arguments and at most reflects a general frustration with the type of argument

defendant made at sentencing).

"It has long been regarded as normal and proper for a judge to sit in the same case upon

remand, and to sit in successive trials involving the same defendants."  *Liteky v. United States*, 510

U.S. 540, 551 (1994).  There is no constitutional fault with assigning post-conviction review

matters to the original trial judge.  *See Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997)

(rejecting claim that trial judge being asked at postconviction proceeding to change his final

judgment should be disqualified).

A claim of judicial misconduct by a state judge in the context of federal habeas review

does not simply require that the federal court determine whether the state judge committed judicial

misconduct; rather, the question is whether the state judge's behavior "rendered the trial so

fundamentally unfair as to violate federal due process under the United States Constitution."

*Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted), *cert. denied*, 517 U.S.

1158 (1996).  A state judge's conduct must be significantly adverse to a defendant before it

violates constitutional requirements of due process and warrants federal intervention.  *See Garcia*

*v. Warden, Dannemora Corr. Facility*, 795 F.2d 5, 8 (2d Cir. 1986).  It is not enough that a federal

court not approve of a state judge's conduct.  Objectionable as the conduct at issue might be, when

considered in the context of the trial as a whole it may not be of sufficient gravity to warrant the

conclusion that fundamental fairness was denied.  *See Duckett*, 67 F.3d at 741 (citations omitted).

1    Here, Petitioner alleges that the trial court's bias deprived him of a complete and accurate

2    record of the trial proceedings.  Specifically, Petitioner maintains that the trial court knew of and

3    refused to comply with its obligation to correct any gaps or deficiencies in the record because of

4    the trial judge's bias against Petitioner.

5    It is not disputed that, during the record correction proceedings in this matter, certain gaps

6    in the record were revealed.  *Marks v. Superior Court*, 27 Cal. 4th 176, 180, 192–95 (2002)

7    (considering various issues relating to verification and settlement of the record).  These included

8    apparently unrecorded portions of the trial and competency hearing, including unreported

9    comments by Petitioner in open court.  *Id*. at 180, 194.  California law requires that, in capital

10   cases, all conferences and proceedings "be conducted on the record with a court reporter present."

11   Cal Penal Code § 190.9(a)(1).  When gaps in the record occur, as they did in Petitioner's case, "the

12   [Judicial Council] rules provide a procedure for filling them in."  *Marks*, 27 Cal. 4th at 192.

13   Essentially, the rules allow the parties to review the record for omissions and submit "settled

14   statements" regarding the omitted proceedings for certification by the trial court.  *Id*. at 193–94.

15   After engaging in disputed settled statement proceedings, Petitioner filed an appeal relating

16   to various issues surrounding record certification to the California Supreme Court, which found

17   that the settled statements in Petitioner's case did not conform to the applicable rules.  *Id*. at 195.

18   The California Supreme Court noted that while there is scant judicial authority regarding settled

19   statements, compliance is particularly important in capital cases, so as to "avoid[] questions as to

20   the sufficiency of the appellate record."  *Id*. at 195–97.  Accordingly, the California Supreme

21   Court remanded the matter back to the trial court for "resettlement of the statements on appeal

22   relating to the guilt and penalty trials and the Penal Code section 1368 [competency] hearing."  *Id*.

23   at 197.  At that point, further proceedings were held, and concluded to the satisfaction of

24   Petitioner's appellate counsel, Richard Power.  (AG017978.)

25   Petitioner claims that, despite the record correction proceedings that were eventually

26   approved by Petitioner's appellate counsel, the initial gaps in the record, combined with the trial

14

1  court's deficiencies in the initial settled statement procedures, are indicative of bias against

2  Petitioner by the trial court.  This claim is without merit.  Petitioner can cite to nothing indicating

3  that the problems in certifying the record were the result of judicial bias.  In addition, Petitioner

4  can cite to no clearly established federal law that would support his claim that gaps in the record—

5  particularly gaps that were later addressed in a process approved and directed by the California

6  Supreme Court—indicate judicial bias.  Because Petitioner cannot establish that the trial court's

7  behavior "rendered the trial so fundamentally unfair as to violate federal due process under the

8  United States Constitution," *Duckett*, 67 F.3d at 740, this portion of Petitioner's claim must be

9  denied.

10     In addition, Petitioner argues that pro-prosecution bias, and/or racial animus caused the

11  trial court to deny Petitioner a full and fair hearing on his *Atkins* claim of inability to be executed

12  due to intellectual disability.  Specifically, Petitioner maintains that the trial court unreasonably

13  rejected the testimony of Drs. Wood, Cowardin and Gur that Petitioner is intellectually disabled

14  under *Atkins*.

15     This Court carefully considered Petitioner's claim that the trial court was unreasonable in

16  determining whether Petitioner was intellectually disabled in its Order filed June 25, 2015.  ECF

17  No. 52.  The Court examined the testimony of Drs. Wood, Cowardin and Gur, as well as the

18  complete record before the trial court on Petitioner's *Atkins* claim, and addressed Petitioner's

19  multiple arguments before concluding that under the highly deferential AEDPA standard,

20  Petitioner was unable to show that the trial court's factual findings or legal conclusions were

21  objectively unreasonable under clearly established federal law.

22     Here, Petitioner is essentially attempting to re-argue the claim that this Court has already

23  considered.  Petitioner cites no additional evidence that would establish that the trial court's

24  decision was not objectively unreasonable (*see* ECF No. 52), but was nonetheless motivated by

25  racial animus or pro-prosecution bias.  Petitioner's primary argument is, once again, that the trial

26  court's reasons for not adopting the conclusion of Drs. Wood, Cowardin, and Gur were contrary to

27

28

15

United States District Court
Northern District of California

1  or unsupported by the record, a claim that this Court has exhaustively reviewed.

2  　　　　Petitioner again argues that the trial court ought to have accepted the testimony of Drs.

3  Wood, Cowardin and Gur, but cannot point to anything specific that tends to establish racial

4  animus or pro-prosecution bias.  Petitioner cites to "angry and sarcastic" comments by the trial

5  court in the record, such as the trial court's description of the expert testimony as "unreasonable

6  and unprofessional" (AG028425), and the trial court's apparently mistaken comment that one of

7  Petitioner's experts had not reviewed certain testimony (AG028424–25).  (Pet's Opening Brief at

8  22.).  Petitioner, however, does not cite to any cases where comparable statements regarding

9  testimony or witness preparation rise to the level of judicial misconduct that "rendered the trial so

10  fundamentally unfair as to violate federal due process under the United States Constitution."

11  *Duckett*, 67 F.3d at 740.  Accordingly, Petitioner cannot establish that either the trial court's

12  comments or its decision regarding Petitioner's *Atkins* claims were motivated by racial animus or

13  pro-prosecution bias.  *See, e.g. Lang v. Callahan*, 788 F.2d 1416, 1418 (9th Cir. 1986) (ill-

14  considered comments by judge that do not reflect racial prejudice, such as expressions of disgust

15  at the brutality of the crime, do not generally violate right to impartial tribunal).

16  　　　　As the Court has stated *supra*, the question on federal habeas review is not whether a trial

17  court's conduct might be objectionable.  Rather, a showing of judicial bias must include facts

18  sufficient to demonstrate actual impropriety or the appearance thereof.  *Greenway v. Schriro,* 653

19  F.3d 790, 806 (9th Cir. 2011).  This Petitioner cannot do.  Because Petitioner cannot establish that

20  the California Supreme Court's decision was objectively unreasonable, Claim 6 must be denied.

21  **C.  Claim 7**

22  　　　　In Claim 7, Petitioner contends that the trial court ordered excessive courtroom security, in

23  violation of Petitioner's constitutional rights.  The California Supreme Court addressed this claim

24  in a reasoned opinion on direct review as follows:

25  　　　　　　Prior to the start of trial, defense counsel requested that defendant be subject
26  　　to physical restraints in the courtroom.  One defense attorney expressed fear that
  　　defendant might injure him during trial; the other attorney indicated he was

27  　　　　　　　　　　　　　　　　　　　　　16

United States District Court
Northern District of California

concerned not with defendant's injuring him but with defendant's harming his defense by misconduct before the jury.   The trial court declined to impose the restraints, concluding the record before it failed to establish the "manifest need" required by *People v. Duran* (1976) 16 Cal.3d 282 [], for the restraints.   The proximity of the witness stand to the jury box prompted the court to revisit the issue once defendant was about to testify.   The court proposed two alternatives: defendant could testify from his position at counsel's table or he could testify from the witness stand with a marshal sitting next to him, facing him.   The court recalled defendant's history, which included assaulting an attorney in court and a deputy sheriff during this case.   After a break, defense counsel indicated that defendant wished to testify from the witness chair.   The court explained it would position a marshal in a chair next to defendant on the raised platform that was parallel to Juror No. 7.[4]   The court recalled defendant's prior assaultive behavior, his violation of court orders, and his being removed from the courtroom for being verbally disruptive earlier in the trial.   The court noted that the jury box was only four feet from where defendant would sit, and it would be "total dereliction of [the court's] responsibility" to have the nearest marshal "some 30 or 40 feet away, who would have to go around tables, chairs and other people [to] get to [defendant]."

The court read the following admonition, at the defense's request: "With respect to the position of Deputy Scott, you'll observe that Deputy Scott is seated up next to the jury box.   First of all, let me indicate to you that you are not to speculate as to the reasons why Deputy Scott is in this position, nor are you to let it become part of your deliberations or your conclusions in this case in any way.   This is a perfectly normal procedure, and you should not draw any adverse [inferences] from this of any kind."

Defendant cites *Duran* for the proposition that there must be a "manifest need" for the placement of the marshal so close to him as he testified.   *Duran* imposed the manifest need standard for the use of *physical restraints*.   (*Duran, supra*, 16 Cal. 3d at pp. 290-291 [].)   *Duran* expressly distinguished such shackling from monitoring by security personnel.   "We are not concerned with the use of armed guards in the courtroom.   Unless they are present in unreasonable numbers, such presence need not be justified by the court or the prosecutor."   *Duran*, at p. 291, fn. 8 [].   The *Duran* holding encompassed not only the standard positioning of officers but also their unusual deployment, as is shown by its citation to *People v. David* (1930) [citations omitted], where a deputy drew up his chair immediately behind where the defendant was sitting . . . . The distinction between shackling and monitoring is long-standing.   The David court distinguished that case's deployment of security personnel with the physical restraints that cause prejudice in *People v. Harrington* (1871) 42 Cal. 165. . . .   *Harrington* was the primary authority on

---

[4]   [Case Footnote 5] It appears that the marshal sat four or five feet from defendant's side (facing his ear) next to and slightly behind Juror No. 7.

Case No. 11-CV-2458-LHK
ORDER DENYING CLAIMS 1, 6, AND 7

which Duran relied, and its reasoning indicates that courtroom monitoring by security personnel does not necessarily create the prejudice created by shackling. . . . The United States Supreme Court has likewise refused to find the "conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial [as] the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest. . . ." (*Holbrook v. Flynn* (1986) 475 U.S. 560, 568-569, [].)  *Holbrook* observed, "while shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, . . . it is entirely possible that jurors will not infer anything at all from the presence of the guards. . . . Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm." (*Id.* at p. 569 [].)

We therefore maintain this distinction between shackling and the deployment of security personnel, and decline to impose the manifest need standard for the deployment of marshals inside the courtroom.  [citations omitted].

Defendant now claims the trial court should have had him bound by restraints not visible to the jury.  Defendant never asserted there was less intrusive means of securing the courtroom, and his failure to object now bars the instant claim that through invisible shackling the court could have achieved the same security benefit with less prejudice to defendant. . . . Furthermore, as indicated above, physical restraints may well be more distracting and disorienting to a testifying defendant than a security guard's presence four or five feet away, next to and slightly behind) the jurors.

Defendant had attacked his own counsel in the courtroom, and his disruptive behavior and violations of court orders had led to his removal at one point.  The court observed the proximity of the witness stand to the jury box, and reasonably concluded it would be irresponsible to leave the jury unprotected from a capital defendant with a record of violent behavior in the courtroom.  Under any standard of review, the trial court properly exercised its discretion in securing the courtroom.

*Marks*, 31 Cal. 4th at 222–24.

Petitioner cannot demonstrate that the California Supreme Court's decision upholding the trial court's decision regarding courtroom security was contrary to or an unreasonable application of clearly established U.S. Supreme Court precedent.  *See, e.g., Kemp v. Ryan*, 638 F.3d 1245, 1261–62 (9th Cir. 2011).  A federal court's review of security arrangements is very limited. *Ainsworth v. Calderon*, 138 F.3d 787, 797 (9th Cir.), *amended*, 152 F.3d 1223 (9th Cir. 1998).

United States District Court
Northern District of California

1    The U.S. Supreme Court has also held that the use of security personnel is not inherently

2    prejudicial.  *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986) (presence of four uniformed state

3    troopers did not unconstitutionally deprive defendant of a fair trial).  Rather, the challenged

4    practice must be shown to be actually prejudicial before relief may be granted.  *Id*.

5        Petitioner cannot demonstrate that the security measures imposed by the trial court resulted

6    in any actual prejudice.  The Ninth Circuit has found that no actual prejudice was shown to have

7    resulted from heightened security measures that included screening all persons who entered the

8    courtroom (with use of hand-held metal detection wand, patdowns, and searches of bags and

9    purses for weapons), locking the courtroom door, and posting an extra deputy in the courtroom

10   and two additional deputies outside the courtroom.  *Hayes v. Ayers*, 632 F.3d 500, 521–22 (9th

11   Cir. 2011); *see also Williams v. Woodford*, 384 F.3d 567, 587–89 (9th Cir. 2004) (presence of four

12   uniformed marshals and several other "plain-clothed" guards at trial not inherently prejudicial;

13   defense counsel's statements implying extraordinary security measures cannot support a claim that

14   the security measures at trial undermined the presumption of innocence).

15       Here, the trial court posted a single marshal near Petitioner when he was on the witness

16   stand.  *Marks*, 31 Cal. 4th at 222.  The marshal's presence was ordered due to specific security

17   concerns that the trial court noted on the record.  *Id*.  Moreover, the trial court specifically

18   instructed the jury that such a procedure was "normal" and that the jury was not to let it become a

19   part of its deliberations or conclusions.  *Id*.; *see also Richardson. v. March*, 481 U.S. 200, 211

20   (1987) (finding that jurors are presumed to follow the instructions given to them).  Under such

21   circumstances, and given the applicable U.S. Supreme Court and Ninth Circuit law cited *supra*,

22   Petitioner cannot demonstrate that the California Supreme Court's decision was unreasonable or

23   contrary to clearly established federal law.  *Holbrook*, 475 U.S. at 568–68.

24       Petitioner also maintains that he was in visible restraints when he entered the courtroom.

25   In support of this allegation, Petitioner relies exclusively on the declaration of Anita Clifton, who

26   served as a juror at Petitioner's trial.  (AG022535.)  Juror Clifton's declaration was signed in

19

1   2002, and was presumably part of the record before the California Supreme Court, which rendered

2   its decision on Petitioner's direct appeal in 2003.  The California Supreme Court, however, did not

3   directly address the allegation regarding restraints in Juror Clifton's declaration, which reads in its

4   entirety "[i]t was disturbing to see him walk into court everyday in shackles."  (AG022535.)

5           To begin with, Petitioner cannot actually demonstrate that he was physically restrained,

6   simply by submitting a single declaration lacking relevant detail.  This Court has reviewed Juror

7   Clifton's declaration.  No other evidence in the record indicates that Petitioner was ever physically

8   restrained in view of the jurors.  In fact, as the California Supreme Court's decision and the trial

9   record confirm, the trial court denied the request of Petitioner's counsel that Petitioner be

10  physically restrained while in the courtroom, and specifically found that physical restraints were

11  not justified. *Marks*, 31 Cal. 4th at 222–23.  *Id.*  On direct appeal, Petitioner's counsel essentially

12  acknowledged that Petitioner was not restrained, when arguing that less visible security than the

13  armed deputy—such as physical restraints—*should* have been used.  (AG018193).

14          There are no other declarations from counsel, jurors or others that Petitioner was in

15  shackles when he was brought into the courtroom.  Juror Clifton's declaration is silent as to the

16  appearance of any shackles, and gives no other details.  Given this record, it was not unreasonable

17  for the California Supreme Court to determine that Petitioner had not actually been impermissibly

18  shackled.  28 U.S.C. § 2254(d); *Richter*, 131 S. Ct. at 786 (finding that to prevail under AEDPA, a

19  petitioner must show that the state court's decision was not only wrong, but unreasonable "beyond

20  any possibility for fair-minded disagreement").

21          Petitioner has not demonstrated that he was shackled when he entered the courtroom; even

22  if he had, he would not be entitled to relief on this claim.  The Fifth and Fourteenth Amendments

23  prohibit the use of physical restraints visible to the jury absent a trial court determination, in the

24  exercise of its discretion, that restraints are justified by a state interest specific to a particular trial.

25  *Deck v. Missouri*, 544 U.S. 622 (2005); *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999)

26  (*"Rhoden II"); Spain v. Rushen*, 883 F.2d 712, 716 (9th Cir. 1989).  Generally, the defendant's

20

27  Case No. 11-CV-2458-LHK

28  ORDER DENYING CLAIMS 1, 6, AND 7

United States District Court
Northern District of California

1  right to due process is violated if the trial court fails to make a finding on the record justifying the

2  necessity of physical restraints.  To assess whether shackles are permitted, a trial court must

3  analyze the security risks posed by the defendant and consider less restrictive alternatives before

4  permitting a defendant to be restrained.  *Rhoden II*, 172 F.3d at 636.

5      If a trial court has impermissibly shackled a defendant, there is no reversible error on

6  habeas review unless a federal habeas court determines that what the jurors saw "was so inherently

7  prejudicial as to pose an unacceptable threat to defendant's right to a fair trial."  *Holbrook v.*

8  *Flynn*, 475 U.S. 560, 572 (1986).  When a defendant's shackling was not actually seen by the jury

9  in the courtroom, no error results, or, put differently, the error is deemed harmless or not

10  prejudicial.  *Rhoden II*, 172 F.3d at 636.  To determine whether the imposition of visible physical

11  restraints amount to prejudicial error, the reviewing court considers the appearance and visibility

12  of the restraining device, the nature of the crime with which the defendant was charged, and the

13  strength of the state's evidence against the defendant.  *Larson v. Palmateer*, 515 F.3d 1057, 1063–

14  64 (9th Cir. 1057, 1063–64 (9th Cir. 2008).

15      *Walker v. Martel*, 709 F.3d 925, 942 (9th Cir. 2013), is persuasive authority here.  In

16  *Walker*, a capital case, the parties stipulated that the petitioner had been visibly shackled during

17  both the guilt and penalty phases of the trial.  *Walker*, 709 F.3d at 942.  The shackles caused

18  Walker to visibly limp to and from the witness stand when he testified during the guilt and penalty

19  phases.  *Id.* at 929.  Moreover, there was no finding by the trial court that restraints were

20  necessary.  *Id.*.  Despite these undisputed facts regarding the visibility of the shackles and the lack

21  of record justification for them, the Ninth Circuit reversed the district court's finding of prejudice

22  due to shackling, holding that, *inter alia*, the strong evidence of guilt, combined with the fact that

23  the restraints could have indicated custody status as opposed to dangerousness, demonstrated that

24  "the state court reasonably could conclude that it was not reasonably probable that the jury would

25  have acquitted Walker" absent the restraint.  *Id.* at 930, 943–45.

26      Here, the record is even weaker than it was in *Walker*, where the shackling was undisputed

27                                          21

28

United States District Court
Northern District of California

United States District Court
Northern District of California

and continuous during both the guilt and penalty phases, including when Walker was testifying. *Id.* at 929–30. To begin with, Juror Clifton is silent as to the appearance and visibility of any alleged restraining device, which is important in determining prejudice. *Id.* at 942 (finding that "[n]ot all restraints are created equal"). Moreover, when a juror becomes aware of shackles only during certain instances, it may suggest a defendant's "custody status, not a proclivity for violence." *Id.* Here, Juror Clifton notes only that she saw Petitioner wear some sort of unidentified shackles when he walked into court, and does not state that she saw him restrained during the trial. *Id.*; *see also Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 2004) (finding that juror's viewing of handcuffs with a coat draped over the handcuffed hands as the defendant went to or from the courtroom was not inherently or presumptively prejudicial).

In addition, the evidence against Petitioner was substantial, and in such circumstances, the verdict was less likely to have been affected by an error such as shackling. *Walker*, 709 F.3d at 943. As discussed *supra*, the criminalist testified with "virtual absolute certainty" that the bullets that shot Baeza and Myers came from Petitioner's gun. *Marks*, 31 Cal. 4th at 207. In addition, ballistics analysis "indicated" that the bullet that shot McDermott came from Petitioner's gun and "suggested" that the bullet that injured Luong came from the same source. *Id.* Eyewitnesses also testified as to the shootings. *Id.* at 205–06. Additionally, Petitioner was overheard telling another defendant that "he was in for three murders" and that the victims had died because "I shot them." *Id.* at 208. In the face of such evidence of guilt, "it is not reasonably probable that [Petitioner] would have obtained a different result had he not been forced to wear the restraint." *Walker*, 709 F.3d at 943. Thus, even assuming that Petitioner had established that he was visibly shackled when entering the courtroom, he is unable to establish that he was prejudiced, as the record makes clear that the state court could have reasonably concluded that there was no prejudice. *Id.* at 931, 942-43. Claim 7 must be denied in its entirety.

## IV.   CONCLUSION

For the foregoing reasons, Claims 1, 6, and 7 are DENIED.

22

Case No. 11-CV-2458-LHK
ORDER DENYING CLAIMS 1, 6, AND 7

1    **IT IS SO ORDERED.**

2    Dated: September 15, 2016

3

4    _____
     LUCY H. KOH
5    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                          23

28   Case No. 11-CV-2458-LHK
     ORDER DENYING CLAIMS 1, 6, AND 7

United States District Court
Northern District of California