1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

12
13
14
15
16
17

DELANEY GERAL MARKS,

           Petitioner,

    v.

RON DAVIS, Warden, California State
Prison at San Quentin,

          Respondent.

Case No. 11-CV-02458-LHK

**DEATH PENALTY CASE**

ORDER DENYING CLAIMS 9 AND 11

Re: Dkt. Nos. 62, 63

18
19
20
21

       In 1994, Petitioner Delaney Geral Marks ("Petitioner") was convicted of two counts of
first degree murder with personal use of a firearm, and two counts of attempted premeditated
murder and infliction of great bodily injury, and sentenced to death.  On December 14, 2011,
Petitioner filed a petition for a writ of habeas corpus before this Court.  ECF No. 3 ("Pet.").

22
23
24
25

       The Court has ruled on six of Petitioner's 22 claims.  *See* ECF Nos. 52, 74.  This Order
addresses Claims 9 and 11.  Petitioner requests an evidentiary hearing as to these claims.  For the
reasons discussed below, Claims 9 and 11 are DENIED, and Petitioner's request for an evidentiary
hearing on these claims is DENIED.

26
27
28

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 9 AND 11

## I.     BACKGROUND

### A.  Factual Background[1]

On October 17, 1990, Petitioner entered a Taco Bell restaurant in Oakland, California. After ordering, he shot employee Mui Luong ("Luong") in the head.  Luong survived the shooting but remained in a persistent vegetative state.  Petitioner then entered the Gourmet Market, not far from the Taco Bell.  There, Petitioner shot John Myers ("Myers") and Peter Baeza ("Baeza"). Baeza died at the scene but Myers survived.  Later that evening, Petitioner and his girlfriend, Robin Menefee ("Menefee"), took a cab driven by Daniel McDermott ("McDermott").  Petitioner shot and killed McDermott.  *Marks*, 31 Cal. 4th at 204–06.

Petitioner was arrested shortly after McDermott was shot.  Lansing Lee ("Lee"), a criminalist, testified at trial with "virtually absolute certainty" that the bullets that shot Baeza and Myers came from Petitioner's gun.  *Id.* at 207.  Lee also testified that his analysis "indicated" that the bullet that shot McDermott came from Petitioner's gun and "suggested" that the bullet that injured Luong also came from the same source.  *Id.*  Eyewitness testimony also identified Petitioner as the shooter.  *Id.* at 204–07.  Petitioner testified and denied all of the shootings.  *Id.* at 207.  The defense also presented evidence that Petitioner's hands did not test positive for gunshot residue.  *Id.* at 208.  On April 24, 1994, the jury convicted Petitioner of two counts of first degree murder with personal use of a firearm, and two counts of attempted premeditated murder with personal use of a firearm and infliction of great bodily injury.

During the penalty phase, the prosecutor presented in aggravation evidence of Petitioner's past violent conduct, including incidents of domestic violence and violent conduct while incarcerated.  *Id.* at 208–10.  The prosecutor also presented evidence of the effect of the murders on the families of the victims.  *Id.* at 210–12.  In mitigation, Petitioner testified as to his history of seizures.  *Id.* at 212.  Other witnesses testified that Petitioner had grown up in a strong family

---

[1] The following facts are taken from the California Supreme Court's opinion on direct appeal. *See People v. Marks*, 31 Cal. 4th 197, 203–14 (2003).  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 9 AND 11

1    environment, and had not engaged in problematic behavior until he was discharged from the army

2    and began using drugs. *Id.* at 212–13. Petitioner's daughter testified that Petitioner had never hit

3    her, and that she saw him regularly when he was not incarcerated. *Id.* at 213. On May 6, 1994,

4    the jury set the penalty for the capital crimes at death. *Id.* at 203.

5    **B. Procedural History**

6         On July 24, 2003, the California Supreme Court affirmed the conviction and sentence on

7    direct appeal. *People v. Marks*, 31 Cal. 4th 197 (2003). The U.S. Supreme Court denied certiorari

8    on May 3, 2004. *Marks v. California*, 541 U.S. 1033 (2004).

9         Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. On

10   March 16, 2005, that Court ordered Respondent to show cause in the Alameda County Superior

11   Court why the death sentence should not be vacated and Petitioner re-sentenced to life without

12   parole on the ground that Petitioner was intellectually disabled[2] within the meaning of *Atkins v.*

13   *Virginia*, 536 U.S. 304 (2002), which held that intellectually disabled individuals may not be

14   executed. AG023690.[3] The California Supreme Court denied the remaining claims in the petition

15   on the merits without explanation. In addition to the merits decision, as separate and independent

16   grounds for denial, the California Supreme Court held that four of Petitioner's claims were

17   procedurally barred.

18        The Alameda County Superior Court conducted an evidentiary hearing on the issue of

19   Petitioner's alleged intellectual disability. On June 13, 2006, the Superior Court denied the

20   petition, and found that Petitioner had failed to prove by a preponderance of the evidence that he is

21   intellectually disabled within the meaning of *Atkins*. AG023700–22. On August 14, 2006,

22   Petitioner filed a further petition for writ of habeas corpus on the issue of his intellectual disability.

23   The petition was denied by the California Supreme Court on December 15, 2010. AG028382.

24

25   [2] At the time *Atkins* was decided, the condition at issue was known as "mental retardation," but the
     U.S. Supreme Court recently announced that it would henceforth use the term "intellectual
26   disability." *Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014). This Court will do the same, except
     when quoting from the record.
27   [3] Citations to "AG" refer to the Bates-stamped page numbers identified in the California Attorney
     General's lodging of the state court record with this Court.
28
     Case No. 11-CV-02458-LHK
     ORDER DENYING CLAIMS 9 AND 11

United States District Court
Northern District of California

1

2

3

4

On December 14, 2011, Petitioner filed his federal petition for writ of habeas corpus in this Court.  ECF No. 3.  The parties subsequently filed cross-motions for summary judgment on Claims 2, 3, and 5.  ECF Nos. 37, 38.  The claims were denied, and summary judgment in favor of Respondent granted on June 25, 2015.  ECF No. 52.

5

6

7

8

9

On December 15, 2015, Petitioner and Respondent filed opening briefs on the merits as to Claims 1, 4, 6, 7, 8, 9, 10, and 11.  ECF No 62 ("Resp't's Br."); 63 ("Pet'r's Br.").  On February 12, 2016, Petitioner and Respondent filed response briefs.  ECF No. 64 ("Pet'r's Opp."); ECF No. 65 ("Resp't's Opp.").  The Court denied Claims 1, 6, and 7 on September 15, 2016.  ECF No. 74.  The Court will address Claims 4, 8, and 10 in separate orders.

10

## II.     LEGAL STANDARD

11

### A.  Antiterrorism and Effective Death Penalty Act (28 U.S.C. § 2254(d))

12

13

14

15

16

17

18

19

20

Because Petitioner filed his original federal habeas petition in 2011, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to the instant action.  *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003) (holding that AEDPA applies whenever a federal habeas petition is filed after April 24, 1996).  Pursuant to AEDPA, a federal court may grant habeas relief on a claim adjudicated on the merits in state court only if the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

21

### 1.  Contrary To or Unreasonable Application of Clearly Established Federal Law

22

23

24

25

26

27

As to 28 U.S.C. § 2254(d)(1), the "contrary to" and "unreasonable application" prongs have separate and distinct meanings.  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court.").  A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case

28

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 9 AND 11

United States District Court
Northern District of California

1  differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Id.* at

2  412–13.

3      A state court's decision is an "unreasonable application" of clearly established federal law

4  if "the state court identifies the correct governing legal principle . . . but unreasonably applies that

5  principle to the facts of the prisoner's case." *Id.* at 413. "[A]n *unreasonable* application of federal

6  law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86,

7  101 (2011). A state court's determination that a claim lacks merit is not unreasonable "so long as

8  'fairminded jurists could disagree' on [its] correctness." *Id.* (quoting *Yarborough v. Alvarado*, 541

9  U.S. 652, 664 (2004)).

10     Holdings of the U.S. Supreme Court at the time of the state court decision are the sole

11  determinant of clearly established federal law. *Williams*, 529 U.S. at 412. Although a district

12  court may "look to circuit precedent to ascertain whether [the circuit] has already held that the

13  particular point in issue is clearly established by Supreme Court precedent," *Marshall v. Rodgers*,

14  133 S. Ct. 1446, 1450 (2013) (per curiam), "[c]ircuit precedent cannot refine or sharpen a general

15  principle of [U.S.] Supreme Court jurisprudence into a specific legal rule," *Lopez v. Smith*, 135 S.

16  Ct. 1, 4 (2014) (per curiam) (internal quotation marks omitted).

17      **2.  Unreasonable Determination of the Facts**

18      In order to find that a state court's decision was based on "an unreasonable determination

19  of the facts," 28 U.S.C. § 2254(d)(2), a federal court "must be convinced that an appellate panel,

20  applying the normal standards of appellate review, could not reasonably conclude that the finding

21  is supported by the record before the state court," *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir.

22  2014) (internal quotation marks omitted). "[A] state-court factual determination is not

23  unreasonable merely because the federal habeas court would have reached a different conclusion

24  in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). That said, "where the state courts

25  plainly misapprehend or misstate the record in making their findings, and the misapprehension

26  goes to a material factual issue that is central to petitioner's claim, that misapprehension can

27  fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable."

28

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 9 AND 11

United States District Court
Northern District of California

1    *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

2            In examining whether a petitioner is entitled to relief under 28 U.S.C. § 2254(d)(1) or

3    § 2254(d)(2), a federal court's review "is limited to the record that was before the state court that

4    adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  In the event

5    that a federal court "determine[s], considering only the evidence before the state court, that the

6    adjudication of a claim on the merits resulted in a decision contrary to or involving an

7    unreasonable application of clearly established federal law, or that the state court's decision was

8    based on an unreasonable determination of the facts," the federal court evaluates the petitioner's

9    claim *de novo*.  *Hurles*, 752 F.3d at 778.  If error is found, habeas relief is warranted if that error

10   "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

11   *Abrahamson*, 507 U.S. 619, 638 (1993).  Petitioners "are not entitled to habeas relief based on trial

12   error unless they can establish that it resulted in 'actual prejudice.'"  *Id.* at 637 (quoting *United*

13   *States v. Lane*, 474 U.S. 438, 449 (1986)).

14           **B.  Federal Evidentiary Hearing (28 U.S.C. § 2254(e))**

15           Under *Cullen v. Pinholster*, habeas review under AEDPA "is limited to the record that was

16   before the state court that adjudicated the claim on the merits."  563 U.S. at 180–81.  The Ninth

17   Circuit has recognized that *Pinholster* "effectively precludes federal evidentiary hearings" on

18   claims adjudicated on the merits in state court.  *Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th Cir.

19   2013); *see also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("Although the Supreme Court

20   has declined to decide whether a district court may ever choose to hold an evidentiary hearing

21   *before* it determines that § 2254(d) has been satisfied, an evidentiary hearing is pointless once the

22   district court has determined that § 2254(d) precludes habeas relief.") (internal quotation marks

23   and citation omitted).

24   **III.     DISCUSSION**

25       **A.  Claim 9**

26           In Claim 9 of Petitioner's habeas petition, Petitioner asserts that he was deprived of his

27   constitutional right to effective, conflict-free counsel because one of Petitioner's two trial

28                                                                6
     Case No. 11-CV-02458-LHK
     ORDER DENYING CLAIMS 9 AND 11

attorneys, Albert Thews ("Thews"), was afraid of Petitioner. Pet'r's Br. at 37–43. Thews asked that Petitioner be physically restrained at trial based on fears for Thews's personal safety. In the midst of the discussion with the trial court on that motion, Thews asked to withdraw from the case. The trial court declined to physically restrain Petitioner and denied Thews's motion to withdraw. According to Petitioner, the trial court did not sufficiently inquire into Thews's conflict of interest.

Petitioner presented this claim in his state habeas petition, and the California Supreme Court denied Petitioner relief without explanation. AG023690 ("All other claims set forth in the petition for writ of habeas corpus are denied. Each claim is denied on the merits."). Because the California Supreme Court did not provide reasons for its denial of Petitioner's claim, the Court must determine what arguments or theories could have supported the California Supreme Court's decision. *See Richter*, 562 U.S. 86 at (2011) ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision."). The Court then "must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the U.S. Supreme Court. *Id.*

### 1.  Alleged Conflict of Interest

On December 10, 1992, private counsel Thews and Louis Wies ("Wies") were appointed to represent Petitioner at trial, after the Alameda County Public Defender's Office declared a conflict in Petitioner's case. AG023077.

On March 23, 1994, toward the start of the guilt phase of the trial, Thews and Wies requested that Petitioner be physically restrained during trial. Thews first stated, "We feel we have a fair jury. . . . We feel we have a defense in this case, and you have heard my opening statement. We feel that we can proceed farther." AG014665. However, Thews expressed concern that if Petitioner "acts out and is violent in court, that would be consistent with the imagine [sic] that is projected by the People here. It will seriously prejudice his case." AG014665–66. Thews also represented that Petitioner was increasingly agitated and had made a threat against Thews, which Petitioner vigorously denied. AG014675–76. Although Thews did

7

1    not explicitly express concern for Thews's physical safety on the record, the trial court and other

2    parties made clear that Thews was concerned for his safety.  *See* AG014678 (trial court stating

3    "Mr. Thews is concerned with his safety"); *see also, e.g.*, AG014663–64, AG014683–84.

4         Wies echoed Thews's concern that Petitioner's misbehavior during the trial would

5    prejudice the case.  However, Wies did not believe that Petitioner presented a risk of physical

6    danger.  Specifically, Wies stated, "I'm not concerned with [Petitioner] striking me" and "my

7    concern is not for personal safety of persons."  AG014677–78.

8         In the midst of the discussion in court on defense counsel's request to restrain Petitioner,

9    Thews moved to withdraw on the grounds that "there's a conflict between [Petitioner] and I in

10   terms of my representation, my cross-examination of the witnesses, my procedure in carrying out

11   this particular trial."  AG014684.  Wies and the prosecutor opposed the motion to withdraw.  *Id.* at

12   AG014684–85.  The trial court then took the motion to withdraw under submission.  AG014686.

13        Upon returning from a brief recess, the trial court denied the motion to restrain Petitioner

14   without prejudice.  AG014689.  With respect to Thews's motion to withdraw, the trial court noted,

15   "I've carefully considered that motion also.  And I've considered this not simply in a vacuum or

16   not simply based on the record here before me today.  But I've considered it in view of the entire

17   record in this case that's been presented to me."  AG014691.  The trial court then denied Thews's

18   motion: "Based on my entire review of the whole record here, I'm denying the motion to

19   withdraw.  I don't find that there is any irremediable breakdown in communication between Mr.

20   Thews and [Petitioner] that would merit his, Mr. Thews's withdrawal.  I think Mr. Thews's

21   withdrawal at this stage of the proceedings would be a great detriment to [Petitioner]."

22   AG014692.  The trial court then denied Thews's motion for reconsideration.  AG014692.

23        It does not appear that Thews made a second motion to withdraw at any point during the

24   trial.  However, during the guilt phase of the trial, on March 29, 1994, Petitioner moved to relieve

25   his attorneys and represent himself.  AG015264–65.  Wies and Thews also moved for a hearing on

26   Petitioner's competence, and contended that Petitioner was unable to assist in Petitioner's defense

27   and was convinced that Thews and Wies had taken bribes to convict Petitioner.  AG015280.  The

28

United States District Court
Northern District of California

8

1    trial court denied the motions.

2          In an October 22, 2002 declaration, Thews further described Thews's March 23, 1994

3    motion to withdraw and fears for his physical safety:

4          At one point early in the proceedings, I moved to withdraw as [Petitioner's]
           counsel, because his inability to control his thought process and behavior raised a
5          concern for my personal safety.  I believed the situation created a conflict of
           interest because [Petitioner's] uncontrollable agitation was directly tied to his
6          irrational beliefs that certain nonexistent evidence could and should be introduced
           to help his case.  I felt it would be a disservice to [Petitioner] either to placate him
7          by pursuing fruitless or prejudicial lines of examination or to be distracted by
           concerns for his reaction while I examined witnesses in the way I saw fit.  After the
8          court denied my motion to withdraw, Mr. Weis told me that he would keep an eye
           on [Petitioner] so that I could concentrate on litigating the guilt phase.

9    AG023117.

10         **2.  Analysis**

11         The U.S. Supreme Court has held that the general rule for evaluating a claim of ineffective

12   assistance of counsel is enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Mickens v.*

13   *Taylor*, 535 U.S. 162, 166 (2002).  To prevail on a *Strickland* claim, Petitioner must establish two

14   things.  First, he must establish that counsel's representation was deficient, i.e., that it "fell below

15   an objective standard of reasonableness" under prevailing professional norms.  *Strickland*, 466

16   U.S. at 687–88.  Second, Petitioner must establish that he was prejudiced by counsel's deficient

17   performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional

18   errors, the result of the proceeding would have been different."  *Id.* at 694.  "A reasonable

19   probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

20         Rather than rely on *Strickland*, Petitioner supports his claim for ineffective assistance by

21   citing *Cuyler v. Sullivan*, 446 U.S. 335, 351 (1980).  Pet'r's Br. at 38.  *Sullivan* held "that an actual

22   conflict of interest" created by multiple representation may violate the Sixth Amendment right to

23   effective assistance of counsel where the conflict of interest "adversely affected [the] lawyer's

24   performance."  *Sullivan*, 446 U.S. at 348.  If a defendant proves that such a conflict of interest

25   exists, then prejudice is presumed.  *See Mickens*, 535 U.S. at 166 (noting *Sullivan* is an

26   "exception" to the "general rule" that otherwise requires defendants to show prejudice under

27

28                                                       9

1    *Strickland*).  In addition, *Sullivan* held that state trial courts are required to investigate a conflict of

2    interest from multiple representation upon an attorney's timely objection.  *Sullivan*, 446 U.S. at

3    346 (citing *Holloway v. Arkansas*, 435 U.S. 475 (1978)).

4          Petitioner's reliance on *Sullivan* is unavailing.  Petitioner does not suggest a conflict of

5    interest based on multiple representation, but rather argues that a conflict arose from Thews's fears

6    for Thews's physical safety.  However, the U.S. Supreme Court has not extended *Sullivan* beyond

7    conflicts involving multiple concurrent representations at trial.  *Mickens*, 535 U.S. at 174–76.

8    Indeed, in *Mickens*, the U.S. Supreme Court specifically stated that an expansion of *Sullivan*

9    beyond multiple representation conflicts "remains, as far as the jurisprudence of this Court is

10   concerned, an open question."  *Id.* at 176 (noting that *Sullivan* "does not clearly establish, or

11   indeed even support," the more expansive application of *Sullivan* taken by the circuit courts); *see*

12   *also Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir. 2005) ("The *Mickens* Court specifically and

13   explicitly concluded that *Sullivan* was limited to joint representation . . . .").

14         Because no clearly established Supreme Court law extends *Sullivan* to a conflict of interest

15   as suggested by Petitioner, the California Supreme Court's rejection of Petitioner's conflict of

16   interest claim could not be "contrary to, or an unreasonable application of, any clearly established

17   Federal law as determined by the United States Supreme Court."  *See* 28 U.S.C. § 2254(d)(1);

18   *Foote v. Del Papa*, 492 F.3d 1026, 1030 (9th Cir. 2007) (affirming district court's denial of

19   petitioner's habeas claim because the U.S. Supreme Court "has never held that the *Sullivan*

20   exception applies either to a defendant's 'irreconcilable conflict' with his appointed appellate

21   counsel or to such counsel's conflict of interest").  In addition, the decision was not based on an

22   unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(2).  Accordingly, Claim 9 is

23   DENIED.

24   **B.  Claim 11**

25         In Claim 11, Petitioner presents two arguments related to the prosecution's presentation of

26   allegedly false and misleading identification testimony.  First, Petitioner contends that the

27   prosecution employed suggestive identification procedures.  Pet'r's Br. at 51.  Second, Petitioner

28
     10

United States District Court
Northern District of California

1   argues that the prosecution failed to disclose credible evidence that would have undermined the

2   identification testimony presented. *Id.*

3        Petitioner presented this claim in his state habeas petition, and the California Supreme

4   Court denied Petitioner relief without explanation. AG023690 ("All other claims set forth in the

5   petition for writ of habeas corpus are denied. Each claim is denied on the merits."). Under

6   *Richter*, the California Supreme Court's decision constitutes a merits adjudication subject to

7   AEDPA deference. 562 U.S. at 98 ("Where a state court's decision is unaccompanied by an

8   explanation, the habeas petitioner's burden still must be met by showing there was no reasonable

9   basis for the state court to deny relief.").

10       The Court first addresses the allegations regarding suggestive identification procedures,

11  then the allegations of the prosecution's failure to disclose material information.

12       **1.  Suggestive Identification Procedures**

13            **a.  Identification Procedures**

14       On October 22, 1990, Oakland Police Officer Dan Mercado ("Mercado") held a physical

15  lineup. AG014410. Petitioner, while represented by counsel, chose the five other members of the

16  lineup and selected Petitioner's position in the lineup. AG014410–11, AG014414. After

17  Petitioner's selection, Mercado reviewed the lineup to ensure that the lineup was fair. AG014411.

18  Petitioner did not object to the lineup. AG014413.

19       At least five witnesses were brought to the Oakland Police Department to view the

20  physical lineup: Sherman Boyd ("Boyd"), Marla Harris ("Harris"), Grace Haynes ("Haynes"),

21  Diane Griffin ("Griffin"), and Denise Frelow ("Frelow"). AG014424. Witnesses were instructed

22  not to discuss the case and not to sit together during the lineup. AG014416. The lineup was then

23  presented to the witnesses, who marked a card if they identified anyone. AG014415–16,

24  AG014419. Once the lineup was completed, Mercado examined the cards with defense counsel.

25  AG014422–23. Boyd, Harris, Haynes, and Griffin firmly identified Petitioner at the physical

26  lineup, while Frelow indicated that she thought she recognized Petitioner but was not sure.

27  AG014757 (Boyd) (stating that he recognized Petitioner "as soon as he came out"); AG014453–54

28

11

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 9 AND 11

1   (Harris) (stating that she recognized Petitioner "as soon as the person walked out"); AG014442

2   (Haynes) (explaining that as soon as she "saw his face, [Haynes] recognized who he was");

3   AG014463–64 (Griffin) (stating that she recognized Petitioner "as soon as he walked out" in the

4   lineup); AG014433 (Frelow) (noting that she placed a question mark on the card on Petitioner's

5   spot in the lineup).

6          On March 17, 1994, the trial court held a hearing regarding the propriety of the physical

7   lineup.  AG014407–77.  Mercado, Harris, Haynes, Griffin, and Frelow testified.  Boyd was not

8   available to testify that day and instead testified about the physical lineup on March 22, 1994, as

9   discussed below.  At the March 17, 1994 hearing, Mercado testified that did not show any

10  photographs to Boyd, Harris, Haynes, Griffin, or Frelow before the physical lineup on October 22,

11  1990.  AG014425.  Harris, Haynes, Griffin, and Frelow confirmed that they were not shown any

12  photographs by police before the lineup, and did not see any photographs of the alleged shooter on

13  television before the lineup.  *See* AG014455–56 (Harris); AG014446–47 (Haynes); AG014464–65

14  (Griffin); AG014433–35 (Frelow); AG014443.

15         After hearing the testimony, the trial court found that "nothing in the lineup procedure is in

16  any way suggestive and is conducive to mistaken identification by any of these witnesses."

17  AG014475.  The trial court explained:

18         There is no testimony, whatsoever, to indicate that there was, in fact, any
           conversation between witnesses regarding the procedures in the lineup.  On the
19         contrary, each of the witnesses who have testified here . . . testified very clearly that
           there was no conversation between themselves and any other potential witness
20         regarding the lineup procedures. . . . Each witness specifically said that they were
           instructed to have no such conversation, and they followed those instructions, and
21         there was no such conversation.  To infer, despite this direct and clear testimony on
           this point, that there could have – may have been such conversation . . . is, I think,
22         simply and purely speculation.

23         The lineup procedure, itself, I believe it was entirely appropriate.  There is – I find
           no – no evidence of any kind to indicate that the lineup was in any way suggestive.
24
           The position of the [Petitioner] in the lineup was selected by him, the members of
25         the lineup were selected by him, and also further review by the police department
           to make sure there was no inadvertent suggestion, in terms of the people appearing
26         in the lineup.  I've viewed these photographs [of the individuals in the lineup], and
           this appears to be a fair and representative lineup.  There is nothing about the
27         makeup of the lineup, itself, with respect to the individuals standing in the lineup,
           their location, their clothing, skin color, facial features or any other thing depicted
28

United States District Court
Northern District of California

12

United States District Court
Northern District of California

in those photographs, that indicates that this lineup was in any way suggestive. AG014474–75.

The trial court confirmed this ruling on March 22, 1994, after holding another preliminary hearing for Boyd to testify.  Like Harris, Haynes, Griffin, and Frelow, Boyd testified that he was not shown any photographs of any suspects and did not see any news accounts of the shooting. AG014607, AG014611.  The trial court ruled that it saw "nothing of any sort that would indicate that there was any undue suggestiveness or, for that matter, any suggestiveness of any dimension with respect to the lineup."  AG014613.

At least one eyewitness did not participate in the physical lineup.  John Myers ("Myers") was shot on October 17, 1990 at the Gourmet Market, but survived.  Petitioner alleges that Myers was shown "a photograph of a physical line-up while he was in intensive care."  Pet. at 215. Petitioner cites to no part of the record describing the photograph lineup.  Petitioner alleges that Myers was unsure whether Petitioner or another individual in the lineup (individual number six) was the man that shot him.  Myers ultimately chose individual number six.  *Id.*

**b.  Analysis**

As noted above, eyewitnesses Boyd, Harris, Haynes, Griffin, and Frelow identified Petitioner at the physical lineup on October 22, 1990.  Myers was unsure whether Petitioner or another individual was the shooter, but ultimately chose the other individual as the shooter. According to Petitioner, Petitioner's appearance differed from these eyewitnesses' earlier descriptions of the shooter given on October 17, 1990, the night of the shooting.  Pet'r's Br. at 51– 52. From this, Petitioner concludes that the police must have suggestively shown the eyewitnesses photographs of Petitioner before the lineup.  Petitioner also contends that the physical lineup was unfair because Petitioner was the only member of the lineup who wore braids.  *Id.* at 52; Pet'r's Opp. at 49–50.

Due process protects against the admission of evidence derived from police-organized identification procedures that are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *Simmons v. United States*, 390 U.S. 377, 384 (1984).

"If [the court] find[s] that a challenged procedure is not impermissibly suggestive, [the] inquiry into the due process claim ends." *United States v. Bagley*, 772 F.2d 482, 492–93 (9th Cir. 1985). However, even "a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." *Manson v. Brathwaite*, 432 U.S. 98, 106, 114 (1977) ("[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ."). To determine whether identification testimony is sufficiently reliable, courts consider five factors: (1) the witness' opportunity to view the defendant at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification. *Id.* at 114. Thus, admission of identification testimony amounts to a violation of due process only if "(1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification; and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure." *See Van Pilon v. Reed*, 799 F.2d 1332, 1338 (9th Cir. 1986) (internal citations omitted).

In the instant case, Petitioner cites nothing in the record to support the contention that the physical lineup was impermissibly suggestive because the witnesses had previously seen photographs of Petitioner. Indeed, police officer Mercado testified that he did not show photographs before the physical lineup to eyewitnesses, including Harris, Haynes, Griffin, Frelow, or Boyd. AG014425. Moreover, before trial, at a hearing specifically directed to determining whether the physical lineup was suggestive, Harris, Haynes, Griffin, and Frelow confirmed that they were not shown any photographs by police before the lineup, and did not see any photographs of the alleged shooter on television before the lineup. *See* AG014455–56 (Harris); AG014443, AG014446–47 (Haynes); AG014464–65 (Griffin); AG014433–35 (Frelow). Boyd likewise confirmed that he had not seen any photographs or news accounts of Petitioner before the physical lineup. AG014607, AG014611, AG014760–61. Thus, the California Supreme Court was reasonable in declining to find that the physical lineup was tainted by the police showing

14

United States District Court
Northern District of California

1    photographs to eyewitnesses.

2         In addition, that Petitioner was the only one in the physical lineup with braids does not

3    show that he was presented so differently from the others in the lineup as to make the lineup

4    unduly suggestive.  *See United States v. Burdeau*, 168 F.3d 352, 357–58 (9th Cir.) (differences in

5    photos of perpetrator and others in a photo array "in no way implied that the witnesses should

6    identify him as the perpetrator"), *cert. denied*, 528 U.S. 958 (1999); *see also Moore v. Scribner*,

7    2007 WL 1848028, at *5 (N.D. Cal. June 27, 2007) ("Given the similarity among the individuals

8    depicted in the photographs with respect to their race, gender, clothing, facial hair, and hair styles,

9    the fact that Moore had two earrings whereas others had one or none is a relatively minor

10   discrepancy that did not impermissibly suggest Moore was the suspect.").  The trial court viewed

11   photographs from the lineup and specifically found that "this appears to be a fair and

12   representative lineup.  There is nothing about the makeup of the lineup, itself, with respect to the

13   individuals standing in the lineup, their location, their clothing, skin color, facial features or any

14   other thing depicted in those photographs, that indicates that this lineup was in any way

15   suggestive."  AG014474–75.  Thus, Petitioner provides no support to show that the physical

16   lineup was "so impermissibly suggestive as to give rise to a very substantial likelihood of

17   irreparable misidentification."  *Simmons*, 390 U.S. at 384.

18        Further, Petitioner identifies nothing suggestive about the photograph lineup shown to

19   Myers in the hospital.  Indeed, Myers did not ultimately select Petitioner as the shooter from the

20   photograph lineup, Pet. at 215, and Petitioner's counsel cross examined Myers during the guilt

21   phase of Petitioner's trial about the discrepancies between Myers's various descriptions of the

22   shooter.  *See* AG015219.  Moreover, photograph lineups are not necessarily suggestive.  *See, e.g.*,

23   *United States v. Ash*, 413 U.S. 300, 324 (1973); *Davis v. Butler*, 210 F. App'x 584, 587 (9th Cir.

24   2006) (finding that a photograph lineup of five photographs was not impermissibly suggestive).

25   Accordingly, Petitioner does not establish that Myers was exposed to any identification procedure

26   that was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable

27   misidentification."  *Simmons*, 390 U.S. at 384.

28

United States District Court
Northern District of California

15

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 9 AND 11

United States District Court
Northern District of California

Petitioner raises two additional challenges to Myers's testimony.  Although Petitioner includes these two challenges in Petitioner's claim regarding suggestive identification procedures, neither challenge is related to suggestive tactics.  First, Petitioner contends that the prosecution improperly elicited testimony regarding the physical and psychological effects Myers suffered after the shooting.  Specifically, during the guilt phase of Petitioner's trial, the prosecution elicited testimony about the chronology of events, including the shooting of Myers and Myers's coworker Baeza.  After Myers testified to calling 911, the prosecution asked Myers, "And with that, what did you do?"  Myers responded "I was on my back, I covered the hole in my chest and – well, just before covering the hole on my chest, I kind of grabbed [Baeza's] leg and kind of gave a little bit of a shake to try to let him know help was coming, you know, hang in there."  AG0151339.  The prosecution asked, "What's the next thing you remember," to which Myers responded, "It went back to my kids and my wife and everything, another prayer to help me pull through it, and I just didn't want anybody else raising my kid."  *Id.*  Later, Myers described the pain that he felt in being moved and his fear that Myers "didn't know if [Myers] could hang on that long" to get to the hospital.  AG015147–49.  Petitioner contends that this testimony was irrelevant and unfairly prejudicial.

Second, Petitioner contends that the prosecution improperly read during the guilt phase of Petitioner's trial part of a statement made by Myers at an earlier preliminary hearing.  Myers's preliminary hearing statement did not identify Petitioner as the shooter.  However, Myers described the shooter as a black male with braided hair, of medium build and approximately 5' 8" tall.  AG015220–22.  Petitioner contends that the prosecution's reading of Myers's statement from the preliminary hearing violated the California Evidence Code, which requires that an identification of a perpetrator consist of an independent recollection of the perpetrator or an in-court identification.  Pet. at 216.

Neither of these two challenges to Myers's testimony relates to suggestive identification procedures and thus neither is governed by *Simmons*, 390 U.S. 377, or related cases.  In fact, Petitioner cites no relevant clearly established law addressing the introduction of irrelevant or

16

prejudicial evidence, or the introduction of evidence in violation of state evidence law.  This alone is reason to deny Petitioner's claim.  *See* 28 U.S.C. § 2254(d) (noting that habeas relief may be granted only when a state court decision is contrary to, or an unreasonable application of, clearly established federal law).

Moreover, state evidence law is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999) ("A federal habeas court, of course, cannot review questions of state evidence law."); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.) (holding that admission of "irrelevant and highly prejudicial" testimony does not warrant habeas relief unless the admission was "arbitrary or fundamentally unfair"), *cert. denied*, 479 U.S. 839 (1986).  Petitioner does not claim that the introduction of Myers's victim impact testimony or Myers's preliminary statement "so fatally infected his trial as to render it fundamentally unfair or . . . a complete miscarriage of justice." *Henry*, 197 F.3d at 1031.

In addition, although Petitioner does claim that the testimony was irrelevant and prejudicial, such allegations do not establish grounds for habeas relief in the instant case.  The U.S. Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 & n.2 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established United States Supreme Court precedent under § 2254(d)); *see also Zapien v. Martel*, 805 F.3d 862, 869 (9th Cir. 2015) (because there is no U.S. Supreme Court case "establishing the fundamental unfairness of admitting multiple hearsay testimony," *Holley* bars any such claim on federal habeas review).  Here, absent such "clearly established Federal law," the Court cannot conclude that the California Supreme Court acted contrary to, or unreasonably applied, such federal law in denying Petitioner's challenges to Myers's testimony.  *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack

17

United States District Court
Northern District of California

1    of holdings from this Court . . . it cannot be said that the state court 'unreasonabl[y] appli[ed]

2    clearly established Federal law.'").

3            In sum, the Court cannot say that the California Supreme Court's denial of Petitioner's

4    claim regarding suggestive identification procedures and Myers's testimony was contrary to, or

5    involved an unreasonable application of, clearly established federal law, or that the denial was

6    based on an unreasonable determination of the facts in light of the evidence presented in the state

7    court proceeding.  28 U.S.C. § 2254(d).  Accordingly, Petitioner's subclaim is denied.

8            **2.  Failure to Disclose**

9            Next, Petitioner contends that the prosecution failed to investigate or failed to disclose

10   exculpatory evidence that would have undermined the identification of Petitioner as the shooter.

11   Petitioner identifies a list of allegedly suppressed or uninvestigated evidence: (1) Boyd and Harris

12   received benefits in exchange for their testimony against Petitioner; (2) Boyd had ingested drugs

13   and alcohol on the day of the shooting; (3) Jerry Arriba ("Arriba") told police that Haynes had an

14   obstructed view of the shooter; (4) Keith Wilson ("Wilson") and Bobbie Anderson ("Anderson")

15   reported that descriptions of the shooter matched a man named Keith Anderson; (5) Joseph

16   Bermio ("Bermio"), a nearby resident looking out his window, reported seeing an African

17   American man the night of the shooting that looked different from Petitioner; (6) Sara Smith

18   Chatmon ("Chatmon") reported that she knew the shooter, but was dissuaded from participating in

19   the case, and (7) Jimmy Marks, Petitioner's brother, was arrested in connection with the shooting

20   but had an alibi.  Pet'r's Br. at 53–54.

21           Petitioner bases this subclaim on *Brady v. Maryland*, 373 U.S. 83 (1963).  Under *Brady*

22   and its progeny, the prosecution has a duty to disclose evidence favorable to an accused, and the

23   failure to disclose such evidence violates due process "where the evidence is material either to

24   guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Strickler v.*

25   *Greene*, 527 U.S. 263, 280 (1999) (quoting *Brady*, 373 U.S. at 87).  The prosecution's duty under

26   Brady encompasses both impeachment evidence and exculpatory evidence.  *Id.*  Evidence is

27   material "if there is a reasonable probability that, had the evidence been disclosed to the defense,

28

United States District Court
Northern District of California

18

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 9 AND 11

1   the result of the proceeding would have been different." *Id.* Thus, a *Brady* violation requires

2   showing three components: (1) "The evidence at issue must be favorable to the accused, either

3   because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been

4   suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued."

5   *Id.* at 281–82.

6           To the extent that Petitioner contends that the prosecution failed to sufficiently investigate

7   the above alleged exculpatory evidence, *Brady* provides no support for Petitioner's claim.  In

8   *Brady*, after petitioner John Brady was convicted of murder, Brady discovered that the prosecution

9   failed to disclose that Brady's companion had made a statement admitting to the murder.  *Brady*,

10  373 U.S. at 84.  The U.S. Supreme Court ruled that the prosecution's suppression of the statement

11  violated due process, because "the suppression by the prosecution of evidence favorable to an

12  accused upon request violates due process where the evidence is material either to guilt or to

13  punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.  Thus, *Brady*

14  did not establish a constitutional standard by which to measure the thoroughness of a

15  prosecution's investigation into potentially exculpatory evidence.  Petitioner cites no authority

16  clearly establishing that *Brady*, or another U.S. Supreme Court case, imposes an obligation on the

17  prosecution to do a certain level of investigation.  Nor does Petitioner cite any authority clearly

18  establishing that the prosecution's investigation in Petitioner's case fell below a constitutional

19  standard.  Indeed, Petitioner's petition and opening brief do not explain how the prosecution's

20  investigation into the above alleged exculpatory evidence was deficient.  *See* Pet. at 208–22;

21  Pet'r's Br. at 53–54.

22          To the extent that Petitioner argues that the prosecution failed to *disclose* the above alleged

23  exculpatory evidence, however, *Brady* and its progeny provide the relevant clearly established

24  federal law.  As noted above, on habeas review the California Supreme Court rejected Petitioner's

25  *Brady* claim without explanation.  Because the California Supreme Court did not provide reasons

26  for its denial of Petitioner's claim, the Court must determine what arguments or theories could

27  have supported the California Supreme Court's decision.  *See Richter*, 562 U.S. at 102 ("Under

28
                                                    19

1 § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could

2 have supported, the state court's decision . . . .").  The Court then "must ask whether it is possible

3 fairminded jurists could disagree that those arguments or theories are inconsistent with the holding

4 in a prior decision" of the U.S. Supreme Court.  *Id.*  With this standard in mind, the Court

5 examines the alleged failures to disclose identified by Petitioner.

6          First, Petitioner contends that the prosecution failed to disclose that eyewitnesses Boyd and

7 Harris were given benefits in exchange for their testimony against Petitioner, specifically that they

8 were not charged with narcotics possession "for which they were arrested following the date in

9 question and prior to [Petitioner's] trial."  Pet. at 222.  This contention has no factual basis in the

10 record.  Petitioner does not provide the date, or even the year, of the alleged arrests.  Further,

11 Petitioner cites nothing in the record demonstrating that the prosecution declined to charge Boyd

12 and Harris, or that the decision not to charge was based on Boyd's and Harris's promise to testify

13 against Petitioner.  Indeed, Boyd submitted a declaration in 2002 as part of Petitioner's state

14 habeas proceedings.  The declaration does not mention any narcotics arrest or any benefits

15 received in exchange for Boyd's testimony.  *See* AG022492–97.  Thus, the California Supreme

16 Court could have reasonably found that the prosecution did not suppress such evidence and thus

17 did not violate *Brady*.  *See Robinson v. Hill*, 2012 WL 1622655, at *5 (N.D. Cal. May 9, 2012)

18 (finding no *Brady* violation because the petitioner's allegations that the prosecution destroyed

19 "material evidence" were "conclusory" and lacked "factual basis").

20          Similarly, Petitioner finds no support in the record for his contention that the prosecution

21 suppressed information provided by Arriba, Wilson, Anderson, Bermio, and Chatmon.  The

22 prosecution contends that the prosecution disclosed the statements of these individuals to the

23 defense.  Resp't's Opp. at 23–24.  In support, the prosecution cites a letter sent by the prosecution

24 to Petitioner's counsel on January 6, 1994, over two months before opening statements for the

25 guilt phase of trial.  AG001333–44.  In the letter, the prosecution states, "I am in receipt this date

26 of your informal request for discovery in the above entitled matter.  I know that this request is

27 merely pro forma . . . because from our prior conversations, I know that you are in possession of a

United States District Court
Northern District of California

28

20

vast amount of these materials."  The letter continues: "My file documents that all of the discovery materials you are entitled to receive . . . has been previously supplied to your predecessors in the Public Defenders Office. . . . For your convenience enclosed please find a summary of the reports, statements and police officer notes that have previously been supplied.  If there are any materials listed there you have not received please contact me immediately so I can supply them to you."  AG001333.  The enclosed list includes statements by Arriba, Wilson, Anderson, Bermio, as well as an interview with Chatmon.  In light of this evidence, the California Supreme Court could reasonably have concluded that the prosecution did not suppress information provided by Arriba, Wilson, Anderson, Bermio, and Chatmon, but rather disclosed that information to the defense.

Petitioner counters that the prosecution's letter was sent "in response to the defense request for such discovery, indicating that it had not been disclosed."  Pet'r's Opp. at 49.  However, this contention is contradicted by the letter itself.  The prosecution's letter is clear that the letter lists only evidence that "[has] previously been supplied."  AG001333.  The letter reaffirms that "all of the discovery materials you are entitled to receive . . . has been previously supplied."  *Id.*  Further, the letter states, "If there are any materials listed there you have not received please contact me immediately so I can supply them to you."  *Id.*  Petitioner does not contend that defense counsel contacted the prosecution to request any additional evidence.  Accordingly, Petitioner's arguments that the prosecution failed to disclose evidence do not show that the California Supreme Court acted unreasonably in finding that no *Brady* violation occurred.

Next, Petitioner claims that the prosecution failed to disclose that Boyd had ingested drugs and alcohol on the day of the shooting.  This information is not reflected in Boyd's interview with the police.  AG020088–92.  However, in a declaration signed by Boyd in 2002, Boyd states, "The day of the shooting started for me like any other day.  I got up, had a beer and a joint before going to work."  AG022495.  Although the declaration does not state that Boyd was drunk or high during the shooting, or that Boyd was unable to recognize Petitioner, Petitioner alleges that the substances "impaired his senses of observation and memory."

The California Supreme Court could have reasonably concluded that the alleged failure to

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 9 AND 11

United States District Court
Northern District of California

United States District Court
Northern District of California

1    disclose such information did not prejudice Petitioner and thus that the third component of a *Brady*

2    violation was not satisfied.  In Boyd's October 17, 1990 interview with the police, Boyd stated

3    that Petitioner "comes in [to Taco Bell, where Boyd worked] just about every day."  AG020088.

4    Boyd had seen Petitioner at Taco Bell the day before the shooting.  AG020092.  In addition, Boyd

5    had "been seeing [Petitioner] around for about two or three months" in other places that Boyd

6    hung out, like the park.  AG020089.  In Boyd's 2002 declaration, Boyd confirmed that Boyd had

7    met and spoken with Petitioner multiple times before the shooting.  AG022492–93.  Even if

8    Petitioner had been able to introduce the potential impeachment evidence that Boyd had ingested

9    alcohol and drugs on the day of the shooting, there was ample evidence that Boyd recognized and

10   could identify Petitioner as the shooter.

11          Further, there was substantial physical and testimonial evidence connecting Petitioner to

12   the shootings.  As discussed above, the criminalist testified with "virtually absolute certainty" that

13   the bullets that shot Baeza and Myers came from Petitioner's gun.  *Marks*, 31 Cal. 4th at 207.  In

14   addition, ballistics analysis "indicated" that the bullet that shot McDermott came from Petitioner's

15   gun and "suggested" that the bullet that injured Luong came from the same source.  *Id.*  At least

16   four eyewitnesses—Griffin, Haynes, Harris, and Boyd—testified as to the shootings and identified

17   Petitioner as the shooter.  *Id.* at 205–06.  Additionally, Petitioner was overhead telling another

18   defendant that "he was in for three murders" and that the victims had died because "I shot them."

19   *Id.* at 208.  In the face of such evidence of guilt, and in light of the limited probative value of the

20   alleged impeachment evidence, the California Supreme Court could have reasonably concluded

21   that there is not "a reasonable probability that, had the evidence been disclosed to the defense, the

22   result of the proceeding would have been different."  *Strickler*, 527 U.S. at 280.  Thus, the

23   California Supreme Court reasonably found that no *Brady* violation occurred based on the

24   prosecution's alleged failure to disclose Boyd's ingestion of drugs and alcohol the day of the

25   shootings.

26          Lastly, Petitioner claims that the prosecution failed to disclose that Jimmy Marks

27   ("Jimmy"), Petitioner's brother, was investigated for the shootings.  Petitioner alleges that Jimmy

28
Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 9 AND 11

1   was stopped multiple times by the police on the night in question, but purposefully manufactured

2   an alibi that placed Jimmy in Berkeley, far from the shootings.  Pet. at 221.  In 2002, Jimmy

3   prepared a declaration describing the day of the shootings.  In the declaration, Jimmy declares that

4   on the day of the shooting he was picked up by the police, but the police stated that Jimmy "could

5   not be the guy because [Jimmy] could not have changed [Jimmy's] clothes that fast."  AG022700.

6   After that encounter, Jimmy met his girlfriend and they went to Berkeley to see a movie.  *Id.*

7   After the movie, when Jimmy returned to Oakland, the police stopped Jimmy again.  However, the

8   police let Jimmy go when Jimmy showed them the movie ticket stub.  AG022701.

9        In opposition to Respondent's briefing, Petitioner seems to concede that Jimmy's "alibi"

10   was not false and that Jimmy went to Berkeley after the shootings occurred.  Pet'r's Opp. at 51.

11   However, Petitioner contends that Jimmy's actions "reasonably could have been construed by a

12   jury to constitute flight and to evidence a consciousness of guilt."  *Id.*  However, Petitioner

13   provides no factual basis for this contention.  Petitioner points to no evidence of Jimmy's guilt as

14   to the shootings.  Moreover, Jimmy's 2002 declaration indicates that the police stopped Jimmy

15   multiple times, but then let Jimmy go because they did not believe that Jimmy was the shooter

16   based both on Jimmy's alibi *and* Jimmy's appearance.  In light of the limited value of this

17   information, and the ample evidence of Petitioner's guilt discussed above, the California Supreme

18   Court could have reasonably concluded that there is not a reasonable probability that, had the

19   potential exculpatory evidence been disclosed to the defense, the result of the proceeding would

20   have been different.  *Strickler*, 527 U.S. at 280.  Therefore, it was reasonable for the California

21   Supreme Court to conclude that there was not "a reasonable probability that, had the evidence

22   been disclosed to the defense, the result of the proceeding would have been different."  *Id.*  Thus,

23   the California Supreme Court reasonably found that no *Brady* violation occurred.

24        In sum, Petitioner's arguments concerning suggestive identification procedures, Myers's

25   testimony, and the prosecution's failure to disclose certain evidence do not demonstrate that the

26   California Supreme Court unreasonably applied or made a decision contrary to clearly established

27   federal law.  *See* 28 U.S.C. § 2254(d).  Nor does Petitioner show that the California Supreme

28

United States District Court
Northern District of California

23

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 9 AND 11

Court made an unreasonable determination of the facts.  Accordingly, Claim 11 is DENIED.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Petitioner's Claims 9 and 11.  In addition, because Petitioner's arguments as to Claims 9 and 11 are unavailing, Petitioner's request for an evidentiary hearing as to Claims 9 and 11 is also DENIED.  *See Sully*, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.").

**IT IS SO ORDERED.**

Dated: September 20, 2016

_____
LUCY H. KOH
United States District Judge

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 9 AND 11