1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

DELANEY GERAL MARKS,

        Petitioner,

   v.

RON DAVIS, Warden, California State Prison at San Quentin,

        Respondent.

Case No. 11-CV-02458-LHK

**DEATH PENALTY CASE**

ORDER DENYING CLAIM 8

Re: Dkt. Nos. 62, 63

     In 1994, Petitioner Delaney Geral Marks ("Petitioner") was convicted of two counts of first degree murder with personal use of a firearm, and two counts of attempted premeditated murder and infliction of great bodily injury, and sentenced to death.  On December 14, 2011, Petitioner filed a petition for a writ of habeas corpus before this Court.  ECF No. 3 ("Pet.").

     The Court has ruled on 9 of Petitioner's 22 claims.  *See* ECF Nos. 52, 74, 75, 76.  This Order addresses Claim 8 of the petition.  Petitioner requests an evidentiary hearing as to this claim.  For the reasons discussed below, Claim 8 is DENIED, and Petitioner's request for an evidentiary hearing is DENIED.

# I.    BACKGROUND

## A. Factual Background[1]

On October 17, 1990, Petitioner entered a Taco Bell restaurant in Oakland, California. After ordering, he shot employee Mui Luong ("Luong") in the head.  Luong survived the shooting but remained in a persistent vegetative state.  Petitioner then entered the Gourmet Market, not far from the Taco Bell.  There, Petitioner shot John Myers ("Myers") and Peter Baeza ("Baeza").  Baeza died at the scene but Myers survived.  Later that evening, Petitioner and his girlfriend, Robin Menefee ("Menefee"), took a cab driven by Daniel McDermott ("McDermott").  Petitioner shot and killed McDermott.  *Marks*, 31 Cal. 4th at 204–06.

Petitioner was arrested shortly after McDermott was shot.  Lansing Lee ("Lee"), a criminalist, testified at trial with "virtual absolute certainty" that the bullets that shot Baeza and Myers came from Petitioner's gun.  *Id.* at 207.  Lee also testified that his analysis "indicated" that the bullet that shot McDermott came from Petitioner's gun and "suggested" that the bullet that injured Luong also came from the same source.  *Id.*  Eyewitness testimony also identified Petitioner as the shooter.  *Id.* at 206–07.  Additionally, Petitioner was overheard telling another defendant that "he was in for three murders" and that the victims had died because "I shot them." *Id.* at 208.

Petitioner testified and denied all of the shootings.  *Id.* at 207.  The defense also presented evidence that Petitioner's hands did not test positive for gunshot residue.  *Id.* at 208.

On April 24, 1994, the jury convicted Petitioner of two counts of first degree murder with personal use of a firearm, and two counts of attempted premeditated murder with personal use of a firearm and infliction of great bodily injury.

During the penalty phase, the prosecutor presented in aggravation evidence of Petitioner's past violent conduct, including incidents of domestic violence and violent conduct while

---

[1] The following facts are taken from the California Supreme Court's opinion on direct appeal. *See People v. Marks*, 31 Cal. 4th 197, 203–14 (2003).  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

2

incarcerated. *Id.* at 208–10.  The prosecutor also presented evidence of the effect of the murders on the families of the victims.  *Id.* at 210–11.  In mitigation, Petitioner testified as to his history of seizures.  *Id.* at 212.  Other witnesses testified that Petitioner had grown up in a strong family environment, and had not engaged in problematic behavior until he was discharged from the army and began using drugs.  *Id.* at 212–13.  Petitioner's daughter testified that Petitioner had never hit her, and that she saw him regularly when he was not incarcerated.  *Id.* at 213.  On May 6, 1994, the jury set the penalty for the capital crimes at death.  *Id.* at 203.

### B.  Procedural History

On July 24, 2003, the California Supreme Court affirmed the conviction and sentence on direct appeal.  *People v. Marks*, 31 Cal. 4th 197 (2003).  The U.S. Supreme Court denied certiorari on May 3, 2004.  *Marks v. California*, 541 U.S. 1033 (2004).

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  On March 16, 2005, that Court ordered Respondent to show cause in the Alameda County Superior Court why the death sentence should not be vacated and Petitioner re-sentenced to life without parole on the ground that Petitioner was intellectually disabled[2] within the meaning of *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that intellectually disabled individuals may not be executed.  AG023690.[3]  The California Supreme Court denied the remaining claims in the petition on the merits without explanation.  In addition to the merits decision, as separate grounds for denial, the California Supreme Court held that four of Petitioner's claims were procedurally barred.

The Alameda County Superior Court conducted an evidentiary hearing on the issue of Petitioner's alleged intellectual disability.  On June 13, 2006, the Superior Court denied the petition, and found that Petitioner had failed to prove by a preponderance of the evidence that he is

---

[2] At the time *Atkins* was decided, the condition at issue was known as "mental retardation," but the U.S. Supreme Court recently announced that it would henceforth use the term "intellectual disability."  *Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).  This Court will do the same, except when quoting from the record.

[3] Citations to "AG" refer to the Bates-stamped page numbers identified in the California Attorney General's lodging of the state court record with this Court.

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 8

United States District Court
Northern District of California

intellectually disabled within the meaning of *Atkins*. AG023700–22. On August 14, 2006, Petitioner filed a further petition for writ of habeas corpus on the issue of his intellectual disability. The petition was denied by the California Supreme Court on December 15, 2010. AG028382.

On December 14, 2011, Petitioner filed his federal petition for writ of habeas corpus in this Court. ECF No. 3. Respondent filed a motion for summary judgment on Claims 2, 3, and 5 on March 26, 2013. ECF No. 37. Petitioner cross-moved for summary judgment on Claims 2, 3, and 5 on March 28, 2013. ECF No. 38. Both Petitioner and Respondent filed opposition briefs on June 10, 2013. ECF Nos. 44, 45. On August 8, 2013, Petitioner and Respondent filed reply briefs. ECF Nos. 48, 49. The claims were denied, and summary judgment in favor of Respondent granted on June 25, 2015. ECF No. 52.

On December 15, 2015, Petitioner and Respondent filed opening briefs on the merits as to Claims 1, 4, 6, 7, 8, 9, 10, and 11. ECF No 62 ("Resp't's Br."); 63 ("Pet'r's Br."). Petitioner filed a response on February 11, 2016. ECF No. 64 ("Pet'r's Opp."). Respondent filed a response on February 12, 2016. ECF No. 65 ("Resp't's Opp."). The Court denied Claims 1, 6, and 7 on September 15, 2016. ECF No. 74. The Court denied Claims 9 and 11 on September 20, 2016. ECF No. 75. The Court denied Claim 4 on September 27, 2016. ECF No. 76. The Court will address Claim 10 in a separate order.

## II.      LEGAL STANDARD

### A.   Antiterrorism and Effective Death Penalty Act (28 U.S.C. § 2254(d))

Because Petitioner filed his original federal habeas petition in 2011, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to the instant action. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003) (holding that AEDPA applies whenever a federal habeas petition is filed after April 24, 1996). Pursuant to AEDPA, a federal court may grant habeas relief on a claim adjudicated on the merits in state court only if the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

4

1    presented in the State court proceeding."  28 U.S.C. § 2254(d).

2        **1.  Contrary To or Unreasonable Application of Clearly Established Federal Law**

3        As to 28 U.S.C. § 2254(d)(1), the "contrary to" and "unreasonable application" prongs

4    have separate and distinct meanings.  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("Section

5    2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas

6    relief with respect to a claim adjudicated on the merits in state court.").  A state court's decision is

7    "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to

8    that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case

9    differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts."  *Id*. at

10   412–13.

11       A state court's decision is an "unreasonable application" of clearly established federal law

12   if "the state court identifies the correct governing legal principle . . . but unreasonably applies that

13   principle to the facts of the prisoner's case."  *Id.* at 413.  "[A]n *unreasonable* application of federal

14   law is different from an *incorrect* application of federal law."  *Harrington v. Richter*, 562 U.S. 86,

15   101 (2011).  A state court's determination that a claim lacks merit is not unreasonable "so long as

16   'fairminded jurists could disagree' on [its] correctness."  *Id.* (quoting *Yarborough v. Alvarado*, 541

17   U.S. 652, 664 (2004)).

18       Holdings of the U.S. Supreme Court at the time of the state court decision are the sole

19   determinant of clearly established federal law.  *Williams*, 529 U.S. at 412.  Although a district

20   court may "look to circuit precedent to ascertain whether [the circuit] has already held that the

21   particular point in issue is clearly established by Supreme Court precedent," *Marshall v. Rodgers*,

22   133 S. Ct. 1446, 1450 (2013) (per curiam), "[c]ircuit precedent cannot refine or sharpen a general

23   principle of [U.S.] Supreme Court jurisprudence into a specific legal rule," *Lopez v. Smith*, 135 S.

24   Ct. 1, 4 (2014) (per curiam) (internal quotation marks omitted).

25       **2.  Unreasonable Determination of the Facts**

26       In order to find that a state court's decision was based on "an unreasonable determination

27   of the facts," 28 U.S.C. § 2254(d)(2), a federal court "must be convinced that an appellate panel,

28
Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 8

applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court," *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (internal quotation marks omitted).  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).  That said, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

In examining whether a petitioner is entitled to relief under 28 U.S.C. § 2254(d)(1) or § 2254(d)(2), a federal court's review "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  In the event that a federal court "determine[s], considering only the evidence before the state court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or that the state court's decision was based on an unreasonable determination of the facts," the federal court evaluates the petitioner's claim *de novo*.  *Hurles*, 752 F.3d at 778.  If error is found, habeas relief is warranted if that error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  Petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"  *Id.* at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).

**B. Federal Evidentiary Hearing (28 U.S.C. § 2254(e))**

Under *Cullen v. Pinholster*, habeas review under AEDPA "is limited to the record that was before the state court that adjudicated the claim on the merits."  563 U.S. at 180–81.  The Ninth Circuit has recognized that *Pinholster* "effectively precludes federal evidentiary hearings" on claims adjudicated on the merits in state court.  *Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th Cir. 2013); *see also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("Although the Supreme Court

6

1   has declined to decide whether a district court may ever choose to hold an evidentiary hearing

2   *before* it determines that § 2254(d) has been satisfied . . . an evidentiary hearing is pointless once

3   the district court has determined that § 2254(d) precludes habeas relief.") (internal quotation marks

4   and citation omitted).

5   **III.   DISCUSSION**

6         In Claim 8, Petitioner contends that his trial was fundamentally unfair for four reasons: (1)

7   the prosecution introduced improper and inflammatory arguments during the guilt phase opening

8   statements; (2) the prosecution and trial court coerced favorable testimony from a witness; (3) the

9   trial court failed to ensure that Petitioner knowingly and intelligently waived his Fifth Amendment

10   right not to testify; and (4) the admission of certain photographic evidence was prejudicial.

11         Petitioner presented this claim in his state habeas petition, and the California Supreme

12   Court denied relief on the merits without explanation. AG023690 ("All other claims set forth in

13   the petition for writ of habeas corpus are denied. Each claim is denied on the merits.").[4]  Because

14   the California Supreme Court did not provide reasons for its denial of Petitioner's claim, this

15   Court must determine what arguments or theories could have supported the California Supreme

16   Court's decision. *See Richter*, 562 U.S. at 102 ("Under § 2254(d), a habeas court must determine

17   what arguments or theories supported or, as here, could have supported, the state court's

18   decision."). The Court then "must ask whether it is possible fairminded jurists could disagree that

19   those arguments or theories are inconsistent with the holding in a prior decision" of the U.S.

20   Supreme Court. *Id.*

21         The Court addresses Petitioner's four subclaims under Claim 8 in turn.

22         **1.   Improper and Inflammatory Arguments**

23         Petitioner contends that the prosecutor introduced improper and inflammatory arguments

24   during the prosecutor's opening statement during the guilt phase of Petitioner's trial. Pet'r's Br. at

25   _____

26   [4] The California Supreme Court also found that this claim was procedurally barred because the
claim could have been, but was not, raised on direct appeal. AG023690. In the briefing submitted

27   to this Court, neither party addresses the procedural bar. Because the Court fully considers the
claim on the merits, it need not reach whether the claim was procedurally barred.

28

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 8

32.  Specifically, Petitioner claims that (a) the prosecutor introduced inflammatory argument about Petitioner's character; and (b) the prosecutor made irrelevant and prejudicial arguments about the impact of the shooting on victim Luong.  The Court addresses Petitioner's challenges respectively.

### a.  Arguments About Petitioner's Character

First, Petitioner contends that the prosecutor's opening statement during the guilt phase improperly attacked Petitioner's character.  The opening statement began as follows:

> MR. BURR [THE PROSECUTOR]: May it please the Court, ladies and gentlemen of the jury and alternates.  This is the most malevolent, mean spirited individual you will ever encounter in your lifetime.  His capacity for violence is exceeded only by his willingness to commit it.  He has no conscience, he has no compassion for human life.

> MR. THEWS [DEFENSE COUNSEL]: He is entering into the area of argument.  I will object at this time, your Honor.

> THE COURT: I have indicated that this is the opportunity attorneys have to present what they believe the evidence will show.  And to that extent you will consider any remarks made by either counsel in that light.  Go ahead, Mr. Burr.

> MR. BURR: The evidence will show that he has no compassion and no consideration for human life, he has no conscience for people who looked him in the eye and they saw nothing but death.  He is an urban dweller's worst nightmare come to life.  You or a loved one is at work waiting on customers, and the total stranger comes up to you as you were working, without any warning, without any provocation he kills you.

> . . .

> The evidence will show that he is a cold hearted, vicious individual, who without any remorse needlessly extinguished three lives.

AG014545–46.  Petitioner contends that these statements "eradicated [Petitioner's] constitutional right to presumptive innocence and encouraged the jury to consider [Petitioner's] alleged character as evidence of his guilt, in violation of due process."  Pet'r's Br. at 33.

"Improper argument does not, per se, violate a defendant's constitutional rights."  *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993).  It "is not enough that the prosecutors' remarks were undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, a defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Id.*; *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

8

United States District Court
Northern District of California

fairness of the trial, not the culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  In order to prevail on federal habeas review, the prosecutor's misconduct must have resulted in prejudice, that is, the misconduct must have had a substantial and injurious effect or influence in determining the jury's verdict.  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

Factors that a court may take into account in determining whether misconduct was prejudicial are: (1) whether a curative instruction was issued, *see Darden*, 477 U.S. at 182; (2) the weight of the evidence of guilt, *United States v. Young*, 470 U.S. 1, 19 (1985); (3) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (4) whether the misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972); and (5) whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 182.  *See also Tan*, 413 F.3d at 1115 (identifying factors to consider); *Rogers v. Carey*, 2005 WL 3560588, at *9 (N.D. Cal. Dec. 29, 2005) (same).  If the court finds that no unfairness or prejudice resulted, the court need not determine whether the prosecutor's comments were improper.  *Tatmon v. Haviland*, 504 F. App'x 631, 632 (9th Cir. 2013).

Here, the California Supreme Court could reasonably have determined that, even if the prosecutor's remarks during opening statements were improper, there was no prejudice and thus no constitutional violation.  First, the trial court issued five curative instructions.  Specifically, the trial court instructed the jury at least three times—before opening statements, and both before and after closing statements—that the arguments of the attorneys are not evidence.  For example, before opening statements the trial court gave the following jury instruction: "What attorneys say in a case by way of opening statements or closing statements or at any tine [sic] they address the court or the jury is not evidence in the case, and it must not be considered as evidence by you. The purpose of an opening statement is to, in essence, give you a preview of what the attorneys

9

believe the evidence will show." AG014538. The trial court repeated the same admonition in the jury instructions before closing statements: "Now the rules, so to speak, that you are to use to consider and evaluate the statements and closing statements of the attorneys are exactly the same now as they have been throughout this case. And that is that statements made by attorneys are not evidence in the case. . . . [A]s I have said the statements are not evidence." AG016345. After closing statements, the trial court again instructed the jury, "As I've indicated to you several times now, statements made by the attorney's during the trial are not evidence." AG016506. The jury is presumed to follow its instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Tan*, 413 F.3d at 1115 ("[W]e presume jurors follow the court's instructions absent extraordinary situations.").

In addition, the trial court instructed the jury that opening statements provide "a preview of what the attorneys believe the evidence will show." AG014538. After the prosecutor made the comments during opening statements to which Petitioner objects, the trial court reaffirmed its earlier jury instruction: "[T]his is the opportunity attorneys have to present what they believe the evidence will show. And to that extent you will consider any remarks made by either counsel in that light." AG014545.

Lastly, following closing statements, the trial court specifically instructed the jury: "You must not be influenced by pity for a defendant or by prejudice against him. You must not be biased against the defendant because he has been arrested for this offense, charged with a crime, or brought to trial. None of these circumstances is evidence of guilt, and you must not infer or assume from any or all of them that he is more likely to be guilty than innocent. You must not be influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." AG016505–06.

Petitioner does not contend that there are "extraordinary circumstances" that would prevent the jury from following the trial court's five curative jury instructions. *Tan*, 413 F.3d at 1115. Accordingly, the Court presumes that the jury understood that the prosecutor's statements were not evidence, and that the jury did not base its decision on prejudice against Petitioner.

Further, "[w]hen the case is particularly strong, the likelihood that prosecutorial

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 8

United States District Court
Northern District of California

1   misconduct will affect the defendant's substantial rights is lessened because the jury's

2   deliberations are less apt to be influenced."  *United States v. Weatherspoon*, 410 F.3d 1142, 1151

3   (9th Cir. 2005); *see also Berger v. United States*, 295 U.S. 78, 89 (1935) (finding "pronounced and

4   persistent" misconduct was prejudicial, but noting that "[i]f the case against Berger had been

5   strong, or, . . . the evidence of his guilt 'overwhelming,' a different conclusion might be reached").

6   In the instant case, there was substantial physical and testimonial evidence connecting Petitioner to

7   the shootings.  As discussed above, a criminalist testified with "virtual absolute certainty" that the

8   bullets that shot Baeza and Myers came from Petitioner's gun.  *Marks*, 31 Cal. 4th at 207.  In

9   addition, ballistics analysis "indicated" that the bullet that shot McDermott came from Petitioner's

10  gun and "suggested" that the bullet that injured Luong came from the same source.  *Id.*  At least

11  four eyewitnesses testified as to the shootings and firmly identified Petitioner as the shooter.  *Id.* at

12  205–06.  Additionally, Petitioner was overheard telling another defendant that "he was in for three

13  murders" and that the victims had died because "I shot them."  *Id.* at 208.  The strength of the

14  prosecution's case against Petitioner weighs against finding that the remarks were prejudicial.

15          Lastly, the prosecutor's statements were not prominent in the context of the entire trial, or

16  repeated throughout the trial.  *See Darden*, 477 U.S. at 182; *Lincoln*, 807 F.2d at 809.  The

17  prosecutor's opening statement spans 31 transcript pages, and the challenged comments appear on

18  only two.  While the prosecutor repeated during closing statements that Petitioner "is an urban

19  dwellers worst nightmare actually come to life" and "a cold hearted, vicious, violent individual

20  without a shred of humanity in his total human being," AG016347, such comments appear on only

21  two of the 71 transcript pages of the prosecutor's closing statement.  AG016347–419.  No similar

22  comments appeared in the prosecutor's rebuttal statement.  AG016444–502.

23          By comparison, in *Darden*, the prosecutor called the defendant an "animal," stated that the

24  defendant "shouldn't be out of his cell unless he has a leash on him and a prison guard at the other

25  end of that leash," and that the prosecutor wished to see the defendant "sitting here with no face,

26  blown away by a shotgun."  *Darden*, 477 U.S. at 180 & n.12.  "Almost every page [of the

27  transcript of closing argument] contain[ed] at least one offensive or improper statement."  *Id.* at

28
11

194 (Blackmun, J., dissenting).  Nonetheless, the U.S. Supreme Court held that no prejudice resulted in light of the trial court's multiple instructions that the arguments of counsel were not evidence and the "overwhelming" evidence of guilt.  *Id.* at 182 (majority op.); *see also Runningeagle v. Ryan*, 686 F.3d 758, 780, 782 (9th Cir. 2012) (finding the prosecutor's statements that the defendant's alleged crime was "unspeakable horror" and that "[t]he evil is among us" in the courtroom were not prejudicial in light of the trial judge's instructions and the substantial evidence of guilt).

Similarly, the trial court in the instant case specifically instructed the jury not to determine the case based on prejudice against Petitioner, and gave multiple curative instructions that the arguments of counsel were not evidence.  AG016505–06.  In addition, the evidence against Petitioner was strong, and the prosecutor's comments were not pervasive throughout the trial.  Accordingly, under *Darden*, the Court can not find that the California Supreme Court's denial of this subclaim was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts.

### b. Argument About Victim Impact

Next, Petitioner contends that the prosecutor introduced irrelevant and inflammatory evidence of purported victim impact.  The prosecutor described the long-term physical consequences and necessary care of Luong, who was shot and left in a vegetative state.  For example, at one point the prosecutor's opening statement described the consequences of Luong's injuries as follows:

> Now, there is the possibility that she is what they call locked out.  And what that means is that the brain is functioning and the brain is conscious.  She is conscious of what's going on around her, but she can't communicate.  She can't communicate to the outside world.  That is a possibility.  Maybe she's not in a vegetative state, maybe she is trapped in this vegetated body. . . . [T]here are some different techniques or methods that they have at this facility because they deal with head trauma patients to see if there's any kind of communication, to see if she recognizes things, people, and responds to pain, sounds.  And what they basically found is that she is very inconsistent.  She does make sounds.  There is a sound that she makes that the best description of it is mama, mama, and they don't know whether she is saying mama, or whether she's just making a sound that's involuntary to whatever discomfort or whatever reason is causing her to say this, or it's not even saying, assuming she's saying anything.

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 8

United States District Court
Northern District of California

1   AG014560.  Petitioner argues that this "irrelevant, highly inflammatory victim impact

2   information" was designed to, and did, inflame the jury against Petitioner.  Pet. at 182–83.

3          As noted above, "[i]mproper argument does not, per se, violate a defendant's constitutional

4   rights."  *Jeffries*, 5 F.3d at 1191.  In evaluating a claim of prosecutorial misconduct based on

5   allegedly improper argument, the Court must determine if the allegedly improper remarks

6   "rendered the proceedings fundamentally unfair."  *Id.* (citing *Darden*, 477 U.S. at 181).

7          In the instant case, the prosecutor's statement about Luong accurately reflects the evidence

8   that was later presented at trial.  During the guilt phase, the prosecutor called Cynthia Amelon, a

9   physician who oversaw the care of Luong at a rehabilitation center.  AG014831–32.  Dr. Amelon's

10  testimony about Luong's persistent vegetative state described Luong's physical condition in detail,

11  including the sounds made by Luong that the prosecutor described in his opening statement:

12      [MR. BURR]: You say the cry comes out, a sound comes out that's ma?

13      A: Yeah, she actually gets a sound voice pattern through every once in a while that
        says ma.

14      Q: So you don't know whether it's just a cry?

15      A: A cry that comes out with a voice response or if she's trying to say, you know,
        mom or something like that.

16
17  AG014845.  Moreover, Dr. Amelon described being "locked out" and explained why the doctors

18  did not believe that Luong was locked out.  AG014845–46.  During Dr. Amelon's testimony, the

19  prosecutor also introduced a videotape depicting care being given to Luong.  AG014850.

20         Petitioner does not challenge the introduction of Dr. Amelon's testimony.  In addition, the

21  California Supreme Court upheld the admission of the videotape on direct review in 2003, and

22  found that the prosecution was "entitled to provide visual evidence of Luong's condition to prove

23  that she had suffered great bodily injury," an element of the crime charged.  *Marks*, 31 Cal. 4th at

24  226–27.  Although Petitioner asserts that the videotape of Luong is prejudicial, Petitioner does not

25  challenge the admission of the videotape before this Court.  Pet. at 183.

26         Based on this record, the California Supreme Court could have reasonably determined that

27  the prosecutor's opening statement about Luong's physical condition accurately described the

28

13

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 8

United States District Court
Northern District of California

evidence that would be presented at trial and that Petitioner was not prejudiced by the prosecutor's description of the evidence. Thus, the prosecutor's statement did not render Petitioner's trial "fundamentally unfair." *See Jeffries*, 5 F.3d at 1191. Petitioner cites no case to the contrary. Accordingly, the California Supreme Court's denial of this subclaim was not contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts.

### 2. Coercion of Testimony

Next, Petitioner contends that the trial court and prosecutor cooperated to coerce favorable testimony from witness Dr. Aguedo Retodo, a trauma surgeon who treated victims John Myers ("Myers") and Luong after the shooting. Pet'r's Br. at 33. According to Petitioner, the trial court and prosecutor's coercion rendered Dr. Retodo's testimony unreliable.

### a. Background

Specifically, out of the presence of the jury, the prosecutor Mr. Burr explained to the trial court that Dr. Retodo had been uncooperative in other cases with the prosecution's office. Dr. Retodo had attempted to evade subpoenas, refused to fully review medical records, and, on one occasion, claimed that Dr. Retodo had a lack of memory about the case. AG014872–81. Based on this history, the prosecutor expressed concern that Dr. Retodo may be uncooperative in his testimony in Petitioner's case. The trial court had the oath administered to Dr. Retodo, and, in relevant part, had the following colloquy:

> [THE COURT]: Okay. Have you reviewed the medical records that Mr. Burr's referred to here regarding the treatment of Mui Luong and John Myers?
>
> A: I did.
>
> Q: And you reviewed those today?
>
> A: Yes, I did.
>
> Q: All right. . . . [D]o you have a recollection at this time of the events of October 17th, 1990, with respect to your observation of Mui Luong and John Myers?
>
> A: Yes, I can reconstruct the events, after reviewing the records that was given to me earlier.
>
> Q: So you are prepared to answer questions –

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 8

United States District Court
Northern District of California

A: Yes, I am.

Q: – posed by – both Mr. Burr and by the attorneys representing [Petitioner]?

A: I'm ready.  Can you hear me all right?

Q: Mr Burr, I'm prepared at this point to accept those representations.

　　What I'd suggest is, in view of the statements you have made, if there is difficulty that occurs during the testimony, I'll recess the case, send the jury upstairs, and then I will discuss the sanctions that are available to this court at that time.

　　It may be, except – from what Dr. Retodo is indicating here, that we may not reach that problem.

AG014885–86.  Dr. Retodo and the trial court also discussed Dr. Retodo's duty with regard to accepting service of subpoenas.  AG014888–93.  Upon completion of the court's examination of Dr. Retodo, the jury was brought in and the prosecution called Dr. Retodo, who testified about his treatment of Myers and Luong.  Petitioner did not cross-examine Dr. Retodo.  AG014910.

　　Based on the above passage, Petitioner argues that the trial court improperly admonished Dr. Retodo that any claim of failed memory could lead to sanctions.  According to Petitioner, the trial court's mention of sanctions and "the prosecutor's threats" were coercive and rendered Dr. Retodo's testimony unreliable.  Pet'r's Br. at 34.

### b.　Analysis

　　Petitioner supports this claim by relying on *Webb v. Texas*, 409 U.S. 95, 98 (1972) (per curiam), which held that the government's substantial interference with the testimony of defense witnesses violates due process.  *See also United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998) ("Unnecessarily strong admonitions against perjury aimed at discouraging defense witnesses from testifying have been held to deprive a criminal defendant of his Sixth Amendment right to compulsory process for obtaining witnesses in his favor.").  In *Webb*, the U.S. Supreme Court reversed a defendant's conviction after the trial judge "gratuitously singled out" the defense's sole witness for a "lengthy admonition on the dangers of perjury," including assuring the witness that if he lied on the stand, "he would be prosecuted and probably convicted for perjury."  *Webb*, 409 U.S. at 97–98.  The witness then refused to testify.  *Id.* at 95.  The U.S. Supreme Court held that the trial judge's remarks "effectively drove that witness off the stand," and deprived the

1   defendant of due process.  *Id.* at 98.

2        In the instant case, Petitioner's reliance upon *Webb* is unavailing.  Dr. Retodo was a

3   government witness, who testified even after the mention of sanctions.  The U.S. Supreme Court

4   has not extended *Webb* to forbid the government's interference with the testimony of the

5   government's witnesses.  Indeed, the Ninth Circuit specifically acknowledged in *United States v.*

6   *Juan*, 704 F.3d 1137, 1141 (2013), a direct appeal of a criminal case and not a habeas petition, that

7   "no court applying *Webb* has ever extended its principles to prosecution witnesses."  Moreover,

8   "no court applying *Webb* has ever extended it to situations, like this one, where the allegedly

9   threatened witness continued to testify after the alleged threat.  Instead, the prototypical *Webb*

10  challenge involves conduct so threatening as to effectively drive the witness off the stand."  *Id.*

11  (internal quotation marks and brackets omitted).

12       Because no U.S. Supreme Court holding extends *Webb* to the government's interaction

13  with Dr. Retodo, the California Supreme Court's denial of this subclaim can not be "contrary to,

14  or an unreasonable application of, any clearly established Federal law as determined by the United

15  States Supreme Court."  28 U.S.C. § 2254(d)(1).  The Court also finds that the California Supreme

16  Court did not make an unreasonable determination of the facts.  *See id.* § 2254(d)(2).

17       **3.  Knowing and Intelligent Waiver**

18       Petitioner's next subclaim alleges that Petitioner did not validly waive his Fifth

19  Amendment right against self-incrimination.  According to Petitioner, the colloquy between

20  Petitioner and the trial court during the guilt phase reveals that Petitioner did not understand his

21  right not to testify.  Petitioner also argues that Petitioner was not competent to validly waive his

22  right not to testify.

23            **a.  Background**

24       On March 31, 1994, outside of the presence of the jury, Petitioner's defense counsel,

25  Albert Thews ("Thews"), informed the court that "[Petitioner] wants to testify, and we want him

26  to testify."  AG015895.  Thews confirmed that Thews had discussed Petitioner's constitutional

27  rights, including the right not to testify, with Petitioner over the last several months.

28

United States District Court
Northern District of California

16

Petitioner interrupted the proceedings: "I'm listening.  Somebody hasn't asked me a question.  They're just citing the law.  You're telling me I have the right to remain silent if I wish to, if I want to voice my opinion or voice my testimony I can but nobody has directly given me a direct statement what's given to [Petitioner] to respond, so I haven't responded to that question." AG015896.  The trial court and Petitioner then engaged in a discussion:

> THE DEFENDANT: – confident to what Mr. Thews said.  And my choice is to take the stand and have on the record what actually took place, and note that I'm not dark complected, I'm not jet black, I'm medium brown with the fu Manchu, and I want to proceed on that.  That I was –
>
> . . .
>
> THE COURT: Mr. Marks, you have indicated it is your intention to testify.
>
> THE DEFENDANT: Yes.
>
> THE COURT: I presume you understand you have a right to do that, you have a right to take the stand and testify in your own behalf, you understand you have that right?
>
> THE DEFENDANT: Yes.
>
> THE COURT: You also understand you have a right not to do that, you have a right to remain there at the counsel table and put the People to the proof, and that is to rely on the state of the evidence and force the People to prove their case without any proof.  Do you understand?
>
> THE DEFENDANT: At this point I don't believe the state of evidence, I have enough to pronounce on the presumption of innocence on the Defendant or I wouldn't be taking the stand.  Are you comfortable with what I'm saying, sir?

AG015897.  In response, the trial court read aloud the instruction that would be read to the jury if Petitioner chose not to testify, including that the jury "must not draw any inference from the fact that a defendant does not testify."  AG015898.  The Court then continued to question Petitioner:

> THE COURT: So you understand if you decide not to testify that's what the jury would be told by me.  Do you understand that?
>
> THE DEFENDANT: Yes, I understand that.
>
> THE COURT: I would also instruct the district attorney that they would not be a [sic] allowed to comment on that fact in any way in their closing argument.  In other words, Mr. Burr would not be able to call the jury's attention to the fact that the defendant had not testified.  Do you understand that?
>
> THE DEFENDANT: Well, at this point I have been deprived of the right of freedom of speech, and that's my right.  I'm willing to get on the stand and speak because I want to tell them what I have been suffering as a victim.

17

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 8

1

2

THE COURT: I appreciate that, Mr. Marks.  I want to make sure – just a second.  I want to make sure you understand what your rights are here.  And in particular do you understand that if you decided not to testify, Mr. Burr could not comment on that point, that is he could not point out Mr. Marks has the right the right not [to] testify.

3

THE DEFENDANT: He has the right, he has brought out my whole career.

4

5

THE COURT: Do you understand that you – you understand if you decide not to testify that he could not comment on that fact, that he could not comment to the jury that they should –

6

THE DEFENDANT: I think – I think open field if he took the stand.

7

THE COURT: Do you understand?

8

9

THE DEFENDANT: I'm fully competent, magistrate.  I'm fully comprehend of what you say, Magistrate[,] and my wishes are to take the stand.

10

THE COURT: Okay.  Thank you very much.  Okay.  Thank you.

AG015898–99.

11

12

Later, both Petitioner and Petitioner's defense counsel confirmed that Petitioner wanted to

13

testify.  *See* AG015910 (Petitioner) ("That's why I'm taking the stand, because I can say that.  I

14

can say I never fired the gun."); AG016000 (Petitioner's counsel Louis Wies) ("[Petitioner] is

15

prepared to testify and wishes to testify.").  Petitioner testified during the guilt phase on April 6

16

and 7, 1994.

17

        **b.  Analysis**

Due process and the Fifth Amendment's privilege against self-incrimination entitle a

18

criminal defendant to make a voluntary and knowing decision to remain silent or to testify in his

19

own defense.  *Rock v. Arkansas*, 483 U.S. 44, 51–53 (1987).  The Ninth Circuit has held that the

20

right to testify "essentially is a strategic trial decision with constitutional implications" and is not a

21

"personal right[] that a defendant must waive explicitly."  *United States v. Joelson*, 7 F.3d 174,

22

178 (9th Cir. 1993) (citing *United States v. Martinez*, 883 F.2d 750 (9th Cir. 1989), *vacated on*

23

*other grounds by* 928 F.2d 1470 (9th Cir. 1991)).  Thus, a court has "no obligation to make an on-

24

the-record determination as to whether a defendant wants to testify," even when there appears to

25

be some disagreement between defendant and counsel.  *Id.* at 177.  In other words, "the defendant

26

by taking the stand waives this significant right even though the record gives no explicit assurance

27

28

18

United States District Court
Northern District of California

1    that this waiver was knowing and intelligent." *Martinez*, 883 F.2d at 756–57 ("The court has no

2    obligation to inquire into whether the defendant knowingly and intelligently waived the right not

3    to testify inherent in the privilege against compelled self-incrimination."). For the trial court to

4    inquire into the choice to testify or not testify "poses a danger that the judge will appear to

5    encourage the defendant to invoke or waive this right." *Joelson*, 7 F.3d at 178.

6         In the instant case, the trial court had no constitutional obligation to engage in a discussion

7    with Petitioner as to whether Petitioner's decision to testify was voluntary and knowing. *Id.* at

8    177. Thus, in the absence of any colloquy with the court, Petitioner would have validly "waive[d]

9    this significant right [not to testify]" by taking the stand on April 6 and 7, 1994. *Martinez*, 883

10    F.2d at 756–57.

11         Moreover, Petitioner does not dispute that Petitioner's decision to testify was voluntary.

12    During the trial, Petitioner repeatedly indicated that he wished to testify, and Petitioner's counsel

13    confirmed that counsel also wished Petitioner to testify. *See* AG015895, AG015898–99,

14    AG015910, AG016000. Petitioner does not suggest any coercion or intimidation influenced

15    Petitioner's decision to testify. *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (citations omitted)

16    ("A waiver is voluntary if it was the product of free and deliberate choice rather than intimidation,

17    coercion, or deception." (internal quotation marks omitted)). Accordingly, the California Supreme

18    Court could reasonably have concluded that Petitioner's decision to testify was voluntary.

19         However, Petitioner contends that Petitioner did not make a knowing decision to testify,

20    for two reasons. First, Petitioner contends that Petitioner could not make a knowing waiver of his

21    Fifth Amendment rights because he was incompetent at the time of trial. Pet'r's Br. at 34 n.10, 35.

22    This challenge reiterates allegations raised in Claims 2, 3, and 4. In denying Claim 2, this Court

23    held that Petitioner received constitutionally adequate psychiatric assistance, effective assistance

24    of counsel, and adequate fact-finding procedures at the 1992 competency trial in which a jury

25    found Petitioner competent to stand trial. *Marks*, 112 F. Supp. 3d at 959–69. In denying Claim 3,

26    this Court found that the trial court did not err in refusing to suspend Petitioner's guilt phase

27    proceedings and redetermine Petitioner's competency. *Id.* at 969–81. In denying Claim 4, this

28

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 8

United States District Court
Northern District of California

1    Court determined that the evidence does not raise a substantial doubt as to Petitioner's

2    competency.  ECF No. 76.  For the reasons outlined in this Court's orders denying Claims 2, 3,

3    and 4, Petitioner's argument about his competency lacks merit.

4          Second, Petitioner argues that the colloquy between Petitioner and the trial court reveals

5    that Petitioner did not understand his right not to testify.  However, Petitioner cites no clearly

6    established U.S. Supreme Court law demonstrating that Petitioner did not knowingly decide to

7    testify.  Petitioner explicitly acknowledged that he had a legal right not to testify: "You're telling

8    me I have the right to remain silent if I wish to, if I want to voice my opinion or voice my

9    testimony I can but nobody has directly given me a direct statement what's given to [Petitioner] to

10   respond, so I haven't responded to that question."  AG015895.  When asked whether Petitioner

11   wished to testify, Petitioner repeatedly indicated that he did.  AG015897.

12         Moreover, Petitioner's counsel confirmed that counsel had discussed Petitioner's decision

13   to testify with Petitioner, including Petitioner's right not to testify.  Both counsel and Petitioner

14   wanted Petitioner to testify.  AG015895, AG016000.  The trial court "should not interfere" with

15   the decision of Petitioner and counsel, as "the decision [to testify] is a matter of trial strategy

16   between the defendant and counsel."  *Martinez*, 883 F.2d at 757.

17         In addition, Petitioner acknowledged that he understood that the trial court would instruct

18   the jury not to draw any negative inferences from a decision not to testify.  AG015898.  Petitioner

19   was less clear that he understood that the prosecutor could not comment on the decision if

20   Petitioner chose not to testify.  However, "[t]he Constitution does not require that a criminal

21   suspect know and understand every possible consequence of a waiver of the Fifth Amendment

22   privilege."  *Colorado*, 479 U.S. at 574.  Moreover, in light of the insistence of Petitioner and

23   Petitioner's counsel that Petitioner wished to testify, as well as Petitioner's acknowledgement of

24   the fundamental principle that he had a right not to testify, the California Supreme Court could

25   have reasonably concluded that Petitioner understood Petitioner's right not to testify.

26         Because the California Supreme Court could reasonably have concluded that Petitioner's

27   decision to testify was both voluntary and knowing, the California Supreme Court's denial of this

28

United States District Court
Northern District of California

20

1    subclaim was neither contrary to, nor the result of an unreasonable application of, clearly

2    established federal law, as determined by the U.S. Supreme Court.  *See* 28 U.S.C. § 2254(d)(1).

3    Moreover, the California Supreme Court's decision was not an unreasonable determination of the

4    facts.  *See id.* § 2254(d)(2).  Accordingly, this subclaim must be denied.

5        **4.  Admission of Certain Photographic Evidence**

6        Lastly, Petitioner contends that the trial court violated his constitutional rights by allowing

7    the prosecution to introduce "false, unreliable and misleading" photographs during the guilt phase

8    of Petitioner's trial.  Pet. at 184.  The photographs depicted a velour shirt that Petitioner was

9    wearing when arrested on October 17, 1990.  In 1994, a prosecution investigator photographed the

10   top at Taco Bell, the scene of one of the shootings, to test the effects of the lighting on the color of

11   the shirt.  AG015764–65.  The photographs illustrate that the color of the top appears to vary

12   under fluorescent lights, and were proffered to support why eyewitnesses gave different

13   descriptions of the shirt on the night of the shooting.  Petitioner contends that because there was

14   no proof that the lighting in Taco Bell in 1994 was the same as it was in 1990, the photographs

15   lacked foundation, were irrelevant, and were prejudicial.

16       The trial court admitted the photographs on the following basis:

17       So I have been very careful to examine the photographs taken in 1994, Exhibit 52,
         and compare them with the photos taken in 1990 on the night of the shooting in the
18       Taco Bell which are group Exhibit 12.  I have compared various different photos in
         Exhibit 12 with various different photos in Exhibit 52 depicting the same general
19       scenes.  And I want to be very sure in my own mind that the lighting fixtures had
         not changed.  It appears to me that they have not changed. . . . But there appear to
20       be no changes at all in the lighting fixtures themselves.  I have also been informed
         when counsel met with me in chambers that these pictures were taken at night and
21       of course the shooting was done at night.  And of course the importance would be
         of ambient sunlight coming in through the windows would have an effect on the
22       lighting in either set of photos had taken in 1990 and the ones taken now.

23       Mr. Thews point is well taken in that the identity of the fluorescent tubes in the
         structures we can't say what were in 1990 as compared to what were in 1994.  But I
24       do think in the context of this case and the Taco Bell interior, I agree with Mr. Burr
         that is something that goes more to the question of weight, not of admissibility.

25   AG015768–69.  On state habeas, the California Supreme Court denied Petitioner's claim without

26   explanation.

27

28

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 8

1        A state court's evidentiary ruling is not subject to federal habeas review unless a specific

2    constitutional guarantee is violated or the error is of such magnitude that the result is a denial of

3    the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031

4    (9th Cir. 1999) ("A federal habeas court, of course, cannot review questions of state evidence

5    law."); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.) (holding that admission of "irrelevant and

6    highly prejudicial" testimony does not warrant habeas relief unless the admission was "arbitrary or

7    fundamentally unfair*"), cert. denied*, 479 U.S. 839 (1986).

8        To support that the admission of the photographs rendered his trial fundamentally unfair,

9    Petitioner relies upon Ninth Circuit precedent, much of it pre-AEDPA.  However, "even clearly

10   erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant

11   of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by

12   the [U.S.] Supreme Court."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  "In cases

13   where the [U.S] Supreme Court has not adequately addressed a claim, [the] court cannot use its

14   own precedent to find a state court ruling unreasonable."  *Id.*

15       As relevant here, the U.S. Supreme Court "has not yet made a clear ruling that admission

16   of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to

17   warrant issuance of the writ."  *Id.* (finding that trial court's admission of irrelevant pornographic

18   materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an

19   unreasonable application of, clearly established United States Supreme Court precedent under

20   § 2254(d)); *see also Zapien v. Martel*, 805 F.3d 862, 869 (9th Cir. 2015) (because there is no

21   United States Supreme Court case establishing the fundamental unfairness of admitting multiple

22   hearsay testimony, Holley bars any such claim on federal habeas review).  Absent such "clearly

23   established Federal law," the Court cannot conclude that the state court's ruling was an

24   "unreasonable application" thereof.  *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the

25   lack of holdings from this Court . . . it cannot be said that the state court 'unreasonabl[y] appli[ed]

26   clearly established Federal law.'").

27       Petitioner fails to demonstrate that the California Supreme Court's denial of his claim was

28

United States District Court
Northern District of California

contrary to or an unreasonable application of clearly established federal law, or an unreasonable

determination of the facts.  Accordingly, this subclaim must be denied.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Claim 8.  Because Petitioner's arguments as

to Claim 8 are unavailing, Petitioner's request for an evidentiary hearing as to Claim 8 is also

DENIED.  *See Sully*, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district

court has determined that § 2254(d) precludes habeas relief.").

**IT IS SO ORDERED.**

Dated: September 27, 2016

_____

LUCY H. KOH
United States District Judge

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 8