UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DELANEY GERAL MARKS,<br><br>        Petitioner,<br><br>    v.<br><br>RON DAVIS, Warden, California State<br>Prison at San Quentin,<br><br>        Respondent. | Case No. 11-CV-02458<br><br>**ORDER DENYING CLAIM 12**<br><br>Re: Dkt. No. 86, 87 |

        In 1994, Petitioner Delaney Geral Marks ("Petitioner") was convicted of two counts of

first degree murder with personal use of a firearm, and two counts of attempted premeditated

murder and infliction of great bodily injury, and sentenced to death.  On December 14, 2011,

Petitioner filed a petition for a writ of habeas corpus before this Court.  ECF No. 3 ("Pet.").

        The Court has ruled on 11 of Petitioner's 22 claims.  *See* ECF Nos. 52, 74, 75, 76, 77, 81.

This Order addresses Claim 12 of the petition.  Petitioner requests an evidentiary hearing as to this

claim.  For the reasons discussed below, Claim 12 is DENIED, and Petitioner's request for an

evidentiary hearing is DENIED.

**I.        BACKGROUND**

## A.  Factual Background[1]

On October 17, 1990, Petitioner entered a Taco Bell restaurant in Oakland, California. After ordering, he shot employee Mui Luong ("Luong") in the face. Luong survived the shooting but remained in a persistent vegetative state. Petitioner then entered the Gourmet Market, not far from the Taco Bell. There, Petitioner shot John Myers ("Myers") and Peter Baeza ("Baeza"). Baeza died at the scene but Myers survived. Later that evening, Petitioner and his girlfriend, Robin Menefee ("Menefee"), took a cab driven by Daniel McDermott ("McDermott"). Petitioner shot and killed McDermott. *Marks*, 31 Cal. 4th at 204–06. Petitioner was arrested shortly after McDermott was shot.

At trial, Lansing Lee ("Lee"), a criminalist, testified with "virtual absolute certainty" that the bullets that shot Baeza and Myers came from Petitioner's gun. *Id.* at 207. Lee also testified that his analysis "indicated" that the bullet that shot McDermott came from Petitioner's gun and "suggested" that the bullet that injured Luong also came from the same source. *Id.* At least four eyewitness identified Petitioner as the shooter. *Id.* at 205. Further, Menefee testified at trial that, on the night of the shootings, Petitioner left her for approximately 30 to 60 minutes and then returned and told Menefee that he had shot two people. *Id.* at 206. Menefee testified that she and Petitioner entered McDermott's cab. When the cab stopped, Petitioner told Menefee to leave the cab, and Menefee went into an alley. Menefee heard a gunshot, and Petitioner ran towards Menefee and told her that he had shot McDermott. *Id.*

Although McDermott carried $1 bills in his taxi in order to make change, McDermott had no paper currency on his body or in his taxi after the shooting. Petitioner, however, was arrested with seven $1 bills on his person. *Id.* at 206–07. Petitioner was also overheard telling another defendant that "he was in for three murders" and that the victims had died because "I shot them." *Id.* at 208.

---

[1] The following facts are taken from the California Supreme Court's opinion on direct appeal. *See People v. Marks*, 31 Cal. 4th 197, 203–14 (2003). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

2

Petitioner testified at trial and denied all of the shootings. *Id.* at 207. The defense also presented evidence that Petitioner's hands did not test positive for gunshot residue. *Id.* at 208.

On April 24, 1994, the jury convicted Petitioner of two counts of first degree murder with personal use of a firearm, and two counts of attempted premeditated murder with personal use of a firearm and infliction of great bodily injury.

During the penalty phase, the prosecutor presented in aggravation evidence of Petitioner's past violent conduct, including incidents of domestic violence and violent conduct while incarcerated. *Id.* at 208–10. The prosecutor also presented evidence of the effect of the murders on the families of the victims. *Id.* at 210–11. In mitigation, Petitioner testified as to his history of seizures. *Id.* at 212. Other witnesses testified that Petitioner had grown up in a strong family environment, and had not engaged in problematic behavior until he was discharged from the army and began using drugs. *Id.* at 212–13. Petitioner's daughter testified that Petitioner had never hit her, and that she saw him regularly when he was not incarcerated. *Id.* at 213. On May 6, 1994, the jury set the penalty for the capital crimes at death. *Id.* at 203.

## B.    Procedural History

On July 24, 2003, the California Supreme Court affirmed the conviction and sentence on direct appeal. *People v. Marks*, 31 Cal. 4th 197 (2003). The U.S. Supreme Court denied certiorari on May 3, 2004. *Marks v. California*, 541 U.S. 1033 (2004).

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. On March 16, 2005, the California Supreme Court ordered Respondents to show cause in the Alameda County Superior Court why the death sentence should not be vacated and Petitioner re-sentenced to life without parole on the ground that Petitioner was intellectually disabled within the meaning of *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that intellectually disabled individuals may not be executed. AG023690.[2] The California Supreme Court denied the remaining claims in the petition on the merits without explanation. In addition to the merits

---

[2] Citations to "AG" refer to the Bates-stamped page numbers identified in the California Attorney General's lodging of the state court record with this Court.

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 12

decision, as separate grounds for denial, the California Supreme Court held that four of

Petitioner's claims were procedurally barred.

The Alameda County Superior Court conducted an evidentiary hearing on the issue of Petitioner's alleged intellectual disability.  On June 13, 2006, the Superior Court denied the petition, and found that Petitioner had failed to prove by a preponderance of the evidence that he is intellectually disabled within the meaning of *Atkins*.  AG023700–22.  On August 14, 2006, Petitioner filed a further petition for writ of habeas corpus on the issue of his intellectual disability. The petition was denied by the California Supreme Court on December 15, 2010.  AG028382.

On December 14, 2011, Petitioner filed his federal petition for writ of habeas corpus in this Court.  ECF No. 3.  Respondent filed a motion for summary judgment on Claims 2, 3, and 5 on March 26, 2013.  ECF No. 37.  Petitioner cross-moved for summary judgment on Claims 2, 3, and 5 on March 28, 2013.  ECF No. 38.  Both Petitioner and Respondent filed opposition briefs on June 10, 2013.  ECF Nos. 44, 45.  On August 8, 2013, Petitioner and Respondent filed reply briefs.  ECF Nos. 48, 49.  The claims were denied, and summary judgment in favor of Respondent granted on June 25, 2015.  ECF No. 52.

On December 15, 2015, Petitioner and Respondent filed opening briefs on the merits as to Claims 1, 4, 6, 7, 8, 9, 10, and 11.  ECF No. 62; 63.  Petitioner filed a response on February 11, 2016.  ECF No. 63.  Respondent filed a response on February 12, 2016.  ECF No. 65.

The Court denied Claims 1, 6, and 7 on September 15, 2016.  ECF No. 74.  The Court denied Claims 9 and 11 on September 20, 2016.  ECF No. 75.  The Court denied Claims 4 and 8 on September 27, 2016.  ECF Nos. 76, 77.  The Court denied Claim 10 on November 15, 2016. ECF No. 81.

On February 3, 2017, Petitioner and Respondent filed opening briefs on the merits of Claims 12 through 22.  ECF Nos. 86 ("Pet'r Br."), 87 ("Resp. Br.").  On March 29, 2017, Petitioner and Respondent filed responses.  ECF Nos. 89 ("Pet'r Reply Br."), 90 ("Resp. Reply Br.").

## II.     LEGAL STANDARD

**A.    Antiterrorism and Effective Death Penalty Act (28 U.S.C. § 2254(d))**

Because Petitioner filed his original federal habeas petition in 2011, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to the instant action.  *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003) (holding that AEDPA applies whenever a federal habeas petition is filed after April 24, 1996).  Pursuant to AEDPA, a federal court may grant habeas relief on a claim adjudicated on the merits in state court only if the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

**1.    Contrary To or Unreasonable Application of Clearly Established Federal Law**

As to 28 U.S.C. § 2254(d)(1), the "contrary to" and "unreasonable application" prongs have separate and distinct meanings.  *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court.").  A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts."  *Id.* at 412–13.

A state court's decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  A state court's determination that a claim lacks merit is not unreasonable "so long as 'fairminded jurists could disagree' on [its] correctness."  *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Holdings of the U.S. Supreme Court at the time of the state court decision are the sole

5

determinant of clearly established federal law. *Williams*, 529 U.S. at 412. Although a district court may "look to circuit precedent to ascertain whether [the circuit] has already held that the particular point in issue is clearly established by Supreme Court precedent," *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (per curium), "[c]ircuit precedent cannot refine or sharpen a general principle of [U.S.] Supreme Court jurisprudence into a specific legal rule," *Lopez v. Smith*, 135 S. Ct. 1, 4, (2014) (per curium) (internal quotation marks omitted).

### 2. Unreasonable Determination of the Facts

In order to find that a state court's decision was based on "an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court," *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (internal quotation marks omitted). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). That said, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

In examining whether a petitioner is entitled to relief under 28 U.S.C. § 2254(d)(1) or § 2254(d)(2), a federal court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). In the event that a federal court "determine[s], considering only the evidence before the state court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or that the state court's decision was based on an unreasonable determination of the facts," the federal court evaluates the petitioner's claim *de novo*. *Hurles*, 752 F.3d at 778. If error is found, habeas relief is warranted if that error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

6

1 *Abrahamson*, 507 U.S. 619, 638 (1993). Petitioners "are not entitled to habeas relief based on trial

2 error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (quoting *United*

3 *States v. Lane*, 474 U.S. 438, 449 (1986)).

4 **B.     Federal Evidentiary Hearing (28 U.S.C. § 2254(e))**

5     Under *Cullen v. Pinholster*, habeas review under AEDPA "is limited to the record that was

6 before the state court that adjudicated the claim on the merits." 563 U.S. at 180–81. The Ninth

7 Circuit has recognized that *Pinholster* "effectively precludes federal evidentiary hearings" on

8 claims adjudicated on the merits in state court. *Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th Cir.

9 2013); *see also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("Although the Supreme Court

10 has declined to decide whether a district court may ever choose to hold an evidentiary hearing

11 *before* it determines that § 2254(d) has been satisfied . . . an evidentiary hearing is pointless once

12 the district court has determined that § 2254(d) precludes habeas relief.") (internal quotation marks

13 and citation omitted).

14 **III.     DISCUSSION**

15     Claim 12 of Petitioner's habeas petition asserts that Petitioner was denied effective

16 assistance of counsel during the guilt phase of Petitioner's trial. *See* Pet. at 222–36; Pet'r Br. at 1.

17 Petitioner presented this claim in his state habeas petition, and the California Supreme Court

18 rejected the claim on the merits without explanation. AG023690 ("All other claims set forth in the

19 petition for writ of habeas corpus are denied. Each claim is denied on the merits."). Because the

20 California Supreme Court did not provide reasons for its denial of Petitioner's claim, the Court

21 must determine what arguments or theories could have supported the California Supreme Court's

22 decision. *See Richter*, 562 U.S. at 102 ("Under § 2254(d), a habeas court must determine what

23 arguments or theories supported or, as here, could have supported, the state court's decision.").

24 The Court then "must ask whether it is possible fairminded jurists could disagree that those

25 arguments or theories are inconsistent with the holding in a prior decision" of the United States

26 Supreme Court. *Id.*

27     In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court held

28

7

that ineffective assistance of counsel is cognizable as a denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance, of counsel. *Id.* at 686. To prevail on an ineffective assistance of counsel claim, a petitioner must establish that: (1) his counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms; and (2) he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688–94. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Ultimately, a petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "might be considered sound trial strategy" under the circumstances. *Id.* at 689 (internal quotation marks omitted). Moreover, a "doubly" deferential standard of review is appropriate in analyzing ineffective assistance of counsel claims under AEDPA because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential.'" *Richter*, 562 U.S. at 105 (internal quotation marks omitted). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

In the instant claim, Petitioner argues that trial counsel was ineffective during the guilt phase of Petitioner's trial in (1) failing to consult a competency expert to support a finding that Petitioner was incompetent to stand trial; (2) failing to investigate a viable mental state defense during the guilt phase of trial; and (3) failing to investigate and support a defense that Petitioner did not commit the crimes. Pet'r Br. at 6–13. The Court considers each of Petitioner's subclaims below.

**A.    Trial Counsel's Alleged Failure to Consult a Competency Expert to Support a Finding that Petitioner was Incompetent to Stand Trial**

Petitioner first argues that trial counsel was ineffective in "unreasonably fail[ing] to consult with a mental health expert to support [trial counsel's] request for a competency evaluation, and to

provide such an expert with background materials to render an opinion regarding, and a complete assessment of, [Petitioner's] competency." Pet'r Br. at 8. This argument relates to counsel's motions during the course of Petitioner's capital murder trial for a second competency hearing. The Court briefly recounts the facts and procedural history relevant to this subclaim, and then turns to the merits.

### 1. Relevant Facts and Procedural History

#### a. Petitioner's Initial Competency Hearing

On January 31, 1992, the state trial court, upon Petitioner's motion, suspended criminal proceedings against Petitioner and appointed two psychiatrists, Karen Gudiksen, M.D., and Fred Rosenthal, M.D., to evaluate Petitioner's competency to stand trial. AG000943-44; AG000946-47. In March 1992, both experts informed the court that, in their opinions, Petitioner was not competent to stand trial. According to Dr. Rosenthal, the nature of Petitioner's condition was organic, meaning based on neurological defects or brain damage. Neither expert rendered a formal diagnosis of organic brain damage, however, because "appropriate neurological testing" would have been necessary in order to complete a diagnosis of Petitioner's medical condition, and there was insufficient funding available for Drs. Gudiksen and Rosenthal to complete such testing. AG009803-04, AG023064-65; AG023584. Petitioner's counsel, however, had previously been granted funding to employ Dr. David Stein, Ph.D., to perform neuropsychological testing on petitioner. AG010927. Dr. Stein eventually performed the testing in May 1992. AG010928-29.

At the state's request, a full jury trial on the issue of Petitioner's competency was conducted before Judge Michael Ballachey of the Alameda County Superior Court from June 24 to July 22, 1992. AG000957-60; AG001258. Petitioner called all three doctors as expert witnesses. Drs. Gudiksen and Rosenthal both testified that, in their opinions, Petitioner was not competent to stand trial. AG010591; AG010883. Dr. Stein testified that, based upon the neurological testing that he had performed, Petitioner suffered from considerable pervasive brain impairment. AG010948–49. Petitioner's counsel did not provide Dr. Stein's test results to Drs. Gudiksen and Rosenthal. AG023065, AG023074.

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 12

The state offered three lay witnesses from the Santa Rita Jail who testified in support of Petitioner's competency. *See Marks*, 31 Cal. 4th at 217–18. The state's witnesses included Deputy Sheriff Timothy Durbin ("Durbin"), who testified that Petitioner asked Durbin for a work assignment in June 1992. *Id.* at 217; AG011211–12. Petitioner believed that if he had a job "it would look better to his jury when he went to trial later in the year." AG011212. Petitioner told Durbin "that he was rejecting an invitation to appear" on the television show *America's Most Wanted* because his attorney had advised him "that it wouldn't be in his best interests" because Petitioner might "'trip himself up,' and hurt his case." *Id.* Petitioner also told Durbin that he would have a competency hearing in June. AG011213. Durbin asked whether that was a hearing to decide whether Petitioner could fire his attorney, and Petitioner responded, "No, it is a competency hearing to see whether or not I am sane." *Id.* Petitioner told Durbin "I should lose that in June and I'll start my main trial later in the year or early '93." *Id.*

On July 22, 1992, the jury found Petitioner competent to stand trial. AG001257.

### b. Motions During Trial for a Second Competency Hearing

On January 21, 1994, three days before jury selection in Petitioner's capital murder trial was set to begin, the defense moved under California Penal Code section 1368 to suspend the proceedings and have a second hearing to determine Petitioner's competency. AG011558, AG011563–64. Petitioner's counsel represented to the trial court that Petitioner was out of touch with basic reality and could not comprehend the significance of simple facts that were necessary to prepare his case.

The state law applicable to Petitioner's motion for a second competency hearing provided: "When a competency hearing has already been held and defendant has been found competent to stand trial . . . a trial court need not suspend proceedings to conduct a second competency hearing unless it is presented with a substantial change of circumstances or with new evidence casting a serious doubt on the validity of that finding." *People v. Kelly*, 1 Cal. 4th 495, 542 (1992). After reviewing the transcript of the 1992 initial competency trial, the trial court found on January 24, 1994, that Petitioner's circumstances at trial were not substantially different from his

10

circumstances at Petitioner's initial competency trial, and that the new evidence Petitioner presented did not cast a serious doubt on the validity of the jury's prior finding that Petitioner was competent. AG011586–87.

On March 28, 1994, Petitioner moved to dismiss his attorneys and to represent himself. Also on that day, Petitioner's counsel again moved to have the trial court suspend the proceedings and conduct a hearing under section 1368 to determine Petitioner's competency. AG014987. The trial court indicated that it would consider the motions on the next day, and until then, trial would resume as scheduled. AG014989.

Once trial resumed on that day, Petitioner interrupted the proceedings on several occasions as the defense attempted to point out inconsistencies between eyewitnesses' descriptions of the shooter's dark complexion and dark clothing with photographs of Petitioner wearing a light-colored top and having a medium complexion. *See, e.g.*, AG015087–88. First, Petitioner interrupted when the trial court addressed the jurors regarding the photographs of Petitioner:

> THE COURT: Then, ladies and gentlemen, counsel have also entered into a stipulation, and I will inform you that with respect to the exhibits, 28A, B and C, to which there's been testimony, that they reflect the photographs of the defendant, Delaney Marks. Photograph 28A is a photograph, booking photograph, so to speak, taken shortly after his arrest on October 18, 1990. 23B [sic] and 28C are photographs taken of Mr. Marks on earlier occasions, prior to October 18, 1990. So is that –
>
> THE DEFENDANT: Excuse me, Your Honor, that was after I was transferred.
>
> THE COURT: Mr. Marks, please.
>
> THE DEFENDANT: That was after I was taken to Oakland that was taken.
>
> THE COURT: Mr. Marks, I'm going to stop these proceedings and have you removed from the courtroom if you continue.
>
> THE DEFENDANT: Sir, you have misquoted.
>
> THE COURT: If I hear one more remark from you, Mr. Marks, we will stop these proceedings, and I will have you removed. Go ahead, Mr. Thews [defense counsel].

AG015045–46.

Later that day, after his counsel finished cross-examining an eyewitness who could not

recollect what the shooter was wearing or whether the shooter had any facial hair, Petitioner again

interrupted the proceedings:

> THE DEFENDANT: This [witness] came within five feet –
>
> THE COURT: Mr. Marks, I don't want to do this again. Mr. Marks, please keep quiet.
>
> THE DEFENDANT: [Defense counsel] keeps blotching his question.
>
> THE COURT: Mr. Burr [the prosecutor], you may proceed.

AG015086–88. After the state performed a short redirect examination, Petitioner again

interrupted the proceedings during his counsel's recross of the witness:

> DEFENSE COUNSEL: Directing your attention to 8A again, the photo of Mr. Marks, with the light colored jacket, when you say that's consistent –
>
> THE DEFENDANT: That's a shirt. That ain't no jacket. You're trying to insinuate -
>
> DEFENSE COUNSEL: Could we have a recess, please, Your Honor?
>
> THE COURT: Let's complete the testimony of this witness, then I'll take a recess.
>
> DEFENSE COUNSEL: All right. When you say that jacket is consistent with –
>
> THE DEFENDANT: That's a shirt, that's not a jacket. He's blotching –
>
> DEFENSE COUNSEL: Could we have a recess?
>
> THE DEFENDANT: You need one. You need to question –
>
> THE COURT: Mr. Marks, if you don't remain quiet and let your attorney represent you here, I'm going to have you removed. I've told you this several times in several different questions. Now, please –
>
> THE DEFENDANT: Your Honor, you know, he's blotching these proceedings. This person came within five feet of [me] with a mustache. [The witness] hasn't stated that. He's insufficient as a counsel.
>
> DEFENSE COUNSEL: Could we have a recess?

12

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 12

United States District Court
Northern District of California

1      THE COURT: It looks like we need one.

2      THE DEFENDANT: I think *he's* 1368.

3  AG015089–90 (emphasis added).  After the jurors were excused, the Court instructed Petitioner

4  that, if Petitioner continued to disrupt the proceedings, the Court would remove Petitioner from

5  the courtroom.  Petitioner stated in response:

6          THE DEFENDANT: I give you my word, Your Honor, under oath that I
7          won't do any disruptive misconduct, I will not voice my opinion
           anymore, I will not say anything else.
8
           But I was just saying, if somebody came within five feet of you, you would
9          know if they would have any facial hair.  He's not questioning.  As an
           attorney, Mr. Burr [the prosecutor] was so sufficient, as he went through the
10         photographs, A, B, C and D –

11         THE COURT: Mr. Marks, I'm not your attorney, obviously, but I'm –
12
           THE DEFENDANT: I'm not going to say anything else.
13
           THE COURT: I'm going to tell you from my observation –
14
           THE DEFENDANT: I'm not saying anything else.
15
           THE COURT:  Fine.  I want to address –
16
17         THE DEFENDANT: She was openly see [sic] his mustache, Your
           Honor, five feet, she said, and right this five feet, she didn't see a
18         mustache, he couldn't possibly even never mentioned that to her, Your
           Honor.  He tried to make her force me in the jacket to make me appear
19         guilty.  That's the sweat shirt he keeps –
20
           THE COURT: Thank you, Mr. Marks.
21
   AG015090–92.
22
           On the next day, March 29, 1994, the trial court held a sealed hearing on Petitioner's
23
   motions to dismiss his attorneys and to represent himself.  The trial court denied Petitioner's
24
   motions.  AG015273, AG01529.
25
           That same day, the trial court heard arguments on the defense's section 1368 motion to
26
27 suspend the proceedings and hold a second competency hearing.  AG015279.  In support of the

28                                                     13

1    motion to suspend the proceedings, defense counsel contended that Petitioner was unable to

2    answer his counsel's questions, and that Petitioner was firmly convinced that the prosecutor, trial

3    court, and defense counsel had accepted bribes in his case.  AG015280–81.

4        The trial court denied the defense's section 1368 motion to suspend the proceedings.

5    AG015298.  The trial court again found (1) that Petitioner's circumstances had not substantially

6    changed from his circumstances at the time of the 1992 competency determination; and (2) the

7    new evidence Petitioner submitted did not cast a serious doubt on that determination.  The trial

8    court also noted that Petitioner's outbursts and his responses to the court's questions showed that

9    Petitioner understood the nature of the proceedings as well as the significance of the evidence

10   being introduced against him, and that Petitioner was able to recognize and understand weaknesses

11   or flaws in that evidence.  AG015293–98.

12                    **c. California Supreme Court's Decision on Direct Appeal**

13       On direct appeal to the California Supreme Court, Petitioner argued that insufficient

14   evidence supported the jury's July 22, 1992 finding that Petitioner was competent.  *Marks*, 31 Cal.

15   4th at 218.

16       On July 24, 2003, the California Supreme Court upheld the jury's July 22, 1992 finding

17   that Petitioner was competent.  The California Supreme Court held, among other reasons, that "the

18   People below produced abundant evidence that contradicted" the experts that testified in favor of

19   Petitioner at the competency hearing.  *Id.* at 219.  Indeed, the California Supreme Court noted,

20   "most of [the state's evidence] c[ame] from defendant's own mouth." *Id.*  For example, Petitioner

21   had himself remarked that he "didn't do no Taco Bell shootings and no Gourmet shootings, and no

22   cab shootings," which "support[ed] the inference that [Petitioner] fully recognized the magnitude

23   of the charges he faced and the potential consequences." *Id.* at 219.  Moreover, the California

24   Supreme Court explained, Petitioner's remarks to Sheriff Durbin in June 1992 "indicated

25   [Petitioner] understood the nature of the competency hearing:  '[i]t is a competency hearing to see

26   whether or not I am sane.'" *Id.* at 220.  The California Supreme Court further cited evidence of

27   Petitioner cooperating with counsel, taking their advice, and "show[ing] he was able to cooperate

28
                                                    14

with counsel but sometimes refused to do so, largely to achieve a substitution of counsel." *Id.* The California Supreme Court also explained that, "although defendant's outbursts [during trial] did not comport with courtroom protocol, they did reflect his attempt to provide advice to counsel." *Id.*

In sum, the California Supreme Court found that "Defendant was properly found competent to stand trial." *Id.* at 221.

### d. Claims 2, 3, and 4 of Petitioner's Federal Habeas Petition

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which the California Supreme Court rejected. AG023690. On December 14, 2011, Petitioner filed his federal petition for writ of habeas corpus in this Court. *See* Pet.

Three claims raised in Petitioner's federal habeas petition are relevant to the instant subclaim. In Claim 2 of his federal habeas petition, Petitioner asserted that he was denied a fair, reliable, and adequate determination of his competency in his June–July 1992 competency trial. *See Marks v. Davis*, 112 F. Supp. 3d 949, 959 (N.D. Cal. 2015). In Claim 3, Petitioner asserted that the capital murder trial court should have held a second competency proceeding during Petitioner's capital murder trial. *Id.* at 969. Finally, in Claim 4, Petitioner asserted that he was, in fact, incompetent to stand trial. *See Marks v. Davis*, 2016 WL 5395962, at *5 (N.D. Cal. Sept. 27, 2016).

On June 25, 2015, the Court issued an order denying Claims 2 and 3 of Petitioner's federal habeas petition. ECF No. 52; *Marks*, 112 F. Supp. 3d at 959.

In ruling on Claim 2, the Court found that Petitioner received adequate psychological testing and that Petitioner had a meaningful opportunity at his June–July 1992 competency hearing to present evidence in support of his claim that he was incompetent. *Id.* at 963, 969. The Court also held that Petitioner could not establish that his counsel was constitutionally ineffective during his competency hearing. Specifically, Petitioner argued that his trial counsel was constitutionally ineffective in failing to "provide[] the results of Dr. Stein's neuropsychological testing to Drs. Gudiksen and Rosenthal," and failing to "elicit[] testimony from Dr. Stein that Petitioner was

incompetent to stand trial." *Id.* at 963. The Court held, however, that even assuming that his counsel rendered deficient performance, Petitioner was "unable to establish prejudice." *Id.* at 964. The Court explained:

> Even had defense counsel provided the neuropsychological test results to the two court-appointed psychiatrists, Drs. Gudiksen and Rosenthal, and also elicited from Petitioner's clinical psychologist, Dr. Stein, the opinion that Petitioner was incompetent to stand trial, the state's contrary evidence, especially Durbin's testimony and defendant's own documented statements and conduct, was sufficiently strong that Petitioner cannot show a reasonable probability the jury would have found Petitioner incompetent to stand trial.

*Id.* at 966. Thus, the Court denied Petitioner's claim that he was denied a fair, reliable, and adequate determination of his competency in his June–July 1992 competency trial.

The Court also denied Claim 3, in which Petitioner asserted that he was entitled to a second competency hearing. As set forth above, under California law, "after an initial finding of competency, a second hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding." *Gomez v. Harrington*, 522 F. App'x 393, 394 (9th Cir. 2013) (internal quotation marks omitted). In denying Claim 3, the Court explained that California's standard was consistent with clearly established federal law, which requires the trial court to suspend the proceedings and conduct a hearing to determine competency if the trial court becomes aware of circumstances that would lead a reasonable person to have a "bona fide doubt" as to the defendant's competence. *Marks*, 112 F. Supp. 3d at 973 (quoting *Pate v. Robinson*, 383 U.S. 375, 385 (1966)). After reviewing the record, the Court found that, "[i]n light of Petitioner's comments, the jury's previous determination following an exhaustive hearing that Petitioner was competent, and the trial court's ability to observe Petitioner in person, this Court cannot say that the trial court was objectively unreasonable in finding no bona fide doubt had been raised as to Petitioner's competency to stand trial." *Id.* at 977. Thus, the Court held that "the California Supreme Court's decision to affirm the trial court's rejection of Petitioner's" request for a second competency hearing was neither contrary to nor an unreasonable application of federal law, nor was it "based

16

upon an unreasonable determination of the facts in light of the evidence before it." *Id.* at 981.

Finally, on September 27, 2016, the Court denied Claim 4, in which Petitioner argued that he was, in fact, incompetent to stand trial. *Marks*, 2016 WL 5395962, at *5. The Court considered contemporaneous evidence of Petitioner's incompetency, in addition to post-conviction evidence of incompetence. Ultimately, the Court held that the California Supreme Court could have reasonably concluded from this evidence that Petitioner was, in fact, competent to stand trial. *Id.* at *10.

### 2. Whether Defense Counsel was Ineffective in Failing to Consult a Competency Expert in Support of Defense Counsel's Request for a Second Competency Hearing

Having reviewed the relevant factual and procedural background, the Court turns to Petitioner's argument in Claim 12 that his trial counsel was ineffective in failing to request a mental health expert and consult with that expert to support defense counsel's request for a second competency hearing. Pet'r Br. at 8. According to Petitioner, had defense counsel requested and consulted with a mental health expert in support of its request for a second competency hearing, that mental health expert would have found Petitioner incompetent, the trial court would have conducted a second competency hearing, and Petitioner would have been found incompetent to stand trial at the second competency hearing. Pet'r Reply at 2.

The Court need not determine whether defense counsel rendered deficient performance in failing to request or consult a competency expert in support of defense counsel's motion for a second competency hearing because, even assuming that defense counsel rendered deficient performance, the Court finds that Petitioner cannot establish prejudice under *Strickland.* Specifically, the California Supreme Court could have reasonably concluded that, even if defense counsel had requested and consulted with a qualified mental health expert—and even assuming that this mental health expert would have opined that Petitioner was incompetent to stand trial— there was no reasonable probability that the trial court would have held a second competency hearing, or that Petitioner would have been found incompetent at a second competency hearing.

### i. No Reasonable Probability the Trial Court Would Have Held a Second Competency Hearing

17

1        First, the California Supreme Court could have reasonably determined that, even if defense

2   counsel had consulted with and retained a mental health expert—and even if that mental health

3   expert opined that Petitioner was incompetent—there was no reasonable probability that the trial

4   court would have held a second competency hearing.  As set forth above, under California law,

5   "after an initial finding of competence, a second hearing is required only 'if the evidence discloses

6   a substantial change of circumstances or new evidence is presented casting serious doubt on the

7   validity of the prior finding.'"  *Gomez*, 552 F. App'x at 394 (quoting *People v. Medina*, 11 Cal.

8   4th 694, 734 (1995)).  As this Court explained in denying Claim 3, at the time that defense counsel

9   moved for a second competency hearing, "the trial court was well aware" that an "exhaustive"

10  competency hearing had been held in 1992.  *Marks*, 112 F. Supp. 3d at 977, 980.  Accordingly,

11  "the trial court was well aware" that a jury found Petitioner competent to stand trial in 1992

12  "despite the testimony of two court-appointed psychiatrists" who opined that Petitioner was

13  incompetent, and despite the testimony of Dr. Stein who opined that Petitioner suffered from

14  pervasive brain impairment.  *Id.* at 980.  The trial court was also "well aware" that the jury found

15  Petitioner competent largely because of Petitioner's own statements, which reasonably could have

16  been interpreted as "demonstrating that [Petitioner] was well aware of the nature of the

17  proceedings against him and the potential punishments he faced."  *Id.* at 965, 980 (internal

18  quotation marks omitted).

19        Moreover, at the time that defense counsel moved for a second competency hearing, the

20  trial court had had the opportunity to interact with and observe Petitioner during the course of

21  Petitioner's capital murder trial.  As the Court reasoned in denying Claim 3, the record showed

22  that "Petitioner behaved at trial as if he understood the nature and purpose of the proceedings

23  against him and was capable in assisting in his defense."  *Id.* at 981.  In particular, Petitioner

24  interrupted the capital murder proceedings on March 28, 1994—the same day that defense counsel

25  moved for a second competency hearing—and spoke out of turn to complain that defense counsel

26  was not sufficiently impeaching the eyewitnesses that had identified Petitioner.  *See, e.g.*,

27  AG015089–90 ("THE DEFENDANT: That's a shirt. That ain't no jacket. . . . This person came

28

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 12

within five feet of [me] with a mustache. She hasn't stated that. He's insufficient as counsel."). The trial court could have reasonably interpreted these interruptions as demonstrating Petitioner's ability to "'offer assistance to counsel.'" *Marks*, 112 F. Supp. 3d at 977 (quoting *Marks*, 31 Cal. 4th at 221).

In sum, at the time that defense counsel moved for a second competency hearing during Petitioner's capital murder trial, the trial court was aware that *three* mental health experts had testified in Petitioner's favor at Petitioner's initial competency hearing, but that a jury had nonetheless found Petitioner competent to stand trial at the initial competency hearing because of the words "from [Petitioner's] own mouth." *Marks*, 31 Cal. 4th at 219. Moreover, the trial court had had the opportunity to interact with and observe Petitioner during the course of the capital murder trial, and Petitioner had demonstrated during the course of his capital murder trial his ability to "offer assistance to counsel." *Id.* at 221. In light of this, the California Supreme Court could have reasonably concluded that, even had defense counsel produced the opinion of a *fourth* mental health expert in support of defense counsel's motion to suspend the proceedings and hold a second competency hearing, there was no reasonable probability that the trial court would have considered the opinion of a fourth mental health expert to be "a substantial change of circumstances or new evidence" that "cast[] serious doubt on the validity of the prior finding" that Petitioner was competent such that a second competency hearing was warranted under California law. *Gomez*, 552 F. App'x at 394.

Accordingly, because there was no reasonable probability that the trial court would have held a second competency hearing had Petitioner produced the opinion of a fourth mental health expert, the California Supreme Court could have reasonably concluded that Petitioner was not prejudiced by defense counsel's failure to consult with and retain an additional mental health expert.

### ii. No Reasonable Probability Petitioner Would Have Been Found Incompetent at a Second Competency Hearing

Moreover, even on the assumption that the trial court *would* have held a second competency hearing had defense counsel consulted with and retained a mental health expert to

19

1    support defense counsel's motion for a second competency hearing, the California Supreme Court

2    could have reasonably concluded that Petitioner would not have been found incompetent at a

3    second competency hearing. Again, *three* mental health experts testified at Petitioner's initial

4    competency hearing in favor of Petitioner, and yet the jury found Petitioner competent because

5    "the state's contrary evidence, especially Durbin's testimony and defendant's own documented

6    statements and conduct, was sufficiently strong." *Marks*, 112 F. Supp. 3d at 966. Moreover,

7    "Petitioner behaved at trial as if he understood the nature and purpose of the proceedings against

8    him and was capable in assisting in his defense." *Id.* at 981. Thus, the California Supreme Court

9    could have reasonably concluded that, even if a second competency hearing had been held and an

10    *additional* mental health expert testified at that hearing in favor of Petitioner, Petitioner would not

11    have been found incompetent at that second competency hearing. Indeed, in denying Claim 4 of

12    Petitioner's habeas petition, in which Petitioner asserted that he was, in fact, incompetent to stand

13    trial, this Court examined both contemporaneous and post-conviction evidence of Petitioner's

14    competence to stand trial and concluded that the California Supreme Court was reasonable in

15    rejecting Petitioner's claim that Petitioner was actually incompetent. *Marks*, 2016 WL 5395962,

16    at *6.

17         Thus, because there was no reasonable probability that Petitioner would have been found

18    incompetent at a second competency hearing, the California Supreme Court could have reasonably

19    concluded that Petitioner was not prejudiced by defense counsel's failure to consult with and

20    retain an additional competency expert.

21               **iii. Summary**

22        In sum, the Court finds that the California Supreme Court's summary denial of this

23    subclaim was neither contrary to, nor the result of an unreasonable application of, clearly

24    established federal law as determined by the U.S. Supreme Court in *Strickland*. *See* 28 U.S.C. §

25    2254(d)(1). Specifically, the California Supreme Court could have reasonably concluded that,

26    even assuming that trial counsel rendered deficient performance, Petitioner was not prejudiced

27    because there is no reasonable probability that the trial court would have held a second

28

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 12

competency hearing. Moreover, the California Supreme Court could have reasonably concluded that, even had the trial court held a second competency hearing, there was no reasonable probability that Petitioner would have been found incompetent at that second competency hearing. Because Petitioner cannot establish prejudice under *Strickland*, this subclaim must be denied.

**B.** **Trial Counsel's Alleged Failure to Investigate a Guilt Phase Mental State Defense**

Petitioner's second subclaim asserts that trial counsel was ineffective in failing to investigate a mental state defense during the guilt phase of trial. Pet'r Br. at 4–6. According to Petitioner, defense counsel failed to investigate a guilt phase mental state defense despite the fact that trial counsel knew that Drs. Gudiksen, Rosenthal, and Stein had opined that Petitioner had mental health problems, and despite the fact that trial counsel themselves had raised concerns to the trial court about Petitioner's bizarre behavior. *Id.* According to Petitioner, had trial counsel investigated a mental state defense, trial counsel would have presented a mental state defense at trial and such a defense would have been successful. *Id.*

As an initial matter, the Court notes that there is no indication in the record that Petitioner's trial counsel did, in fact, fail to investigate a guilt phase mental state defense. Susan Sawyer ("Sawyer"), who was assigned as Petitioner's counsel in 1991, submitted a declaration in support of Petitioner's state habeas petition. Sawyer's declaration states that "[a]s part of our office's investigation of potential mental state defenses in Mr. Marks's case, we retained Dr. David Stein to perform a neuropsychological evaluation of Mr. Marks." AG023072. Dr. Stein conducted his evaluation in May 1992. *Id.* Sawyer further declares that "[o]n or about December 8, 1992, [Sawyer] retained a psychiatrist to evaluate Mr. Marks to determine if there were any bases for a plea of not guilty by reason of insanity." AG023076–77. Shortly after retaining this psychiatrist, Sawyer's office declared a conflict and attorneys Louis Weis ("Weis") and Albert Thews ("Thews") were appointed to represent Petitioner. AG023077. Sawyer states that she "advised [the psychiatrist] that Weis would be contacting him shortly." *Id.* There is nothing in the record to suggest that Weis or Thews failed to consult this psychiatrist, or otherwise failed to investigate a guilt phase mental state defense. Thews submitted a declaration in support of

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 12

1   Petitioner's habeas petition to the California Supreme Court, but Thews's declaration does not

2   contain any discussion of his investigation or consideration of a mental state defense.

3          Nonetheless, even assuming that Weis and Thews failed to investigate a guilt phase mental

4   state defense, and even assuming that this failure constituted deficient performance, the California

5   Supreme Court could have reasonably concluded that Petitioner was not prejudiced by trial

6   counsel's failure to investigate a guilt phase mental state defense. Specifically, "demonstrating

7   *Strickland* prejudice requires showing both a reasonable probability that counsel would have made

8   a different decision had he investigated [a guilt phase mental state defense], and a reasonable

9   probability that the different decision would have altered the outcome." *Bemore v. Chappell*, 788

10  F.3d 1151, 1169 (9th Cir. 2015). For the reasons discussed below, the California Supreme Court

11  could have reasonably concluded that (1) there was no reasonable probability that defense counsel

12  would have presented a guilt phase mental state defense; and (2) even if defense counsel had

13  presented a guilt phase mental state defense, there was no reasonable probability that the outcome

14  of trial would have been different.

15      **1.  No Reasonable Probability Defense Counsel Would Have Made a Different
            Decision and Presented a Guilt Phase Mental State Defense**
16

17         First, the California Supreme Court could have reasonably concluded that, even if defense

18  counsel had investigated a guilt phase mental state defense, there is no reasonable probability that

19  defense counsel would have presented that defense at trial. In California, in order "[t]o prevail on

20  a mental health defense, [Petitioner] would have to prove either that because of his mental illness

21  or voluntary intoxication, he did not in fact form the intent unlawfully to kill, or that he was not

22  guilty by reason of insanity—i.e., that he was incapable of knowing or understanding the nature

23  and quality of his or her act and of distinguishing right from wrong at the commission of the

24  offense." *Bemore*, 788 F.3d at 1169 (internal quotations and citations omitted). However, the

25  California Supreme Court could have reasonably concluded that, "even if counsel had unearthed

26  significant evidence" in support of a guilt phase mental state defense, Petitioner would not have

27  been willing to accept a defense that "would have required [Petitioner] to essentially admit that he

28

22

committed the murders." *Woods v. Sinclair*, 764 F.3d 1109, 1133 (9th Cir. 2014) (internal quotation marks omitted).

Significantly, Petitioner made several motions during the course of trial to have his attorneys discharged because Petitioner believed that his attorneys "thought he was guilty." *Marks*, 31 Cal. 4th at 215; AG017192–93. Petitioner insisted that he "didn't do no Taco Bell shootings and no Gourmet shootings and no cab shootings." *Marks*, 31 Cal. 4th at 218. Petitioner's initial trial attorney, Joseph Najpaver ("Najpaver"), attempted to "negotiate a plea through which defendant would receive a sentence of life imprisonment without possibility of parole." *Id.* Petitioner believed, however, that Najpaver was trying to "manipulate [Petitioner] to take life sentences for something [he] did not do.'" *Id.*; *see also, e.g.*, AG010480–81. Indeed, on November 6, 1992, Petitioner physically *kicked* Najpaver in the groin and stomach at least four or five times in open court because Petitioner believed that Najpaver was not presenting "material evidence" that would contradict eyewitnesses' descriptions of Petitioner, such as the fact that Petitioner is "not six feet [tall]" and that Petitioner is "medium in complexion." AG017193. Moreover, as set forth above with regards to Petitioner's competence to stand trial, Petitioner interrupted the proceedings on several occasions to interject regarding the eyewitnesses' descriptions of Petitioner as the shooter. *See, e.g.*, AG015090–92 ("DEFENDANT: . . . I was just saying, if somebody came within five feet of you, you would know if they would have any facial hair.").

Given Petitioner's strong and repeated insistence to his counsel throughout the course of the proceedings that he was not the shooter and that the eyewitnesses were incorrect, the California Supreme Court could have reasonably concluded that Petitioner would not have accepted a defense that "'would have required [Petitioner] to essentially admit that he committed the murders,'" even if defense counsel had "unearthed significant evidence" in support of such a defense. *Woods*, 764 F.3d at 1133. Indeed, Petitioner "failed to present the [California] Supreme Court with any evidence (or even a declaration) that he would have been willing to abandon his [innocence] defense if presented with an alternative [mental state] defense." *Id.* Accordingly, in

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 12

light of the record before the California Supreme Court, the California Supreme Court could have reasonably concluded that there was no reasonable probability that Petitioner would have accepted a mental state defense, even assuming trial counsel had investigated such a defense and found evidence in support of such a defense. *See id.* (denying inadequate assistance of counsel claim premised on counsel's failure to present mental state defense because there was no evidence in the record that the petitioner would have accepted a mental state defense); *see also Bean v. Calderon*, 163 F.3d 1073, 1082 (9th Cir. 1998) (denying inadequate assistance of counsel claim premised on counsel's failure to present mental state defense where the petitioner "refus[ed] to adopt the diminished capacity defense"). Thus, Petitioner cannot establish prejudice under *Strickland*.

**2. No Reasonable Probability a Diminished Capacity Defense Would Have Succeeded**

Second, even assuming trial counsel had investigated and presented a guilt phase mental state defense at trial, the California Supreme Court could have reasonably concluded that there was no reasonable probability that a diminished capacity defense "would have altered the outcome" of trial. *Bemore*, 788 F.3d at 1169.

In support of Petitioner's argument that a diminished capacity defense would have been successful, Petitioner presented to the California Supreme Court declarations from lay witnesses who knew Petitioner. *See* Pet. at 225. For example, Dana Howard ("Howard") issued a declaration stating that she had observed Petitioner acting "nervous and jumpy" on an unspecified date after Petitioner was released from prison in July 1990. AG022564. Howard also stated that Petitioner "was incoherent and talking out of his mind" when Howard saw him "a few days before [Petitioner's] arrest" for the instant capital offenses, which occurred in October 1990. AG022564–65. George Bullock ("Bullock") issued a declaration stating that he saw Petitioner "in 1990 sometime after the death of [Petitioner's] mother," which occurred in March 1990. AG022513–15. Bullock stated that Petitioner "look[ed] weird and unkempt," that Petitioner was "depressed and down on his luck," and that Petitioner's "mind seemed to be in a crazed state" when Petitioner spoke about his mother. *Id.* Petitioner also presented the declaration of George Woods, Jr., M.D. ("Woods"), a licensed physician specializing in psychiatry and neuropsychiatry.

24

AG023133.  In preparation for his declaration, Woods interviewed Petitioner and Petitioner's family, and Woods reviewed declarations of individuals who had witnessed Petitioner and Petitioner's statements during trial.  AG022984.  Woods concluded that Petitioner suffers "from disorders of both mood and thought," including "depression and dissociation, consistent with PTSD, a mood disorder, as well as psychosis."  AG023160.  According to Woods, Petitioner's "brain impairment coupled with his disruptive psychotic illness, left [Petitioner] unable to appreciate the nature of his actions or to conform his behavior to the law at the time of the offense for which he was tried and convicted."  AG023163–64.

However, the California Supreme Court could have reasonably concluded that, even if Petitioner had presented this evidence at trial, there is no reasonable probability that a jury would have found that Petitioner did not, in fact, intend to kill, or that Petitioner "was incapable of knowing or understanding the nature and quality of his" actions and "distinguishing right from wrong at the commission of the offense."  *Bemore*, 788 F.3d at 1169.

Specifically, any testimony that Petitioner was acting "nervous and jumpy" in the months leading up to the instant shootings, or that Petitioner was "unable to appreciate the nature of his actions" at the time of the shootings, "would have been countered [at trial] by the substantial evidence that the crime involved deliberate, premeditated decisions."  *Id.*  Shenan Boyd ("Boyd"), an employee at Taco Bell who saw Petitioner come to the Taco Bell "just about every day or so," testified at trial that Petitioner greeted Boyd on the night of the shooting and that Petitioner acted "pretty much normal."  AG014737–38.  Petitioner ordered two encharitos from Luong, "pulled out his gun," pointed the gun directly at Luong's face, and fired a single shot.  AG014744–45.  Petitioner then left the Taco Bell quickly and walked approximately 795 feet from the Taco Bell to Gourmet Market.  There, Petitioner shot Baeza and Myers.  Myers testified that Petitioner appeared "deliberately focused," and that Petitioner took "straight aim" at Myers.  AG015128.  Petitioner met up with Menefee and told Menefee that "he had shot two people."  AG05689.  According to Menefee, Petitioner acted "like his normal self."  AG015689.  Petitioner and Menefee entered McDermott's taxi, and Petitioner directed McDermott to the back of a parking lot

25

near Petitioner's grandmother's house. AG015694. Petitioner told Menefee to leave the taxi, and Petitioner shot McDermott. AG015695–97. After the shooting, Petitioner and Menefee hid under a building near Petitioner's grandmother's house for approximately 25 minutes. AG015698–99. Petitioner and Menefee then bought groceries and went to a bus stop, and Petitioner changed his hairstyle. AG015707–08. Moreover, several eyewitnesses testified that Petitioner was wearing a brown jacket on the night of the shootings, and Sergeant Mark Landes ("Landes") recovered a brown jacket on the night of the shootings from an alleyway near the home of Petitioner's grandmother. *See* AG015451–52.

Thus, evidence presented at trial showed that Petitioner, while appearing "normal," deliberately shot his victims in the head at close range, that Petitioner directed McDermott to an isolated area before shooting McDermott, that Petitioner told Menefee to leave the taxi before Petitioner shot McDermott, and that Petitioner took actions after the shootings that demonstrated that Petitioner understood the significance of the shootings, such as hiding from the police, changing his hairstyle, and possibly changing his clothes. Accordingly, the California Supreme Court could have reasonably concluded that, "even had the defense presented a mental health defense, the jury could well have concluded from the evidence that the killing was done in a calculated manner by a perpetrator able to understand and intend the consequences of his actions." *Bemore*, 788 F.3d at 1170 (finding no *Strickland* prejudice for failure to present mental state defense, even though an expert submitted a declaration that the petitioner was not able to form the requisite intent at the time of the homicide, because other evidence showed that the crime involved deliberate decisions); *Porter v. Biter*, 2017 WL 1295035, at *5 (N.D. Cal. Apr. 7, 2017) (finding the state court reasonably concluded petitioner was not prejudiced by defense counsel's failure to present mental state defense at trial because the manner the victims were killed and petitioner's "conduct after the shooting show[ed] clear, deliberate thinking and consciousness of guilt").

### 3. Summary

In sum, the Court finds that the California Supreme Court's summary denial of this subclaim was neither contrary to, nor the result of an unreasonable application of, clearly

26

established federal law as determined by the United States Supreme Court in *Strickland*. *See* 28 U.S.C. § 2254(d)(1). Even assuming that trial counsel was deficient in failing to investigate a guilt phase mental state defense, the California Supreme Court could have reasonably concluded that Petitioner was not prejudiced by trial counsel's deficiency. Specifically, the California Supreme Court could have reasonably concluded that Petitioner would not have accepted a guilt phase mental state defense, even assuming defense counsel had investigated and uncovered evidence in support of such a defense. Moreover, the California Supreme Court could have reasonably concluded that, even assuming defense counsel had investigated and presented evidence at trial in support of a mental state defense, the outcome of trial would not have been different because evidence in the record suggested that Petitioner acted deliberately and understood the consequences of his actions at the time of the shootings.

Accordingly, the California Supreme Court could have reasonably concluded that Petitioner failed to "show[] a reasonable likelihood that the result of the guilt phase would have been different but for counsel's errors." *Strickland*, 466 U.S. at 688. Because Petitioner cannot establish prejudice under *Strickland*, this subclaim must be denied.

## C. Trial Counsel's Alleged Failure to Investigate and Present Evidence that Petitioner Did Not Commit the Crimes

Lastly, Petitioner argues that trial counsel was ineffective in failing to investigate and support the defense that Petitioner was not responsible for the crimes. Pet'r Br. at 9. Petitioner argues in this subclaim that trial counsel was ineffective in (1) failing to challenge the identification evidence; (2) failing to investigate materially exculpatory evidence or to present alibi evidence; (3) failing to consult with a firearms expert; (4) failing to investigate and challenge Menefee's testimony. The Court considers each of these arguments in turn.

### 1. Failure to Challenge Identification Evidence

Petitioner contends that trial counsel was ineffective in "fail[ing] to mount an effective challenge to the prosecution's contradictory identification testimony at trial." Pet'r Br. at 10. According to Petitioner, counsel's failure "to object to the introduction of lineup identifications" at

trial was objectively unreasonable. *Id.* Moreover, Petitioner argues that trial counsel was objectively unreasonable in failing "to retain an eyewitness identification expert." *Id.*

The Court briefly recounts the relevant facts and procedural history relevant to this subargument, and then considers the merits.

### a. Relevant Facts and Procedural History

On October 22, 1990, Oakland Police Officer Dan Mercado ("Mercado") held a physical lineup. AG014410. Petitioner, while represented by counsel, chose the five other members of the lineup and selected Petitioner's position in the lineup. AG014410–11; AG014414. After Petitioner's selection, Mercado reviewed the lineup to ensure that the lineup was fair. AG014411. Petitioner did not object to the lineup. AG014413.

At least five witnesses were brought to the Oakland Police Department to view the physical lineup: Boyd, Marla Harris ("Harris"), Grace Haynes ("Haynes"), Diane Griffin ("Griffin"), and Denise Frelow ("Frelow"). AG014424. Witnesses were instructed not to discuss the case or sit together during the lineup. AG014416. Once the lineup was completed, Mercado examined the cards with defense counsel. AG014422–23. Boyd, Harris, Haynes, and Griffin firmly identified Petitioner at the physical lineup, while Frelow indicated that she thought she recognized Petitioner but was not sure. *See, e.g.*, AG014757, AG014433; *see also Marks v. Davis*, 2016 WL 5110651, at *7 (N.D. Cal. Sept. 20, 2016) (describing witness's identification during the identification procedure in further detail).

On March 17, 1994, the trial court held a hearing regarding the propriety of the physical lineup. AG014407–77; *see also Marks*, 2016 WL 5110651, at *7 (describing hearing in further detail). At the conclusion of the hearing, the trial court found "no evidence of any kind to indicate that the lineup was in any way suggestive." AG014474–75; *see also* AG014613 (confirming, after holding another preliminary hearing for an additional eyewitness to testify, that the trial court saw "nothing of any sort that would indicate that there was any undue suggestiveness or, for that matter, any suggestiveness of any dimension with respect to the lineup").

Petitioner asserted in his state habeas petition that the prosecution employed suggestive

28

lineup identification procedures, and the California Supreme Court denied Petitioner's claim on the merits without explanation. AG023690. In his federal habeas petition, Petitioner asserted in Claim 11 that the lineup identification procedures were suggestive and unfair. *Marks*, 2016 WL 5110641, at *8.

This Court denied Claim 11 on September 20, 2016. *Id.* at *7. The Court explained that the due process clause "protects against the admission of evidence derived from police-organized identification procedures that are 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Id.* at *8 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1984)). After analyzing the record and the parties' arguments, the Court concluded that "Petitioner provide[d] no support to show that the physical lineup was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Id.* at *9 (quoting *Simmons*, 390 U.S. at 384). Accordingly, the Court held that the California Supreme Court did not unreasonably apply clearly established federal law or make an unreasonable determination of the facts in denying Petitioner's suggestive identification procedures claim.

### b. Failure to Challenge Identification Evidence

Having considered the relevant facts and procedural history, the Court turns to the merits of Petitioner's subargument in Claim 12 that trial counsel was ineffective in failing to further "challenge the fairness of the identification procedures," and in failing to call an eyewitness identification expert to testify at trial. *See* Pet. at 10. The Court first considers Petitioner's argument that trial counsel was ineffective in failing to further object to the fairness of the lineup identification procedures, and then considers Petitioner's argument that trial counsel was ineffective in failing to call an eyewitness identification expert at trial.

### i. Failure to Object at Trial to Fairness of Identification Procedures

Petitioner first contends that his trial counsel was ineffective in failing to object to or challenge the lineup identification procedures at trial. Petitioner incorporates by reference the arguments that Petitioner made in Claim 11 that the lineup identification procedures were constitutionally invalid. *See id.* n. 6. However, as discussed above, this Court already rejected

Petitioner's argument in Claim 11 that he was denied due process because the lineup identification procedures were suggestive and unfair. *See Marks*, 2016 WL 5110641, at *8. This Court concluded in Claim 11 that there is no support in the record for Petitioner's assertion that the lineup identification procedures were impermissibly suggestive. *Id.* at *8–9.

This Court's analysis and ruling on Claim 11 is dispositive of Petitioner's related inadequate assistance of counsel claim. For the reasons set forth in the Court's order denying Claim 11, there is no support in the record for Petitioner's argument that the lineup identification procedures were impermissibly suggestive. Accordingly, the California Supreme Court could have reasonably concluded that trial counsel was not deficient in further objecting to or challenging at trial the lineup identification procedures. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) ("[T]he merits of the coercion claim control the resolution of the *Strickland* claim because trial counsel cannot have been ineffective for failing to raise a meritless objection."). Moreover, because there is no evidence in the record to suggest that the lineup was impermissibly suggestive, the California Supreme Court could have reasonably concluded that Petitioner was not prejudiced because there was no reasonable probability that the outcome of the proceedings would have been different had Petitioner's counsel objected to or further challenged the lineup identification procedures at trial. *Id.* Thus, there is no merit to Petitioner's subargument that trial counsel was ineffective in failing to further object to the lineup identification procedures at trial.

### ii. Failure to Call Eyewitness Expert

Petitioner further asserts that trial counsel was ineffective in failing to "retain an eyewitness identification expert." Pet'r Br. at 10. The Court need not consider whether trial counsel was deficient in failing to retain an eyewitness identification expert because, for the reasons discussed below, the Court finds that Petitioner cannot establish prejudice under *Strickland* from trial counsel's alleged deficiency.

First, Petitioner has "offered no evidence that an [eyewitness identification] expert would have testified on his behalf at trial." *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001).

United States District Court
Northern District of California

Rather, Petitioner "merely speculates that such an expert could be found." *Id.* Petitioner's

speculation that an eyewitness identification expert would have testified on his behalf—and that

this testimony would have affected the outcome of trial—"is insufficient to establish prejudice."

*Id.* This alone warrants denial of Petitioner's subargument that counsel was ineffective for failing

to consult with and retain an eyewitness identification expert.

Second, even assuming that an eyewitness identification expert would have offered

favorable testimony at trial, the Ninth Circuit has "made clear that [it] 'adhere[s] to the position

that skillful cross examination of eyewitnesses, coupled with appeals to the experience and

common sense of jurors, will sufficiently alert jurors to specific conditions that render a particular

eyewitness identification unreliable.'" *Howard v. Clark*, 608 F.3d 563, 574 (9th Cir. 2010); *see*

*also Hughes v. Hubbard*, 246 F.3d 674 (Table), at *1 (9th Cir. 2000) ("We have held that cross-

examination is sufficient to alert jurors to specific conditions that render eyewitness identification

unreliable"). Accordingly, the Ninth Circuit has concluded that "because [Ninth Circuit]

precedent establishes that expert testimony on the unreliability of eyewitness testimony may be

excluded without prejudice to defendants, it [is] also not prejudicial for defense counsel to fail to

call such a witness." *Rose v. Evans*, 414 F. App'x 1, 4 (9th Cir. 2011).

Here, trial counsel thoroughly cross-examined at trial the eyewitnesses who identified

Petitioner. *See, e.g.*, AG014766–73 (cross-examining Boyd about his description of the shooter

and whether he witnessed the shooter pull the trigger); AG015003–25 (cross-examining Griffin

about what she witnessed on the night of the shooting and her recollection of the shooter's

clothing and complexion); AG015074–79 (cross-examining Haynes about her identification of

Petitioner and her recollection of the shooter's complexion); AG015216–20 (cross-examining

Myers about his description of the shooter); AG015247–58 (cross-examining Frelow about her

observations of the shooter).

Further, in addition to defense counsel cross-examining the eyewitnesses at trial, the trial

court instructed the jury on how to evaluate and weigh eyewitness testimony. AG016516–17 ("In

determining the weight to be given [to] eyewitness identification testimony, you should consider

United States District Court
Northern District of California

the believability of the eyewitnesses, as well as other factors which bear upon the accuracy of the witness's identification of the defendant, including but not limited to any of the following," including the stress that the witness was subjected to, the cross-racial nature of the identification, and the witness's ability to provide a description of the perpetrator); *see also* AG016712–14.

Thus, the record shows that defense counsel thoroughly cross-examined the eyewitnesses and that the trial court instructed the jury on the reliability of eyewitness testimony. In light of this record, the California Supreme Court could have reasonably concluded that Petitioner was not prejudiced by the lack of an eyewitness identification expert at trial. *See, e.g.*, *Howard*, 608 F.3d at 573–74 (denying *Strickland* claim where trial counsel "extensively cross-examined" the eyewitnesses and "the jurors were instructed on the potential shortcomings of eyewitness testimony"); *Brown v. Terhune*, 158 F. Supp. 2d 1050, 1071 (N.D. Cal. Sept. 6, 2001) (denying *Strickland* claim where "counsel cross-examined the witnesses about prior inconsistencies and emphasized" problems with their identification of the petitioner).

Moreover, the California Supreme Court could have further concluded that Petitioner was not prejudiced by the lack of an eyewitness identification expert because the eyewitness identification evidence was particularly strong in this case. Not only was there a high *quantity* of individuals who identified Petitioner as the shooter—at least four eyewitnesses—but the eyewitness identification was particularly reliable because the eyewitnesses included an individual who saw Petitioner on a regular basis. Specifically, Boyd, who was an employee at Taco Bell, testified that Petitioner would come to the Taco Bell "basically just about every day or so," and that Boyd also knew Petitioner from the community. AG014737–38. Boyd not only identified Petitioner as the shooter, but also testified that when Petitioner walked up to the Taco Bell counter prior to the shooting, Boyd greeted Petitioner and Petitioner greeted Boyd in return. *Id.* Accordingly, Boyd's identification of Petitioner as the shooter was more reliable than an identification from someone who had never seen Petitioner prior to the shooting because Boyd saw Petitioner as a customer on a regular basis prior to the shooting, and Boyd spoke with Petitioner immediately before the shootings occurred. Thus, for this additional reason, the

32

California Supreme Court could have concluded that Petitioner was not prejudiced by the lack of an eyewitness identification expert—who could have offered general impeachment of eyewitness testimony—because the eyewitness identification in this case was particularly reliable.

In sum, Petitioner cannot establish that his trial counsel was ineffective for failing to further object to or challenge at trial the lineup identification procedures, or for failing to call an eyewitness identification expert at trial. This subargument must be denied.

### 2. Failure to Investigate Materially Exculpatory Evidence or to Present Alibi Evidence

Second, Petitioner argues that counsel was ineffective in "fail[ing] to investigate materially exculpatory evidence or to present alibi evidence." Pet'r Br. at 10. As part of this subargument, Petitioner asserts that trial counsel failed to investigate and present evidence of (1) alternate suspects; (2) Petitioner's alibi; or (3) "evidence to support the testimony of Austin Williams, who had excluded [Petitioner] as a suspect in the McDermott homicide." *Id.* The Court addresses each of these subarguments below in turn.

#### a. Failure to Investigate Alternate Suspects

Petitioner first asserts that trial counsel was ineffective in "fail[ing] to investigate and present evidence of alternate suspects." Pet'r Br. at 10–11. Specifically, Petitioner asserts that trial counsel should have investigated evidence that the shootings were committed by Jimmy Marks ("Jimmy"), who is Petitioner's brother, or Keith Anderson ("Anderson"). Pet. 229–300.[3]

The Court need not decide whether trial counsel was deficient in failing to investigate evidence of alternate suspects. Even assuming that trial counsel rendered deficient performance, the Court finds that the California Supreme Court could have reasonably concluded that Petitioner

_____

[3] To the extent Petitioner argues that trial counsel should have investigated and presented evidence that an individual other than Jimmy or Anderson committed the crime, Petitioner has provided no specific evidence or allegations regarding who this unknown individual may be or what information or evidence defense counsel should have investigated. *See* Pet'r Br. at 10–11; Pet. at 229–300. Thus, Petitioner has not established entitlement to habeas relief on this basis. *See Brown v. Subia*, 2009 WL 1118871, at *9 (E.D. Cal. Apr. 27, 2009) (denying *Strickland* claim premised on defense counsel's failure to investigate other suspects where the petitioner offered only "vague and conclusory" assertions about what further investigation would have uncovered).

United States District Court
Northern District of California

failed to establish prejudice under *Strickland*. Specifically, the California Supreme Court could have reasonably concluded that there is no reasonable probability that investigation of Jimmy or Anderson would have changed the outcome of trial.

First, the California Supreme Court could have reasonably concluded that Petitioner was not prejudiced by trial counsel's failure to investigate Jimmy. Petitioner submitted a declaration from Jimmy in support of Petitioner's state habeas petition. *See* AG022686. Jimmy stated in his declaration that the police picked Jimmy up on the day of the shootings. AG022699–700. However, the police let Jimmy go because the police concluded that Jimmy "could not be the guy because [Jimmy] could not have changed [his] clothes that fast." AG22700. The police "did not tell [Jimmy] why they picked [him] up." *Id*. According to Jimmy, the police dropped him off in front of the police station, and Jimmy called his girlfriend. *Id*. Jimmy and his girlfriend then took a bus to Berkeley and saw a movie. *Id*. The police picked Jimmy up on his way home from Berkeley, but again let Jimmy go once Jimmy showed the police the movie ticket stub. AG022701.

Jimmy's declaration shows only that the police let Jimmy go because they did not believe that Jimmy was the shooter. Petitioner points to no evidence suggesting that the police's conclusion was incorrect, or that Jimmy committed the crimes. Rather, Petitioner offers only conclusory speculation that an "adequate investigation" would have uncovered facts that Jimmy committed the shooting, which is insufficient to warrant habeas relief. *See Brown v. Subia*, 2009 WL 1118871, at *9 (E.D. Cal. Apr. 27, 2009) (denying *Strickland* claim premised on defense counsel's failure to investigate other suspects where the petitioner offered only "vague and conclusory" assertions about what further investigation would have uncovered).

Second, the California Supreme Court could have reasonably concluded that Petitioner was not prejudiced by trial counsel's alleged failure to investigate Anderson. Petitioner asserts that Anderson "lived near Taco Bell" and "matched eyewitness' description of the shooter." Pet. at 230. Petitioner also states that, on the night of the shootings, Sarah Chatmon Smith ("Smith") gave a statement to the police that she went to the front door of Gourmet Market on the night of

the shooting and saw a black male standing in front of the cash register with a gun. AG020173. Smith believed that the shooter was Anderson, and Smith stated that she saw a friend of Anderson's, "David," across the street from the Gourmet Market at the time of the shootings. AG020173–86.

However, Erika Emerson, Anderson's girlfriend, told the police that she and Anderson left home at 7:15 p.m. to take the bus to 38th Street and Telegraph in Oakland, where they met up with "David" and talked until 9:00 p.m. *See* AG020094–95. The Gourmet Market shooting occurred at approximately 7:40 p.m. near Jackson and 14th Street in Oakland. *See Marks*, 31 Cal. 4th at 204. Thus, even had Smith testified that Anderson was the shooter, the prosecution would have presented evidence at trial that Anderson was not at Gourmet Market at the time of the shootings. Moreover, had Smith identified Anderson at trial, Smith's testimony would have been contradicted at trial by the *four* eyewitnesses who identified Petitioner, in addition to the other substantial physical and testimonial evidence connecting Petitioner to the shootings, such as ballistic evidence, *Marks*, 31 Cal. 4th at 207; Menefee's testimony, *id.* at 206; circumstantial evidence that Petitioner may have had McDermott's money at the time of Petitioner's arrest, *id.*; and testimony that Petitioner was overheard telling another defendant that "he was in for three murders" and that the victims had died because "I shot them," *id.* at 208.

In light of this evidence—and in light of the minimal evidence presented in support of Petitioner's state habeas petition to suggest that Anderson committed the shootings—the California Supreme Court could have reasonably concluded that Petitioner was not prejudiced by trial counsel's alleged failure to investigate and present evidence that Anderson was the shooter. *See Andrews v. Davis*, 798 F.3d 759, 791 (9th Cir. 2015) (denying *Strickland* claim premised on trial counsel's failure to investigate third parties where other substantial physical and testimonial evidence connected the petitioner to the murders); *Shields v. Sherman*, 2016 WL 6091105, at *8 (C.D. Cal. Sept. 7, 2016) (finding no prejudice from counsel's failure to present further evidence that another individual committed the crime where "the prosecutor's evidence of petitioner's guilt was strong," such as evidence that "Petitioner was identified as the shooter by four eyewitnesses").

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 12

1   This subargument must be denied.

2              **b. Failure to Investigate and Present Alibi Evidence**

3           Petitioner next argues that trial counsel was ineffective in failing to investigate Petitioner's

4   alibi for the crimes. Pet'r Br. at 11.  In support of Petitioner's alibi, Petitioner presented to the

5   California Supreme Court a declaration from Pamela Lewis ("Lewis"), who declares that she saw

6   Petitioner on a bus "from downtown Oakland to Alameda . . . sometime between four and five

7   o'clock" on the day of the shootings.  AG022635; Pet'r Br. at 11.

8           However, even if Petitioner was on a bus from downtown Oakland to Alameda

9   "sometime" between four and five in the afternoon, Petitioner could have still been at the scene of

10  the crime in Oakland at the time of the shootings, which began at approximately 7:30 p.m. in the

11  evening.  *See Marks*, 131 Cal. 4th at 204.  Significantly, Lewis's declaration "contains no specific

12  facts about petitioner's whereabouts at the time of the shootings," and Petitioner's contention that

13  this evidence "would have established petitioner's innocence is speculative at best." *Mo v.*

14  *Junious*, 2016 WL 4443211, at *18 (C.D. Cal. July 13, 2016); *see also Cunningham v. Wong*, 704

15  F.3d 1143, 1159–60 (9th Cir. 2013) (finding petitioner was not prejudiced by trial counsel's

16  failure to present alibi evidence where the proffered alibi was "extremely weak").  Moreover,

17  "strong independent evidence of petitioner's participation" in the shootings was presented at trial,

18  *Mo*, 2016 WL 4443211, at *18, including the testimony of at least four eyewitnesses who

19  identified Petitioner; ballistic evidence, *Marks*, 31 Cal. 4th at 207; Menefee's testimony, *id.* at

20  206; circumstantial evidence that Petitioner may have had McDermott's money at the time of

21  Petitioner's arrest, *id.*; and testimony that Petitioner was overheard telling another defendant that

22  "he was in for three murders" and that the victims had died because "I shot them," *id.* at 208.

23  Accordingly, the California Supreme Court could have reasonably determined that Petitioner was

24  not prejudiced from his trial counsel's failure to investigate and present evidence that Petitioner

25  was on a bus from downtown Oakland to Alameda during the afternoon on the day of the

26  shootings.  This subargument must be denied.

27              **c. Failure to Investigate and Present Evidence to Support the Testimony of
                    Austin Williams**

28

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 12

Petitioner further asserts that trial counsel should have conducted further investigation to "support the testimony of Austin Williams," a cab driver who Petitioner contends "excluded Mr. Marks as a suspect in the McDermott homicide." Pet'r Br. at 11. However, for the reasons discussed below, the California Supreme Court was not unreasonable in rejecting this subargument.

As an initial matter, Petitioner overstates the record regarding Williams's testimony. Williams testified at trial that a man and a woman approached his cab on the night of the murders. AG015419. Williams told the couple that he was not the first cab in line, and he directed them to McDermott's cab. AG015422. Williams heard that McDermott had been shot approximately 10 or 15 minutes later. AG015426. That night, Williams was driven by the police to a street curb where Petitioner was standing. AG015442. Williams testified that he told the police that he did not think Petitioner was the man who approached his cab. AG015430.

At trial, Williams was shown a photograph of Petitioner and testified that the man in the photograph appeared to be the man who tried to get in his cab the night of the murder. AG015433–34. However, Williams stated that "because of the hairdo," the man in the photographs looked different from how Petitioner appeared in the courtroom. AG015434. Williams testified that he was "not certain" if Petitioner was the man that tried to get in his cab. AG015435. However, Williams stated that he was "very sure" that Menefee was the woman who tried to get in his cab that evening. AG015424–25.

Following Williams's testimony, the state called Sergeant Mark Landes ("Landes"), who was the officer who conducted the curbside identification procedure. AG015443. Landes testified that Williams told Landes the night of the murder "that the man that we had stopped, [Petitioner], looked very similar to the person that attempted to get into his cab, but [Williams] couldn't be certain, and so [Williams] did not make a positive identification." AG015443.

Thus, contrary to Petitioner's assertion that Williams "excluded [Petitioner] as a suspect" at trial, Pet'r Br. at 11, Williams's testimony was largely inconclusive regarding whether Petitioner was the man who tried to enter Williams cab the night of the murder. Moreover,

37

Williams was "very sure" that Menefee, Petitioner's girlfriend, was the woman who tried to enter his cab the night of the murder. AG015435. Menefee testified that she was with Petitioner the night of the murders, and that she and Petitioner attempted to get into Williams's cab before entering McDermott's cab. AG015690–91; *see also Marks*, 31 Cal. 4th at 206. Moreover, Petitioner changed his hairstyle and possibly his clothing after the shootings occurred and before Petitioner's arrest, AG015707–08; AG015451–55, and thus the government could have explained Williams's uncertainty in identifying Petitioner.

In any event, even if Williams did exclude Petitioner as the individual that attempted to enter Williams's cab, Petitioner offers only the vague and conclusory statement that trial counsel was deficient in failing to investigate and present "evidence to support the testimony of Austin Williams." Pet'r Br. at 11. Petitioner does not articulate what "evidence" could have supported Williams's testimony, and Petitioner did not include with his habeas petition any evidence indicating that Petitioner was not the individual who attempted to enter Williams's cab. Petitioner's vague and conclusory speculation is not sufficient to warrant habeas relief. *See Shepard v. Gipson*, 2016 WL 7229115, at *8 (E.D. Cal. Dec. 13, 2016) ("[S]peculation that further investigation by counsel may have uncovered exculpatory evidence is insufficient to establish prejudice.") (citing *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001)).

Further, even if evidence "support[ing]" Williams's testimony existed, Pet'r Br. at 11, the jury was presented at trial with substantial physical and testimonial evidence apart from Williams's testimony that connected Petitioner to the McDermott shooting, including ballistic evidence, *Marks*, 31 Cal. 4th at 207; Menefee's testimony that she was in McDermott's cab with Petitioner and that Petitioner told Menefee that he shot McDermott, *id.* at 206; and circumstantial evidence that Petitioner may have had McDermott's money at the time of Petitioner's arrest, *id*. Thus, the California Supreme Court could have reasonably concluded that there was no reasonable probability that the outcome of the trial would have been different had trial counsel investigated and presented evidence to support Williams's testimony. This subargument must be denied.

### 3. Failure to Consult with a Firearms Expert

38

Third, Petitioner contends that trial counsel was ineffective in failing to "consult[] with an appropriate [firearms] expert" and present such an expert at trial. Pet'r Br. at 12. The Court briefly addresses the firearm evidence presented at trial, and then discusses Petitioner's argument.

At trial, criminalist Lansing Lee testified with "virtually absolute certainty" that the bullets fired at Baeza and Myers came from the gun found on Petitioner at the time of Petitioner's arrest. *Marks*, 31 Cal. 4th at 260. Lee testified that his analysis "indicated" that the bullet recovered from McDermott came from Petitioner's gun, and "suggested" that the bullet that injured Luong came from that source. *Id.* Petitioner's trial counsel did not contest Lee's analysis that the bullets recovered from the shootings came from the weapon found on Petitioner. Rather, Petitioner testified at trial that he got the gun from Menefee's cousin, Felix Mitchell ("Mitchell"), on the night of the shootings after the shootings had already occurred. AG016036–37. Petitioner testified that he was in the process of delivering the gun to a drug location in Oakland, where he would be paid $150, at the time that he was arrested. AG016038–54. In support of Petitioner's defense that he was not the shooter, trial counsel argued at trial that no gunshot residue ("GSR") was found on Petitioner's hands and clothing at the time of Petitioner's arrest, that no blood was found on Petitioner's clothing, and that there was no fingerprint evidence connecting Petitioner to the shootings. *See, e.g.*, AG015508; AG015600–603; AG016429–30. The prosecution argued that the lack of GSR on Petitioner's hands and clothing was because the four hour time lapse between the shooting and when Petitioner's hands were tested for GSR. *See, e.g.*, AG015941–46.

According to Petitioner, defense counsel should have consulted with and presented the testimony of an independent firearms expert, who could have testified that "the lack of GSR was consistent with [Petitioner] not having fired a gun," and who would have testified that "the firearms evidence did not conclusively link [Petitioner's] gun to the commission of the charged offenses." Pet'r Br. at 12. In support of his habeas petition to the California Supreme Court, Petitioner submitted the declaration of John Thornton, a forensic scientist. AG023120. Thornton declared that he "would expect that a firearm discharged in the interior of the taxi would have deposited gunshot residue (GSR) including the signature components of the primer mixture."

39

AG023128. Thornton further stated that, given the photographs of the crime scenes that he reviewed, "there should have been blood on and possibly even in the barrel of the gun, as well as on the hands and clothing of the shooter." AG023127. Moreover, Thornton stated that "[t]he materials that [he] reviewed, including [Lee's] trial testimony, indicate that the impression of near-certainty delivered with respect to several projectiles could have been subjected to a full and contentious airing of the considerations relevant to bullet identification." AG023123.

However, for the reasons discussed below, the Court finds that the California Supreme Court could have reasonably concluded that trial counsel was not deficient in failing to consult with or hire an independent firearms expert to testify at trial, and that Petitioner was not prejudiced by trial counsel's failure to consult or hire an independent firearms expert to testify at trial.

First, although Thornton declares that an independent firearm expert "could have apprised counsel of the significance of the exculpatory results of GSR testing" and the lack of blood on Petitioner, AG023128, the record shows that trial counsel *was* aware of the significance of the lack of GSR and blood on Petitioner's hands and clothing. Specifically, trial counsel called Joseph Fabiny, a criminalist in the Alameda County Sheriff's Department, to testify about GSR and the fact that Petitioner did not have GSR on his hands or clothing. *See, e.g.*, AG015933–34. Trial counsel also cross-examined Lee at trial about GSR. *See, e.g.*, AG015598–99. Moreover, trial counsel elicited testimony from Sergeant Landes that the GSR test that Landes conducted on Petitioner was negative, and trial counsel elicited testimony from Landes that, despite the large amount of blood at the crime scene, blood was not found on Petitioner's clothing. *See, e.g.*, AG015505–08. Trial counsel argued to the jury during closing statements that the lack of GSR and blood on Petitioner's hands and clothing supported a verdict of not guilty. *See, e.g.*, AG016429–30 ("There is no gunshot residue and [Petitioner] is not the shooter."). Given that trial counsel argued throughout trial about the lack of GSR and blood on Petitioner, the California Supreme Court could have reasonably concluded that trial counsel presented the relevant facts to the jury, and that trial counsel was not deficient in failing to consult and present an "independent" firearms expert. AG023128; *see Richter*, 562 U.S. at 107 (recognizing that defense counsel is

40

"entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies" when it comes to retaining and presenting experts at trial).

Second, although Thornton asserts that an independent firearms expert could have testified at trial to "considerations relevant to bullet identification," AG023123, the California Supreme Court could have reasonably concluded that trial counsel made a reasonable strategic decision to not raise considerations relevant to bullet identification at trial. Petitioner testified at trial that he received the gun from Mitchell after the shootings occurred. Accordingly, Lee's testimony about the ballistics evidence was not inconsistent with Petitioner's testimony or the defense's theory of the case. Trial counsel could have reasonably decided that the more effective trial strategy was to focus on the lack of GSR and blood on Petitioner's hands and clothing, rather than to call an independent expert at trial to draw further attention to the ballistics evidence, a strategy that would have "carried its own serious risks." *See Richter*, 562 U.S. at 108; *see also Caballero v. Scribner*, 2009 WL 1564122, at *16 (C.D. Cal. June 2, 2009) (finding trial counsel was not deficient for failing to call ballistic expert where "Petitioner's counsel reasonably could have believed that introducing a ballistic expert would have detracted from the theory of the defense"). Indeed, although Thornton's declaration raises general areas of inquiry that defense counsel could have pursued with regards to the ballistics evidence, and although it questions some of Lee's choice of words, *see* AG023124, it does not contradict Lee's central conclusions regarding the ballistics evidence. *See* AG023124–26. Thus, the California Supreme Court could have reasonably concluded that trial counsel was not deficient in failing to present an independent firearms expert to raise considerations relevant to bullet identification at trial.

Finally, even assuming that trial counsel was deficient in failing to consult with an independent firearm expert regarding the lack of GSR or the bullet identifications, the California Supreme Court could have reasonably concluded that there was no reasonable probability that the outcome of the trial would have been different had trial counsel consulted with and presented an independent firearms expert at trial. As set forth above, trial counsel presented to the jury the fact

41

that Petitioner did not have GSR or blood on his hands or clothing, and Thornton's declaration does not contradict Lee's central conclusions regarding the ballistics evidence. *See* AG023124–26. Accordingly, the California Supreme Court could have reasonably concluded that there was no reasonable probability that the outcome of trial would have been different had trial counsel consulted with or presented an independent ballistics expert at trial. *See Riley v. Vasquez*, 927 F.2d 610 (Table), at *3 (9th Cir. 1991) (denying *Strickland* claim where nothing indicated that "an independent expert could have told counsel or the jury anything that would have changed the outcome of the trial").

Moreover, even assuming that trial counsel would have been able to successfully impeach the firearm evidence at trial, the California Supreme Court could have reasonably concluded that Petitioner was not prejudiced by trial counsel's failure to consult with or call an independent firearms expert to testify at trial. Apart from the ballistics evidence, other substantial physical and testimonial evidence connected Petitioner to the shootings, including the four eyewitnesses who testified at trial that Petitioner was the shooter, *Marks*, 31 Cal. 4th at 206–08; Menefee's testimony, *id.* at 206; circumstantial evidence that Petitioner may have had McDermott's money at the time of Petitioner's arrest, *id.*; and that Petitioner was overheard telling another defendant that "he was in for three murders" and that the victims had died because "I shot them," *id.* at 208.

In sum, the Court finds that Petitioner cannot establish that the California Supreme Court unreasonably applied *Strickland* in rejecting this subargument.

### 4. Failure to Investigate and Impeach Menefee

Lastly, Petitioner contends that trial counsel was ineffective in "fail[ing] to investigate and impeach" Menefee. Pet'r Br. at 13. According to Petitioner, trial counsel was aware that Menefee "suffered from mental illness and severe memory and cognitive impairments," and counsel was aware that she had received "leniency and benefits for her testimony" in Petitioner's case, but trial counsel nonetheless failed to investigate and impeach Menefee's testimony at trial. *Id.* Petitioner also contends that trial counsel was ineffective in failing to object to the prosecutor's introduction of testimony from investigator Greg Karczewski ("Karczewski"), who Petitioner contends

42

improperly bolstered Menefee's testimony. *Id.* Lastly, Petitioner contends that trial counsel was ineffective in "fail[ing] to object to the inadmissible hearsay in [Menefee's] tape-recorded interview with the police." *Id.* However, for the reasons discussed below, the Court finds that the California Supreme Court was not unreasonable in rejecting this subargument. The Court first addresses Claim 10 of Petitioner's habeas petition, which is relevant to the instant subargument, and then addresses the merits of Petitioner's subargument.

In Claim 10 of Petitioner's federal habeas petition, Petitioner asserted that his trial was fundamentally unfair because "the prosecutor failed to disclose material evidence relating to Menefee that would have impeached her credibility at trial." *See Marks v. Davis*, 2016 WL 6696126, at *4 (N.D. Cal. Nov. 15, 2016). This included evidence that "Menefee suffered from developmental and mental disabilities," that Menefee received leniency in return for her testimony against Petitioner, and that Menefee was an "untruthful informant." *See id.* at *4–12. Petitioner also asserted in Claim 10 that the prosecution's introduction of testimony from investigator Karczewski improperly buttressed Menefee's testimony. *Id.* at *17.

This Court denied Claim 10 on November 15, 2016. *Id.* Specifically, the Court held that "Petitioner point[ed] to no factual basis in the record in support for his assertion that Menefee actually suffered from" mental disabilities. *Id.* at *5. Moreover, the Court found that Petitioner "offer[ed] only speculation that Menefee was provided lenient treatment in exchange for her testimony against" Petitioner. *Id.* at *7. Finally, the Court found that Petitioner's assertion that Menefee was an informant was "not supported by the record." *Id.* at *11. The Court further found that, in any event, Petitioner was not prejudiced by the prosecutor's alleged failure to disclose evidence regarding Menefee because "other substantial physical and testimonial evidence connected Petitioner to the shootings apart from Menefee's testimony." *Id.* at *12. Finally, the Court held that "[t]he record d[id] not demonstrate that" the prosecutor improperly buttressed Menefee's testimony through Karczewski . *Id.* at *17.

Thus, the Court has already analyzed Petitioner's arguments regarding Menefee and the record in this case, and the Court determined that the record did not support Petitioner's claim that

43

Menefee suffered from mental health problems, or that the trial counsel improperly buttressed Menefee's testimony through Karczewski. Accordingly, given the Court's analysis in rejecting Claim 10, trial counsel could not have been ineffective for failing to impeach Menefee on the basis of her alleged mental disabilities, or for failing to object to the testimony of Karczewski at trial.

First, for the reasons set forth in the Court's order denying Claim 10, Petitioner's assertions that Menefee suffered from "mental health problems," that Menefee received "benefits for her testimony in [Petitioner's] case," and that Menefee was an untruthful informant, are not supported by the record. *See Marks*, 2016 WL 6696126, at *4–12. Petitioner offers only conclusory speculation that "[a] reasonable investigation into [Menefee's] background would have revealed" such evidence, which is insufficient to warrant habeas relief. *See* Pet'r Br. at 13; *see Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (denying ineffective assistance of counsel claim where petitioner offered only "conclusory suggestions"). Moreover, trial counsel thoroughly cross-examined Menefee at trial, and drew attention to inconsistencies in her testimony. *See, e.g.*, AG015749–50. The California Supreme Court could have reasonably concluded that trial counsel was not ineffective regarding its investigation and impeachment of Menefee.

Moreover, for the reasons set forth this Court's order denying Claim 10, the record does not support Petitioner's assertion that the prosecution improperly "vouched for the testimony of Menefee through the investigator." *Marks*, 2016 WL 6696126, at *17. Accordingly, the California Supreme Court could have reasonably concluded that trial counsel was not deficient for failing to raise an objection that the prosecution was improperly bolstering Menefee's testimony through Karczewski. *See Juan H.*, 408 F.3d at 1273 ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection.").

Finally, to the extent that Petitioner asserts that trial counsel rendered deficient performance by not objecting "to the inadmissible hearsay in Ms. Menefee's tape-recorded interview with the police," Pet'r Br. at 13, Petitioner is not entitled to habeas relief on this basis. Menefee's tape-recorded statement was played to the jury but was not transcribed in the record. *See* AG015761–62. Petitioner states only that counsel was ineffective for "fail[ing] to object to

44

the inadmissible hearsay in Ms. Menefee's tape-recorded interview with the police," but Petitioner does not provide any explanation of what Menefee's tape-recorded interview consisted of, or what portions of Menefee's tape-recorded interview constituted inadmissible hearsay. *See* Pet. at 235; Pet'r Br. at 13. Further, Petitioner offers no discussion of how the introduction of Menefee's tape-recorded statements prejudiced Petitioner. *See* Pet. at 235; Pet'r Br. at 13. "[U]nder *Strickland,* a petitioner bears the burden of establishing both deficient performance and prejudice." *Ellis v. Harrison*, 2016 WL 4059692, at *24 (C.D. Cal. Apr. 19, 2016). Petitioner has not met his burden here, where Petitioner has stated only conclusively that his trial counsel was constitutionally ineffective, but Petitioner has not provided the Court with any explanation regarding the content of Menefee's tape recorded interview, why the interview constituted inadmissible hearsay, or how Petitioner was prejudiced by the introduction of the interview. *See Bruce v. Kramer*, 2010 WL 466156, at *4 n.8 (C.D. Cal. Jan. 27, 2010) ("[C]onclusory allegations not supported by a statement of specific facts are insufficient to state a claim for a constitutional violation warranting habeas relief."); *see also Jones*, 66 F.3d at 204 (finding that "conclusory suggestions" of ineffective assistance "fall far short of stating a valid claim of constitutional violation"). Accordingly, the California Supreme Court was not unreasonable in rejecting this argument.

In sum, for the reasons set forth in this Court's order denying Claim 10, Petitioner cannot establish that his trial counsel was ineffective in failing to investigate and impeach Menefee, or in objecting to the prosecution's improper vouching of Menefee's testimony through the testimony of Karczewski. *See Marks*, 2016 WL 6696126, at *8–17. Moreover, because Petitioner has offered only conclusory assertions in support of Petitioner's claim that trial counsel was ineffective in failing to object to the introduction of Menefee's interview with the police, Petitioner has failed to establish entitlement to habeas relief. Thus, Petitioner's subargument regarding Menefee must be denied.

### 5. Summary

To summarize, the Court finds that the California Supreme Court's summary denial of Petitioner's subclaim that trial counsel was ineffective in failing to investigate evidence that

45

Petitioner did not commit the crime was neither contrary to, nor the result of an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court in *Strickland*. *See* 28 U.S.C. § 2254(d)(1). Specifically, the California Supreme Court could have reasonably concluded that trial counsel was not ineffective in (1) failing to challenge the eyewitness identification; (2) failing to investigate exculpatory evidence, including Petitioner's alibi, alternate suspects, or evidence to support Williams's testimony; (3) failing to challenge the firearm evidence at trial; or (4) failing to investigate and impeach Menefee. This subclaim must be denied.

## IV.      CONCLUSION

For the foregoing reasons, the Court DENIES Claim 12. Because Petitioner's arguments as to Claim 12 are unavailing, Petitioner's request for a federal evidentiary hearing as to Claim 12 is also DENIED. *See Sully*, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.").

**IT IS SO ORDERED.**

Dated: June 1, 2017

_____
LUCY H. KOH
United States District Judge

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIM 12