1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DELANEY GERAL MARKS,

               Petitioner,

     v.

KEVIN R. CHAPPEL, et al.,

               Respondents.

Case No. 11-CV-02458-LHK

**ORDER DENYING CLAIMS 13 AND 22**

Re: Dkt. Nos. 86, 87

       In 1994, Petitioner Delaney Geral Marks ("Petitioner") was convicted of two counts of first degree murder with personal use of a firearm, and two counts of attempted premeditated murder and infliction of great bodily injury, and sentenced to death. On December 14, 2011, Petitioner filed a petition for a writ of habeas corpus before this Court. ECF No. 3 ("Pet.").

       The Court has ruled on 20 of Petitioner's 22 claims. *See* ECF Nos. 52, 74, 75, 76, 77, 81, 91, 92. This Order addresses the remaining claims of the petition—Claims 13 and 22. Petitioner requests an evidentiary hearing for Claim 13. For the reasons discussed below, these claims are DENIED, and Petitioner's request for an evidentiary hearing is DENIED.

I.       BACKGROUND

## A.     Factual Background[1]

On October 17, 1990, Petitioner entered a Taco Bell restaurant in Oakland, California. After ordering, he shot employee Mui Luong ("Luong") in the head. Luong survived the shooting but remained in a persistent vegetative state. Petitioner then entered the Gourmet Market, not far from the Taco Bell. There, Petitioner shot John Myers ("Myers") and Peter Baeza ("Baeza"). Baeza died at the scene but Myers survived. Later that evening, Petitioner and his girlfriend, Robin Menefee ("Menefee"), took a cab driven by Daniel McDermott ("McDermott"). Petitioner shot and killed McDermott. *People v. Marks*, 31 Cal. 4th 197, 204–06 (Cal. 2003).

Petitioner was arrested shortly after McDermott was shot. Lansing Lee ("Lee"), a criminalist, testified at trial with "virtual absolute certainty" that the bullets that shot Baeza and Myers came from Petitioner's gun. *Id.* at 207. Lee also testified that his analysis "indicated" that the bullet that shot McDermott came from Petitioner's gun and "suggested" that the bullet that injured Luong also came from the same source. *Id.* At least four eyewitness identified Petitioner as the shooter. *Id.* at 205. Further, although McDermott carried $1 bills in his taxi in order to make change, McDermott had no paper currency on his body or in his taxi after the shooting. Defendant, however, was arrested with seven $1 bills on his person. *Id.* at 206–07. Petitioner was also overheard telling another defendant that "he was in for three murders" and that the victims had died because "I shot them." *Id.* at 208.

At trial, Petitioner testified and denied all of the shootings. *Id.* at 207. The defense also presented evidence that Petitioner's hands did not test positive for gunshot residue. *Id.* at 208.

On April 24, 1994, the jury convicted Petitioner of two counts of first degree murder with personal use of a firearm, and two counts of attempted premeditated murder with personal use of a firearm and infliction of great bodily injury.

During the penalty phase, the prosecutor presented in aggravation evidence of Petitioner's

---

[1] The following facts are taken from the California Supreme Court's opinion on direct appeal. *See People v. Marks*, 31 Cal. 4th 197, 203–14 (2003). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 13 AND 22

past violent conduct, including incidents of domestic violence and violent conduct while incarcerated. *Id.* at 208–10. The prosecutor also presented evidence of the effect of Petitioner's capital murders on the families of the victims. *Id.* at 210–11. In mitigation, Petitioner testified as to his family history, his experience in the Navy, the death of his mother, and that he experienced seizures. *Id.* at 212. Other witnesses testified that Petitioner had grown up in a strong family environment, and had not engaged in problematic behavior until he was discharged from the Navy and began using drugs. *Id.* at 212–13. Petitioner's daughter testified that Petitioner had never hit her, and that she saw him regularly when he was not incarcerated. *Id.* at 213. On May 6, 1994, the jury set the penalty for the capital crimes at death. *Id.* at 203.

## B.    Procedural History

On July 24, 2003, the California Supreme Court affirmed the conviction and sentence on direct appeal. *Marks*, 31 Cal. 4th 197. The U.S. Supreme Court denied certiorari on May 3, 2004. *Marks v. California*, 541 U.S. 1033 (2004).

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. On March 16, 2005, the California Supreme Court ordered Respondents to show cause in the Alameda County Superior Court why the death sentence should not be vacated and Petitioner re-sentenced to life without parole on the ground that Petitioner was intellectually disabled within the meaning of *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that intellectually disabled individuals may not be executed. AG023690.[2] The California Supreme Court denied the remaining claims in the petition on the merits without explanation. In addition to the merits decision, as separate grounds for denial, the California Supreme Court held that four of Petitioner's claims were procedurally barred.

The Alameda County Superior Court conducted an evidentiary hearing on the issue of Petitioner's alleged intellectual disability. On June 13, 2006, the Superior Court denied the petition, and found that Petitioner had failed to prove by a preponderance of the evidence that he

United States District Court
Northern District of California

---

[2] Citations to "AG" refer to the Bates-stamped page numbers identified in the California Attorney General's lodging of the state court record with this Court.

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 13 AND 22

was intellectually disabled within the meaning of *Atkins*. AG023700–22. On August 14, 2006, Petitioner filed a further petition for writ of habeas corpus on the issue of his intellectual disability. The petition was denied by the California Supreme Court on December 15, 2010. AG028382.

On December 14, 2011, Petitioner filed his federal petition for writ of habeas corpus in this Court. ECF No. 3. Respondent filed a motion for summary judgment on Claims 2, 3, and 5 on March 26, 2013. ECF No. 37. Petitioner cross-moved for summary judgment on Claims 2, 3, and 5 on March 28, 2013. ECF No. 38. Both Petitioner and Respondent filed opposition briefs on June 10, 2013. ECF Nos. 44, 45. On August 8, 2013, Petitioner and Respondent filed reply briefs. ECF Nos. 48, 49. The claims were denied, and summary judgment in favor of Respondent granted on June 25, 2015. ECF No. 52.

On December 15, 2015, Petitioner and Respondent filed opening briefs on the merits as to Claims 1, 4, 6, 7, 8, 9, 10, and 11. ECF No. 62; 63. Petitioner filed a response on February 11, 2016. ECF No. 63. Respondent filed a response on February 12, 2016. ECF No. 65.

The Court denied Claims 1, 6, and 7 on September 15, 2016. ECF No. 74. The Court denied Claims 9 and 11 on September 20, 2016. ECF No. 75. The Court denied Claims 4 and 8 on September 27, 2016. ECF Nos. 76, 77. The Court denied Claim 10 on November 15, 2016. ECF No. 81.

On February 3, 2017, Petitioner and Respondent filed opening briefs on the merits of Claims 12 through 22. ECF Nos. 86 ("Pet'r Br."), 87 ("Resp. Br."). On March 29, 2017, Petitioner and Respondent filed responses. ECF Nos. 89 ("Pet'r Opp."), 90 ("Resp. Opp.").

On June 1, 2017, this Court issued an order denying Claim 12. ECF No. 91. On June 27, 2017, this Court issued an order denying Claims 14 through 21. ECF No. 92.

## II.     LEGAL STANDARD

### A.     Antiterrorism and Effective Death Penalty Act (28 U.S.C. § 2254(d))

Because Petitioner filed his original federal habeas petition in 2011, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to the instant action. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003) (holding that AEDPA applies whenever a federal habeas

4

petition is filed after April 24, 1996). Pursuant to AEDPA, a federal court may grant habeas relief on a claim adjudicated on the merits in state court only if the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

### 1. Contrary To or Unreasonable Application of Clearly Established Federal Law

As to 28 U.S.C. § 2254(d)(1), the "contrary to" and "unreasonable application" prongs have separate and distinct meanings. *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court."). A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 412–13.

A state court's decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). A state court's determination that a claim lacks merit is not unreasonable "so long as 'fairminded jurists could disagree' on [its] correctness." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Holdings of the U.S. Supreme Court at the time of the state court decision are the sole determinant of clearly established federal law. *Williams*, 529 U.S. at 412. Although a district court may "look to circuit precedent to ascertain whether [the circuit] has already held that the particular point in issue is clearly established by Supreme Court precedent," *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (per curium), "[c]ircuit precedent cannot refine or sharpen a general

principle of [U.S.] Supreme Court jurisprudence into a specific legal rule," *Lopez v. Smith*, 135 S. Ct. 1, 4, (2014) (per curium) (internal quotation marks omitted).

### 2. Unreasonable Determination of the Facts

In order to find that a state court's decision was based on "an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court," *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (internal quotation marks omitted). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). That said, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

In examining whether a petitioner is entitled to relief under 28 U.S.C. § 2254(d)(1) or § 2254(d)(2), a federal court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). In the event that a federal court "determine[s], considering only the evidence before the state court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or that the state court's decision was based on an unreasonable determination of the facts," the federal court evaluates the petitioner's claim *de novo*. *Hurles*, 752 F.3d at 778. If error is found, habeas relief is warranted if that error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).

**B. Federal Evidentiary Hearing (28 U.S.C. § 2254(e))**

6

Under *Cullen v. Pinholster*, habeas review under AEDPA "is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 180–81. The Ninth Circuit has recognized that *Pinholster* "effectively precludes federal evidentiary hearings" on claims adjudicated on the merits in state court. *Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th Cir. 2013); *see also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("Although the Supreme Court has declined to decide whether a district court may ever choose to hold an evidentiary hearing *before* it determines that § 2254(d) has been satisfied . . . an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.") (internal quotation marks and citation omitted).

## III.   DISCUSSION

This Court has resolved 20 of Petitioner's 22 claims. The remaining claims are Claim 13 and Claim 22. The Court addresses these claims in turn.

### A.   Claim 13

Claim 13 of Petitioner's federal habeas petition alleges that Petitioner was deprived of a fair and reasonable penalty phase decision, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. *See* Pet. at 236–37. This claim consists of two subclaims. Specifically, Petitioner alleges that, at the penalty phase of his trial, (1) the prosecutor committed prosecutorial misconduct by intentionally and affirmatively misleading the jury during closing arguments; and (2) Petitioner's trial counsel rendered ineffective assistance of counsel by failing to investigate and present certain mitigating evidence. *See id.* at 236–87.

Petitioner presented this claim to the California Supreme Court in his state habeas petition. *See* AG019887 (asserting, in claim twelve of his state habeas petition, that petitioner was prejudicially deprived of a fair and reliable determination of penalty). The California Supreme Court denied this claim on the merits without explanation. AG023690. In addition, the California Supreme Court held, except to the extent Petitioner argued that his trial counsel was ineffective, Petitioner's claim was procedurally barred because the claim "could have been, but [was] not, raised on [direct] appeal." AG023690. In his federal habeas petition, Petitioner argues that this

United States District Court
Northern District of California

claim is not procedurally barred. Petitioner also argues that the California Supreme Court erred in denying this claim on the merits.

The Court first addresses Petitioner's subclaim in Claim 13 that the prosecutor committed misconduct, which the California Supreme Court held was procedurally barred. The Court then addresses Petitioner's subclaim that Petitioner's trial counsel was constitutionally ineffective, which the California Supreme Court denied on the merits.

### 1. Prosecutor's Alleged Misleading of the Jury

First, Petitioner argues that he is entitled to habeas relief because, during the penalty phase, the prosecutor "intentionally misled the jurors." *See* Pet. at 239. This argument is based primarily on the prosecutor's statements during closing arguments during the penalty phase of trial that "[t]here is nothing, nothing medically or psychiatrically wrong with this man down here at the end of the table at all. . . . If there was anything, anything psychiatrically or medically wrong with him, you would have heard it. . . . if there was anything, a scintilla of anything that his lawyers could have grabbed a hold of to bring to you, they would have." *See id.* at 239–40. Petitioner states that the prosecutor made these statements despite knowing that the "argument was contrary to the actual facts," which showed that Petitioner "suffered from pervasive and significant brain damage." Pet'r Br. at 25–26. Petitioner further argues that the prosecutor intentionally misled the jury during the penalty phase of trial that Petitioner "had modified the handgun found in his possession to make it easier to conceal and retrieve" the handgun quickly, despite the fact that the Prosecutor had "no good faith or reliable basis to conclude the gun had been modified." *See id.*

Respondent contends that this subclaim is procedurally defaulted because the California Supreme Court rejected this subclaim on the ground that Petitioner could have, but did not, raise this subclaim on direct appeal to the California Supreme Court. *See* AG023690 (citing *In re Dixon*, 41 Cal. 2d 756 (1953)). Respondent contends that the rule of procedural default applied by the California Supreme Court—the so-called "*Dixon* bar"—forecloses this Court from reviewing Petitioner's subclaim of prosecutorial misconduct during the penalty phase of trial. For the reasons discussed below, the Court agrees with Respondent that Petitioner's prosecutorial

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 13 AND 22

misconduct subclaim is procedurally barred, and thus the Court cannot consider this subclaim on federal habeas review.

"Generally, when a state court's rejection of a federal claim is based on a violation of a state procedural rule that is adequate to support the judgment and independent of federal law, a habeas petitioner has procedurally defaulted his claim" and a federal court cannot review the claim. *Carter v. Chappel*, 2013 WL 1120657, at *36 (S.D. Cal. Mar. 18, 2013) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (stating that federal courts will not review "a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment")). If the state procedural rule invoked by the state court is both adequate and independent, then to overcome the procedural bar, the petitioner must establish either "cause" for the default and "actual prejudice" as a result of the alleged violation of federal law, or the petitioner must demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

As stated above, the California Supreme Court applied the state procedural rule of *In re Dixon*, 41 Cal. 2d 756 (1953), to deny Petitioner's claim that the prosecutor violated Petitioner's rights under the United States Constitution. Under the "'*Dixon* bar,' a defendant procedurally defaults a claim raised for the first time on state collateral review if [the defendant] could have raised it earlier on appeal." *Johnson v. Lee*, 136 S. Ct. 1802, 1804 (2016) (citing *In re Dixon*, 41 Cal. at 264 ("[Habeas corpus] will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction.")). Here, the California Supreme Court concluded that the *Dixon* bar applied to Petitioner's prosecutorial misconduct subclaim because Petitioner's argument that the prosecutor committed misconduct during the penalty phase of trial "could have," but was not, raised on direct appeal. *See* AG023690. Because the Supreme Court applied the *Dixon* bar to Petitioner's subclaim, the Court must decide whether the *Dixon* bar is an "adequate" and "independent" state procedural rule. If so, Petitioner's claim that the prosecutor committed misconduct during the penalty phase of trial is procedurally defaulted, and this Court may not consider it on federal habeas review. For the reasons discussed below, the

Court finds that the *Dixon* procedural bar is both "adequate" and "independent," and thus the

*Dixon* bar forecloses Petitioner's prosecutorial misconduct subclaim in Claim 13.

First, the *Dixon* bar is "adequate." For a state procedural rule to be "adequate," the "state rule must be 'firmly established and regularly followed.'" *Johnson*, 136 S. Ct. at 1805 (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)). Significantly, in *Johnson v. Lee*, the United States Supreme Court recently held that "California's *Dixon* bar satisfies both" of these "adequacy criteria." 136 S. Ct. at 1805. Specifically, the United States Supreme Court concluded that the *Dixon* bar has been "firmly established" in California for "decades," and that the *Dixon* "bar is regularly followed" by the California Supreme Court. *Id.* (internal quotation marks omitted). The United States Supreme Court further emphasized in *Johnson* that the *Dixon* bar is an "adequate" procedural bar because "[f]ederal and state habeas courts across the country follow the same rule as *Dixon*." *Id.* Thus, as the United States Supreme Court found in *Johnson*, this Court finds that the *Dixon* bar "qualifies as adequate to bar federal habeas review." *Id.*

Second, the California Supreme Court's application of the *Dixon* bar is "independent" of federal law. As the Ninth Circuit has explained, a state procedural bar is "independent" if "the state law basis for the decision [is] not be interwoven with federal law." *La Crosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001) (citing *Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983)). Whether a procedural bar is "independent" from federal law is measured at the time that the procedural bar was applied by the state court. *See Vaughn v. Adams*, 116 F. App'x 827, 828 (9th Cir. 2004) (looking to the date the "habeas petition was denied by the California Supreme Court" in determining whether the application of *Dixon* was "an independent procedural bar"); *Jones v. Ayers*, 2008 WL 906302, at *27 (E.D. Cal. Mar. 31, 2008) (explaining that "the independence of the *Dixon* default is determined . . . when it was imposed").

Here, the California Supreme Court applied the *Dixon* bar to Petitioner's prosecutorial misconduct subclaim on March 16, 2005. AG23690. At that time, the *Dixon* bar was "independent" from federal law. Specifically, in 1998, in *In re Robbins*, 18 Cal. 4th 770, 811–12 (Cal. 1998), the California Supreme Court clarified "that it now declines to consider federal law

when determining whether claims are procedurally defaulted" under the *Dixon* bar. Accordingly, district courts in this circuit have held that, after the *Robbins* decisions in 1998, "the *Dixon* bar is independent" of federal law. *See, e.g.*, *Protsman v. Pliler*, 318 F. Supp. 2d 1004, 1007 (S.D. Cal. 2004) (examining whether *Dixon* rule was independent and concluding that, following *Robbins*, "the *Dixon* bar is independent"); *Flores v. Roe*, 2005 WL 1406086, at *11 (E.D. Cal. June 14, 2005) (concluding that the California Supreme Court's application of the *Dixon* bar, following *Robbins*, was an independent state ground). Accordingly, because the California Supreme Court applied the *Dixon* bar to Petitioner's claim on March 16, 2005, after the *Robbins* decision in 1998, the California Supreme Court's application of the *Dixon* bar was "independent" of federal law. *See Protsman*, 318 F.Supp. 2d at 1007 (finding application of *Dixon* bar by the California Supreme Court in 2002, after *Robbins* was decided, was an independent state law ground).

In sum, the Court finds that the California Supreme Court's application of the *Dixon* bar to Petitioner's prosecutorial misconduct subclaim is both an "adequate" and "independent" state law ground. Accordingly, because the *Dixon* bar is both "adequate" and "independent," this Court cannot consider Petitioner's prosecutorial misconduct subclaim on federal habeas review unless Petitioner establishes "cause" for his procedural default and "actual prejudice" from the alleged violation of federal law, or unless Petitioner establishes a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. Significantly, Petitioner has not attempted to make any such showing. By failing to address these issues, Petitioner "therefore fails to establish cause, prejudice, or miscarriage of justice." *Ramirez v. Stolc*, 2016 WL 2962454, at *3 (E.D. Cal. May 23, 2016) (finding Petitioner failed to establish cause, prejudice, or fundamental miscarriage of justice to avoid application of *Dixon* bar where Petitioner failed to "address these issues"). Accordingly, Petitioner's procedural default with respect to his prosecutorial misconduct subclaim in Claim 13 is not excused, and this claim is not reviewable in this Court.

### 2. Ineffective Assistance of Counsel at the Penalty Phase of Trial

The Court next turns to Petitioner's subclaim in Claim 13 that Petitioner's counsel was

11

ineffective at the penalty phase of trial for failing to present mitigation evidence.[3] As set forth above, the California Supreme Court applied the *Dixon* bar to Claim 13 except to the extent that the claim was based on ineffective assistance of counsel. AG023690. To the extent Claim 13 was based on ineffective assistance of counsel, the California Supreme Court denied Petitioner's claims on the merits without explanation. *See id.* Because the California Supreme Court did not provide reasons for its denial of Petitioner's subclaim, this Court must determine what arguments or theories could have supported the California Supreme Court's decision. *See Richter*, 562 U.S. at 102 ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision."). The Court then "must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the United States Supreme Court. *Id.*

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court held that ineffective assistance of counsel is cognizable as a denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance, of counsel. *Id.* at 686. To prevail on an ineffective assistance of counsel claim, a petitioner must establish that: (1) his counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms; and (2) he was prejudiced by counsel's performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688–94. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Ultimately, a petitioner must overcome the "strong presumption that counsel's conduct

---

[3] In his brief in support of Claim 13, Petitioner argues in his introduction that trial counsel was ineffective for "fail[ing] to object and exclude the prosecutor's unfair" closing argument. *See* Pet'r Br. at 22. Petitioner does not further develop this argument in his brief in support of Claim 13, and this argument does not appear in Petitioner's federal habeas petition. Most significantly, Petitioner does not appear to have raised this in his state habeas petition. *See* AG019887–AG019895. Because Petitioner has not properly presented this argument to the state courts, and because Petitioner did not properly raise this argument in his federal habeas petition, this Court cannot consider it for the first time in Petitioner's opening brief on federal habeas review. *See Hiivala v. Wood*, 195 F. 3d 1098, 1106 (9th Cir. 1999) ("A habeas petitioner must give the state courts the first opportunity to review any claim of federal constitutional error before seeking federal habeas review of that claim.").

12

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 13 AND 22

falls within the wide range of reasonable professional assistance" and "might be considered sound trial strategy" under the circumstances. *Id.* at 689 (internal quotation marks omitted). Moreover, a "doubly" deferential standard of review is appropriate in analyzing ineffective assistance of counsel claims under AEDPA because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential." *Richter*, 562 U.S. at 105 (internal quotation marks omitted). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

In the instant claim, Petitioner argues that trial counsel was ineffective during the penalty phase of Petitioner's trial because trial counsel failed to adequately investigate and present mitigating evidence. In general, Petitioner argues that trial counsel failed to adequately investigate and present during the penalty phase three categories of mitigating evidence (1) evidence that Petitioner suffered from "pervasive brain damage and psychiatric disorders;" (2) evidence of Petitioner's family history; (3) evidence to rebut the prosecution's aggravating evidence. *See* Pet'r Br. at 29–35. In resolving this subclaim, the Court first discusses the aggravating and mitigating evidence that was presented at the penalty phase of Petitioner's trial. The Court then discusses Petitioner's arguments regarding the mitigating evidence that should have been investigated and presented, and whether Petitioner's trial counsel rendered ineffective assistance of counsel.

### a. Evidence Presented at Penalty Phase of Trial

#### 1. State's Aggravation Evidence

As the California Supreme Court summarized on direct appeal, the state "presented evidence [during the penalty phase of trial] of specific instances of [Petitioner's] misconduct against both civilians and law enforcement officers," in addition to "evidence of the effect of the murders on the families of Daniel McDermott and Peter Baeza." Marks, 31 Cal. 4th at 208. The Court briefly summarizes this evidence below.

#### i. Petitioner's Other Violent Criminal Conduct

Brenda Bailey ("Bailey") testified during the penalty phase that she had grown up with

13

Petitioner and knew him "since he was a little boy." AG017007; *see also Marks*, 31 Cal. 4th at 208. On December 14, 1978, Bailey was at her home in Alameda when Petitioner came over to her apartment to use the telephone. AG017007–08. After completing the phone call, Petitioner made derogatory comments to Bailey about Bailey's brothers. AG017008. Bailey told Petitioner she did not want to hear those comments. *Id.* Petitioner then began to hit Bailey in the head with the telephone. *Id.* Petitioner grabbed Bailey's foot and pulled her from the chair upon which she was sitting. AG017010. Bailey hit the concrete floor and broke two of her bottom teeth. *Id.* Petitioner then grabbed Bailey and pushed her through a thick bathroom window. AG017010, AG017014–15; *see also Marks*, 31 Cal. 4th at 208–09. Petitioner also threw Comet and fingernail polish remover on Bailey. AG017014. Petitioner told Bailey that if she told anyone about the assault, he would put a bomb in her six-year old son's mouth, cut off her nine year old son's head, and "kill [her] mother." AG017015–16. As a result of the assault, Bailey needed 26 stitches on the inside of her chin and 27 stitches on the outside of her chin. AG017014. Bailey suffered a concussion, a broken nose, and several cuts on her body. AG017017. After the assault, Bailey would get "sick to [her] stomach" when Petitioner would call her, and Bailey's doctors told her that she was developing a stomach ulcer. AG017020. Bailey obtained a weapon after the attack. *Id.*

Shirley Hitchens ("Hitchens") testified during the penalty phase that she had lived with Petitioner for approximately a year, but that she ultimately left Petitioner because he had mentally and physically abused her. AG016881; *see Marks*, 31 Cal. 4th at 209. Hitchens testified that Petitioner had beaten her and stabbed her in the back with a knife. AG016882. Hitchens never went to the police for these assaults because she was afraid of Petitioner. AG016888.

On January 31, 1982, approximately two months after Hitchens left Petitioner, Petitioner who was in a car approached Hitchens and wanted her to get into the car. AG016880–83. Hitchens did not get in the car because she was scared of Petitioner. *Id.* Hitchens ran to Bobby Jones ("Jones") for help. AG016883–84. Petitioner tried to physically get Hitchens into his car, but Jones intervened. AG016886. Jeff Heilbronner ("Heilbronner") testified during the penalty

14

phase that he witnessed Petitioner chase Jones around Petitioner's vehicle while Petitioner was wielding a knife. AG016894–96; *see Marks*, 31 Cal. 4th at 209. The police soon arrived, including Officer Terry Lewis ("Officer Lewis"), who also testified during the penalty phase of Petitioner's capital murder trial. After the police arrived, Petitioner dropped the knife that he was holding and entered the driver's side of his vehicle. AG016918. Jones approached Petitioner's car and began banging on the driver's side window. The police ordered Jones to stop banging on the window, but Jones refused to stop. AG016919. Officer Lewis testified that he grabbed Jones, and the two men fell to the street. *Id.* Petitioner remained in his vehicle. Another officer at the scene twice ordered Petitioner to exit his vehicle, but Petitioner did not comply. AG016901. Instead, Petitioner put his car into reverse and began driving backwards. The police warned Petitioner that individuals were behind Petitioner's car, and that Petitioner should not back the car up. AG016901. Petitioner reversed his car and drove over Officer Lewis and Jones. AG016920; AG016906.

Trent Payne testified during the penalty phase of Petitioner's trial that on December 24, 1988, at approximately midnight, he and his father Jim Payne ("Payne") went to a 7-Eleven store in Alameda. AG016930–31. While Payne was at the counter to pay, Petitioner stole approximately $400 to $500 from Payne. AG016932. Payne and Petitioner fought over the money, and Petitioner threw Payne to the ground and bloodied Payne's nose. AG016934–36; *see Marks*, 31 Cal. 4th at 209.

Reginald Saunders, the Deputy District Attorney for Alameda County, testified during the penalty phase of Petitioner's trial that on November 6, 1992, Petitioner was sitting with his arms shackled in the courtroom. AG017090–01. Petitioner's attorney, Joseph Najpaver ("Najpaver"), entered the courtroom. AG017092. Petitioner suddenly "bolted" from his chair towards Najpaver. AG017093. Petitioner began kicking Najpaver repeatedly in his groin and stomach. AG017094. Petitioner kicked Najpaver hard and "very fast," at least five times. *Id.*; *see also Marks*, 31 Cal. 4th at 210. Petitioner acted "cold and deliberate." AG017085. A bailiff eventually grabbed Petitioner and separated him from Najpaver. AG017094.

Finally, several individuals testified during the penalty phase regarding violent incidents that Petitioner had with individuals and correctional officials while Petitioner was in various correctional facilities.  For example, Alameda County Deputy Sheriff Greg Breslin ("Deputy Breslin") testified that on February 4, 1989, Petitioner was yelling and kicking his cell door in the North County Jail. AG016954.  Petitioner was in a "karate stance" and challenging Deputy Breslin to a fight. AG016956.  Deputy Breslin told Petitioner to calm down and that if he did not calm down, Petitioner would have to be removed from his cell. AG016957.  Petitioner did not calm down.  *Id.*  Deputy Breslin left to get another officer, Deputy Sheriff Darren Nelson ("Deputy Nelson")—who also testified during the penalty phase about the incident—and the two deputies went back to Petitioner's cell. AG016957.  Another officer opened Petitioner's cell while Deputies Breslin and Nelson stood outside of the cell. AG016959.  Petitioner refused Deputy Breslin's order to go to the back of his cell, and instead Petitioner lunged towards Deputy Breslin. AG016960; AG017000.  Petitioner bit Deputy Breslin in the back of his neck and punched Deputy Breslin in the groin. AG016960.  Petitioner was eventually subdued and taken to a different area of the prison. AG016960.  Petitioner bragged to Deputy Breslin, "I bit you and punched you in the balls.  How does it feel, punk?" AG016961.  Deputy Nelson testified that Petitioner remarked: "I bit him real good.  And I remember he cried out like a bitch." AG017003.

Alameda County Deputy Sheriff Joseph Hoeber ("Deputy Hoeber") testified that on March 28, 1989, at the North County Jail, he witnessed Petitioner attempting to throw "karate style" "back kicks" at the "shins and lower leg area" of Deputy Jones, who was attempting to escort Petitioner to an appointment.  *See* AG016967–68, AG016975.  Petitioner was "acting aggressively," and managed to kick Deputy Jones "at least once or twice in the shins." AG016970.  Deputy Hoeber joined Deputy Jones, and the two men moved Petitioner into a multi-purpose room.  *Id.* AG016969.  Petitioner "put his foot up on the wall and drove himself backwards into Deputy Jones." AG016969–70.  Deputy Hoeber pulled Petitioner to the ground so that Petitioner could not continue kicking.  The deputies eventually "tactically withdrew" from the multi-purpose room so as to not further escalate the incident.  *Id.*

Alameda County Deputy Sheriff Sebastian Tine ("Deputy Tine") testified that on October 1, 1992, at the Santa Rita Jail, Petitioner asked Deputy Tine for a roll of toilet paper and a razor. AG016978. When Deputy Tine returned with the toilet paper and razor and opened Petitioner's cell door to deliver the items, Petitioner struck Deputy Tine in the face. AG016982; *see also Marks*, 31 Cal. 4th at 210. The blow knocked Deputy Tine's glasses off of his face and drew blood. AG016981–82. Deputy Tine "thought [he] had lost [his] eye at that time because [he] could not see." AG016982. Deputy Tine received medical attention at the medical facility at the Santa Rita jail. AG016983. The medical facility at the jail advised that Deputy Tine "go see a surgeon and have [the cut] properly sutured." AG016983–84. Deputy Tine went to the hospital and received 17 stitches on his face. AG016984. Deputy Tine still had a scar on his face as a result of the incident. AG016985.

Finally, correctional officer James Hewitt testified that on January 19, 1986, while Petitioner was housed at the California Men's Colony West Facility at San Luis Obispo, Petitioner approached another inmate and struck the inmate in the nose. AG017029; *Marks*, 31 Cal. 4th at 210.

### ii.      Impact of Crime on Victims of Shooting

In addition to evidence about Petitioner's past violent conduct, the prosecution also presented evidence during the penalty phase of the impact of the instant capital murder crimes on the friends and family members of Petitioner's victims. Specifically, the prosecution presented testimony from friends and family members of McDermott and Baeza, who both died on the night of the shootings.

McDermott's older daughter, Jacqulin Le Gree ("Le Gree"), testified that her father was a kind and loving man that went out of his way to help strangers. *See* AG016856–57. Le Gree had to identify her father's body at the coroner's office after his death. AG016864. Le Gree testified that she feels her father's loss most painfully when her children tell her that they do not remember their grandfather. AG016758–59; AG016866–67.

McDermott's youngest daughter, Ingrid Page ("Page"), testified that her father was

United States District Court
Northern District of California

"everything to [her]," and that the hardest part of losing her father has been that her father "died because someone shot him and they took his life," and that McDermott never had the chance to meet Page's husband or her daughter. AG016872–74.

Thomas Carter ("Carter"), an employee of Baeza at the Gourmet Market, testified that, prior to meeting Baeza, Carter could not get a job because Carter suffered from a seizure disorder. AG017037–38. Baeza gave Carter a job at the Gourmet Market, and Baeza helped Carter obtain disability benefits. *See* AG017038–39. Carter testified that Baeza was always helping others, and that Baeza would extend credit to those who could not pay. AG017040. Carter testified that Baeza treated Carter like a son, and that Carter's seizures had almost disappeared due to Baeza's assistance. *See* AG017041–42. Following Baeza's death, Carter lost his job at the Gourmet Market, and Carter testified that he was unable to find another job. *Id.* Since losing his job, Carter's seizures had returned, and his fiancé left him because she could not "take the pressure" of his seizures. *Id.*

Baeza's daughter, Carmen Baeza Waller ("Waller"), testified that her father was a "class act, a gentlemen." AG017043–44. Waller testified that Baeza was very involved in his grandchildren's lives, and that he loved spending times with his kids and his wife. *Id.* Baeza's memorial service was "standing room only," and people that the family did not know approached the family throughout the service to describe Baeza's acts of kindness. *See* AG017048–49. Waller testified that, after the memorial service, the family brought a collage of photographs from Baeza's life to his widow's home. Waller's four-year-old son moved his toys next to the collage and explained that he "just wanted to play with Poppo, like we used to." AG017047–48.

Baeza's wife, Fanny Baeza ("Fanny"), testified that she met Baeza when she was nine and Baeza was seven. *See* AG017057. They immigrated to the United States together from Chile in 1962, with their two children. AG017057–58. Baeza bought the Gourmet Market in 1972. AG017059–60. Fanny testified that Baeza was her "best friend," and that he was "honest, hard work[ing], responsible," with "high ethics" and "high morals." AG017062. Fanny testified that Baeza was a good husband, and that he would "call [her] during the day four or five times to tell

18

me how much he love[d] [her]." AG017064. Fanny was recovering from breast cancer when she found out that Baeza was murdered. *Id.* Fanny testified that, by losing Baeza, she "lost another me." AG017068. Fanny "lost everything" after Baeza's death, and she had to sell their home and come out of retirement. AG017069. She testified that, since her husband's death, she had become very lonely and that she had woken "up every morning at 3:15," which is the time the police called her on the night of the shootings to tell her about her husband's death. AG017072.

Baeza's son, Charles Baeza ("Charles"), testified that Baeza taught Charles how to work hard and how to be polite. AG017073. Charles had to identify his father's body at the morgue. AG017082. He testified that the financial impact of his father's death was "devastating," and that there was not enough money in the estate to even pay for the funeral. AG017075–77. When Charles and his mother visited Gourmet Market after the shooting, people came up and "just thank[ed] [them] for letting [Baeza] be part of their lives." AG017084. One woman told Charles that Baeza extended her credit until she got a job after she fled her husband. AG017085. The woman told Charles that she had since become successful, and that she would not have become successful if not for Baeza's generosity and kindness. *Id.*

### 2. Petitioner's Mitigation Evidence

The Court next summarizes the evidence presented by Petitioner in mitigation. As the California Supreme Court summarized, Petitioner testified at the penalty phase of trial, and his testimony "covered both the general circumstances of his life and the specific incidents raised by the People's penalty phase evidence." *Marks*, 31 Cal. 4th 212. In addition, several members of Petitioner's family and other individuals who knew Petitioner throughout his life testified in mitigation. These witnesses "presented mostly consistent testimony that described [Petitioner] as having grown up in a good family environment with religion, where there was no drug or alcohol abuse, no domestic violence, and with a father who encouraged education and hard work." *Id.* at 213.

### i. Petitioner's Testimony

Petitioner testified as to his version of the events presented in aggravation. For example,

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 13 AND 22

Petitioner testified that, on the day that Petitioner allegedly chased Jones with a knife and ran over Officer Lewis and Jones with his car, it was Jones who chased Petitioner with the knife, not the other way around. Petitioner did not think he ran over Officer Lewis, but Petitioner admitted that Petitioner "might have hit his leg." AG017166–67. Petitioner stated that, if he did run over Officer Lewis, it was only because Petitioner was fleeing from being murdered by Jones and he did not see Officer Lewis. AG017167–69. Additionally, Petitioner testified that he "pickpocketed" Payne, but that he was not aggressive towards Payne. AG017158. Moreover, Petitioner testified that he kicked Najpaver because he needed a different attorney, but the trial court had denied his motions to have different attorneys. *See* AG017241–42. Petitioner knew that physical contact would result in Petitioner receiving a new attorney. *Id.*

Petitioner also testified about his family and life growing up. Petitioner grew up in Alameda, and Petitioner was the oldest child in a family of six. AG017197–98, AG017201. Petitioner helped his parents with his younger brothers and sisters. *Id.* Petitioner's father worked "very hard" while Petitioner was growing up, including working in construction or in shipyards. AG017198. Petitioner's mother also "worked very hard." *Id.* Petitioner participated in sports, singing, and dance in grade school. AG017199.

Petitioner joined the Navy in 1974 at the age of 18. AG017202. Petitioner was in the Navy for two years, and Petitioner served on the U.S.S. Nimitz. AG017203–10. Petitioner testified that he received awards in the Navy. AG017236. After the Navy, Petitioner received money to continue his education, and Petitioner went to Merritt College. AG017211–12. However, Petitioner did not do any work in school because he "didn't want to." *Id.* Petitioner stated that he "really didn't go" to classes, he "was just a body there." AG017212.

In 1978, Petitioner's girlfriend got pregnant, and Petitioner started working as a receptionist. AG017212. In 1980, Petitioner was arrested after the incident with Bailey. AG017213. Petitioner plead either no contest or guilty, and was placed on probation. *Id.* Petitioner continued his work in school and "maintained some kind of odd job." AG017214. Petitioner was in and out of prison over the course of the next decade. *See, e.g.*, AG017217–18;

20

*see also Marks*, 31 Cal. 4th at 211. Petitioner frequently violated his parole. *See id.*

In October 1988, Petitioner was in a bus accident and injured his head. AG017222–24. According to Petitioner, he began suffering from epileptic seizures as a result of the accident. AG017224–25. Petitioner testified that he had been getting medication for the seizures since 1988. AG017227–28. Petitioner also testified that his head had been injured in 1987 when the police threw him against a wall. AG017230.

While Petitioner was in prison, Petitioner's mother passed away. No one in Petitioner's family told Petitioner for four months. AG017223. Petitioner "fell out" upon hearing that his mother died, and "went into epilepsy convulsions and seizures and fits." AG017224.

### ii. Testimony of Other Family Members and Individuals who Knew Petitioner

Reverend Betty Williams ("Williams"), a pastor, testified that she has known Petitioner since Petitioner was born because she lived in the same building as Petitioner's parents. AG017106–07. Williams saw Petitioner "through his grade school years and junior high school years." AG017109. According to Williams, Petitioner was "just like any average child." AG017109. Williams testified that Petitioner "did have some problems of growing up," but Williams did not further elaborate. AG017109. Williams stated that Petitioner "was a very good child" with good manners, and that Petitioner was "never disrespect[ful]" of Williams or Petitioner's parents. AG017109. According to Williams, Petitioner did not "tak[e] sides in any fights or get into any major trouble" as a child. *Id.* Williams stated that she was surprised to see Petitioner end up in prison after his Navy service, and that throughout her relationship with Petitioner she never feared for her own safety. AG017111. Williams stated that she did not see Petitioner as a murderer. *Id.* Williams testified that Petitioner was affected by his mother's death because Petitioner's "mother was the only person that he really had that he felt loved him and helped him when he was in a crisis." AG017112.

Relisha Marks ("Relisha"), Petitioner's daughter, also testified. AG017118. Relisha testified that, when her father was not in prison, she saw him once or twice a week at her grandmother's house. *Id.* Relisha testified that she never had any problems with Petitioner and

21

that Petitioner treated her "normal, just fine." AG017119. Relisha stated that Petitioner never hit her and that she never saw Petitioner hit anyone else. AG017119.

Willorisin Childs ("Childs"), the grandmother of Petitioner's daughter, testified that she has known Petitioner since he was approximately eight years old, and that she saw Petitioner on a regular basis while he was growing up. AG017123. Childs testified that she never had any problems with Petitioner when he was a child, and that Petitioner was a good kid until he left the Navy. AG017124.

Damon Marks ("Damon"), Petitioner's younger brother, testified that he admired Petitioner growing up, and that Petitioner was the "best brother out of all [his] brothers." AG017134. Damon testified that Petitioner "played a good role" in the family, and that Petitioner was "very helpful" to the family. AG017134. Damon testified that Petitioner "was a good brother in school, good in all sports, the kind of brother that you will want in the family." AG017134. Damon stated that the family attended church on a weekly basis growing up, and that his mother and father supported their children growing up. AG017137. Damon stated that Petitioner's problems started once Petitioner left the Navy. AG017135.

Effie Jones ("Jones") testified that she had known Petitioner his entire life, and that she considered Petitioner her nephew, although they were not related. AG017142. Jones testified that Petitioner never presented any problems growing up, and that he "was a good kid." AG017142. Jones stated that Petitioner was very close to his mother and that he had a good relationship with his siblings. AG017145. Jones testified that she noticed a significant change in Petitioner's behavior after his mother's death. AG017145.

Bobbie Jane Redic ("Redic"), Petitioner's aunt, testified that she did not see any problems with Petitioner when he was a child. AG017150. Redic testified that Petitioner was helpful to the family, and that he never did anything to suggest that he had a violent nature. AG017151. Redic testified that, after Petitioner's mother died, Redic noticed a "drastic behavioral change" in Petitioner. According to Redic, following his mother's death, Petitioner "would start a conversation with you that sounded very sensible, and then [Petitioner] would go off on a tangent

on something else." AG017152.

Elaine Marks Bell ("Elaine"), Petitioner's sister, testified that Petitioner's mom "loved [Petitioner], and [Petitioner] loved [his] mother," and that Petitioner's mother stood by all of her children. AG017280–81. Elaine testified that Petitioner was not the same when he came back from the Navy. AG017281. Elaine testified that Petitioner was not able to come to his mother's funeral. AG017283. Elaine stated that she and her brother came from a "great home," and that her parents were disappointed with Petitioner because they "expected him to go on and do some good things." AG017283–84.

### b. Ineffective Assistance of Counsel

Petitioner argues in Claim 13 that trial counsel was ineffective during the penalty phase because trial counsel "failed to investigate adequately and introduce readily available" mitigation evidence. Pet'r Br. at 29; *see* AG019895. Specifically, Petitioner argues that trial counsel failed to investigate evidence that Petitioner "suffered from pervasive, significant brain damage and psychiatric disorders," which were evident based on the reports of "mental health professionals who evaluated [Petitioner] prior to his competency trial." Pet'r Br. at 29. In addition, Petitioner contends that trial counsel failed to introduce evidence of Petitioner's "multi-generational history" of poverty, substance, and physical abuse, and that trial counsel failed to investigate and present evidence of Petitioner's long-term exposure to neurotoxic chemicals. *Id.* at 29–32. Finally, Petitioner argues that trial counsel failed to adequately investigate and impeach the state's witnesses who testified in aggravation. *Id.* at 33. The Court addresses these four categories of evidence, and trial counsel's performance with respect to the investigation and presentation of this evidence during the penalty phase of trial, below.

### i. Organic Brain Impairment and Psychiatric Disorders

First, Petitioner argues that trial counsel was ineffective in failing to investigate and introduce evidence that Petitioner suffered from organic brain impairment and psychiatric disorders. Specifically, Petitioner contends that trial counsel failed to "investigate the evidence developed" in advance of Petitioner's competency trial, which "would have informed counsel"

23

that Petitioner suffered "from pervasive brain damage and psychiatric disorders," including Post Traumatic Stress Disorder ("PTSD"), depression, psychosis, Schizoaffective Disorder, and dementia. *See* Pet'r Br. at 29. In support of this claim, Petitioner relies on reports and testimony presented during Petitioner's competency hearing, in addition to new expert reports submitted in support of Petitioner's state habeas petition. *See* Pet'r Br. at 29; Pet. at 254–78. Accordingly, to resolve the instant subclaim, the Court first provides a brief overview of the background and procedural history of Petitioner's 1992 competency trial, which is relevant to understand the instant subclaim. The Court then discusses the evidence Petitioner contends should have been presented in mitigation, and then discusses whether trial counsel was ineffective.

### a. Background on Petitioner's Competency Trial

On January 31, 1992, the state trial court, upon Petitioner's motion, suspended criminal proceedings against Petitioner and appointed two psychiatrists, Karen Gudiksen, M.D ("Dr. Gudiksen"), and Fred Rosenthal, M.D. ("Dr. Rosenthal"), to evaluate Petitioner's competency to stand trial. AG000943–44, AG000946–47. In March 1992, both experts informed the Court that, in their opinions, Petitioner was not competent to stand trial. Neither Dr. Rosenthal nor Dr. Gudiksen rendered a formal diagnosis of organic brain damage, however, because "appropriate neurological testing" would have been necessary in order to complete a diagnosis of Petitioner's medical condition, and there was insufficient funding available for Drs. Gudiksen and Rosenthal to conduct such testing. AG009803–04, AG023064–65, AG023584. However, Petitioner's counsel had previously been granted funding to employ Dr. David Stein, Ph.D. ("Dr. Stein"), to perform neuropsychological testing on Petitioner. *See* AG019027. Dr. Stein performed the testing in May 1992. AG01928–29.

At the state's request, a full jury trial on the issue of Petitioner's competency was conducted before Judge Michael Ballachey of the Alameda County Superior Court from June 24 to July 22, 1992. AG000957–60, AG001258. Petitioner called all three doctors as expert witnesses. Dr. Rosenthal testified that he had performed an evaluation of Petitioner in prison, and that he had reviewed Petitioner's psychological, criminal, and social history. AG01589.

24

According to Dr. Rosenthal, the nature of Petitioner's condition was organic, meaning based on neurological defects of brain damage. Dr. Rosenthal listed "organic personality disorder" as his diagnosis, and also testified that he "felt there was evidence of schizophrenia, paranoid type, but [he] was not as certain that that [wa]s the diagnosis." AG010599. Dr. Rosenthal also noted that there "was possibly substance dependence." AG010599.

Dr. Stein testified during Petitioner's competency trial that Dr. Stein had conducted a "battery" of neuropsychological and personality tests that Dr. Stein performed on Petitioner. *See* AG01933–57. Dr. Stein described each of the tests that he performed on Petitioner, which assessed Petitioner's sequencing of material, ability to understand speech and language, sensory-perceptual abilities, parietal lobes, temporal lobes, and Petitioner's ability to read and complete arithmetic. *See id.* Dr. Stein concluded that, "having given him this whole battery of tests . . . my conclusions are that he has considerable pervasive brain imparity." AG010949. Dr. Stein found that "for the most part, [Petitioner is] anywhere from mildly to moderately to severely impaired depending on what part of the brain." AG019049. Dr. Stein stated that the impairment was "fairly significant." AG010949. Although Dr. Stein did not testify as to the cause of Petitioner's organic brain impairments with "medical certainty," Dr. Stein opined that the cause of Petitioner's brain damage could be Petitioner's history of head injuries and drug abuse. AG010957. In addition, Dr. Stein testified that Petitioner scored at "the third and second grade level" on tests for reading, spelling, and arithmetic, even though Petitioner had "a high school diploma." AG010948.

In opposition, the state offered three lay witnesses from the Santa Rita Jail who testified in support of Petitioner's competency. *See Marks*, 31 Cal. 4th at 217–18; AG011159. Holly Lasalle, an accounting supervisor at the Santa Rita Jail, testified that Petitioner "never spent more money at the prison commissary than he had remaining in his account." *Marks*, 31 Cal. 4th at 217. Sergeant Harvey Lewis testified that Petitioner completed various paperwork requesting legal materials. *See, e.g.*, AG011188. Deputy Sheriff Timothy Durbin ("Durbin"), a classification officer at Santa Rita Jail, testified that in June 1992, Petitioner asked Durbin for a work

United States District Court
Northern District of California

assignment because Petitioner believed that if he had a job it would look better to the jury in his upcoming trial. Petitioner told Durbin that he was rejecting an invitation to appear on the television program *America's Most Wanted* because his attorney had advised him that it was not in his best interest. Petitioner told Durbin that he would have a competency hearing soon. When Durbin asked whether that was a hearing to decide whether Petitioner could fire his attorney, Petitioner responded "No, it is a competency hearing to see whether or not I am sane." Petitioner told Durbin that Petitioner "should lose that in June and I'll start my main trial later in the year or early '93." *Marks*, 31 Cal. 4th at 217.

In rebuttal, the defense called Dr. Jules Burstein ("Dr. Burstein"), a clinical and forensic psychologist. Dr. Burstein examined Petitioner's competence in 1989 regarding a prior case. *See* AG011258. In 1989, Dr. Burstein had concluded that Petitioner was competent, but that Petitioner simply did not wish to cooperate with his attorney and that Petitioner was a malingerer. AG011259–60. Dr. Burstein concluded that Petitioner was "someone who is kind of acting bizarre and crazy in order to get the judicial proceedings against him to stop." *Id.* Petitioner told Dr. Burstein in 1989 that Petitioner "acted like a zip-down fool in the courtroom" because Petitioner did not want the public defender as his attorney. AG011283. Dr. Burstein testified that he examined Petitioner again in July 1992 in advance of Petitioner's 1992 competency trial, and that he had changed his mind about Petitioner. In advance of the 1992 competency evaluation, Dr. Burstein examined Petitioner's social history, in addition to the reports of Drs. Gudiksen, Rosenthal, and Stein. *Id.* Dr. Burstein came to the conclusion that Petitioner was incompetent. Dr. Burstein noted several changes in Petitioner's presentation from 1989 to 1992. *See* AG011262–63. In addition, although Petitioner's prior clinician found Petitioner non-psychotic in 1989, Petitioner's current therapist, Josalyn Harris, "who has a good reputation as a clinician, found [Petitioner] to be psychotic," and Dr. Burstein agreed. AG011262–63. Dr. Burstein found Petitioner had "no capacity to shift his behavior towards his attorney" when Dr. Burstein examined Petitioner in 1992, and Dr. Burstein concluded that it would be "extraordinarily difficult for [Petitioner] to cooperate rationally" and that Petitioner exhibited "real cognitive and thinking

impairments." AG011264. Dr. Burstein told the State on cross-examination that there was *nothing* in his notes or the materials provided to him that indicated that Petitioner was competent. AG011270.

On July 22, 1992, the jury found Petitioner competent to stand trial. AG001257. The defense moved for a judgment notwithstanding the verdict, but the court denied the motion. *See Marks*, 31 Cal. 4th at 218.

On July 21, 1994, three days before jury selection in Petitioner's capital murder trial was set to begin, the defense moved under California Penal Code § 1368 to suspend the proceedings and have a second competency hearing. *See* AG011558, AG011563–64. Petitioner's counsel represented to the trial court that Petitioner was out of touch with basic reality and could not comprehend the significance of simple facts that were necessary to prepare his case.

The state law applicable to Petitioner's motion for a second competency hearing provided: "When a competency hearing has already been held and defendant has been found competent to stand trial . . . a trial court need not suspend proceedings to conduct a second competency hearing unless it is presented with a substantial change of circumstances or with new evidence casting a serious doubt on the validity of that finding." *People v. Kelly*, 1 Cal. 4th 495, 542 (1992). After reviewing the transcript of the 1992 initial competency trial, the trial court found on January 24, 1994, that Petitioner's circumstances at trial were not substantially different from his circumstances at Petitioner's pre-trial competency hearing, and that the new evidence Petitioner presented did not cast a serious doubt on the validity of the competency jury's prior finding that Petitioner was competent. AG011586–87.

On March 28, 1994, Petitioner's trial counsel again moved to suspend the proceedings and conduct a competency hearing under § 1368. AG014987. The next day, on March 29, 1994, the trial court heard arguments on the motion to suspend the proceedings and hold a competency hearing. The trial court denied the defense's § 1368 motion to suspend the proceedings. AG015298. The trial court again found that Petitioner's circumstances had not substantially changed, and that the new evidence submitted by Petitioner did not cast a serious doubt on the

determination that Petitioner was competent. *See* AG015293–98.

**b. Evidence of Organic Brain Impairment and Psychiatric Disorders Petitioner Contends Should Have Been Presented in Mitigation**

In support of the instant subclaim, Petitioner asserts that the mental health experts who examined Petitioner prior to his 1992 competency hearing documented and observed Petitioner's clinical profile, and that "[a]ny minimally competent trial counsel would have retained and consulted these experts to prepare [Petitioner's] penalty phase defense." *See* Pet. at 255. Petitioner cites the testimony and expert reports introduced during Petitioner's competency hearing discussed above, in addition to expert reports developed after Petitioner's capital murder trial which rely on evidence developed during Petitioner's competency hearing. Petitioner argues that these declarations show that Petitioner suffered from organic brain impairment and "a constellation of psychiatric disorders," and that Petitioner was "both under the influence of extreme mental and emotional disturbance and incapacitated in his ability to understand the nature of his conduct or conform [his conduct] to the requirements of the law on the date of the charged offenses." *Id.*

Specifically, Petitioner relies on declarations submitted in support of Petitioner's state habeas petition in 2002 by Dr. Stein and Dr. Rosenthal, who testified in favor of Petitioner at Petitioner's 1992 competency hearing. Dr. Stein's 2002 declaration states that, consistent with Dr. Stein's testimony at Petitioner's 1992 competency hearing, that Dr. Stein's May 1992 testing of Petitioner "determined that [Petitioner] suffers considerable, pervasive organic brain damage." AG023081. Similarly, Dr. Rosenthal's 2002 declaration states that Dr. Rosenthal reviewed the transcript of Petitioner's capital trial and the neuropsychological testing performed by other doctors in conjunction with Petitioner's 2002 state habeas petition, and Dr. Rosenthal concluded that this additional data "confirm[ed] that [Petitioner] suffers significant, pervasive brain damage," as Dr. Rosenthal had testified during Petitioner's 1992 competency hearing. AG023065. Dr. Rosenthal's declaration concludes that "[o]n the date of the charged offenses, October 17, 1990, [Petitioner's] neuropsychiatric condition satisfied" criteria for mitigation evidence in California, and that Dr. Rosenthal "would have so testified if [he] had been called as a witness at the penalty

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 13 AND 22

phase of [Petitioner's] trial." AG023068–69.

In addition to Drs. Stein and Rosenthal, Petitioner also introduced the declarations of Drs. Karen Froming ("Dr. Froming") and Dr. George Woods, Jr., ("Dr. Woods") in support of his state habeas petition in 2002.

According to Dr. Froming's 2002 declaration, Dr. Froming performed a neuropsychological evaluation of Petitioner in 2002 and Dr. Froming also reviewed the evaluations and testimony performed in 1992 by Drs. Gudiksen, Rosenthal, and Stein. AG022964. Dr. Froming noted that Petitioner's clinical presentation when evaluated by Dr. Froming in 2002 was "defined by a neuropsychiatric disorder." AG022969. Dr. Froming's testing in 2002 showed that Petitioner was "significantly impaired frontotemporally." In addition, Dr. Froming found that Petitioner's "level of understanding of what he reads is at the 10–11 year old level or 4th or 5th grade equivalent." AG022973–74. Dr. Froming found that, although Petitioner's "fluency is at the normal level, measured at the 56th percentile, frontal lobe deficits prevent [Petitioner] from structuring his speech so that it essentially comes to him in a torrent of words and comes out as a flood of words." AG022974. Dr. Froming found that "[t]he severity of deficits detected in [Petitioner's] frontal lobe significantly impaired [Petitioner's] cognition and executive functioning." AG022975. Dr. Froming's declaration does not make any conclusions regarding Petitioner's mental state at the time of the offense or Petitioner's ability to appreciate the nature of his actions at the time of the offense. Rather, Dr. Froming's declaration makes conclusions only with regards to Petitioner's competency at the time of trial. *See* AG022978–79.

Dr. Wood's 2002 declaration submitted in support of Petitioner's state habeas petition states that Dr. Woods performed a neuropsychiatric evaluation of Petitioner in 2002. In preparation for this neuropsychiatric evaluation, Dr. Woods conducted a clinical interview of Petitioner, reviewed Petitioner's social history and personal records, and interviewed Petitioner's family members. Dr. Woods also reviewed the neuropsychological evaluations and testimony prepared in advance of Petitioner's 1992 competency hearing, including the reports and testimony of Drs. Gudiksen, Rosenthal, and Stein. AG023133–34, AG023149. According to Dr. Woods,

29

the reports and testimony of Drs. Gudiksen, Rosenthal, and Stein at the time of Petitioner's 1992 competency hearing demonstrated that Petitioner "was not only psychiatrically impaired, but significantly neurologically defective as well." AG023152. Dr. Woods found that Dr. Froming's testing, performed in 2002, "reinforced Dr. Stein's findings" at the time of Petitioner's 1992 competency hearing. AG023153. Dr. Woods found that "Dr. Froming's testing and clinical observations capture the multiplicity of [Petitioner's] cognitive problems, including his neurological impairment that is consistent with the diagnosis of dementiaform illness." AG023159. Dr. Woods further found that "[t]he clinical profile drawn by [Petitioner's] disordered thinking in light of his neurological impairments meets the diagnostic criteria for Schizoaffective Disorder currently." AG023160. Dr. Woods also reviewed a social history report of Petitioner prepared by Dr. Julie Kriegler, Ph.D, and noted that Dr. Kriegler identified a "clinical criteria diagnostic of PTSD," which gave Petitioner a "propensity to become overwhelmed in stressful circumstances." AG0231340.

Dr. Woods' own clinical analysis concluded that Petitioner "suffer[ed] from a multiplicity of symptoms." First, Dr. Woods found that Petitioner had "significant neuropsychological impairments" and that Petitioner was "unable to track a problem, so that he could foresee possible alternatives." AG023161. Second, Dr. Woods found that Petitioner's "cognitive deficits" were "confounded by [Petitioner's] severe mental illness, Schizoaffective Disorder." AG023162. Dr. Woods found that Petitioner's Schizoaffective Disorder "impair[ed] [Petitioner's] ability to emotionally process his world, and force[d] him to view the world through a psychotic lens." AG023162. Dr. Woods concluded that Petitioner's "brain impairment coupled with his disruptive psychotic illness, left [Petitioner] unable to appreciate the nature of his actions or to conform his behavior to the law at the time of the offenses for which he was tried and convicted." AG023163–64.

### c. Counsel's Performance

Having reviewed the evidence submitted in support of Petitioner's state habeas petition, the Court next considers Petitioner's argument in Claim 13 that counsel was ineffective for failing

30

1   to investigate Petitioner's organic brain defects and Petitioner's psychiatric disorders in

2   preparation for the penalty phase of Petitioner's capital trial.  According to Petitioner, the evidence

3   of Petitioner's organic brain damage and psychiatric disorders discussed above qualified as

4   mitigating evidence under California Penal Code § 190.3 subsections (d) and (h), which allow the

5   trier of fact to take into account "[w]hether or not the offense was committed while the defendant

6   was under the influence of extreme mental or emotional disturbance," or "[w]hether or not at the

7   time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to

8   conform his conduct to the requirements of law was impaired as a result of mental disease or

9   defect."   Cal. Penal Code § 190.3(d)&(h); *see* Pet'r Br. at 29.  Petitioner contends that "[a]vailable

10  evidence would have medically established that [Petitioner] was both under the influence of

11  extreme mental and emotional disturbance, and unable to understand the nature of his conduct or

12  to conform it to the requirements of the law on the date of the charged offenses."  Pet'r Br. at 29.

13       However, the California Supreme Court could have reasonably concluded that the

14  performance of Petitioner's trial counsel fell "within the wide range of reasonable professional

15  assistance," and thus that Petitioner's trial counsel was not constitutionally defective in its

16  investigation and presentation of mitigation evidence relating to Petitioner's organic brain

17  impairments and psychiatric disorders. *Strickland*, 466 U.S. at 689.  Significantly, "this is not a

18  case in which trial counsel failed to conduct any mental health investigation," despite being on

19  notice of potential organic brain impairment or psychiatric issues. *See Carter v. Chappell*, 2013

20  WL 1120657, at *91 (S.D. Cal. Mar. 18, 2013).  To the contrary, at the time of Petitioner's penalty

21  phase trial, Petitioner's trial counsel had conducted significant investigation into Petitioner's

22  mental health in preparation for Petitioner's competency hearing.  As set forth in detail above, Drs.

23  Stein, Rosenthal, and Gudiksen evaluated Petitioner in advance of Petitioner's 1992 competency

24  hearing, and these experts found that Petitioner suffered from organic brain deficiencies.  Indeed,

25  Dr. Stein testified during Petitioner's competency hearing at length about the "battery" of

26  neuropsychological and personality tests that he had performed on Petitioner. *See, e.g.* AG01940–

27  57. Dr. Stein concluded that "having given [Petitioner] this whole battery of tests . . . my

28

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 13 AND 22

conclusions are that [Petitioner] has considerable pervasive brain imparity." AG01949. Dr. Rosenthal testified that, although he was not making a complete diagnosis, that Petitioner suffered from organic personality disorder and that "there was evidence of schizophrenia." AG010599. In addition, Dr. Burstein concluded that, consistent with the conclusion of Petitioner's clinician, Dr. Petitioner was psychotic and that he suffered from a form of organic brain syndrome. AG0112310–11. In reaching these conclusions, these doctors had examined Petitioner, and had also reviewed a nineteen page social history of Petitioner, which was compiled by defense counsel. AG011261; AG01589; AG010881; AG010956. The evidence of organic brain defects and psychiatric disorders submitted by Petitioner in support of his state habeas petition largely confirm and supplement the evidence found and presented during Petitioner's competency hearing. *See, e.g.*, AG023081; AG023065; AG023153.

Accordingly, it is clear that at the time of Petitioner's penalty phase, Petitioner's trial counsel had prepared a social history report of Petitioner, had engaged several experts to examine Petitioner, and trial counsel knew that these experts had concluded that Petitioner suffered from organic brain impairments and psychiatric disorders. On the basis of all of this mental health evidence, a full jury trial was held on Petitioner's competence, and trial counsel twice moved during the course of Petitioner's capital habeas trial for a second competency hearing because trial counsel believed Petitioner to be "seriously mentally ill." *See, e.g.*, AG023115–16. Given that trial counsel was undoubtedly aware of the evidence that Petitioner suffered from organic brain impairments and psychiatric disorders, the question is whether, given trial counsel's knowledge of Petitioner's mental health, Petitioner's trial counsel was ineffective in failing to further pursue and use this evidence in support of Petitioner's penalty phase trial.

Petitioner's trial counsel submitted a declaration in support of Petitioner's habeas petition. AG023112. This declaration, however, does not mention trial counsel's actions in preparing for Petitioner's penalty phase trial, and the declaration does not discuss trial counsel's strategy with regards to Petitioner's penalty phase trial. However, under the double deference owed to the California Supreme Court under *Strickland* and AEDPA, the Court must "indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The question is whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105 (internal quotation marks omitted). Here, for the reasons discussed below, the California Supreme Court could have reasonably concluded that, after investigating Petitioner's mental health in advance of Petitioner's 1992 competency hearing, Petitioner's trial counsel made a "strategic decision" to not introduce the mental health evidence developed during Petitioner's 1992 competency hearing during the penalty phase of Petitioner's capital murder trial, and this strategic decision was not constitutionally deficient. *Strickland*, 460 U.S. at 690–91.

First, the California Supreme Court could have reasonably concluded that, given the outcome of Petitioner's 1992 competency hearing, Petitioner's trial counsel made a tactical decision to not rely on Petitioner's mental health during Petitioner's capital murder trial. To be sure, Petitioner's competency to stand trial is a different issue than whether Petitioner committed the crimes while "under the influence of extreme mental or emotional disturbance," or whether Petitioner had the capacity at the time of the offense "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Cal. Penal Code § 190.3(d)&(h). Nonetheless, a jury during Petitioner's 1992 competency hearing heard the consistent expert testimony of Drs. Gudiksen, Rosenthal, Stein, and Burstein, who testified about Petitioner's organic brain impairments and psychiatric disorders. Despite this consistent expert testimony, the jury in Petitioner's 1992 competency hearing rejected this evidence on the basis of the testimony of only three lay witnesses, who testified about the words from Petitioner's "own mouth." Marks, 31 Cal. 4th at 219. Trial counsel also moved for a second competency hearing on two occasions during the course of Petitioner's capital murder trial, and the trial judge in Petitioner's capital murder trial denied both motions. Thus, Petitioner's trial counsel may have made the strategic decision that the expert evidence from Drs. Gudiksen, Rosenthal, Stein, and Burstein would not be particularly persuasive or compelling to the jury in Petitioner's penalty phase trial, who would have observed Petitioner throughout the capital murder trial and who would have heard evidence

33

of Petitioner's words and actions on the night of the murder.

Indeed, although Petitioner contends that evidence of his organic brain impairments and psychiatric disorders would have shown that Petitioner was delusional and "incoherent," that Petitioner exhibited "poor impulse control," and that Petitioner experienced "psychic numbing," and "depression, paranoia, and anxiety," *see, e.g.*, Pet. at 274–76, evidence presented during the guilt phase of Petitioner's trial demonstrated that Petitioner appeared "normal" on the night of the shootings, and that Petitioner acted calmly and deliberately. For example, Boyd, who knew Petitioner and saw Petitioner come to Taco Bell "just about every day or so," testified at Petitioner's capital trial that Petitioner greeted Boyd on the night of the shooting and that Petitioner acted "pretty much normal." AG014737–38. After greeting Boyd, Petitioner pointed the gun directly at Luong's head and pulled the trigger. Petitioner then walked 795 feet to the Gourmet Market, where Petitioner took "straight aim" at Baeza and Myers. AG015128. Myers testified that Petitioner appeared "deliberately focused." Petitioner left the store "real cool and calm." *Marks*, 31 Cal. 4th at 204. After the Gourmet Market shootings, Petitioner met up with Menefee and told Menefee that he had shot two people. AG05678. According to Menefee, Petitioner acted "like his normal self." AG015689. Petitioner and Menefee entered McDermott's taxi, and Petitioner directed McDermott to drive to a parking lot near Petitioner's grandmother's house. AG015694. During the ride, Petitioner engaged McDermott in a casual conversation about the World Series game, which was playing on the radio. AG015692–93. Petitioner directed McDermott to the back of the parking lot, and Petitioner told Menefee to leave the taxi. AG015693–94. Petitioner then shot McDermott in the face. After the shooting, Petitioner told Menefee that he had shot the driver, and continued to act normally. *Marks*, 31 Cal. 4th at 206. Petitioner and Menefee hid under a building near Petitioner's grandmother's house for approximately 25 minutes, and evidence suggested that Petitioner changed his clothing and hairstyle after the shooting. *Id.*; *see also* AG015707–08; AG015451–52.

In sum, given that a jury during Petitioner's 1992 competency hearing had already rejected the consistent expert testimony of Drs. Stein, Gudiksen, Rosenthal, and Burstein based on the

34

words from Petitioner's "own mouth," and given the evidence presented during Petitioner's capital murder trial which showed that Petitioner acted "normal" and deliberate on the night of the shooting and tried to avoid detection by hiding and changing his clothing and hairstyle, Petitioner's trial counsel may have made the strategic decision that evidence of Petitioner's organic brain impairments and psychiatric disorders was not particularly compelling or effective to show that Petitioner was under the influence of extreme mental and emotional disturbance at the time of the offense, or that Petitioner could not understand his conduct or conform it to the law. *See also, e.g.*, *Boyer v. Chappell*, 793 F.3d 1092, 1105 (9th Cir. 2015) (finding petitioner failed to establish ineffective assistance of counsel based on trial counsel's failure to investigate and present evidence of organic brain damage during the penalty phase because evidence suggested the petitioner was in search of money when he committed the crimes and that he took actions after the crimes "to avoid arousing suspicion"); *Rhoades v. Henry*, 638 F.3d 1027, 1050 (9th Cir. 2011) (finding no ineffective assistance of counsel for failing to present evidence of PTSD because, in part, there was "no suggestion that" the petitioner committed the crime "while in any kind of PTSD-induced disassociative state").

Moreover, the California Supreme Court could have reasonably concluded that trial counsel made the strategic decision to avoid evidence of Petitioner's organic brain defects and psychiatric disorders because if this evidence *was* compelling and effective to the jury, it could function as "a 'two-edged sword'" that demonstrated that Petitioner was dangerous. *Vieira v. Chappell*, 2015 WL 641433, at *72 (E.D. Cal. Feb. 5, 2015) (quoting *Atkins v. Virginia*, 536 U.S. 304, 321 (2002)). Specifically, if trial counsel had argued during mitigation "that [Petitioner] was brain damaged, the jury could conclude that [Petitioner] was 'simply beyond rehabilitation.'" *Id.* (quoting *Pinholster*, 131 S. Ct. at 1410). Instead, it appears from the record that Petitioner's trial counsel "made a tactical decision to focus on Petitioner's positive characteristics at the penalty phase trial, rather than Petitioner's mental health." *Ervin v. Davis*, 2016 WL 4681203, at *10 (N.D. Cal. Sept. 7, 2016). Petitioner's trial counsel emphasized during the penalty phase that Petitioner was raised in a strong home, that Petitioner was helpful in taking care of his siblings,

35

and that Petitioner entered the Navy after graduating high school. Petitioner's friends and family members were called to testify, and these witnesses testified consistently that Petitioner was a good kid, that Petitioner did not show any signs of violence as a child, and that Petitioner began to get into trouble with the law only after returning from the Navy and after the devastating loss of his mother. During closing arguments, Petitioner's counsel emphasized that Petitioner was a "nice kid," and that although Petitioner had committed violent conduct in recent years, Petitioner had not committed any violent conduct in the last eighteen months. AG017617. Petitioner's counsel emphasized to the jury that Petitioner "was something else" before his capital crimes, and that Petitioner "c[ould] be something else" if the jury spared his life. AG017629.

Accordingly, the California Supreme Court could have reasonably concluded that trial counsel made a strategic decision during the penalty phase to avoid presenting Petitioner as an individual who was "beyond rehabilitation," but instead as someone who was capable of rehabilitation and who was indeed already on the path to rehabilitation. *Vieira*, 2015 WL 641433, at *72. Again, the question under AEDPA is whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105 (internal quotation marks omitted). Under the double deference owed to trial counsel's tactical decisions under *Strickland* and AEDPA, the Court cannot say that trial counsel was constitutionally deficient. *See, e.g.*, *Leavitt v. Arave*, 646 F.3d 605, 611–12 (9th Cir. 2011) (finding counsel did not render ineffective assistance of counsel by "steer[ing] clear of the mental health issue" because the evidence could have been perceived as mitigating and it would have conflicted with the reasonable strategy to "humanize" the defendant during mitigation); *Ervin*, 2016 WL 4681203, at *10 (finding counsel did not render ineffective assistance where trial counsel made reasonable strategic decision at mitigation phase "to focus on Petitioner's positive characteristics at the penalty phase trial, rather than Petitioner's mental health"); *Ochoa v. Davis*, 2016 WL 3577593, at *67 (C.D. Cal. June 30, 2016) (denying ineffective assistance of counsel claim where petitioner argued defense counsel should have presented evidence during the mitigation phase of a dysfunctional childhood and brain damage because the evidence could have been interpreted as showing that

36

petitioner was "irretrievably broken"); *Vieira*, 2015 WL 641433, at *72 ("[A]rguing that Petitioner was brain damaged could constitute a 'two-edged sword' that juries might find to show dangerousness," which would have undermined trial counsel's reasonable mitigation strategy to portray the petitioner's crime as "an aberration").

To summarize, the California Supreme Court could have reasonably concluded that, after investigating Petitioner's organic brain defects and psychiatric disorders during the course of Petitioner's 1992 competency trial, Petitioner's trial counsel made a strategic decision to not present this testimony in mitigation at Petitioner's penalty phase trial. "While [trial counsel's] chosen strategy failed, [the Court] must avoid the temptation to evaluate [trial counsel's] decision through the fabled twenty-twenty vision of hindsight." *Leavitt*, 646 F.3d 605 (internal quotation marks omitted). Rather, the Court "must evaluate [trial counsel's] performance only based on whether [trial counsel] made reasonable, informed decisions based on what [trial counsel] knew at the time." *Id.* For the reasons discussed above, the California Supreme Court could have reasonably concluded that, after investigating Petitioner's mental health, trial counsel made a strategic decision to not present evidence of Petitioner's mental health during the penalty phase of Petitioner's trial because the evidence may not have been seen as particularly compelling or persuasive, and because the evidence may have constituted a two-edged sword which would contradict trial counsel's chosen strategy of portraying Petitioner as a good individual who was capable of rehabilitation. Although this Court may not make the same decision in the first instance, under the doubly-deferential standard of *Strickland* and AEDPA, this Court cannot say that the California Supreme Court's decision was objectively unreasonable. *See Richter*, 562 U.S. at 105 (stating that, when § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard").

### d. Prejudice

Further, even assuming that Petitioner's trial counsel was deficient for failing to investigate and present evidence of Petitioner's organic brain defects and psychiatric disorders during

37

Petitioner's penalty phase trial, the California Supreme Court could have reasonably concluded that Petitioner was not prejudiced by trial counsel's deficiency. In order to establish prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "In assessing prejudice, [the Court] reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

Here, the aggravating evidence presented by the State was substantial. For example, during the penalty phase, Bailey testified that Petitioner assaulted Bailey with a telephone, pulled Bailey onto a concrete floor, threw her through a bathroom window, and threw Comet and fingernail polish remover on her. AG01010–14. Petitioner threatened Bailey that if she told anyone about the assault, Petitioner would put a bomb in her six-year old son's mouth, cut off her nine year old son's head, and "kill [her] mother." AG017015–16. As a result of the assault, Bailey suffered a concussion, a broken nose, and she needed 26 stitches on the inside of her chin and 27 stitches on the outside. AG017014. After the attack, Bailey became so nervous about Petitioner that doctors told her she was developing a stomach ulcer. AG01020. Bailey was so afraid of Petitioner, she obtained a weapon to protect herself. *Id.*

In addition, Hitchens, Petitioner's former girlfriend, testified that Petitioner mentally and physically abused her during their relationship. AG016881. Petitioner had beaten Hitchens and stabbed her in the back with a knife. AG016882. Approximately two months after Hitchens left Petitioner, Petitioner approached Hitchens and tried to get Hitchens into his vehicle. AG016880– 83. Once the police responded to the scene, Petitioner put his car in reverse and backed over Officer Lewis. Officer Lewis testified that, if Petitioner had backed the car up in a straight direction, Petitioner's vehicle would have run over Officer Lewis's leg. However, Petitioner turned the wheel and Petitioner's vehicle ran over Officer Lewis's lower back. AG016922–23.

Further, while incarcerated, Petitioner bit Deputy Breslin in the back of his neck and punched Deputy Breslin in the groin. AG01690. Petitioner bragged about his assault of Deputy

38

Breslin after the incident. *Id.* Petitioner punched Deputy Tine in the face while Deputy Tine delivered a toilet paper and razor to Petitioner's cell. AG016981–82. Deputy Tine received 17 stitches as a result of the incident, and Deputy Tine still had a scar on his face from the incident. AG016986. Petitioner also assaulted Deputy Jones, and Petitioner assaulted another inmate. Petitioner assaulted his former attorney, Najpaver, by repeatedly kicking Najpaver in his groin and stomach, "at least five times." AG017085. Petitioner acted "cold and deliberate" in his assault of Najpaver. *Id.*

In addition to the aggravating evidence presented about these other incidents, the aggravating nature of the instant capital murders was significant. "[T]he facts of the crime play an important role in the prejudice inquiry." *Mickey v. Ayers*, 606 F.3d 1223, 1245 (9th Cir. 2010). The evidence presented during the guilt phase established that Petitioner deliberately shot four innocent strangers at close range. Specifically, Petitioner entered a Taco Bell at the night of October 17, 1990, and greeted Boyd, an employee at Taco Bell who knew Petitioner. Petitioner ordered two encharitos from Luong, another Taco Bell employee. Petitioner then "pulled out his gun," pointed the gun directly at Luong's face, and fired a single shot. AG014744–45. Petitioner left the Taco Bell and walked approximately 795 feet from the Taco Bell to Gourmet Market, where Petitioner shot Baeza and Myers at close range. Petitioner met up with his girlfriend, Menefee, and the two entered McDermott's taxi. Petitioner directed McDermott to the back of a parking lot near Petitioner's grandmother's house. AG015694. Petitioner told Menefee to leave the taxi, and Petitioner shot McDermott in the face. AG015696–97. Baeza and McDermott died from the shootings, while Luong and Myers survived. Luong remained in a persistent vegetative state.

Family members of Baeza and McDermott testified during the penalty phase about the good characters of Baeza and McDermott, and the devastating effect that their deaths had on their family, friends, and others in the community. For example, Carter, an employee of Baeza at the Gourmet Market, testified as to Baeza's generosity in giving Carter a job at the Gourmet Market despite Carter's seizure disorder. As a result of Baeza's death, Carter lost his job at the Gourmet

39

Market. Carter had been unable to find another job, and his seizures had returned. Fanny Baeza, Baeza's wife, testified that "she lost everything" after Baeza's death and that she had to sell her home and come out of retirement. AG017069. Baeza's funeral was "standing room only," and full of people from the community who approached Baeza's family and told stories of Baeza's generosity and kindness. AG017084–85.

In light of this substantial aggravating evidence, the California Supreme Court could have reasonably concluded that, even if Petitioner introduced mitigating evidence of organic brain defects and psychiatric disorders in mitigation, the result of the proceedings would not have been different. As set forth above, Petitioner contends that Petitioner's organic brain defects and psychiatric disorders "impaired his abstract thinking," made him "incoherent and rambling," caused him to experience "poor impulse control," "psychic numbing," "depression, paranoia, and anxiety," and other symptoms. *See, e.g.*, Pet. at 274–76. Petitioner contends that a jury considering this evidence would have found that Petitioner was "under the influence of extreme mental and emotional disturbance" at the time of the crime, and that Petitioner was "unable to understand the nature of his conduct or to conform it to the requirements of the law." Pet'r Br. at 29. However, as set forth above with regard to trial counsel's deficient performance, the impact of this mitigating evidence, if presented at trial, would have been substantially lessened by the significant evidence that Petitioner appeared "normal" on the night of the crimes, that Petitioner engaged in ordinary conversations on the night of the shootings, that Petitioner lured McDermott to the back of a parking lot and told Menefee to leave the taxi before shooting McDermott, that Petitioner and Menefee hid from the police after the shootings, and that Petitioner changed his clothing and hairstyle after the shootings. *See, e.g.*, *Boyer*, 793 F.3d at 1105 (finding petitioner failed to establish prejudice from his trial counsel's failure to investigate and present evidence of organic brain damage during the penalty phase because evidence suggested the petitioner was in search of money when he committed the crimes and that he took actions after the crimes "to avoid arousing suspicion"); *Rhoades*, 638 F.3d at 1050 (finding no ineffective assistance of counsel for failing to present evidence of PTSD because, in part, there was "no suggestion that" the petitioner

40

committed the crime "while in any kind of PTSD-induced dissociative state").

Accordingly, the California Supreme Court could have reasonably concluded that Petitioner's mitigating evidence of organic brain defects and psychiatric disorders would not have produced a different outcome given the aggravating evidence of the deliberate nature of Petitioner's actions in shooting four innocent victims, the impact that these crimes had on the victim's families, and Petitioner's other significant violent conduct. The California Supreme Court could have reasonably concluded that Petitioner failed to establish "a substantial, [and] not just conceivable, likelihood of a different result" at the penalty phase of Petitioner's trial. *Pinholster*, 563 U.S. at 189.

### ii. Family and Social History

Next, Petitioner contends that his trial counsel was constitutionally ineffective because they should have investigated and presented "substantial, readily available social history evidence" of a "multi-generational history" of mental illness, poverty, substance abuse, and physical abuse in Petitioner's family. In support of his state habeas petition, Petitioner submitted declarations from approximately forty individuals who knew Petitioner throughout his life, in addition to an expert report prepared by Dr. Julie Kriegler. *See, e.g.*, AG022663–65. The Court first summarizes the evidence that Petitioner contends should have been presented in mitigation. The Court then considers trial counsel's performance and whether Petitioner was prejudiced by trial counsel's alleged deficiencies.

### a. Evidence of Family and Social History that Petitioner Contends Should Have Been Presented

In support of his habeas petition to the California Supreme Court, Petitioner submitted over forty declarations from friends and family members of Petitioner. These declarations state that Petitioner's maternal and paternal families were from poor backgrounds, that Petitioner's paternal ancestors were slaves, and that Petitioner himself grew up in the housing projects of Alameda. Petitioner's father, Jimmie Lee Marks ("Jimmie Lee"), was a severe disciplinarian of his children, and Jimmie Lee often punished his children by whipping them with his hands and belts and, at least on one occasion, with an extension cord. *See* AG022468; AG022689;

41

AG022503–04. Jimmie Lee did not show affection towards his children, and Jimmie Lee made his children leave the house when they were teenagers if they disobeyed. *See* AG022695. Jimmie Lee himself would leave "for long periods of time." AG022467–68. In order to make his children "tough," Jimmie Lee would make them fight each other. AG022546. Petitioner's mother, Sallie Marks ("Sallie"), worked shift work, but took care of the children when she was not working. AG022675–76. Sallie "also used a belt to whip" the children, and Sallie drank a lot. AG022469. At least two individuals described Sallie as a "functioning alcoholic." AG022529; AG022730. On one occasion, Sallie drove Petitioner's sister, Elaine, home while Sallie was drunk and high, and Sallie wrecked the car. AG022471. Sallie was in other car accidents as well, likely as a result of her drinking. AG022471; AG022693. Petitioner's friends and family described one event in which Sallie caught Petitioner and his brother with a girl that they had brought home. Sallie got "so upset when she found them that she got out Jimmie Lee's gun" and the gun accidentally discharged, which sent a bullet through the bathroom wall near where Petitioner was standing. AG022473. Sallie and Jimmie Lee frequently fought, and Jimmie Lee was abusive towards Sallie. AG022527; AG022578.

Building from these declarations, Dr. Kriegler submitted an expert report in support of Petitioner's state habeas petition. AG022981. According to Dr. Kriegler, Petitioner "was endangered by neurological insults *in utero* from a variety of sources including physical abuse by his father perpetrated upon his mother" and his mother's use of alcohol. AG022985. Dr. Kriegler states that Petitioner was raised in a "chaotic and violent home environment," which offered "no emotional nurturing, support, or safety." AG022985. Dr. Kriegler describes Petitioner's father as "terroriz[ing] the children with fierce beatings," and Dr. Kriegler states that Petitioner's father would "abandon[]" the children as teenagers by forcing them to leave the house and "fend for themselves on the streets of Alameda." AG022986. Dr. Kriegler states that "Sallie frequently beat the children more intensely than Jimmie Lee." AG022986. Dr. Kriegler states that domestic violence between Jimmie Lee and Sallie "added to the terror in the home," and that Jimmie Lee and Sallie's "constant alcohol abuse was a clearly destabilizing force for [Petitioner] and his

siblings." According to Dr. Kriegler, each setting that Petitioner encountered as a child "was traumatic, and each disallowed the normative development and functioning critical to the creation of a coherent, integrated self." AG022988.

### b. Counsel's Performance

Having reviewed the evidence which Petitioner contends should have been presented in mitigation, the Court next considers counsel's performance with regards to investigating and presenting evidence of Petitioner's family and social history. According to Petitioner, trial counsel was deficient in investigating Petitioner's family and social background because trial counsel failed to investigate and uncover the family and social history set forth above, which Petitioner contends demonstrates that his family history is characterized by poverty, domestic violence, substance abuse, and physical abuse. *See* Pet'r Br. at 30–31. However, for the reasons discussed below, the California Supreme Court could have reasonably concluded that trial counsel was not deficient in its investigation of Petitioner's family and social background.

The declaration from Petitioner's trial counsel submitted in support of Petitioner's state habeas petition does not explain what investigation Petitioner's trial counsel did into Petitioner's background. However, it is clear from the record that Petitioner's trial counsel prepared a social history report of Petitioner, engaged an investigator to interview witnesses, and Petitioner's trial counsel called Petitioner's friends and family members to testify in favor of Petitioner at Petitioner's penalty phase trial. Significantly, several of the individuals who testified during Petitioner's penalty phase trial—such as Petitioner's sister Elaine, Petitioner's brother Damon, Reverend Betty Williams, Relisha Marks, and Effie Jones—also submitted declarations in support of Petitioner's state habeas petition. Although the declarations of these individuals submitted in support of Petitioner's state habeas petition state that Jimmie Lee was abusive towards Sallie, that both Jimmie Lee and Sallie abused alcohol, and that both Jimmie Lee and Sallie disciplined Petitioner and his siblings with belts and other objects, *none* of these individuals testified to these facts during the penalty phase trial. To the contrary, as the California Supreme Court accurately summarized in its order denying Petitioner's direct appeal, these witnesses presented "mostly

43

consistent testimony that described [Petitioner] as having grown up in a good family environment with religion, where there was no drug or alcohol abuse, no domestic violence, and with a father who encouraged education and hard work." *Marks*, 31 Cal. 4th at 213.

Indeed, Petitioner's sister Elaine testified during the penalty phase trial that the defense investigator interviewed Elaine, and that Elaine told the defense investigator that Elaine and Petitioner grew up in a "great home." AG017284–85. Elaine testified during the penalty phase trial that neither Jimmie Lee nor Sallie abused alcohol. AG017285–86. Elaine's testimony during the penalty phase of Petitioner's trial is in direct contradiction to Elaine's declaration in support of Petitioner's state habeas petition, in which Elaine states that both Jimmie Lee and Sallie abused alcohol, and that Elaine was in a car accident with her mother because her mother was driving while drunk and high. AG022470. Elaine's declaration states that the defense investigator talked to her for thirty minutes in advance of the trial, but Elaine does not state what the defense investigator asked her or why she testified during the penalty phase about facts that she now contends are not true. *See* AG022478–79.

District courts in this Circuit have recognized that "[w]hen counsel or their investigators speak with family members and friends and others who might have had information on family history, but none of them provide the information whose absence a petitioner later complains about, it cannot be said that counsel was ineffective." *Ochoa v. Davis*, 2016 WL 3577593, at *69 (C.D. Cal. June 30, 2016); *see also Ervin v. Davis*, 2016 WL 4681203, at *10 (finding trial counsel was not deficient in failing to introduce mitigating evidence from petitioner's childhood where "*none* of the fifteen witnesses that Petitioner's trial counsel called to the stand during the penalty phase trial . . . even mentioned" childhood problems). Here, as set forth above, the record demonstrates that the defense investigator spoke to several of Petitioner's friends and family members, that defense counsel called these individuals as witnesses during the penalty phase of Petitioner's trial, but that none of these witnesses disclosed—and, in fact, expressly *contradicted*—the information that these witnesses now raise for the first time in Petitioner's habeas petition. Moreover, trial counsel also had access to Petitioner himself, and Petitioner took

44

the stand during the penalty phase to testify about his life and family upbringing.  Petitioner also

did not mention any of the problems now raised for the first time in the declarations submitted by

friends and family members about his home environment.  *See Mickey v. Ayers*, 606 F.3d 1223,

1242–43 (9th Cir. 2010) ("[R]efus[ing] to find counsel deficient for not uncovering evidence" of

petitioner's abuse and family problems where Petitioner himself self-reported that there were no

problems and witnesses confirmed Petitioner's original story).  Again, the testimony presented by

witnesses at Petitioner's penalty phase trial was consistent that Petitioner grew up "in a good

family environment with religion, where there was no drug or alcohol abuse, no domestic

violence, and with a father who encouraged education and hard work."  *Marks*, 31 Cal. 4th at 212.

Accordingly, based on the evidence in the record, the California Supreme Court could have

reasonably concluded that trial counsel was not deficient in its investigation of Petitioner's family

and social history.  *See Vieira*, 2015 WL 641433, at *73 (finding that trial counsel was not

ineffective in failing to uncover evidence of a "highly dysfunctional" family life where the record

showed that petitioner's trial counsel interviewed immediate family, friends, and neighbors, and

these witnesses portrayed petitioner as having been raised in a normal suburban home).

### c.  Prejudice

Moreover, even assuming that Petitioner's counsel was deficient in their investigation of

Petitioner's background and should have uncovered the new evidence presented in Petitioner's

state habeas petition, the California Supreme Court could have reasonably concluded that

Petitioner's counsel was not prejudiced by defense counsel's failure to present this evidence

during the penalty phase, and thus that Petitioner's trial counsel was not ineffective under

*Strickland*.

Significantly, although "[t]he evidence of [Petitioner's] childhood does not paint a pretty

picture, [] it is not so dramatic or unusual that it would likely [have] carr[ied] the day for

[Petitioner]" at the penalty phase.  *Samayoa v. Ayers*, 649 F.3d 919, 929 (9th Cir. 2011).

Petitioner's background of "harsh discipline, poverty, drug abuse," and family alcohol abuse is,

unfortunately, "not an uncommon one."  *Id.*  Indeed, taken as a whole, the additional family and

45

social evidence which Petitioner contends should have been presented in mitigation "is equivocal." *Miles v. Ryan*, 713 F.3d 477, 492–93 (9th Cir. 2013). Although some aspects of the additional evidence presented by Petitioner in support of his habeas petition are disturbing, such as the fact that Jimmie Lee was abusive towards Sallie, the declarations submitted by Petitioner's friends and family members in support of Petitioner's state habeas petition hardly support the dramatic conclusions in Dr. Krieger's expert report that Petitioner faced "unrelenting" trauma as a child, and that Petitioner grew up without "emotional nurturing, support, or safety." AG022985.

For example, the declarations submitted in support of Petitioner's state habeas petition state that Jimmie Lee and Sallie worked hard and provided for the family, that Sallie helped the children get ready for school, that Sallie helped the children with their homework, that Petitioner's family "had Bible study classes in the afternoon," and that Petitioner's family always "had a nice new car and nice furniture." AG022465–70; AG022529. Petitioner's parents made Petitioner and his siblings do chores, complete their homework, and follow curfews. *See, e.g.*, AG022669–70. Petitioner's parents also "tried to show [Petitioner and his siblings] positive examples of people doing right in the neighborhood," and encouraged Petitioner and his siblings "to get a trade or go to school." AG022675–66. Jimmie Lee and Sallie did not allow Petitioner and his siblings to associate with individuals whom they perceived to be bad influences. *See, e.g.*, AG022671. Moreover, although both Jimmie Lee and Sallie used belts and other objects to whip Petitioner and his siblings when they disobeyed, these whippings, "although harsh, were largely disciplinary in nature," and they were "not so unusual or severe as to prevent Petitioner from wanting to live with" his parents after Petitioner returned from the Navy. *Sanders v. Davis*, 2017 WL 2591907, at *57 (E.D. Cal. June 15, 2017) (finding Petitioner failed to establish prejudice from failure to introduce testimony of childhood whippings because "[t]he habeas declarations filed by family members suggest that the beatings Petitioner and his brother [] received at home, although harsh, were largely disciplinary in nature," and "were not so unusual or severe as to prevent Petitioner from wanting to live with [his father] after his parent's divorce"); *see* AG022669 (testifying during the penalty phase that Petitioner lived with his parents after Petitioner returned from the

Navy).

Dr. Krieger's expert report also makes much of the fact that Jimmie Lee made his children move out of the house when they were teenagers, which according to Dr. Krieger, forced Petitioner and his siblings to "fend for themselves on the streets of Alameda." AG022986. However, the declarations submitted by Petitioner's family show that Jimmie Lee believed that his children should not be allowed to stay at home unless they "complete[d] high school and [went] to college or g[ot] a job." AG022676. Indeed, Petitioner was not kicked out of his parent's house. *See, e.g.*, AG022476. Rather, Petitioner stayed at home with his parents until he entered the Navy. Jimmie Lee and Sally "were proud of [Petitioner] joining the Navy." AG022677. Petitioner visited home while he was in the Navy, and Petitioner lived with his parents for a period after returning from the Navy. *See, e.g.*, AG022677.[4]

Accordingly, the California Supreme Court could have reasonably concluded that trial counsel was not deficient in failing to present during the penalty phase evidence that Petitioner faced "unrelenting" trauma as a child, as Dr. Krieger concludes. Although the declarations submitted by Petitioner's family and friends show unfortunate aspects of Petitioner's upbringing that were not presented in mitigation, the record as a whole also shows several other aspects of Petitioner's childhood that appear nurturing, and thus this "equivocal" evidence would not have been particularly powerful mitigation evidence. *Miles*, 713 F.3d at 439 (finding additional evidence of petitioner's family and social history to be "equivocal" because even though petitioner's mother was a prostitute, the petitioner's mother "was clearly quite devoted to" the petitioner and the petitioner "had a community of friends and a support system" even if his surroundings were problematic).

Indeed, if defense counsel *had* presented evidence during the penalty phase that Petitioner was raised in a troubling home environment, "the State could have put on" in rebuttal at least

---

[4] Dr. Krieger's expert report also describes Sallie Lee as getting drunk and dancing with her children "in a sexualized way that made them uneasy." AG023014. However, although the declarations submitted by Petitioner's siblings state that Sallie would, on occasion, get drunk, put on music, and ask the children to dance with her, there is no indication from the declarations submitted by Petitioner's siblings that these interactions were "sexualized." *See, e.g.*, AG022673.

Case No. 11-CV-02458-LHK
ORDER DENYING CLAIMS 13 AND 22

some of the friends and family members who testified at the penalty phase that Petitioner grew up in a strong and supportive home environment. *See Mickey*, 606 F.3d at 1242–43 (stating that petitioner was not prejudiced by trial counsel's failure to introduce evidence of petitioner's troubled childhood because witnesses at petitioner's penalty phase trial testified that petitioner grew up in a strong home environment, and the state could have called at least some of these witnesses "to contradict [Petitioner] or the other witness" who would testify that petitioner's upbringing was troubled).

Moreover, if Petitioner's trial counsel had introduced evidence of Sallie's alcohol abuse or Sallie's harsh discipline of Petitioner and his siblings during the penalty phase trial, this evidence would have distracted from the consistent evidence presented at Petitioner's penalty phase trial— and the evidence in the declarations submitted in support of Petitioner's habeas petition—that Petitioner was very close to his mother and that Petitioner was devastated by her unexpected death in 1990. Multiple witnesses testified during the penalty phase that Petitioner was in prison at the time of his mother's death, that Petitioner was not immediately told of her death, and that Petitioner was not able to attend the funeral. Indeed, Petitioner argues in his habeas petition, as Petitioner's trial counsel argued in Petitioner's penalty phase trial, that Sallie's death had a large impact on Petitioner, and that Petitioner began to significantly decline after her death. *See* Pet'r Br. at 32 (arguing that Sallie's unexpected death caused Petitioner to become "increasingly dysfunctional"). Evidence that Sallie was an alcoholic who harshly disciplined Petitioner would have complicated and detracted from this mitigation evidence, and thus the California Supreme Court could have reasonably concluded that Petitioner was not prejudiced by trial counsel's decision to not present this evidence during Petitioner's penalty phase trial, and instead focus on Sallie's positive attributes and Petitioner's close relationship to her.

In sum, although the additional evidence submitted in support of Petitioner's state habeas petition demonstrates that some aspects of Petitioner's upbringing were troubling, this evidence is largely equivocal, and it is "not so dramatic or unusual that it would likely carry the day for" Petitioner, particularly in light of the substantial aggravating evidence in this case. *Samayoa*, 649

F.3d at 929. As set forth in detail above, Petitioner severely assaulted Bailey, abused Hitchens, ran over Officer Lewis with his vehicle, assaulted Deputies Breslin and Tine, and assaulted his former attorney Najpaver. With regards to the instant capital murders, Petitioner shot four random strangers at close range, killing two of them and leaving one in a persistent vegetative state. The California Supreme Court could have reasonably concluded that the additional evidence of Petitioner's family and social history, even considered together with the other mitigating evidence that Petitioner claims his trial counsel failed to introduce, did not demonstrate "a substantial, [and] not just conceivable, likelihood of a different result" at the penalty phase of Petitioner's trial. *Pinholster*, 563 U.S. at 189.

### iii. Exposure to Neurotoxic Chemicals

Petitioner further contends that his trial counsel was ineffective at the penalty phase for failing to investigate and present evidence of Petitioner's "life-long pervasive exposure to numerous toxic substances," which affected Petitioner's physical, mental and emotional development and functioning. *See* Pet. at 276. Petitioner contends that "[t]rial counsel failed to investigate or recognize the significance of neurotoxin exposure and therefore failed to adequately investigate, prepare, and present evidence of exposure and its toxic effects on" Petitioner, which Petitioner contends would have borne on mitigation. *Id.* at 276–78. The Court first discusses the evidence that Petitioner contends should have been presented in mitigation, and then the Court discusses counsel's performance.

Petitioner asserts that trial counsel should have investigated and presented evidence that Petitioner was exposed to neurotoxic substances because Petitioner was raised in Alameda, and that "[f]rom 1942 to 1978, the Navy abandoned somewhere between 45,000 and 500,000 tons of toxic rubbish on the extreme western end of Alameda." *Id.* at 280. Petitioner asserts that the housing project where Petitioner was raised and the schools in which Petitioner attended were "located on the marsh crust toxic site," which "affects 700 acres of contaminated land." *Id.* at 280–81. Petitioner also asserts that he was exposed "to lead from drinking water" because "his housing unit was built in the 1940's" and "plumbing installed in the early 1940's contained lead."

49

Pet. at 285.  Petitioner further contends that the housing projects in which he lived "were constructed prior to the 1980s, when the use of" lead-based paint and asbestos were common, and lead and asbestos are "present at the existing building sites."  *See* Pet. at 283.

However, the California Supreme Court could have reasonably concluded that trial counsel was not ineffective with regards to its investigation and presentation of evidence that Petitioner was exposed to neurotoxins as a child.

First, the California Supreme Court could have reasonably concluded that trial counsel was not deficient in its investigation of Petitioner's exposure to neurotoxins.  As set forth above, Petitioner's trial counsel investigated Petitioner's social history, and Petitioner's lifelong friends and family members testified at Petitioner's penalty phase trial.  "[N]one of [these] witnesses called to the stand during the penalty phase trial," such as Petitioner's siblings, "even mentioned Petitioner's childhood exposure to toxic chemicals."  *Ervin*, 2016 WL 4681203, at *10 (finding trial counsel was not defective in its failure to investigate evidence of petitioner's childhood exposure to neurotoxins where petitioner's counsel investigated petitioner's background but petitioner's friends and family members did not mention childhood exposure to neurotoxins).  Petitioner's evidence of neurotoxin exposure is far from the facts in cases in which courts have found trial counsel ineffective for failing to investigate and present evidence of the petitioner's exposure to neurotoxins.  For example, in *Caro v. Calderon*, 165 F.3d 1223 (9th Cir. Jan. 11, 1999), the Ninth Circuit found that counsel was ineffective for failing to investigate and introduce evidence of the Petitioner's exposure to pesticides.  In that case, trial counsel *knew* of the petitioner's "extraordinary exposure to pesticides," such as the fact that the petitioner's job in high school was to "stand[] in the fields to indicate to the crop duster where to dump his load of pesticides" without protective clothing, and that the petitioner worked prior to his arrest as a maintenance worker at a corporation that produced toxic pesticides.  *Id.* at 1226.

In contrast to the "extraordinary exposure" in *Caro* of which Caro's trial counsel was aware, *id.*, Petitioner here has introduced only generic evidence and speculation about Petitioner's own exposure to neurotoxins.  Petitioner's evidence of neurotoxin exposure—such as the fact that

50

1    Petitioner lived in Alameda, attended certain elementary schools, and lived in older and poorly

2    maintained housing projects—would also apply to all of the residents of the town of Alameda, the

3    residents of the housing projects in which Petitioner was raised, the students at the schools in

4    which Petitioner attended, and individuals who lived in homes constructed prior to 1940 or 1980.

5    Petitioner merely speculates from the fact that Petitioner lived in these "hot spots" that Petitioner

6    himself suffered the effects of toxic exposure. Indeed, although Petitioner states that his exposure

7    to neurotoxins was "a major contributing factor to the diffuse brain damage identified by Dr. Stein

8    and Dr. Froming," *see* Pet. at 277, the reports of Dr. Stein and Dr. Froming do not make any such

9    conclusion. *See, e.g.*, AG023079–97; AG022977.

10       Second, the California Supreme Court could have reasonably concluded that, even

11   assuming that trial counsel should have investigated and presented evidence of Petitioner's

12   childhood exposure to neurotoxins, Petitioner was not prejudiced by trial counsel's failures. As

13   set forth above, Petitioner's evidence of childhood exposure to neurotoxins is not particularly

14   powerful. This evidence, even when considered together with all of the mitigating evidence that

15   Petitioner contends trial counsel failed to present, the California Supreme Court could have

16   reasonably concluded that this evidence would not outweigh the substantial aggravating evidence

17   in this case. As set forth in detail above, Petitioner severely assaulted Bailey, abused Hitchens,

18   ran over Officer Lewis with his vehicle, assaulted Deputies Breslin and Tine, and assaulted his

19   former attorney Najpaver. With regards to the instant capital murders, Petitioner shot four random

20   strangers at close range, killing two of them and leaving one in a persistent vegetative state. Thus,

21   the California Supreme Court could have reasonably concluded that the additional evidence of

22   Petitioner's family and social history, even considered together with the other mitigating evidence

23   that Petitioner claims his trial counsel failed to introduce, did not demonstrate "a substantial, [and]

24   not just conceivable, likelihood of a different result" at the penalty phase of Petitioner's trial.

25   *Pinholster*, 563 U.S. at 189.

26       **iv. Impeachment of State's Witnesses**

27       Finally, Petitioner argues in Claim 13 that trial counsel was ineffective at the penalty phase

28
                                                        51
     Case No. 11-CV-02458-LHK
     ORDER DENYING CLAIMS 13 AND 22

because trial counsel "fail[ed] to investigate the prosecution's aggravating, other crimes evidence." Pet'r Br. at 33. Specifically, Petitioner argues that "[m]inimal investigation" would have shown that Petitioner could not have run over Officer Lewis and Jones with Petitioner's car, and that Petitioner's assault of Bailey was the result of Petitioner's "neuropsychiatric impairments." Pet. at 33. Petitioner also briefly raises arguments regarding trial counsel's failure to rebut the other aggravating evidence introduced by the prosecution. However, for the reasons discussed below, the California Supreme Court could have reasonably concluded that trial counsel was not ineffective in their investigation and rebuttal of the prosecution's aggravating evidence.

### a. Petitioner's Assault of Officer Lewis and Jones

First, with regards to Officer Lewis and Jones, Petitioner introduces a declaration from Thomas Rogers, M.D. ("Dr. Rogers"), who reviewed the police department reports regarding the incident with Officer Lewis and Jones, and photographs of Officer Lewis's uniform after the incident. AG023057. According to Dr. Rogers, "there is no medical evidence that the wheel of a motor vehicle passed over the pelvis or lower back of Officer Lewis" because there were "no external signs or disturbances to Officer Lewis's skin or clothing that ordinarily are associated with the pathology of transportation injuries when a wheel passes over a human body." AG023058. Dr. Rogers states that "[i]t is well documented in the forensic pathology literature that when a motor vehicle runs over a person's pelvis, the pelvis can definitely fracture, rather than support the weight of the vehicle and leave no signs of injury." AG023059. Moreover, Jones "was not described in any police reports as having been injured." AG023059. Petitioner also states in his habeas petition that witnesses would have testified at mitigation that Petitioner did not run over Officer Lewis and Jones, but that these witnesses were not called upon to testify at the penalty phase of trial.

However, the California Supreme Court could have reasonably concluded that trial counsel was not ineffective in rebutting the prosecution's evidence that Petitioner ran over Officer Lewis and Jones with Petitioner's vehicle. Officer Lewis testified at Petitioner's penalty phase trial that Petitioner ran over Officer Lewis and Jones with Petitioner's vehicle, and Officer Lewis's

52

testimony was corroborated by the testimony of another witness at the penalty phase trial, Heilbronner, who saw Petitioner run over Officer Lewis and Jones. Heilbronner testified that Petitioner "put the car in reverse at a high rate of speed, running over the police officer and the other person on the ground." AG016899. Moreover, although Officer Lewis did not suffer any significant injuries from the event, Officer Lewis nonetheless visited the emergency room after the incident, and Officer Lewis remained at the hospital for forty-five minutes to an hour. AG016926–27.[5] In addition, Petitioner testified during the penalty phase of trial that Petitioner "might have hit [Officer Lewis's] leg" with his vehicle because Petitioner had "no indication of an officer in the area" when Petitioner was reversing his vehicle. AG017168.

In the face of this evidence presented during the penalty phase trial, the California Supreme Court could have reasonably concluded that trial counsel was not ineffective in failing to call Dr. Rogers during the penalty phase trial to rebut the state's aggravation evidence. As set forth above, Dr. Rogers concludes only that, in general, one would "expect[]" further signs of trauma if a vehicle ran over the lower back of an individual. AG023059. The California Supreme Court could have reasonably concluded that Dr. Rogers' conclusion offered little in comparison to the corroborated testimony of Officer Lewis and Heilbronner and the testimony of Petitioner himself.

Moreover, if trial counsel had called Dr. Rogers to testify during the penalty phase of trial about the likely injuries that would result if a vehicle ran over an individual, Dr. Rogers' testimony would have called further attention to the incident, and it would have allowed the prosecution to emphasize the severity of Petitioner's actions. In addition, Dr. Rogers' testimony could have led to a distracting "battle of the experts." *Richter*, 562 U.S. at 109. Furthermore, although Petitioner's defense counsel did not call an expert to rebut Officer Lewis's and Heilbronner's testimony, trial counsel nonetheless cross-examined Officer Lewis and Heilbronner about the incident. Trial counsel asked Officer Lewis about his injuries and his time at the

---

[5] Jones did not testify at trial, and there is no indication from the record as to what injuries, if any, Jones suffered. *See also Marks*, 31 Cal. 4th at 209.

53

emergency room, and trial counsel questioned the lack of serious injuries to Officer Lewis. Thus, even though an expert was not called to discuss the "expected" injuries from a vehicle running over an individual, Officer Lewis's lack of serious injuries was nonetheless raised as an issue before the jury, and the jury could appropriately draw its own conclusions from this evidence even without the assistance of Dr. Rogers' report.

Finally, Petitioner contends that defense counsel could have called certain individuals to testify during the penalty phase that Petitioner did not run over Officer Lewis and Jones, such as Jones himself or other individuals such as Sherry Uecker and Calvin James. However, "Petitioner provides no evidence in the form of either affidavits or declarations stating whether the potential witness was willing to testify or the facts to which the witness would have testified." *Russell v. Martel*, 2011 WL 6817690, at *8 (C.D. Cal. Aug. 9, 2011); *see* Pet. at 287–88. Absent any such evidence, Petitioner cannot establish trial counsel was ineffective for failing to call these witnesses at the penalty phase. *Id.* (citing *Dows v. Wood*, 211 F.3d 480, 486–87 (2000)).

In sum, the California Supreme Court could have reasonably concluded that Petitioner's trial counsel was not ineffective in its investigation and presentation of rebuttal evidence relating to the evidence that Petitioner ran over Officer Lewis and Jones with Petitioner's vehicle.

### b. Petitioner's Assault of Brenda Bailey

Second, with regards to Petitioner's assault of Brenda Bailey, Petitioner submitted a declaration from Bailey in support of his state habeas petition in which Bailey stated that, at the time that Petitioner assaulted her, Petitioner was saying things that "did not make sense." AG022450–51. Bailey stated that if the defense had called her as a witness—instead of treating her as a hostile witness for the prosecution—Bailey would have testified in favor of Petitioner that she "had forgiven" Petitioner, and that Petitioner had told Bailey that he was sorry for what he did. AG022455–56. According to Petitioner, Petitioner's trial counsel should have investigated and presented this testimony from Bailey, which would have demonstrated that Petitioner's assault of Bailey was a result of Petitioner's "neuropsychiatric impairment," and that Petitioner was remorseful about his assault of Bailey. *See* Pet. at 288.

54

However, the California Supreme Court could have reasonably concluded that Petitioner's trial counsel was not ineffective for failing to call Bailey as a defense witness and instead treat Bailey as a hostile witness for the prosecution. Significantly, although Petitioner contends in his habeas petition that Bailey's testimony would have shown that Petitioner's assault of Bailey was the result of Petitioner's "neuropsychiatric impairment," *see id.*, Bailey's declaration submitted in support of Petitioner's state habeas petition does not support this conclusion. To the contrary, Bailey states in her declaration that, on the night of the assault, Petitioner was "obviously high" and "under the influence of PCP." AG022451. Moreover, the remainder of Bailey's declaration confirms the events to which Bailey testified during Petitioner's penalty phase trial, including that Petitioner pulled Bailey onto a concrete floor and pushed her through a bathroom window. *See* AG022452–53. Bailey's declaration also states, as Bailey testified during the penalty phase of Petitioner's trial, that Petitioner threatened to kill Bailey's mother, put a bomb in Bailey's son's mouth, and cut her other son's "neck off." AG022451. The California Supreme Court could have reasonably concluded that, even had Bailey testified during the penalty phase of Petitioner's trial that Petitioner was remorseful about his assault of Bailey, this additional testimony would not outweigh the substantially aggravating nature of Petitioner's brutal assault of Bailey.

### c. Petitioner's Remaining Arguments

Lastly, Petitioner briefly raises several additional arguments regarding trial counsel's ineffectiveness for failure to rebut the state's aggravating evidence.

First, Petitioner argues that trial counsel was ineffective for failing to rebut the prosecution's evidence that Petitioner assaulted inmate Herzog. *See* Pet'r Br. at 33. According to Petitioner, "[t]he altercation with Mr. Herzog resulted from [Petitioner's] justifiable efforts to defend himself from Mr. Herzog's unprovoked and unwarranted assault and attempts to exploit" Petitioner. *Id.* However, Petitioner submits no declaration or evidence in support of this contention, but rather offers only speculation. *See id.*; *see* Pet. at 295–96. Absent any evidence to support this argument, Petitioner cannot establish that trial counsel was ineffective for failing to rebut the prosecution's evidence regarding Herzog. *See Russell*, 2011 WL 6817690, at *8

55

(rejecting ineffective assistance of counsel claim where petitioner presented "no evidence in the form of either affidavits or declarations stating whether the potential witness was willing to testify or the facts to which the witness would have testified").

Second, Petitioner contends that his assaults of correctional officers, Deputies Breslin, Jones, and Tine, in addition to his assault of Najpaver, were the results of Petitioner's neuropsychiatric impairments. *See* Pet. at 295–96. For example, Petitioner asserts that Petitioner assaulted Deputies Breslin and Jones because Petitioner believed the assaults were the result of Petitioner's delusional belief that Petitioner needed "to protect himself from personal annihilation" by assaulting these officers. Pet. at 295. However, evidence presented during the penalty phase of trial contradicts Petitioner's assertion in his habeas petition that these assaults were the "non-volitional" product of Petitioner's delusional beliefs. *See id.* at 292–95. For example, Petitioner was inside of his cell on the date that he assaulted Deputy Breslin, and Petitioner began to yell and kick his cell door. Once Deputy Breslin responded to remove Petitioner from his cell, Petitioner bit Deputy Breslin in the neck and punched him in the groin. Petitioner bragged to Deputy Breslin "I bit you and punched you in the balls. How does it feel, punk?" AG016961. Deputy Nelson testified that Petitioner remarked: "I bit [Deputy Breslin] real good. And I remember he cried out like a bitch." AG017003. The California Supreme Court could have reasonably concluded that Petitioner's actions and remarks would have belied any argument that Petitioner assaulted Deputy Breslin or other correctional officers out of a delusional belief that the assault was necessary for Petitioner's protection, rather than Petitioner's own aggression towards the deputies. Similarly, Petitioner testified during the penalty phase of trial that Petitioner assaulted Najpaver because Najpaver told Petitioner to plead guilty and accept a sentence of life imprisonment, that the judge denied Petitioner's motion to have a different attorney, and Petitioner knew that Petitioner "had to make contact to get rid of" Najpaver as his attorney. *Marks*, 31 Cal. 4th at 214. Petitioner testified that he knew "verbal conflict" would not be sufficient. *Id.*; *see* AG017195.

Further, even assuming these assaults were the result of Petitioner's neurological impairments, as set forth in detail above with regards to evidence of Petitioner's organic brain

impairments and psychiatric disorders, the California Supreme Court could have reasonably concluded that trial counsel was not ineffective for failing to present at trial evidence and arguments that Petitioner suffered from organic brain impairments and psychiatric disorders which caused Petitioner to be violent and dangerous. Accordingly, the California Supreme Court could have reasonably concluded that trial counsel was not ineffective for failing to present this evidence with regards to Petitioner's other assaults.

### 3. Summary

For the reasons set forth above, the Court concludes that the California Supreme Court's decision was not contrary to or an unreasonable application of clearly established federal law. Accordingly, Petitioner's Claim 13 is DENIED. Given this conclusion, Petitioner's request for an evidentiary hearing on Claim 13 is unavailing. *See Sully*, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief."). Petitioner's request for an evidentiary hearing on Claim 13 is therefore DENIED.

## B. Claim 22

Finally, Petitioner contends in Claim 22 of his federal habeas petition that "the constitutional errors that have marred his conviction and penalty, when considered cumulatively as they must be, render [Petitioner's] conviction and sentence fundamentally unfair in violation of the U.S. Constitution. *See* Pet'r Br. at 38. The California Supreme Court denied this claim on the merits without explanation. AG023690.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that the defendant's conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003). However, where there is no single existing constitutional error, nothing can accumulate to the level of a constitutional violation. *See Mansuco v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000). Here, Petitioner has failed to establish any single instance of constitutional error. Accordingly, there are no errors to aggregate. Petitioner's allegation of cumulative error lacks merit, and the Court DENIES Claim

57

22.

**IV.    CONCLUSION**

For the foregoing reasons, the Court DENIES Claims 13 and 22.  Because Petitioner's arguments as to Claims 13 and 22 are unavailing, Petitioner's request for a federal evidentiary hearing as to Claim 13 is also DENIED.  *See Sully*, 725 F.3d at 1075 ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief.").

**IT IS SO ORDERED.**

Dated: September 18, 2017

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

United States District Court
Northern District of California